**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FANATICS COLLECTIBLES TOPCO, INC.,

      Plaintiff,

v.

PANINI S.P.A.,

      Defendant.

                                 /

**Case No. 1:23-cv-06895-JHR**
**[rel: Case No. 1:23-cv-09714-JHR]**

**DEFENDANT PANINI S.P.A.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF**
**<u>FANATICS COLLECTIBLES TOPCO, INC.'S AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD............................................................................................................ 4

ARGUMENT...................................................................................................................... 5

I.     The unfair competition claim fails because the allegations do not establish misappropriation of a property right belonging exclusively to Fanatics. ........................... 5

II.    Fanatics' claim for breach of the obligation to negotiate in good faith does not plausibly allege a binding preliminary agreement. ........................................... 10

       A.    Fanatics' claim is precluded by the draft term sheets, which expressly disclaim a binding commitment........................................................... 11

       B.    Even standing alone, the allegations in the Amended Complaint do not establish a binding preliminary agreement. ........................................ 14

III.   Fanatics' claim for tortious interference with business relations fails for multiple independent reasons. ........................................................................................... 17

       A.    The allegations do not establish the wrongful means or causation elements of tortious interference with business relations. ................................... 18

       B.    Fanatics' claim is barred by the *Noerr-Pennington* doctrine............................... 22

IV.    If the claims are not dismissed, the actions should be consolidated with Panini America designated as Plaintiff. ...................................................................... 23

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Jacobs*,
950 F.2d 89 (2d Cir. 1991)................................................................................................ 24

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
145 F.3d 543 (2d Cir. 1998)............................................................................. 2, 11, 12, 16

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
1995 WL 380300 (S.D.N.Y. June 27, 1995) ...................................................................... 6, 7

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
884 F.2d 69 (2d Cir. 1989)........................................................................................... 11, 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................... 4, 5, 9

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
229 F.3d 1135 (2d Cir. 2000)........................................................................................ 20, 22

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*,
2006 WL 330323 (S.D.N.Y. Feb. 14, 2006).................................................................. 3, 10, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................ 4

*Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co*,
610 F. App'x 69 (2d Cir. 2015) ...................................................................................... 2, 6

*Brook v. Peconic Bay Med. Ctr.*,
152 A.D.3d 436 (N.Y. App. Div. 2017) .............................................................................. 6

*Brown v. Bethlehem Terrace Assocs.*,
525 N.Y.S.2d 978 (N.Y. App. Div. 1988) ........................................................................... 21

*Candid Prods., Inc. v. Int'l Skating Union*,
530 F. Supp. 1330 (S.D.N.Y. 1982)................................................................................... 17

*Carvel Corp. v. Noonan*,
818 N.E.2d 1100 (N.Y. 2004)........................................................................................... 20

*Catskill Dev., LLC v. Park Place Ent. Corp.*,
547 F.3d 115 (2d Cir. 2008)......................................................................................... 3, 18

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)............................................................................................. 12

*Cohen v. Singer*,
  4 F. App'x 38 (2d Cir. 2001) .................................................................... 12, 13, 15, 16

*Colliton v. Cravath, Swaine & Moore LLP*,
  2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008).......................................................... 15

*Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*,
  233 F.3d 697 (2d Cir. 2000)..................................................................................... 23

*Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*,
  568 F. Supp. 2d 329 (S.D.N.Y. 2008)...................................................................... 20

*DraftKings, Inc., v. Michael Hermalyn*,
  No. 24-cv-10299-JEK (D. Mass. Feb. 5, 2024) ...................................................... 19

*Dunhill Securities Corp. v. Microthermal Applications, Inc.*,
  308 F. Supp. 195 (S.D.N.Y. 1969) .......................................................................... 14

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
  758 F. Supp. 2d 211 (S.D.N.Y. 2010)........................................................................ 7

*Four Finger Art Factory, Inc. v. Dinicola*,
  2000 WL 145466 (S.D.N.Y. Feb. 9, 2000)............................................................... 21

*Friedman v. Coldwater Creek, Inc.*,
  551 F. Supp. 2d 164 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009)......................... 19

*Garda USA, Inc. v. Sun Cap. Partners, Inc.*,
  194 A.D.3d 545 (N.Y. App. Div. 2021) ................................................................... 13

*Grewal v. Cuneo*,
  2015 WL 4103660 (S.D.N.Y. July 7, 2015) .......................................................... 2, 6

*Gucci Am., Inc. v. Exclusive Imports Int'l*,
  2007 WL 840128 (S.D.N.Y. Mar. 19, 2007) ....................................................... 3, 19

*Huerta v. Panini Am., Inc.*,
  No. 23-cv-02529 (N.D. Tex., Jan. 29, 2024) ........................................................... 17

*Hutchins v. Solomon*,
  2018 WL 4757970 (S.D.N.Y. Sept. 29, 2018)..................................................... 10, 12

*In re 50 Pine Co.*,
  317 B.R. 276 (Bankr. S.D.N.Y. 2004).............................................................. 10, 13

*In re PCH Assocs.*,
  949 F.2d 585 (2d Cir. 1991)...................................................................................... 24

iii

*In re Peaktop Techs. (USA), Inc. S'holder Derivative Litig. v. Peaktop Int'l Holdings Ltd.*,
2007 WL 700826 (S.D.N.Y. Mar. 6, 2007) ................................................................ 25

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
871 F. Supp. 709 (S.D.N.Y. 1995) ............................................................................. 7

*Internet Law Library, Inc. v. Southridge Cap. Mgmt., LLC*,
208 F.R.D. 59 (S.D.N.Y. 2002) ..................................................................... 4, 24, 25

*ITC Ltd. v. Punchgini, Inc*,
880 N.E.2d 852 (N.Y. 2007) ............................................................................... 2, 6, 8

*Ivy League Sch., Inc. v. Danick Indus., Inc.*,
2014 WL 4099376 (N.Y. Sup. Ct. 2014) .................................................................... 7

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991) ..................................................................................... 20

*Lewin v. Richard Avedon Found.*,
2015 WL 3948824 (S.D.N.Y. June 26, 2015) ............................................... 4, 22, 23

*LoPresti v. Mass. Mut. Life Ins.*,
30 A.D.3d 474 (N.Y. App. Div. 2006) ....................................................................... 6

*MCM Prods. USA, Inc. v. Botton*,
2016 WL 5107044 (S.D.N.Y. Sept. 19, 2016) ........................................................... 6

*Midwest Railcar Corp. v. Everest Railcar Servs., Inc.*,
2017 WL 1383765 (S.D.N.Y. Apr. 13, 2017) ............................................................ 9

*Miller v. Walters*,
997 N.Y.S.2d 237 (N.Y. Sup. Ct. 2014) .................................................................... 7

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,
701 F. Supp. 2d 568 (S.D.N.Y. 2010) ...................................................................... 24

*Nasdaq Stock Mkt., Inc. v. Archipelago Holdings, LLC*,
336 F. Supp. 2d 294 (S.D.N.Y. 2004) ........................................................................ 7

*Panini Am., Inc. v. Eli Nicholas Matijevich, Jr. et al.*,
No. DC-23-04798 (Tex. Dist. Ct., Dallas Co., Apr. 14, 2023) .................................. 3

