**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PANINI AMERICA, INC.

    *Plaintiff,*

    v.

FANATICS, INC.,
FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

    *Defendants.*
_____/

                        **Case No. 1:23-cv-09714-LTS-VF**
                        **[rel: Case No. 1:23-cv-06895-LTS-VF]**


**PANINI AMERICA'S MEMORANDUM IN OPPOSITION
TO FANATICS' OBJECTION TO NONDISPOSITIVE ORDER**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

STANDARD OF REVIEW ........................................................................................................ 5

ARGUMENT .............................................................................................................................. 5

I.      The Magistrate Judge properly exercised her discretion in assessing the merits of
        Fanatics' motion to dismiss. ........................................................................................... 6

II.     The Magistrate Judge properly exercised her discretion in assessing Fanatics' baseless
        burden claims. ................................................................................................................. 9

III.    The Magistrate Judge properly exercised her discretion in recognizing the benefit of a
        limited production of six core documents. ...................................................................... 13

CONCLUSION .......................................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ............................................................................................... 2

*In re Hulley Enterprises Ltd.*,
  400 F. Supp. 3d 62 (S.D.N.Y. 2019) ................................................................................ 5

*Kaplan v. Lebanese Canadian Bank, SAL*,
  610 F. Supp. 3d 533 (S.D.N.Y. 2022) .............................................................................. 5

*Morales v. Next Stop 2006, Inc.*,
  2022 WL 15523370 (S.D.N.Y. Oct. 27, 2022) ................................................................. 5

*N.Y. by James v. Pa. Higher Educ. Assistance Agency*,
  2020 WL 605944 (S.D.N.Y. Feb. 7, 2020) ....................................................................... 7

*Nexstar Broad., Inc. v. Granite Broad. Corp.*,
  2011 WL 4345432 (N.D. Ind. Sept. 15, 2011) ............................................................... 11

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
  571 F. Supp. 3d 106 (S.D.N.Y. 2021) .............................................................................. 5

*RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*,
  2023 WL 1996920 (S.D.N.Y. Jan. 24, 2023) ................................................................... 5

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
  2024 WL 1975478 (N.D. Cal. May 3, 2024) ................................................................... 11

*Republic of Turkey v. Christie's, Inc.*,
  316 F. Supp. 3d 675 (S.D.N.Y. 2018) ........................................................................... 5, 6

*Tera Group, Inc. v. Citigroup, Inc.*,
  2024 WL 4501967 (2d Cir. Oct. 16, 2024) ..................................................................... 1, 6

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law § 348a (2022) ....................................................... 8

**INTRODUCTION**

Fanatics asks this Court to overturn a textbook discretionary decision to require Fanatics to make a targeted production of just *six* agreements (the "License Agreements[1]")—all of which are undisputedly at the "crux" of Panini's claims—as part of the Magistrate Judge's measured approach to moving this case forward in a responsible way while the parties' motions to dismiss are pending in this Court. The claim that this limited order reflects error—let alone clear error that could justify reversal under the governing standard of review—should be easily rejected.

As much as anything, Fanatics' appeal appears targeted at trying to reargue its pending motion to dismiss (ECF No. 99) based on new factual assertions that go well beyond, and in many cases are directly contrary to, the allegations in the Complaint that control at the pleading stage. For example, Fanatics alleges it won the six License Agreements at issue not because of any anticompetitive conduct but because Panini's card offerings were supposedly "stagnant" while Fanatics' were supposedly "innovat[ive]." ECF No. 146 ("Objection") at 1. Panini rejects these assertions, which are neither grounded in the Complaint nor relevant to the Court's consideration of the objections to a discovery ruling. And in invoking these competitive issues, Fanatics' arguments just confirm that this case raises fundamental factual disputes that necessarily require discovery to adjudicate.

To the extent Fanatics' appeal targets the Discovery Order, it dodges the relevant case law, which contemplates the possibility of stays of discovery based on the "'potentially enormous cost of fact discovery' in antitrust cases." *Tera Group, Inc. v. Citigroup, Inc.*, 2024 WL 4501967, at 2 n.3 (2d Cir. Oct. 16, 2024) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.4 (2d Cir.