*Panini Am. Inc. v. Fanatics, Inc. et al.*,
No. 1:23-cv-09714-JHR (S.D.N.Y Oct. 10, 2023) ................................................. 1, 5

*Pizza Pub. Co., v. Tricon Glob. Rests., Inc.*,
2000 WL 1404716 (S.D.N.Y. Sept. 25, 2000) ........................................................... 9

iv

*Primetime 24 Joint Venture v. Nat'l Broad., Co.*,
219 F.3d 92 (2d Cir. 2000)................................................................................................ 22

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) ...................................................................................................... 22, 23

*Purgess v. Sharrock*,
33 F.3d 134 (2d Cir. 1994).............................................................................................. 21

*RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*,
2023 WL 5976273 (S.D.N.Y. Sept. 14, 2023)................................................................. 8

*Red Mt. Med. Holdings, Inc. v. Brill*,
563 F. Supp. 3d 159 (S.D.N.Y. 2021)......................................................................... 8, 10

*Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*,
2022 WL 603998 (S.D.N.Y. Mar. 1, 2022) ..................................................................... 4

*Reprosystem, B.V. v. SCM Corp.*,
727 F.2d 257 (2d Cir. 1984), *cert. denied*, 469 U.S. 828 (1984)............................................ 16

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
309 A.D.2d 288 (N.Y. App. Div. 2003) ..................................................................... 10, 15

*Riddell Sports Inc. v. Brook*,
872 F. Supp. 73 (S.D.N.Y. 1995) ................................................................................ 4, 21

*Semple v. Eyeblaster, Inc.*,
2009 WL 2709281 (S.D.N.Y. Aug. 27, 2009)............................................................ 19, 20

*Shmuel Shmueli, Bashe, Inc. v. Lowenfeld*,
68 F. Supp. 2d 161 (E.D.N.Y 1999) .............................................................................. 24

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
133 F. Supp. 3d 483 (E.D.N.Y. 2015), *aff'd in part, vacated in part on other grounds,
remanded*, 909 F.3d 519 (2d Cir. 2018)............................................................................ 6

*S. Constr. Co. v. Pickard*,
371 U.S. 57 (1962)........................................................................................................... 24

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)............................................................................................ 20

*Susskind v. Ipco Hosp. Supply Corp.*,
373 N.Y.S.2d 627 (N.Y. App. Div. 1975) ...................................................................... 21

*Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
670 F. Supp. 491 (S.D.N.Y. 1987) ............................................................................ 12, 16

*U.S. Elecs., Inc. v. Directed Elecs., Inc.*,
  2007 WL 9819273 (S.D.N.Y. Apr. 10, 2007)................................................................................ 7

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(6)....................................................................................................... 4

Fed. R. Civ. P. 13(a) .............................................................................................. 23, 24, 25

**INTRODUCTION**[1]

On August 3, 2023, Panini America, a subsidiary of Panini S.p.A. ("Panini"), sued plaintiff's parent company and related corporate entities ("Fanatics") for violating federal antitrust and state laws in *Panini America Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-JHR (S.D.N.Y) ("Antitrust Action"). The Antitrust Action addresses Fanatics' attempt to monopolize the markets for sports trading cards, as well as its tortious interference with Panini America's contracts and business relationships and dissemination of false and defamatory statements about Panini America. Four days later, Fanatics filed its initial complaint here against Panini America's parent company asserting claims for unfair competition, tortious interference with business relations, and breach of the obligation to negotiate in good faith. Most of the complaint consisted of inappropriate commentary, argument, and derogatory statements that attempted to rebut the allegations in the Antitrust Action in the court of public opinion but failed as a legal matter to support Fanatics' ostensible claims. The few pages concerning those claims offered only an incoherent narrative largely centered on Fanatics' implausible assertion that Panini devoted months to negotiating a multibillion-dollar transaction in bad faith just to hurt Fanatics.

Fanatics has now had the opportunity to amend its complaint. But rather than cure the legal inadequacies in its pleading, provide facts in lieu of conclusory allegations, and state the coherent, plausible narrative required to survive a motion to dismiss, Fanatics has simply expanded its rhetoric and defamatory statements about Panini. Thus, as with its initial complaint, the claims in Fanatics' Amended Complaint are not merely weak—they are frivolous.

Begin with Fanatics' claim for unfair competition, which is based on the parties' failed negotiations over a potential early termination of Panini America's licenses to produce and sell

---

[1] All citations to "¶ _" are to the Amended Complaint filed January 26, 2024. *See* ECF No. 39.

certain sports trading cards. ¶¶ 122–132. To state a claim for unfair competition under New York law, a plaintiff must allege bad-faith misappropriation of a commercial advantage or property right that belongs exclusively to the plaintiff. *Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69, 70 (2d Cir. 2015); *Grewal v. Cuneo*, 2015 WL 4103660, at *17 (S.D.N.Y. July 7, 2015). Fanatics claims that Panini "misappropriated Plaintiff's exclusive right to pursue and obtain" deals with certain athletes, ¶ 131, by allegedly "proposing early termination, and then stringing along Plaintiff through stall tactics," ¶ 129. But Fanatics' assertion that these potential deals "qualified as a property right or competitive advantage belonging exclusively to" Fanatics, ¶ 125, is legally untenable. And despite Fanatics' repeated use of "misappropriation," its factual allegations do not show that Panini took anything at all from Fanatics. *See ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 859 (N.Y. 2007) (An "unfair competition claim involving misappropriation usually concerns the ***taking and use*** of the plaintiff's property to compete against the plaintiff's own use of the same property.") (emphasis added).

Fanatics' claim for breach of the obligation to negotiate in good faith also fails. The gravamen of this claim is that ***unsigned, draft*** term sheets exchanged by the parties and their counsel beginning in May 2022 created a binding obligation to negotiate in good faith, even though no final agreement was ever reached. Fanatics' assertion that these term sheets created a binding preliminary agreement is wholly conclusory—it does not point to any language evincing an express intent to be bound in the absence of a final agreement. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998) ("proposal" which did not "provide any express manifestation that the parties were bound by its terms" was non-binding). Fanatics' position also contradicts unequivocal language in the draft term sheets expressly disclaiming any binding

2

commitment.[2] This language is dispositive and bars Fanatics' claim. *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, 2006 WL 330323 (S.D.N.Y. Feb. 14, 2006).

Fanatics' claim for tortious interference with business relations—Count 2 of the Complaint—stems from Fanatics' unlawful raid of Panini America employees, which is the subject of litigation brought by Panini America against Fanatics, pending in Texas. Fanatics now claims that Panini allegedly prevented some unnamed group of additional Panini America employees from joining Fanatics by threatening them with legal action. ¶¶ 133–141. In other words, not content with its raid of over 30 Panini America employees, Fanatics is upset that Panini fought back and that Fanatics failed to acquire even more employees. Like the other claims, Count 2 fails as a matter of law for multiple reasons.