---

[1] Specifically, the six documents are license agreements between Fanatics and each of the National Football League, the National Basketball Association, Major League Baseball, and the respective players associations for each of these leagues.

2007)).  This consideration is irrelevant where, as here, the production of six easily identifiable and produceable agreements is all that is at issue.

Fanatics' dramatic claims of prejudice from producing these six agreements are also unsupported by *any* evidentiary record below.  Its briefing rests on the claim that disclosure of the six License Agreements would distort competition between Panini and Fanatics by revealing these agreements' terms.  But these license agreements are all for ten or twenty years, creating monopoly power for Fanatics during this period and *excluding* the possibility of competition for such future licenses in the relevant market for the foreseeable future.  To the extent Fanatics is trying to claim disclosure creates the risk of competitive harm in some *other* market, Fanatics has identified *no* other potential negotiations for which knowledge of the terms of the six License Agreements would impact competition.

Most fundamentally, Fanatics' claims of prejudice fail because they wrongly assume that the six License Agreements at issue will be accessible to *Panini* itself in some hypothetical future negotiations implicating Fanatics.  But the parties have already agreed that these six agreements will only be provided to Panini's lawyers at Boies Schiller Flexner ("BSF") on an *outside-counsel-eyes-only* basis, and the order directing production of the documents reflects that confidential treatment. The agreed Protective Order for this case is express that outside-counsel-eyes-only materials *cannot be disclosed by BSF to Panini* (or anyone else) for use in licensing negotiations or otherwise.  The Protective Order also contains standard use restrictions ensuring that *documents produced for this matter may only be used in this matter*.  BSF will, of course, respect these restrictions, which by themselves are dispositive in showing that Fanatics' claims of competitive harm are empty.  Fanatics' apparent view that BSF cannot be trusted to comply with the Protective Order is unreasonable and offensive.

For these reasons and the reasons set forth below, the Magistrate Judge did not commit error of any sort, let alone clear error.

## FACTUAL BACKGROUND

Panini's claims arise out of Fanatics' alleged monopolization of the market for sports trading cards for players in the major U.S. Professional Sports Leagues: the National Football League, the National Basketball Association, and Major League Baseball (the "Relevant Market"). As Panini's Amended Complaint, ECF No. 69 ("Am. Compl."), sets forth, Fanatics monopolized 100% of this market by securing exclusive interlocking deals with every one of these leagues, and their players associations, of unprecedented length and scope. Am. Compl. ¶¶ 102-109. These interlocking exclusive deals had the purpose and effect of excluding competition in the Relevant Market. Am. Compl. ¶¶ 12, 108-109. Fanatics has also engaged in other illegal acts, constituting both violations of antitrust laws and common law torts, to bolster and extend its monopoly power in the short term through coercive, unfair, and anticompetitive conduct aimed at locking up the inputs necessary for present competition in the Relevant Market, harming Panini and other participants. Am. Compl. ¶¶ 115-207.

Panini filed suit in August 2023 in the Middle District of Tampa before transfer to the Southern District of New York. ECF Nos. 1, 75. The case was transferred to Your Honor in May 2024. At the time, Fanatics' motion to dismiss Panini's claims was fully briefed, as was Panini's motion to dismiss Fanatics' countersuit.[2]

---

[2] After the briefing closed, Panini notified the Court of the final award issued by an arbitration tribunal chaired by the Honorable Michael Mukasey (Ret.). The Tribunal unanimously found that Fanatics intended "to inflict competitive injury" on Panini and that it "took a series of steps apparently designed to hurt Panini's business." ECF No. 113 at 1-2. Contrary to Fanatics' allegation (Objection at 15) that this filing was "improper," the tribunal's findings are squarely relevant to Fanatics' attacks on the Amended Complaint.