*First*, Fanatics does not plausibly allege that Panini "acted for a wrongful purpose or used dishonest, unfair, or improper means." *Catskill Dev., LLC v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Threats of litigation may establish the wrongful means element of a claim for tortious interference with business relations only if the threats are wrongful or frivolous. *Gucci Am., Inc. v. Exclusive Imports Int'l*, 2007 WL 840128, at *7 (S.D.N.Y. Mar. 19, 2007). But, here, the only allegations relevant to this claim support the opposite conclusion: Fanatics admits that Panini launched the Texas suit to prevent its former employees from exposing Panini's trade secrets to Fanatics and recruiting other Panini America employees, and that ***the Texas state court granted Panini's application for a temporary restraining order against Fanatics*** and then entered a preliminary injunction by consent. ¶¶ 102–103; *Panini Am., Inc. v. Eli Nicholas Matijevich, Jr. et al.*, No. DC-23-04798 (Tex. Dist. Ct., Dallas Co., Apr. 14, 2023). *Second*, Fanatics does not allege that it would have entered into any specific contracts with Panini America employees had

---

[2] Because the draft term sheets are explicitly described and quoted in the Amended Complaint, they may be considered at this stage. They are attached as Exhibits A-K to the accompanying declaration of Sabria McElroy.

Panini not allegedly interfered, as required to state a claim for tortious interference with business relations. *See Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 78–79 (S.D.N.Y. 1995). And, lastly, Fanatics' alleged pre-litigation threats are immunized from Fanatics' tortious interference claim under the *Noerr-Pennington* doctrine. *Lewin v. Richard Avedon Found.*, 2015 WL 3948824, at \*28 (S.D.N.Y. June 26, 2015).

The Court should consolidate any claims not dismissed with Panini America's Antitrust Action as compulsory counterclaims. *Internet Law Library, Inc. v. Southridge Cap. Mgmt.*, *LLC*, 208 F.R.D. 59, 64 (S.D.N.Y. 2002) (consolidating compulsory counterclaims in second-filed action with first-filed action and designating plaintiff in first-filed action as "plaintiff" in consolidated action). To the extent these claims should have been raised at all, they should have been raised in the first-filed Antitrust Action.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this standard, a complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678. For a Rule 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*, 2022 WL 603998, at \*1 (S.D.N.Y. Mar. 1, 2022). While the Court "must accept as true all of the allegations contained in a complaint … [t]hreadbare recitals of the elements of a cause of

4

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

**I.**  **The unfair competition claim fails because the allegations do not establish misappropriation of a property right belonging exclusively to Fanatics.**

Fanatics' allegations of unfair competition stem from the parties' negotiations over the potential early termination of Panini America's licenses to produce and sell trading cards for players of the NFL and NBA, and the WWE, UFC, and CLC. ¶ 81. In Fanatics' telling, "Panini dragged out the early termination negotiations in bad faith" for months and tried to "pass off knowingly inflated earnings projections that translated to an unreasonably high early termination fee." ¶ 9.[3] The "parties finally reached an impasse" in early 2023. ¶ 90. Fanatics claims that it was harmed by Panini's negotiation tactics because it lost the opportunity to enter into "licensing arrangements with the [NFL] prospects," who had already been drafted by the time the early termination talks terminated. ¶ 90. It also claims that it "missed out on a full year of revenue stream" from a deal with NBPA. ¶ 90. According to Fanatics, it decided not to pursue these deals during negotiations with Panini because it "reasonably believed it would no longer need to acquire the competing licenses, as it would obtain licenses covering the same subject matter through the proposed early termination." ¶ 128. In other words, according to Fanatics, despite Panini's alleged stall tactics and Fanatics' ***months-long*** knowledge that it had purportedly received inflated earnings projections from Panini, ¶ 86, and despite not even having a signed term sheet, Fanatics remained so confident the deal would close that it chose to put all its eggs in one basket and forgo

---

[3] While immaterial to this Motion, Panini strongly denies Fanatics' version of events, which is riddled with inaccuracies and false statements. Panini negotiated in good faith, while taking an appropriate amount of time to assess the terms and risks of the potential deal. The implausibility of Fanatics' claim that Panini negotiated in bad faith is magnified by the fact that each side was represented by sophisticated legal counsel. And Panini's earnings projections, which were updated quarterly in the normal course of its business, were adversely affected by the very tortious and anticompetitive conduct on which the Antitrust Action is based. ECF No. 69 (Am. Compl.), *Panini Am., Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-JHR (S.D.N.Y. Oct. 10, 2023).

pursuing any backup plans.

New York has "long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd*, 880 N.E.2d at 858. Here, Fanatics attempts to base its claim on a misappropriation theory, which relies on the "principle that one may not misappropriate the results of the skill, expenditures and labors of a competitor." *Id*. To state a claim for unfair competition based on the theory of misappropriation, courts require (1) bad-faith misappropriation of (2) a commercial advantage or property right[4] belonging exclusively to the plaintiff. *Big Vision*, 610 F. App'x at 70; *Grewal*, 2015 WL 4103660, at *17.[5] Fanatics' allegations do not satisfy either of these two requirements.

Fanatics' first problem is that it does not have a property right in unexecuted potential deals with athletes that it chose not to pursue. "The tort of unfair competition is not some amorphous catch-all claim to be appended to any complaint involving claims that a competitor has injured a business rival." *Anti-Monopoly, Inc. v. Hasbro, Inc*., 1995 WL 380300, at *7 (S.D.N.Y. June 27, 1995). Rather, a claim for unfair competition via misappropriation requires a showing that defendant took something in which the plaintiff enjoyed an existing exclusive property right. *ITC Ltd.*, 880 N.E.2d at 859. In its Amended Complaint, Fanatics attempts to establish this element by

---

[4] "The term 'commercial advantage' has been used interchangeably with 'property' within the meaning of the misappropriation theory." *ITC Ltd.*, 880 N.E.2d at 859.

[5] *See also MCM Prods. USA, Inc. v. Botton*, 2016 WL 5107044, at *7–8 (S.D.N.Y. Sept. 19, 2016) ("The tort is not all-encompassing ... the New York Court of Appeals in rejecting the notion that unfair competition is equivalent to the amorphous term commercial unfairness, has stated that misappropriation of another's commercial advantage is a cornerstone of the tort. ... Notably, to act in bad faith, one must exploit some commercial advantage which belonged exclusively to [another].") (internal citations omitted) (alteration in original); *Brook v. Peconic Bay Med. Ctr*., 152 A.D.3d 436, 439 (N.Y. App. Div. 2017) ("A cause of action for unfair competition has not been stated as plaintiffs failed to 'allege the bad faith misappropriation of a commercial advantage which belonged exclusively to'" the plaintiff); *LoPresti v. Mass. Mut. Life Ins*., 30 A.D.3d 474, 476 (N.Y. App. Div. 2006) ("Finally, the plaintiff's cause of action alleging unfair competition was properly dismissed insofar as asserted against the respondents because the complaint failed to allege the bad faith misappropriation of a commercial advantage which belonged exclusively to him."); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 133 F. Supp. 3d 483, 502 (E.D.N.Y. 2015), *aff'd in part, vacated in part on other grounds, remanded*, 909 F.3d 519 (2d Cir. 2018) ("A claim for unfair competition will not lie absent the defendant's bad faith misappropriation of a commercial advantage belonging exclusively to the plaintiff.") (upholding dismissal of unfair competition claim).

asserting that "because no other company was vying for these deals, they qualified as a property right or competitive advantage belonging exclusively to Plaintiff." ¶ 125. Of course, whether Fanatics has a protectible interest in the potential deals is a "legal question that is capable of resolution on a motion to dismiss," *Nasdaq Stock Mkt., Inc. v. Archipelago Holdings, LLC*, 336 F. Supp. 2d 294, 303 (S.D.N.Y. 2004), not a factual allegation.