In September 2024, the Court referred discovery matters to Magistrate Judge Figueredo. ECF No. 117.  From the first September 23, 2024 conference before the Magistrate Judge and in multiple conferences and submissions since, Fanatics has sought to prevent discovery from proceeding.  ECF No. 123 (9/23/24 Hr'g Tr.) at 9:14-18.  The Magistrate Judge recognized, however, that under controlling law, "the filing of a motion to dismiss is not really itself a reason or good cause for a stay of discovery." *Id.* at 12:12-14.  Accordingly, the Magistrate Judge ruled discovery could move forward on a limited basis, *id.* at 12:6-20, 14:8-11, while scheduling status conferences to ensure oversight on a "month-to-month basis" to "alleviate" any "concern from Fanatics about burden," *id.* at 12:17-19.  Fanatics did not file an objection to this ruling allowing discovery to proceed.

Panini requested production of the six License Agreements between Fanatics and, respectively, each of the three major U.S. professional sports leagues and each of their associated players associations.  Fanatics vociferously objected.  Beginning in November and extending through no less than five submissions by the parties, *see* ECF No. 120 (11/4/24 joint letter); ECF No. 129 (11/15/24 Fanatics Letter); ECF No. 130 (11/22/24 Panini Letter); ECF No. 131 (11/26/24 Fanatics Letter); ECF No. 133 (11/27/24 Panini Letter), and two separate oral arguments, ECF No. 126 (11/7/24 Hr'g Tr.); ECF No. 136 (12/12/24 Hr'g Tr.), the Magistrate Judge gave full consideration to Fanatics' arguments regarding whether to order production of these documents. Following that full consideration, the Magistrate Judge found that, after more than a year of litigation, "[t]here's been no real progress," that these agreements go to the "crux of Panini's case," and that the licenses are readily identifiable and collectible without any burden or cost.  ECF No. 136 (12/12/24 Hr'g Tr.) at 4:8-7:21.  Accordingly, Magistrate Judge Figueredo ordered their production on an outside-counsel-eyes-only basis.  *Id.*  This appeal followed.

4

**STANDARD OF REVIEW**

Magistrate judges "are afforded broad discretion in resolving discovery disputes." *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 112 (S.D.N.Y. 2021). Such non-dispositive matters are subject to "highly deferential" review, *id.*, under the "clearly erroneous or contrary to law" standard, *In re Hulley Enterprises Ltd.*, 400 F. Supp. 3d 62, 70 (S.D.N.Y. 2019). A "party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *Id.* "An order is clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed and is contrary to law if it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Pac. Life Ins. Co.*, 571 F. Supp. 3d at 112 (internal quotations omitted).

**ARGUMENT**

Fanatics cannot meet its heavy burden of showing clear error. Magistrate Judge Figueredo's consideration of whether to allow a limited discovery production of six agreements while the parties' motions to dismiss are pending could not have been more judicious. And the legal framework that governed the Discovery Order is precisely the kind of multi-factor balancing test where the Magistrate Judge has broad discretion to weigh the relevant considerations.

To start, filing a motion to dismiss does not by itself constitute "good cause" to stay discovery during the pendency of a motion to dismiss. *See Kaplan v. Lebanese Canadian Bank, SAL*, 610 F. Supp. 3d 533, 534 (S.D.N.Y. 2022); *Republic of Turkey v. Christie's, Inc.*, 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018); *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 2023 WL 1996920, at *2 (S.D.N.Y. Jan. 24, 2023); *Morales v. Next Stop 2006, Inc.*, 2022 WL 15523370, at *1 (S.D.N.Y. Oct. 27, 2022). Rather, a stay is a discretionary determination that encompasses "multiple factors, including the breadth of discovery sought, the burden of responding to it, the prejudice that would result to the party opposing the stay, and the strength of the pending motion

forming the basis of the request for stay." *Republic of Turkey*, 316 F. Supp. 3d at 677 (internal citation omitted).

Below, Fanatics argued that the Magistrate Judge should prevent discovery of the License Agreements because "the prevailing trend in antitrust cases" in particular "is to stay discovery pending motions to dismiss, given the substantial costs associated with such discovery." ECF No. 129 at 1. In so arguing, Fanatics put heavy weight on the recent Second Circuit decision in *Tera Group, Inc. v. Citigroup, Inc.*, 2024 WL 4501967, at *2 n.3 (2d Cir. Oct. 16, 2024). But *Tera Group* and similar cases are expressly premised on concerns about "allowing a potentially massive factual controversy to proceed" with "potentially enormous cost." 2024 WL 4501967, at *2 n.3. The specific discovery at issue here is, again, just six agreements that Fanatics already has in hand. Moreover, there is especially no risk of discovery getting out of control when the Magistrate Judge is managing discovery tightly in monthly status conferences.