Fanatics' legal conclusion that it had a property right in potential deals that it chose not to pursue is wrong. Generally, when courts allow unfair competition claims to proceed, the claims are based on a defendant's misappropriation of well-recognized existing property rights.[6] By contrast, allegations that a plaintiff failed to secure ***potential future*** business opportunities—like those here—cannot sustain a claim for unfair competition. *See, e.g.*, *U.S. Elecs., Inc. v. Directed Elecs., Inc.*, 2007 WL 9819273, at *7 (S.D.N.Y. Apr. 10, 2007) (lost business opportunities did not establish misappropriation of plaintiff's "property"); *Anti-Monopoly,* 1995 WL 380300, at *7 (plaintiff failed to state unfair competition claim where the only "property" allegedly misappropriated was plaintiff's market share).

Indeed, Fanatics' own description of the athlete deals as "potential deals" belies any plausible claim that these deals constituted "property" belonging exclusively to Fanatics. By definition, a "potential" deal does not yet belong to anyone. The only way Fanatics can claim a protectible property interest based on unexecuted contracts is to claim that the subject matter of the contracts—here, the athletes—belonged exclusively to it.

For this reason, the court in *Miller v. Walters*, 997 N.Y.S.2d 237 (N.Y. Sup. Ct. 2014), rejected an unfair competition claim based on factual allegations like those in the Amended

---

[6] *See, e.g.*, *Ivy League Sch., Inc. v. Danick Indus., Inc.*, 2014 WL 4099376, at *10 (N.Y. Sup. Ct. 2014) (trademarks); *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221 (S.D.N.Y. 2010) (trade secrets); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 730 (S.D.N.Y. 1995) (tangible property).

Complaint. In *Miller*, a sports-management firm alleged "that they expended time and effort for one-and-a-half years in order to secure a lucrative second contract for [an NBA player] and that, at the last minute, Defendants committed wrongful acts by which they misappropriated the fruits of Plaintiffs' efforts." *Id.* at 246. The court held that "[s]uch a claim is far afield from a proper misappropriation claim, since Plaintiffs of course do not contend [the NBA player] was their 'property' and they assert no factual basis from which to determine that Plaintiffs worked with [the player] so to gain a 'competitive advantage' in their industry." *Id.*[7] As in *Miller*, Fanatics cannot assert that the NBA players and NFL rookies with whom it could have allegedly contracted are its "property," nor is it able to claim that Panini worked with these players to gain a commercial advantage. *See also RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 2023 WL 5976273, at *12 (S.D.N.Y. Sept. 14, 2023) (dismissing claim for unfair competition based on allegation that defendant misappropriated the "fruits" of grocery store's efforts to promote and distribute products that did not belong to it).

Fanatics' allegations about these potential deals also fail because they do not establish that Panini misappropriated something to gain a commercial advantage. "Misappropriation" requires the taking of another's property for oneself. Black's Law Dictionary (11th ed. 2019) (defining "misappropriation" as "the application of another's property or money dishonestly to one's own use."). Accordingly, "[a]n unfair competition claim involving misappropriation usually concerns the taking and *use* of the plaintiff's property to compete against the plaintiff's own use of the same property." *ITC Ltd.*, 880 N.E.2d at 859 (emphasis added); *see also Red Mt. Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 182 (S.D.N.Y. 2021) (dismissing claim for unfair competition where

---

[7] Fanatics' claim is even further afield from a proper misappropriation claim since, unlike in *Miller*, Fanatics offers only vague claims about the opportunity to pursue "potential deals" and does not even identify the athletes that are the subject of these deals.

plaintiff's "theory of liability" did not "suggest that defendants reap[ed] where [they] ha[ve] not sown by taking [plaintiff's] information or property and then employing it to compete with [plaintiff] in the marketplace") (internal citation omitted). At a minimum, Fanatics must allege that Panini exploited its existing property "to gain commercial advantage." *Midwest Railcar Corp. v. Everest Railcar Servs., Inc.*, 2017 WL 1383765, at *7 (S.D.N.Y. Apr. 13, 2017).[8]

Here, Fanatics cannot point to a single thing that Panini took from it. All Fanatics musters on this point is the vague assertion that its alleged "losses benefited Panini by preventing competition on its NBA and NFLPA licenses for an entire season and tying up its competitor for almost a year with sham negotiations." ¶ 132. Even crediting these allegations as true, they indicate at most that Fanatics exercised its judgment to forgo opportunities to pursue deals with athletes while it pursued negotiations with Panini for early termination of the Panini licenses. The allegations do not indicate that Panini managed to take these deals for itself and use them to compete against Fanatics. Fanatics' mere conclusory labeling of conduct as "misappropriation" that is not, in fact, misappropriation, does not suffice. *Midwest Railcar Corp.*, 2017 WL 1383765, at *7 ("Nor does Everest allege *how* Midwest exploited this skill, labor or goodwill to gain commercial advantage. This allegation is conclusory, and therefore will not be credited.") (citing *Iqbal*, 556 U.S. at 681); *Pizza Pub. Co., v. Tricon Glob. Rests., Inc.*, 2000 WL 1404716, at *3 (S.D.N.Y. Sept. 25, 2000) ("Because there are no facts indicating that [defendant] misappropriated [plaintiff's] property, [plaintiff] cannot sustain a claim for unfair competition under New York law.").

Fanatics' claim that Panini "misappropriated the time, effort, and attention of Plaintiff's

---

[8] In fact, throughout the course of the negotiations, Panini was the only party sharing confidential and proprietary information. Thus, Fanatics was the only party with the opportunity to misappropriate a commercial advantage.

leadership by tying them up in dead-end negotiations," ¶ 131, fares even worse. "[T]ime, effort, and attention" are not property that can be taken and used by another. *See, e.g.*, *Red Mt. Med. Holdings, Inc.*, 563 F. Supp. 3d at 182 (dismissing claim for unfair competition where the plaintiff's "theory of liability [did] not suggest that defendants 'reaped where they have not sown' by taking [the plaintiff's] information or property and then employing it to compete with [the plaintiff] in the marketplace"). Fanatics' unfair competition claim should be dismissed.

## II.    Fanatics' claim for breach of the obligation to negotiate in good faith does not plausibly allege a binding preliminary agreement.

Count 3 is also based on the parties' failed negotiations. In the Amended Complaint, Fanatics acknowledges that the parties never reached a final agreement and negotiations were ongoing when the "early termination talks terminated." ¶ 90. At the same time, it asserts that the parties agreed to be bound by a preliminary agreement to negotiate in good faith. As support, Fanatics alleges that "[a]fter receiving the draft term sheet in May 2022, Panini executives orally informed Fanatics executives that Panini accepted the core structure proposed for the early termination deal" and Panini later "added a provision to the draft term sheet stating that the parties 'will continue to negotiate in good faith with the goal of expeditiously resolving all matters.'" ¶ 82. This is not enough to establish a binding commitment.