Fanatics' Objection tellingly drops its prior heavy reliance on *Tera Group* (which is now not cited at all). But Fanatics cannot escape the import of this case law, which shows that there is no special reason to second guess the Magistrate Judge's "broad discretion" to order Fanatics to make a quintessentially targeted product that does not remotely implicate the "potentially enormous cost" concerns motivating stay decisions in other antitrust cases.

## I.     The Magistrate Judge properly exercised her discretion in assessing the merits of Fanatics' motion to dismiss.

Fanatics' Objection turns in substantial part on the claim that Magistrate Judge Figueredo did not appreciate the supposed strength of its pending motion to dismiss Panini's antitrust claims. Perhaps Fanatics is trying to get one more bite at rearguing issues that are already fully briefed and under consideration based on more than 100 pages of motion papers. In any event, Fanatics'

6

arguments rely on unsupported factual assertions outside the pleadings and just reinforce that discovery is very much required in this case.

First, Fanatics pedantically challenges Magistrate Judge Figueredo's finding that "there's a view that suggests that not all of [Panini's] antitrust claims would be dismissed," and "there are substantial arguments in favor of the antitrust claims moving forward." Objection at 9 (citing ECF No. 136 (12/12/24 Hr'g Tr.) at 7:10-15). According to Fanatics, the Magistrate Judge clearly erred because she did not couch these findings in an express statement regarding whether Fanatics had made "a strong showing that the plaintiff's claim is unmeritorious." Objection at 9 (citing *N.Y. by James v. Pa. Higher Educ. Assistance Agency*, 2020 WL 605944, at *1 (S.D.N.Y. Feb. 7, 2020)). But the Magistrate Judge's recognition that Panini had "substantial arguments in favor of the antitrust claims moving forward" necessarily turns on a determination regarding whether Fanatics has substantial arguments—or not. Nothing in the record suggests that the Magistrate Judge believed Fanatics' arguments were meritorious while allowing limited discovery to proceed.

Fanatics' arguments also ignore that the merits of its motion to dismiss are not independently dispositive. They are just *one* factor in the *multi*-factor analysis that guided the Magistrate Judge's exercise of discretion. Whatever the precise wording, there is no doubt that the Magistrate Judge found reason to think Panini's antitrust claims would proceed into discovery. And she concluded, in such circumstances, that requiring the production of six discrete agreements now would not be burdensome or cause prejudice. She also likewise recognized that there were benefits to producing these agreements rather than continuing to wait, including to avoid further delay in a case that has been pending since August 2023. Balancing such factors in precisely this way is the essence of the Magistrate Judge's discretionary charge in managing discovery for the District Court after the case has been referred. Fanatics does not, because it cannot, offer any

7

plausible basis to conclude that this balance would have come out differently based on a slightly different formulation regarding the merits of its dismissal arguments by the Magistrate Judge.

Second, Fanatics' mere assertion that its motion to dismiss is "indisputably" strong, Objection at 9, does not make it so. The Court—which has the full briefing—can of course draw its own conclusions. Panini is confident that after considering the issues, the Court will agree with Panini's "substantial arguments in favor of the antitrust claims moving forward," as recognized by the Magistrate Judge. For now, Panini simply notes that Fanatics' presentation of these issues in its Objection does not reflect the actual briefing.[3] To take just one example, Fanatics' claims about the supposed strength of its Article III standing argument ignores that:

- Fanatics did not even think to make this argument in its initial motion to dismiss Panini's original complaint;

- Accepting Fanatics' position would require turning decades of exclusive dealing, predatory pricing, group boycott, and other antitrust case law on its head, *see* ECF No. 101 (Panini Opp'n to Mot. to Dismiss) at 9; Areeda & Hovenkamp, Antitrust Law § 348a (2022) (a "rival clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude rivals from the market."); and

- Fanatics relies heavily on a single, readily distinguishable, out-of-circuit district court opinion that has never been cited for relevant purposes by any other court, *see* ECF No. 101 (Panini Opp'n to Mot. to Dismiss) at 14.