For starters, the term sheets—which are incorporated by reference and integral to the Amended Complaint, *Hutchins v. Solomon*, 2018 WL 4757970, at *7 (S.D.N.Y. Sept. 29, 2018)— ***were never signed.*** And each of them expressly and repeatedly disclaims any binding commitment. McElroy Decl., Exs. A-K. As a matter of law, this language precludes Fanatics from attempting to impose liability on Panini for allegedly refusing to negotiate in good faith. *Beekman*, 2006 WL 330323, at *7; *In re 50 Pine Co.*, 317 B.R. 276, 283 (Bankr. S.D.N.Y. 2004); *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 303 (N.Y. App. Div. 2003). But even if the Court

were to ignore this language, Fanatics' conclusory allegations still fall short because they do not point to any language showing that the parties explicitly expressed an intent to be bound before reaching an actual agreement. *Adjustrite*, 145 F.3d at 549.

### A. Fanatics' claim is precluded by the draft term sheets, which expressly disclaim a binding commitment.

Under New York law, "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (internal citation omitted). In the unusual case where preliminary agreements create binding obligations, the binding preliminary agreements fall into one of two categories. *Adjustrite*, 145 F.3d at 548. The first, called a "Type I" preliminary agreement, "is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id*. In other words, a "Type I" agreement is preliminary only in form. *Id*. This type of binding preliminary agreement is clearly not at issue here: the Amended Complaint does not allege that Panini and Fanatics had reached an agreement on all terms that simply needed to be memorialized. To the contrary, it acknowledges that the agreement was subject to future approvals and certain terms remained open for negotiation. ¶¶ 81–82.

The second type of preliminary agreement, "Type II," "is created when the parties agree on certain major terms, but leave other terms open for further negotiation" while accepting "a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Adjustrite*, 145 F.3d at 548. "In contrast to a fully binding preliminary agreement, a binding preliminary commitment does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ...

11

objective within the agreed framework." *Id*. (internal quotations omitted) (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). Fanatics contends that the parties reached a binding Type II preliminary agreement in May 2022 after exchanging a "draft term sheet," and after Panini allegedly orally "accepted the core structure proposed for the early termination deal." ¶ 82. Fanatics is wrong because, as explained below, the term sheets between the parties conclusively refute the existence of a binding preliminary commitment.

The Second Circuit has consistently looked "to four factors in determining whether the parties to a preliminary agreement intended to be bound: (1) the language of the agreement; (2) the existence of open material terms; (3) whether there has been partial performance; and (4) the necessity of putting the agreement in final form as indicated by the customary form of such transactions." *Cohen v. Singer*, 4 F. App'x 38, 40 (2d Cir. 2001) (citing *Adjustrite*, 145 F.3d at 549). Of these factors, the agreement's language is the most important. *Id.*

While Fanatics relies on its description of the draft term sheets and selectively quotes language from these documents as support for its claim,[9] it chose not to attach these documents to the Amended Complaint. But because Fanatics has relied "on the terms and effect of [the draft term sheets] in drafting the complaint," the Court may "consider[ ] the document[s] on a dismissal motion[]" without converting the motion into one for summary judgment. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (collecting cases); *see also Hutchins*, 2018 WL 4757970, at *7. Here, the language of the term sheets makes clear that Fanatics' claim is frivolous.

To begin with, the May 2022 term sheet—which Fanatics claims first created a binding

---

[9] *See* ¶ 82 ("The parties reached their preliminary agreement shortly after Fanatics sent Panini a draft term sheet outlining the terms of the contemplated transaction … Panini's counsel added a provision to the draft term sheet stating that the parties 'will continue to negotiate in good faith with the goal of expeditiously resolving all matters,' …In the coming months, the parties exchanged various draft term sheets and other deal documents containing materially similar language.").

agreement—is titled "Non-Binding Letter of Intent - Confidential for Discussion Purposes Only." Ex. A at 1. The first paragraph then reiterates that it "is for ***discussion purposes only*** with respect to a proposed transaction ... and ***does not constitute a legally binding commitment*** except as set forth in the 'Confidentiality,' 'Governing Law and Dispute Resolution,' and 'Fees and Expenses' provisions below." *Id*. (emphasis added). It is also not signed. Panini's redline of the May 2022 document added another instance of the term "non-binding" to the first paragraph before "letter of intent." Ex. B at 1. This version, too, was unsigned. Later versions of the term sheets contained this clear and unequivocal language that the letters of intent were non-binding except as to the provisions specifically listed in the first paragraph. And all were unsigned. Exs. C–K.

Courts have consistently found that this type of language precludes a claim for breach of the duty to negotiate in good faith as a matter of law. For instance, the court in *In re 50 Pine Co.,* 317 B.R. at 283, dismissed a claim for breach of the duty to negotiate in good faith where a term sheet stated it was "for discussion purposes only" and disclaimed a binding commitment, just as here. Similarly, in *Garda USA, Inc. v. Sun Cap. Partners, Inc*., 194 A.D.3d 545, 547 (N.Y. App. Div. 2021), the court rejected plaintiff's contention that defendant agreed to be bound by an unsigned draft term sheet stating it was non-binding. *See also Cohen*, 4 F. App'x at 40 (holding that "letter of intent" stating that binding agreement was subject to formal agreement and shareholder approval did not bear "indicia of a binding preliminary agreement").

Fanatics' claim that Panini "orally … accepted the core structure proposed for the early termination deal" does not change the analysis. ¶ 82. Fanatics does not allege that Panini expressly agreed to be bound by these allegedly "core" terms, and the draft term sheets establish the opposite—Panini expressly disclaimed any binding commitment. In *Garda*, the Court was unpersuaded by the plaintiff's similar conclusory allegation that defendants "repeatedly said" they

13

"were committed to the transaction, and would soon be ready to sign." *Id*. at 546. The unsigned draft term sheet, which stated it did not bind the parties, was dispositive. *Id*. at 547. So too here.

Nor does the provision in some of the term sheets stating that the parties "will continue to negotiate in good faith with the goal of expeditiously resolving all matters," make a difference. ¶ 82; Ex. F at 1. That language appears in an unsigned prefatory document titled "For Discussion Purposes Only" and follows the language expressly stating that the draft term sheet is "non-binding" and "for discussion purposes only." Ex. F at 1; *see also* Exs. G–K (same).

In *Beekman*, the court held that a similar letter of intent did not constitute a binding preliminary agreement. 2006 WL 330323, at *7. Much as here, the letter of intent in *Beekman* contained an explicit statement of the parties' intent not to be bound followed by a statement that the parties "have a strong interest in moving forward in good faith." *Id*. The court found that this "good faith" language did not create a binding obligation when it followed an expression of an intent to not be bound. *Id.* And, unlike here, the letter of intent in Beekman was ***signed***. *Id.* at *1 n.1. Even then, the court refused to impose a binding obligation on defendants based on a statement agreeing to negotiate in good faith. Here, there can be no doubt that, as a matter of law, a similar statement in an ***unsigned*** draft document that repeatedly disclaims any binding commitment does not impose liability for an alleged failure to negotiate in good faith.[10]

## B.    Even standing alone, the allegations in the Amended Complaint do not establish a binding preliminary agreement.

Even setting aside the language in the draft term sheets expressly disclaiming an intent to be bound, Fanatics' allegations do not establish a binding preliminary agreement.