Finally, Fanatics' merits arguments in its Objection do not just give short shrift to the actual substance of the motion to dismiss briefing, they ask this Court to accept ***factual assertions***— through the vehicle of an objection to a Magistrate Judge's discovery order—that are irrelevant to

---

[3] The full motion to dismiss briefing also shows Fanatics' current claims are not just overstated, they are false. Fanatics now asserts that "all" of Panini's claims are subject to Fanatics' Article III and antitrust injury arguments. Objection at 5. But Fanatics' standing and antitrust injury arguments do not concern Panini's non-antitrust counts, and the dismissal papers show these issues are irrelevant to Panini's state law causes of action (Counts VI, VII, and VIII). *See* ECF No. 100 at 9 (recognizing that the Article III argument is relevant, at most, to Counts I, II, III, and V), 16 (recognizing that antitrust standing is relevant, at most, to Counts I-V).

the Court's Rule 12 determinations.  For example, Fanatics asks this Court to assume that it "won the competitions" for these licenses "by offering favorable commercial terms that reflect a commitment to growth and innovation."  Objection at 1.  Fanatics' Objection likewise seeks to defend against allegations of anticompetitive conduct by alleging that "licensors ha[d]" purportedly "grown fed up with Panini's failure to innovate and its stagnant performance" in circumstances where Panini supposedly had "not sought to make its offerings more attractive to licensing partners or improve its performance (*i.e.*, compete more effectively)."  *Id.*  These self-serving factual claims are, of course, hotly contested.  For example, Panini believes the facts will show that Fanatics obtained these licenses in secret without any "competition," and that, far from Panini's performance becoming "stagnant,"  Panini had achieved remarkable growth in the sports trading card category.  Regardless, these issues are precisely what discovery is for.

## II.     The Magistrate Judge properly exercised her discretion in assessing Fanatics' baseless burden claims.

Fanatics also cannot show error in the Magistrate Judge's consideration of its burden claims, let alone clear error that fatally infects the discretionary consideration of whether production of the License Agreements is warranted under the governing balancing test.

There is, of course, ***no*** cognizable burden associated with collecting and producing the six specific documents at issue.  Fanatics does not claim otherwise.  Instead, it refers to "burdensome and time-consuming coordination with each of the six third-party licensors, who have certain advanced-notice and consent rights under the license agreements" at issue.  Objection at 14; *see also* ECF No. 120 at 3; ECF No. 129 at 4 n.2.  But the fact that such notice "might take some time," ECF No. 136 (12/12/24 Hr'g Tr.) at 10:13-16, does not mean it is burdensome, let alone that those burdens should be treated as so meaningful to trump all other considerations.  Pre-production third party notice letters are routine.  Fanatics and its counsel can readily manage any

ordinary course notice obligations, and any necessary follow up, that may be required. This is not a serious burden argument, and the Magistrate Judge was right not to credit it. In any event, Fanatics now says it already gave the six licensors the required notice. Objection at 16 n.8.

Fanatics also tries to manufacture a burden argument based on claims that that the License Agreements are commercially sensitive. Objection at 12-13. According to Fanatics, this creates a risk that "*Panini* will have access to information it should never have when negotiating" other license agreements. *Id.* at 12 (emphasis added); *see also id.* (challenging "[p]roduction to *Panini* of the license agreements" and claiming that "Magistrate Judge Figueredo's decision allows *Panini* to have access to those terms" (emphasis added)). But the parties have agreed, and the Magistrate Judge recognized, that the License Agreements will be produced only to Panini's outside counsel at BSF, not to *Panini*. The outside-counsel-eyes-only restriction means the License Agreements "shall not be disclosed summarized, described, characterized, or otherwise communicated to any person, except" for (i) outside counsel, (ii) consultants, vendors, or experts assisting in the prosecution or defense of the matter, (iii) a limited subset of fact witnesses in certain circumstances, and (iv) the Court or any private mediator or arbitrator engaged by the parties. Ex. 1 (agreed Protective Order) ¶ 11.[4] The agreed Protective Order further provides that "Any Designated Materials disclosed will be held and used by the person receiving such information *solely for use in connection with the Actions and not for any other purpose*." *Id.* ¶ 7 (emphasis added).