---

[10] *Cf. Dunhill Securities Corp. v. Microthermal Applications, Inc*., 308 F. Supp. 195, 197–98 (S.D.N.Y. 1969) (holding that letter of intent stating that the "parties propose to proceed promptly and in good faith" was non-binding). The *Dunhill* court observed that "[a] letter of intent is a customary device used within the financial community, and it is clear that the financial community does not regard such a document as a binding agreement, but rather, an expression of tentative intentions of the parties." *Id*. at 198.

As an initial matter, Fanatics' conclusory assertion in the Amended Complaint that the parties reached a "preliminary agreement" after Fanatics sent Panini the May 2022 term sheet, ¶ 82, is directly contrary to the allegations in its original complaint that the parties reached "an agreement in principle." ECF No. 1, ¶¶ 73, 111, 124. As set forth in Panini's motion to dismiss the initial complaint, both the Second Circuit and New York Court of Appeals have made clear that an agreement characterized as an "agreement in principle" does not create a binding commitment. *Cohen*, 4 F. App'x at 40; *Richbell Info. Servs.*, 309 A.D.2d at 303.

Fanatics has attempted to plead around this defect by striking the description of the alleged agreement as an "agreement in principle" and replacing that language with "preliminary agreement." *Compare* ¶¶ 9, 81, 89, 128, 143, 144, with ECF No. 1, ¶¶ 9, 74, 81, 111, 124, 125. This is "a transparent attempt by plaintiff to amend [its] pleading in order to avoid a dispositive defense raised by" Panini. *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). "'Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss ... [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'" *Id.* (alterations in original). Here, Fanatics' claim in the Amended Complaint that there was an actual preliminary agreement conflicts with Fanatics' initial statement that there was only an agreement in principle and should therefore be disregarded.

Even if the Court ignores Fanatics' earlier contrary allegations and the unequivocal non-binding language in the term sheets, the Amended Complaint does not state a claim for breach of the duty to negotiate in good faith. As discussed above, the language of an agreement is the most important factor in determining whether parties intend a preliminary agreement to be binding.

Here, the only language that Fanatics points to is a statement in a draft term sheet that the parties will negotiate in good faith. It does not even allege that the term sheets containing this statement were signed (they were not). At the same time, there are no allegations in the Amended Complaint pointing to language expressly stating that the parties intended to be bound. Without such language and without a signed agreement, Fanatics cannot overcome the "strong presumption against finding binding obligation" in a non-final agreement. *Adjustrite*, 145 F.3d at 549 (holding that "proposal" which did "not expressly state that it was a binding agreement" or "provide any express manifestation that the parties were bound by its terms" was non-binding); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984) (reference in informal agreement to future formal agreement held to establish intent of parties not to be bound), *cert. denied*, 469 U.S. 828 (1984); *Arcadian*, 884 F.2d at 72 (reference in memorandum to a binding sales agreement to be completed in the future demonstrated defendant's intent not to be to be bound until that time).[11]

The other factors that the Second Circuit has identified to determine whether a preliminary agreement is a binding contract also show that Fanatics' allegations do not state a claim. *See Cohen*, 4 F. App'x at 40 (listing four factors). The second factor is the existence of open material terms. While Fanatics claims that the parties agreed on a "price formula," ¶ 81, the amount of the termination fee—the most significant term—remained open. ¶ 81.[12] Fanatics also admits that any agreement was subject to the approval of the licensors, ¶ 81, and that the brands remained subject to negotiation, ¶ 82. Even an express provision in a fully executed contract obligating the parties

---

[11] *Cf. Tribune Co.*, 670 F. Supp. at 499 (holding that countersigned commitment letter was binding where letter stated, "[u]pon receipt ... of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue, sell and deliver to us ... the captioned securities, shall become a binding agreement between us").

[12] Fanatics alleges that the parties agreed to "a lump-sum fee equivalent to Panini's projected earnings for the remaining license years, less a discount factor." ¶ 78. Fanatics does not specify the discount factor or a specific projection, nor does it allege that the parties had agreed on these numbers, which are determinative of the exact amount. Subsequently, Fanatics alleges that the agreed-upon fee remain unchanged "throughout June, July, and at least half of August 2022," ¶ 81, indicating that the amount did change before June and after August.

to negotiate future contracts in good faith is too indefinite to be enforced where material terms are left open for negotiation. *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1336 (S.D.N.Y. 1982) (agreement "to negotiate in good faith" the renewal of a contract upon its expiration held unenforceable because material terms left open). Therefore, the second factor does not support the existence of a binding preliminary agreement.

The third and fourth factors—partial performance and the need to put the agreement in final form—also preclude a binding agreement. Fanatics does not allege partial performance and there can be no doubt that a deal of this magnitude between two large, sophisticated corporations would need to be substantially fleshed out to be binding on the parties. Accordingly, Count 3 should be dismissed.

## III.   Fanatics' claim for tortious interference with business relations fails for multiple independent reasons.

Fanatics' claim for tortious interference with business relations—Count 2—concerns Panini's alleged interference with Fanatics' efforts to hire Panini America employees. *See* ¶¶ 102–106; 133–141. The Amended Complaints fails to cure the defects with this claim. Most new paragraphs concern baseless allegations made against Panini America in other suits[13]—including one that was voluntarily dismissed by the plaintiff after Panini threatened Rule 11 sanctions[14]—that have no relevance to Fanatics' tortious interference claim alleged here.

After Fanatics secured the long-term exclusive licenses at issue in the Antitrust Action, Fanatics sought to raid Panini America's employee base in Texas using a combination of threats and improper inducements. Remarkably, while admitting that at least 37 Panini America

---

[13] These cases are fabricated against Panini solely to harm Panini in the media and in this Amended Complaint. Indeed, one was dismissed shortly after the filing of Fanatics' Amended Complaint here, and, to date, the other suits have not all even been served on Panini.

[14] *See* ECF No. 7, *Huerta v. Panini Am., Inc.*, No. 23-cv-02529 (N.D. Tex., Jan. 29, 2024).

employees left to work for Fanatics, ¶ 106, Fanatics now alleges that Panini (or Panini America)[15] somehow acted improperly because it acted to protect its employee base. Specifically, Fanatics claims Panini America prevented some unnamed group of "other" Panini America employees from joining Fanatics by threatening them with legal action if they gave into Fanatics. Fanatics then speculates, "upon information and belief," that "many more" unnamed "employees have been deterred from joining Fanatics Collectibles and forced to remain captive at Panini." ¶ 105. In essence, Fanatics' claim is that Panini's defensive measures prevented it from poaching even more of Panini's employees. The claim fails for at least three reasons: (1) Fanatics fails to sufficiently allege wrongful means; (2) Fanatics fails to establish causation; and (3) the claim is barred by the *Noerr-Pennington* doctrine.

### A. The allegations do not establish the wrongful means or causation elements of tortious interference with business relations.

"To state a claim for [tortious interference with business relations] under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., LLC*, 547 F.3d at 132. Fanatics' allegations do not establish either the third or fourth elements.