In other words, the terms of the Protective Order are express that, contrary to Fanatics' assumption, the License Agreements could never be used for purposes outside of this litigation

---

[4] The parties are still discussing one unrelated provision of the Protective Order, as reflected in the redline shown in Exhibit 1. The use restrictions and the disclosure restrictions on outside-counsel-eyes-only materials are agreed.

and, in all events, "Panini" will not "have access to" outside-counsel-eyes-only information for negotiation (or other purposes), even in summary form. Recognizing the import of these restrictions, the Magistrate Judge found that "to the extent Fanatics is concerned that counsel for Panini may share the information and the license agreements with the business folks at Panini, there's no basis on the record before me to believe that counsel would violate a court order restricting the sharing of this information." ECF No. 136 (12/12/24 Hr'g Tr.) at 6:20-25. Fanatics has no serious argument that the Magistrate Judge committed clear error in crediting BSF's good-faith compliance with a court order in the absence of *any* evidence suggesting otherwise.

Instead, Fanatics claims Panini supposedly "relies on its outside counsel in this matter to assist it with commercial negotiations and disputes, including the commercial matters that are at issue here, such as Panini's GCP cause of action." Objection at 13. Even if this were in fact true, it does not come close to proving—or even suggesting—that BSF will violate court-ordered confidentiality restrictions if the License Agreements are produced now on an outside-counsel-eyes-only basis.[5] Moreover, the only supposed "commercial matter" cited before the Magistrate Judge (or in the Objection) involves GCP, a specialized trading card manufacturer relied on by Panini to print trading cards. The Amended Complaint alleges that Fanatics bought GCP to "harm Panini," Am. Compl. ¶ 149, by gaining "control over Panini's lifeblood," *id.* ¶ 140, and using that control to "undermine Panini's ability to perform," *id.* ¶ 121, and reinforce its monopoly from the six License Agreements of unprecedented length and scope, *id.* ¶ 117. The Amended Complaint

---

[5] In claiming that a discovery stay is an "appropriate method for safeguarding competitively sensitive information pending the resolution of a motion to dismiss" (Objection at 13), Fanatics cites *Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2011 WL 4345432 (N.D. Ind. Sept. 15, 2011), and *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 2024 WL 1975478 (N.D. Cal. May 3, 2024). But neither case implicated a limited production governed by outside-counsel-eyes-only protections to avoid exactly these issues.

further details how Fanatics' CEO, Michael Rubin, threatened to "turn off the GCP machines devoted to Panini whenever it wanted," *id.* ¶ 140, and caused GCP to breach Panini's contract with GCP by buying GCP without Panini's consent, *id.* ¶ 133.

The recent issues with GCP referenced by Fanatics arose after GCP (again, owned by Fanatics) began "doubling Panini's prices" for GCP's services and failed to honor its contractual obligations to Panini. *See* ECF Nos. 133-1 at 1; 133-4 at 1. Though Fanatics attempted to invoke this issue many times below, it never once attached the actual letters showing the nature of the dispute and BSF's actual role. Panini did. ECF No. 133. These letters show that BSF's involvement was based on ***litigation***, not commercial, issues with GCP. Indeed, the correspondence shows that GCP itself recognized that its conduct created a dispute over whether "GCP has, in any way, breached the" contract "between GCP and Panini." ECF No. 133-5 at 1.[6]

Fanatics also ignores that the License Agreements all have ten- to twenty-year terms. Thus, Panini will not have the opportunity to participate in future negotiations with the NFL, NBA, MLB, and its players associations for decades. It follows that—even putting aside that the License Agreements will be produced on an outside-counsel-eyes-only basis—there is no serious risk that disclosure of the terms of these agreements will somehow prejudice Fanatics in connection with renewal negotiations regarding these agreements. To the extent Fanatics argues that disclosure of these License Agreements will somehow harm ***other*** negotiations with ***other*** entities, Fanatics presented no cognizable evidence below identifying what negotiations Fanatics believes could be affected let alone how the terms of the six License Agreements implicate any such hypothetical negotiations—especially in a way that some "competitive process could permanently be harmed."