*First*, Fanatics fails to establish that Panini "acted for a wrongful purpose or used dishonest, unfair, or improper means." *Id.* "The wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim" because "a plaintiff's mere interest or expectation in establishing

---

[15] While this section of the Complaint refers primarily to Panini S.p.A., Fanatics acknowledges that the employees at issue are employed by Panini America, not Panini S.p.A. ¶ 98.

a contractual relationship must be balanced against the competing interest of the interferer as well as the broader policy of fostering healthy competition." *Id.* (internal citations omitted). Thus, threats of litigation—which Fanatics relies on here—may only be used to establish the wrongful means element of a claim for tortious interference with business relations where the litigation is "wrongful" or "patently frivolous." *Gucci Am., Inc.*, 2007 WL 840128, at *7 (wrongful only "if the actor has no belief in the merit of the litigation"); *Semple v. Eyeblaster, Inc.*, 2009 WL 2709281, at *4 (S.D.N.Y. Aug. 27, 2009) (threats of civil litigation "cannot form the basis of a tortious interference with business relations claim unless the claim is patently frivolous").

In *Semple*, the court found no wrongful means were used when the defendant sent a cease-and-desist email to a private-equity company, Millenium, demanding Millenium cease solicitating the defendant's employees to sell their stock, "and stat[ing] that [defendant] reserved all rights to take all appropriate legal action against Millennium if it did not cease and desist such solicitation." *Id.* at *1. There, the defendant's reservation of legal rights was not "patently frivolous" or "wrongful" because "[i]t is well-settled that where a party acts, at least in part, in accordance with its normal economic self-interest, it cannot be found to have acted ***solely*** out of malice for the purpose of a tortious interference claim." *Id.* at *4; *see also Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 171 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009) (acting "in the interests of [the defendant company] and its employees" is not acting solely out of malice).

The same reasoning applies here. Indeed, the scant factual allegations support the ***opposite*** of a frivolous suit: Plaintiff admits that former Panini employees left with thumb drives holding Panini's information,[16] that Panini then sued in Texas to prevent misappropriation of its trade

---

[16] This is not the only time Fanatics has induced employees to steal trade secrets from their employers for the benefit of Fanatics. In *DraftKings, Inc., v. Michael Hermalyn*, DraftKings alleges that its former employee "stole many of DraftKings' most commercially sensitive documents" to aid his now-employer Fanatics. Compl., No. 24-cv-10299-JEK (D. Mass. Feb. 5, 2024), ¶ 59. DraftKings further alleges that, like here, the former employee also solicited other

19

secrets and further unlawful solicitation of its employees, and that the Texas state court *granted* Panini's application for a temporary restraining order against Fanatics. ¶¶ 102, 104.[17] There is now a temporary injunction in place to protect Panini's interests. ¶ 103. When former employees left with Panini's confidential information, ¶ 104, and solicited other Panini employees away, Panini acted "in accordance with its normal economic self-interest" by initiating suit to prevent such unlawful action. *Semple*, 2009 WL 2709281, at *4. Such litigation cannot sustain a tortious interference claim. *Id.*

Fanatics also alleges that Panini tortiously interfered with prospective business "by telling some of [its] employees that Fanatics would be exposed to scrutiny by licensors and that its contracts with licensors could be voided." ¶ 140. But Fanatics does not allege that these alleged statements rise to fraud or misrepresentation, which is required to meet the "wrongful means requirement" of a tortious interference with prospective business claim. *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 343 (S.D.N.Y. 2008) ("'wrongful means' should include 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure,' but not 'persuasion alone'"); *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004) (same).

*Second*, Fanatics fails to allege any ***specific or actual contracts*** that it would have obtained

---

DraftKings employees to leave for Fanatics in violation of his agreements with DraftKings. ¶ 1. There, too, the court granted a TRO. ECF No. 44.

[17] The Court may take judicial notice of the Texas pleadings, as the Second Circuit "has consistently held that, in considering a motion to dismiss, a trial court may rely upon public documents of which the plaintiff had notice that are integral to the plaintiff's claim." *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135, 1135 (2d Cir. 2000); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) (district court did not impermissibly rely on evidence outside the record on motion to dismiss to determine whether litigation was objectively baseless); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court may take judicial notice that "assertions were made in lawsuits"). The petition in the Texas case makes clear that Panini's claims were brought to enforce the former Panini employees' non-disclosure agreements with Panini, which prohibit misappropriation of Panini's trade secrets and solicitation of other Panini employees. Because of this, Fanatics' allegations that the former and current employees were not under any non-compete agreements, ¶¶ 102, 105, is a red herring. As Fanatics recognizes, the Texas litigation brings claims for misappropriation of trade secrets. ¶ 104.

with any specific former Panini America employees had Panini America not allegedly interfered, which is required to state a claim for tortious interference with business relations. *See Riddell Sports Inc.*, 872 F. Supp. at 78–79 ("allegations are too vague to support a finding that [plaintiff] would have executed specific contracts but for interference"). To sufficiently establish the causation element, a "plaintiff must allege that, but for defendant's conduct, his prospective business relations would have coalesced into ***actual contracts***." *Id.* (emphasis added); *Susskind v. Ipco Hosp. Supply Corp.*, 373 N.Y.S.2d 627, 629 (N.Y. App. Div. 1975) ("fatal" that complaint does not allege "specific allegations that the negotiations would have culminated in a contract but for the interference of" defendant). "Vague references" to "difficulty" securing a favorable contract are insufficient to allege actual contracts. *Brown v. Bethlehem Terrace Assocs.*, 525 N.Y.S.2d 978, 980 (N.Y. App. Div. 1988).

Here, Fanatics' allegations—which do not identify any specific employees who Fanatics would have hired, any specific roles they would have contracted for, or even any efforts to initiate the hiring process for any specific role—are not enough to allege "specific contracts" with specific individuals that would have been executed absent Panini's alleged interference. *Riddell Sports Inc.*, 872 F. Supp. at 79. *Compare* ¶ 105 (alleging "many more Panini employees" but failing to name one), and ¶ 141 (vaguely alleging deprivation "of the ability to hire qualified, sought-after employees"), *with Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994) (plaintiff applied for specific job opportunity at NYU, NYU began the interview process and followed up with plaintiff's previous employer, and previous employer falsely told NYU "that [plaintiff] had been terminated for specific incidents of malpractice"). "This omission is fatal" to Plaintiff's claim, and it should be dismissed on this basis alone. *Susskind*, 373 N.Y.S.2d at 629; *Four Finger Art Factory, Inc. v. Dinicola*, 2000 WL 145466, at \*7 (S.D.N.Y. Feb. 9, 2000) (dismissing claim because

complaint failed to specify "any economic opportunities which were lost as a result of the defendants' conduct" where no "other specific parties" alleged).

Fanatics attempts to save its thinly pleaded claim by alleging that "hiring statistics" "strongly suggest" other Panini America employees would have joined Fanatics if Panini had not applied for temporary restraining order against Fanatics. ¶ 106. This is speculative at best. In any event, the alleged "hiring statistics" do not excuse Fanatics from pointing to "specific contracts" that would have been executed absent Panini's alleged interference.