---

[6] In any event, GCP is not a Fanatics licensor, and Panini's dispute with GCP has nothing to do with the terms of any of the License Agreements at issue here nor with any of the licensors with which Fanatics competes on terms with Panini.

Objection at 2.    Fanatics' argument also wrongly assumes, unreasonably and without any foundation, that (i) BSF would be involved in these hypothetical license negotiations with these hypothetical other entities, and (ii) again, if BSF somehow was involved, it would ignore the clear restrictions on the use of outside-counsel-eyes-only information in the Protective Order.

### III.    The Magistrate Judge properly exercised her discretion in recognizing the benefit of a limited production of six core documents.

The Magistrate Judge's assessment of the final factors in the balancing test—the benefits of making a limited production of the License Agreements now and the prejudice that could follow absent a production —are also well justified and not clearly erroneous.    The gravamen of Panini's Complaint is that:

> Fanatics's anticompetitive, monopolistic acts, in undermining Panini's (and others) presence in the marketplace, have the purpose and effect of destroying competition in and for the market for the production and sale of Major U.S. Professional Sports Leagues trading cards, both immediately and for the long term. Competition "for" the market through bidding on licenses with the Leagues and players associations would normally take place every handful of years. Fanatics has ended that form of competition. ***By entering into licensing agreements of unprecedented length and scope, including with all major sports leagues, combined with its other Anticompetitive Conduct, Fanatics has created insurmountable barriers to entry to competition "for the market."***

Am. Compl. ¶ 12 (emphasis added).

In short, while the interlocking, long-term nature of the License Agreements is not the only anticompetitive conduct alleged in the Amended Complaint, it is unquestionably central.    Indeed, Fanatics itself sought to transfer Panini's case from the Middle District of Florida to the Southern District of New York precisely on the ground that "the crux of Panini's case" is Fanatics' six long-term license agreements and "the majority" of those licenses are with entities located in this judicial district.    ECF No. 24 at 4, 15.    And in its Objection, Fanatics rightly does not challenge the Magistrate Judge's finding that the agreements are relevant, at a minimum, to Panini's

13

unreasonable restraint of trade, monopolization, and attempted monopolization claims—three of Panini's core causes of action.  Objection at 15.

Production of the six core agreements in an antitrust case will necessarily facilitate moving the case forward efficiently and expeditiously, and there was ample reason for the Magistrate Judge to believe that "[d]elay" in producing documents that both sides agree are at the "crux" of the litigation "itself prejudices the plaintiff"— especially in a case that has been pending since August 2023.  ECF No. 136 (12/12/24 Hr'g Tr.) at 7:1-5.  Indeed, Fanatics' claim that there is no "compelling need for immediate discovery," ECF No. 129 at 4, cannot be squared with its own invocation of the advanced-notice and consent rights of the licensors under the License Agreements.  If, as Fanatics claimed below, there is genuinely a possibility that notice to the third-party licensors would lead them to "petition the Court for additional protections" or "move to quash the production," *id.* at 4 n.2, then the risk of such protracted litigation—and the corresponding further delay in any actual production of the most core documents in the case—is precisely what justifies starting the production process of these six documents now.  Waiting for formal discovery to begin in full before third party objections or concerns are heard just invites further delay.

## CONCLUSION

For the above reasons, the Magistrate Judge's Discovery Order requiring Fanatics to produce the six License Agreements to Panini was well within her discretion under the governing balancing test, and Fanatics has not met its burden of showing clear error.  The objection to the Discovery Order should be overruled.

January 21, 2025

Respectfully submitted,

*/s/ David Boies*
David Boies
Eric Brenner
**Boies Schiller Flexner LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Jason Hilborn*
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

Ursula Ungaro*
**Boies Schiller Flexner LLP**
100 SE 2nd Street Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
uungaro@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**Boies Schiller Flexner LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc. and Panini S.p.A.*

*\*Admitted pro hac vice*

15