## B.    Fanatics' claim is barred by the *Noerr-Pennington* doctrine.

Fanatics' tortious interference claim also fails because Panini's alleged prelitigation threats and its Texas litigation are immunized from the claim under the *Noerr-Pennington* doctrine. *Noerr-Pennington* protects "efforts to influence governmental action through litigation, lobbying, and the like" under the First Amendment, "provided the activities are more than a mere 'sham.'" *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135. The doctrine "is applicable to ... state-law claims such as fraud and tortious interference," *id.*, and extends "to pre-litigation 'threat letters.'" *Lewin*, 2015 WL 3948824, at *27; *Primetime 24 Joint Venture v. Nat'l Broad.*, *Co.*, 219 F.3d 92, 100 (2d Cir. 2000) ("Courts have extended *Noerr–Pennington* to encompass concerted efforts incident to litigation, such as prelitigation 'threat letters.'"). Litigation is only a "sham" where the behavior is "objectively baseless in the sense that no reasonable [person] could realistically expect success on the merits." *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135. And "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 n.5 (1993). Accordingly, Panini's alleged litigation threats are immunized under *Noerr-Pennington* because Fanatics fails to allege the litigation would be "objectively baseless in the sense that no reasonable [person] could realistically expect success on the merits." *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135. Indeed,

22

*Panini has already won on the merits* in similar litigation—litigation brought in Texas state court against former employees—in successfully seeking emergency relief. ¶¶ 102–103; *Pro. Real Est. Invs., Inc.*, 508 U.S. at 61 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."). And Fanatics admits that employees left Panini America with thumb drives, ¶ 104, giving rise to at least a genuine dispute of fact over whether those drives contained proprietary information and foreclosing any allegation that a trade secret misappropriation claim would be a "sham." *Lewin*, 2015 WL 3948824, at *28 (failure to show "sham" litigation where outcome "depend[s] on the resolution of genuine disputes as to material facts"). Thus, Fanatics fails to allege any facts that show Panini threatened "sham" litigation, and its tortious interference claim also should be dismissed under the *Noerr-Pennington* doctrine.

## IV.   If the claims are not dismissed, the actions should be consolidated with Panini America designated as Plaintiff.

All Fanatics' claims should be dismissed for the reasons set forth above. But if any of its claims survive, they should be consolidated with the first-filed Antitrust Action as counterclaims with Panini America designated as plaintiff.

Under Federal Rule of Civil Procedure 13(a), a pleading must state as a counterclaim any claim that arises out of the "transaction or occurrence that is the subject matter of the opposing party's claim ... and does not require adding another party over whom the court cannot acquire jurisdiction." A claim and counterclaim arise out of the same "transaction or occurrence," if "a logical relationship exists between the claim and the counterclaim and if the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir. 2000) (internal quotation marks omitted). "Where a party institutes a second action based upon a compulsory counterclaim in a still pending action, courts can use the

procedural devices of transfer, stay and consolidation to avoid multiple litigation and to effectuate the Rule." *Internet Law Library*, 208 F.R.D. at 63 (internal citation omitted). "The purpose of [Rule] 13(a) is to permit a court to decide all related claims in one action, thereby avoiding a wasteful multiplicity of litigation." *In re PCH Assocs.*, 949 F.2d 585, 594 (2d Cir. 1991) (internal quotation marks and citation omitted). Rule 13(a) "was particularly directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint." *Adam v. Jacobs*, 950 F.2d 89, 93 (2d Cir. 1991) *(*quoting *S. Constr. Co. v. Pickard*, 371 U.S. 57, 60 (1962)).

The Antitrust Action—the first-filed action—arises from the unlawful conduct of Fanatics in monopolizing and attempting to monopolize the market for the production and sale of new professional sports trading cards, including by controlling and restricting access to key inputs that Panini America and any other competitors require to compete successfully. Fanatics' Complaint is a direct response to the Antitrust Action, in which Fanatics claims that Panini—not Fanatics—is the party that competed unfairly. The Complaint not only repeatedly references the Antitrust Action, it expounds on Fanatics' purported defenses at length. Given these allegations, Fanatics cannot credibly deny that its claims are "logically connected" to Panini's Antitrust Action. Indeed, its claims derive mainly from the Antitrust Action itself and should have been pleaded, if at all, as counterclaims. *See Shmuel Shmueli, Bashe, Inc. v. Lowenfeld*, 68 F. Supp. 2d 161, 165 (E.D.N.Y 1999) (holding that claims were compulsory counterclaims because they "derive either from transactions underlying the Southern District claims … or indeed, from the Southern District action itself"); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 589–90 (S.D.N.Y. 2010) ("[T]he question of whether the [earlier action] is a mere pretext for illegal action is one that is logically intertwined with the validity of the [current] legal claims.").

24

Fanatics' attempt to evade Rule 13(a) by intentionally avoiding naming the same parties as those in Antitrust Action does not change the analysis. Fanatics sued Panini S.p.A. instead of Panini America, the plaintiff in the Texas and Antitrust suits, even though Panini America holds the licenses at issue and is the party that allegedly threatened the employees with litigation. But when parties in two suits "represent the same interests," the actions may be considered duplicative even if the parties are not identical. *See In re Peaktop Techs. (USA), Inc. S'holder Derivative Litig. v. Peaktop Int'l Holdings Ltd.*, 2007 WL 700826, at \*2–3 (S.D.N.Y. Mar. 6, 2007) (holding that claims against defendants who were not parties to the previous lawsuit were barred as compulsory counterclaims when, as a wholly-owned subsidiary, the defendant represented the "same interests" as the entity that was a party to the previous lawsuit).[18]

When Fanatics filed this lawsuit, it unnecessarily and improperly multiplied the proceedings. But rather than granting leave to Fanatics to re-file its claims as counterclaims in the Antitrust Action, the "court can just as easily achieve the same result by consolidating the two actions and designating [Panini America] as 'plaintiff.'" *Internet Law Library*, 208 F.R.D. at 64.

## CONCLUSION

For the reasons set forth above, Panini requests an order dismissing the Amended Complaint in its entirety with prejudice for failure to state a claim upon which relief can be granted.

---

[18] Here, Fanatics alleges that Panini S.p.A. and Panini America are essentially one in the same when it asserts that "executives of Panini America and Panini S.p.A. operate in tandem and make decisions together, and Panini America is 100% owned and controlled by Panini S.p.A. Accordingly, Fanatics treats Panini America as an arm of Panini for purposes of personal jurisdiction." ¶ 19 n.8. Thus, Fanatics clearly believes that Panini S.p.A. and Panini America represent the same interests. And the Fanatics entity serving as plaintiff in this case—Fanatics Collectibles Topco, Inc.— represents the same interests as Fanatics SPV, LLC, a defendant in the Antitrust Action and Texas state court litigation. In the Antitrust Action, Fanatics' Chief Legal Officer submitted a declaration in which he testified that "Fanatics' trading card operations are part of its Fanatics Collectibles business, which includes Defendants Fanatics Collectibles Intermediate Holdco, Inc. and Fanatics SPV, LLC." Case No. 1:23-cv-09714-JHR, ECF 24-1, ¶ 2. Moreover, Fanatics SPV, LLC is the Fanatics entity that is a party to the draft term sheets on which Fanatics relies to claim the existence of a binding preliminary agreement. Exs. A–K.

February 23, 2024

Respectfully submitted,

*/s/ David Boies*
David Boies
Eric Brenner
**Boies Schiller Flexner LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Jason Hilborn*
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

Ursula Ungaro**
**Boies Schiller Flexner LLP**
100 SE 2nd Street Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
uungaro@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**Boies Schiller Flexner LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini S.p.A.*

*Pro hac vice
**Pro hac vice forthcoming

26