UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FANATICS COLLECTIBLES TOPCO, INC.,

                              Plaintiff,

            -against-                                    23-CV-6895-LTS-VF

PANINI S.P.A.,

                              Defendant.

---

Memorandum Order

Fanatics Collectibles Topco., Inc. ("Fanatics" or "Plaintiff") brings this action

against Panini, S.p.A. ("Panini" or "Defendant"), asserting state law claims for unfair

competition, breach of the obligation to negotiate in good faith, and tortious interference with

business relations.  (Docket entry no. 39 (the "Amended Complaint" or "AC").)  The Court has

subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1332.

Defendant now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss the Amended Complaint for failure to state a claim upon which relief may

be granted.  (Docket entry no. 46 (the "MTD").)  In the alternative, Defendant, asserting that this

action should have been brought as a compulsory counterclaim to an action previously

commenced by Defendants, moves to consolidate this action with that one, Panini Am. v.

Fanatics, Inc., No. 23-CV-9714-LTS (filed Aug. 3, 2023).  (Docket entry no. 47 ("Def. Mem.") at

23.)  For the following reasons, Defendant's motion to dismiss is granted in part and denied in

part, and Defendant's request for consolidation is denied without prejudice to renewal.

<u>B</u>ACKGROUND

Unless otherwise indicated, the following allegations are taken from the Amended Complaint, all well-pleaded factual content of which is presumed true for purposes of this motion practice.[1]

Fanatics is a new entrant into the United States sports merchandising and trading card industries, holding exclusive licensing contracts for the intellectual property of several major United States sports leagues and their associated players associations that will come into effect in future years.  (AC ¶¶ 11, 13.)  Panini is an Italian-owned corporation which began operating in the United States in 2009.  (<u>Id.</u> ¶¶ 14, 29.)  According to the Amended Complaint, Panini currently has exclusive or semi-exclusive licenses with the National Basketball Association ("NBA"), the NBA Players Association ("NBPA"), the National Football League ("NFL"), the NHL Players Association ("NHLPA"), World Wrestling Entertainment ("WWE"), Ultimate Fighting Championship ("UFC"), and the Collegiate Licensing Company ("CLC"), among others.  (<u>Id.</u> ¶¶ 29, 58, 81.)  Fanatics has entered into exclusive licensing agreements with many of these organizations which will go into effect after Panini's licenses expire in 2025-2026. (<u>Id.</u> ¶ 78.)

Fanatics alleges that it was the only competitor vying for lucrative deals with the NBPA and certain NFL prospects in the spring of 2022.  (<u>Id.</u> ¶ 89.)  Around that time, however, Panini, which then had active licenses with the NBPA and NFL entities, "knowingly and

---

[1]    The Court has also considered factual matter drawn from documents that are integral to, attached to, or incorporated by reference in the Amended Complaint.  <u>See</u> <u>DeLuca v. AccessIT Grp., Inc.</u>, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) ("[E]xtrinsic documents may be considered as part of the pleadings if they are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint.").

intentionally" sidetracked Fanatics' efforts by proposing a deal for early termination of Panini's licenses (id. ¶¶ 128),[2] to accelerate the launch of Fanatics' subsequent licenses, and then unduly prolonging negotiations over terms. (Id. ¶¶ 90, 128.) During the negotiations, Panini allegedly shared with Fanatics falsely inflated earnings projections, based on which the proposed transaction was to be priced, and engaged in other "bad-faith tactics." (Id. ¶¶ 128; see also id. ¶¶ 86-88.) Fanatics alleges that Panini did not intend to finalize a deal in good faith and instead used the potential of a deal to "stall" Fanatics, "[running] the clock" on Fanatics' ability to negotiate with potential licensors for rights it would be able to exercise during the interim period before its own licensing agreements became effective. (Id. ¶¶ 90, 128.) Panini repeatedly extended the projected closing date of the agreement for over six months (id. ¶ 146), during which time the parties exchanged numerous, unsigned draft term sheets. (See docket entry no. 49 ("McElroy Decl.") at Ex. A-K.) Fanatics alleges that, in May 2022, during these exchanges, "Panini executives orally informed Fanatics executives that Panini accepted the core structure proposed for the early termination deal, although certain less significant terms . . . remained open for negotiation." (AC ¶ 82.) By early 2023, the deal had fallen apart due to changing market realities and Panini's reduced profit projections. (Id. ¶¶ 85, 86.) By that time, the window for Fanatics to make alternative deals with third parties had closed, and Fanatics, consequently, lost significant revenue opportunities. (Id. ¶¶ 90, 132, 147.)

Thereafter, in late March 2023, Fanatics attempted to hire interested and qualified professionals in the industry, many of whom were then Panini employees. (Id. ¶¶ 94, 135.) This recruitment was necessary for Fanatics to prepare for the impending start of several new licenses.

---

[2]    These included licenses with the NFL, NBA, related Players Associations, the WWE, UFC, and the CLC. (Id. ¶¶ 81, 143.)

(Id. ¶ 94.)  Thirty-seven Panini employees left and joined Fanatics.  (Id. ¶ 96.)  In order to prevent further personnel loss, Panini threatened its remaining employees with litigation if they were to leave Panini to join Fanatics.  (Id. ¶ 136.)  Panini did, in fact, initiate a lawsuit against Fanatics and seven high-level former Panini employees in Texas, Panini Am. v. Eli Nicholas Matijevich, Jr. et al., No. DC-23-04798 (Tex. Dist. Ct., Dallas Cnty., filed Apr. 14, 2023), an action that Fanatics maintains is meritless.  (Id. ¶¶ 97, 102.)  Panini also brought claims against Fanatics in this Court for tortious interference with contract and business relations, in response to this same effort to recruit Panini personnel, in addition to antitrust claims relating to Fanatics' licensing agreements.  (Id. ¶ 107); see Panini Am., Inc. v. Fanatics, Inc., No. 23-CV-9714-LTS (S.D.N.Y. filed Aug. 3, 2023, in M.D. Fl.) (the "Antitrust Action").  Panini's threats to sue its employees if they left for Fanatics resulted in a "stark drop-off" in Fanatics' ability to hire Panini employees.  (Id. ¶ 139.)

Fanatics filed this action in the Southern District of New York on August 7, 2023 (docket entry no. 1), four days after Panini had filed the Antitrust Action in the Middle District of Florida.  The Antitrust Action was transferred to this Court on November 3, 2023.  (Antitrust Action, docket entry no. 76.)  On May 3, 2024, both actions were transferred to the undersigned.

DISCUSSION

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  In

deciding a Rule 12(b)(6) motion to dismiss, the Court must "draw all reasonable inferences in [p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (citation omitted).

Unfair Competition Claim

In Count I of the Amended Complaint, Fanatics alleges that Panini engaged in unfair competition by using the sham prospect of a deal to prevent Fanatics from forming other lucrative arrangements. (AC ¶¶ 124, 127.) Unfair competition under New York law[3] is a "broad and flexible doctrine" that encompasses behavior where one "endeavor[s] to reap where one has not sown; it is taking the skill, expenditures and labor of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co., 610 F. App'x 69, 70 (2d Cir. 2015) (citation omitted). To plead a prima facie case for unfair competition, Fanatics must allege (1) "the bad faith misappropriation," (2) of a "commercial advantage," (3) belonging to Fanatics. MiniFrame Ltd v. Microsoft Corp., No. 11-CV-7419-RJS, 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013).

---

[3]     Both parties rely on New York and Second Circuit authority in their argumentation with respect to these state law claims, and the Court does the same.

Fanatics argues that it had an exclusive commercial advantage with respect to the licensing of intellectual property rights for the NBPA and NFL prospects because no other entity was seeking to engage in such licensing efforts at the time, and that Panini deprived it of that advantage, as well as of the time, effort, attention, money, and financial market opportunities that Fanatics wasted on the potential deal for Panini's licensing rights covering "substantively similar licenses" for the period in question. (Docket entry no. 53 ("Pl. Mem.") at 21.) Even if the Court credits Fanatics' argument that its business opportunity with respect to the NFL prospects and NBPA constituted an "exclusive commercial advantage," however, Fanatics must still show that the lost advantage was utilized to Panini's benefit in some way in order to state an unfair competition claim. See Red Mt. Med. Holdings, Inc. v. Brill, 563 F. Supp. 3d 159, 181 (S.D.N.Y. 2021) ("[The misappropriation theory of unfair competition] is nevertheless limited to instances where a defendant took 'the skill, expenditures, and labors' of plaintiff in bad faith and employed it for 'its own commercial advantage.'" (quoting Roy Exp. Co. Establishment of Vaduz v. Columbia Broad. Sys., Inc., 972 F.2d 1095, 1105 (2d Cir. 1982))). "Under New York law, an unfair competition claim involving misappropriation usually concerns the taking and use of plaintiff's property to compete against the plaintiffs own use of the same property." ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 478 (2007) (internal quotations and citation omitted). Misappropriation under New York law, therefore, typically encompasses scenarios where a defendant unfairly benefits from the plaintiff's time and effort by seizing the results of that work, thus "reaping where they have not sown." See, e.g., Milton Abeles, Inc. v. Farmers Pride, Inc., 603 F. Supp. 2d 500, 502-503 (E.D.N.Y. 2009) (Defendant took plaintiff's customer list and used it to steal business); Bytemark Inc. v. Xerox Corp., 342 F. Supp. 3d 496, 504 (S.D.N.Y. 2018) (Defendant used partnership to take information about plaintiff's proprietary technology and cut

plaintiff out of future business); <u>Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.</u>, 127 A.D.3d 48, 56-57 (N.Y. App. Div., 1st Dep't 2015) (Defendant induced a competitor's business partner to breach their exclusive contract and then misappropriated plaintiff's "confidential competitive information obtained from [the business partner]" through that breach of contract). Fanatics makes no such allegations here.

Fanatics does not allege that Panini <u>took</u> Fanatics' exclusive advantage by, for example, forming any new contracts with any of Fanatics' potential business partners, or by misusing any work product Fanatics developed or confidential information divulged during the allegedly illusory negotiations. To the contrary, Panini's alleged bad faith tactics, while perhaps potentially actionable under other theories, are not alleged to have provided any <u>direct</u> commercial benefit for Panini and thus do not support a viable unfair competition claim.[4]  To prevail on such a claim, is not enough to allege – as Fanatics has – that Panini merely <u>cost</u> Fanatics an exclusive advantage.  <u>See</u> <u>ITC</u>, 9 N.Y.3d at 479.  The Court therefore grants Defendant's motion insofar as it seeks the dismissal of Count I.

---

[4]    Fanatics argues that Panini incurred a commercial benefit from the sham negotiations by "avoiding competition" and "harming a direct competitor."  (Pl. Mem. at 22.)  In essence, Fanatics asserts that Panini prevented Fanatics from making alternative deals with the NBPA (with whom Panini held a nonexclusive license) and certain prospective NFL players (not yet covered by Panini's exclusive NFLPA license), which inherently benefitted Panini as the only other major competitor in the market.  (<u>Id.</u>; AC ¶¶ 89, 90, 124.)  Taking these allegations as true, Fanatics still fails to allege how Panini <u>misappropriated</u> Fanatics' "exclusive commercial advantages."  Even if Panini may have indirectly benefitted from a competitor's setbacks, this alone is not sufficient to show that Panini had "reaped where it had not sown" as required to state an unfair competition claim.

Claimed Breach of Obligation to Negotiate in Good Faith

In Count II, Fanatics asserts that, in spring 2022, Panini had an obligation to negotiate in good faith for the early termination of Panini's licenses, and thus had – and violated – a duty to "use its best efforts to negotiate with Fanatics . . . and close the transaction on customary and reasonable terms." (AC ¶ 145.) Fanatics asserts that this duty arose in May 2022, when "Panini executives orally informed Fanatics executives that Panini accepted the core structure proposed for the early termination deal," while leaving certain terms open for final negotiation. (Id. ¶ 82.)

"[C]laims for breach of good faith and fair dealing do not state an independent cause of action," but rather are derivative of a party's contractual obligations. Silvester v. Time Warner, Inc., 763 N.Y.S.2d 912, 918 (Sup. Ct. N.Y. 2003). To plead a prima facie claim for breach of contract under New York Law, Fanatics must allege: "(1) the existence of a contract, (2) the performance of that contract by one party, (3) breach of that contract by the other party; and (4) damages." Koutsoudakis & Iakovou L. Grp., PLLC v. Osman, No. 22-CV-6351-ER-SLC, 2024 WL 5284018, at *6 (S.D.N.Y. Dec. 20, 2024). Fanatics claims that the parties had a preliminary agreement with respect to the early termination of Panini's licensing rights, and that Panini breached its obligation of good faith and fair dealing with respect to efforts to finalize such agreement. New York law recognizes two types of enforceable preliminary agreements. Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc., 401 B.R. 598, 617 (S.D.N.Y. 2009). A "Type I" agreement is one in which "the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation" and simply "contemplate memorializing their agreement in a more formal document." Id. at 618 (citations and internal punctuation omitted). A "Type II" preliminary agreement "is one that expresses

mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987). Parties to a Type II agreement may "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." Id. To determine whether such an agreement was formed, the Court considers: (1) the language of the agreement, (2) the context of the negotiations, (3) the existence of open material terms, (4) whether there has been partial performance, and (5) the necessity of putting the agreement in final form as indicated by the customary form of such transactions. Brown v. Cara, 420 F.3d 148, 157 (2d Cir. 2005).

Fanatics first asserts that a Type II agreement was formed by the alleged oral agreement of Panini executives to "the core structure" of the proposed deal in May 2022. (AC ¶ 82.) Although the Court is bound to accept Fanatics' factual averments as true, it is not bound to accept conclusory assertions. Twombly, 550 U.S. at 555-56. Fanatics provides no allegations as to the wording, terms, or context of this alleged oral agreement. The mere allegation that unnamed Fanatics executives were informed by unnamed Panini executives that the Panini executives "accepted" a proposed "core structure" with further unspecified terms to be negotiated is insufficient to allege plausibly that the parties had agreed to be bound to negotiate a final agreement around the "accepted" terms. Therefore, the Court cannot find Panini entered a Type II agreement on the basis of the alleged May 2022 conversation alone.

Fanatics further alleges that the parties continued negotiating after May 2022, and exchanged several draft term sheets that – beginning in June 2022 and continuing over the "coming months" – provided that the parties will "continue to negotiate in good faith." (AC

¶ 82.)  Fanatics takes two positions regarding the term sheets, exemplars of which have been

proffered by Panini in support of the motion.  Fanatics first argues that the term sheets are

outside the scope of the Amended Complaint and should be ignored for purposes of this motion

practice, asserting that its claim of the existence of an enforceable Type II preliminary agreement

is based solely on the alleged oral agreement between the parties' executives.  (Pl. Mem. at 6-7,

9.)  Fanatics further argues that the term sheets are not inconsistent with the existence of such an

agreement and do not negate the existence of a Type II agreement.  (Id. at 9.)  Neither argument

is sufficient to sustain Fanatics' burden of pleading the existence of a Type II agreement that

gave rise to an obligation to negotiate final terms.  The Court has already explained that the

conclusory allegations of an oral agreement do not plausibly plead a Type II agreement that

would support the cause of action asserted in Count II.  The Court next examines Fanatics'

allegations and arguments regarding the term sheets.

<u>The Term Sheets</u>

In support of its Motion to Dismiss, Panini has proffered eleven draft term sheets

that the parties allegedly exchanged throughout 2022.  (McElroy Decl. at Ex. A-K.)  Fanatics

argues that the Court should strike these documents because they "are neither incorporated into

nor integral to Fanatics' Complaint" despite Fanatics' references to and quotations from them in

the Amended Complaint.  (Pl. Mem. at 2-3, 12.)  The Court finds that Fanatics' Amended

Complaint demonstrates that the term sheets are integral and properly considered in connection

with this motion practice.

"A document is integral to the complaint where the complaint relies heavily upon

its terms and effect."  <u>Goel v. Bunge, Ltd.</u>, 820 F.3d 554, 559 (2d Cir. 2016).  The substance of

Fanatics' claim relies upon contract terms alleged in the Amended Complaint by reference to the

draft term sheets.  (See AC ¶ 82.)  Although Fanatics asserts that the parties' May 2022 oral

agreement is the basis of the preliminary agreement, Fanatics alleges no details of that oral

agreement apart from allegations referencing the terms documented in the term sheets.  (Id.)

Additionally, as Fanatics concedes, the Amended Complaint explicitly references material

changes made to the July 22, 2022 term sheet sent by Panini's counsel, which, for the first time

during the exchange of the term sheets, added a provision that "[t]he parties will continue to

negotiate in good faith during the period from the date of this term sheet until August 31, 2022,

with the goal of substantially resolving all material operational and financial matters by July 31,

2022 and executing definitive agreements by August 31, 2022."  (McElroy Decl. at Ex. D; AC

¶ 82; see also Pl. Mem. at 14 n.6.)  In light of Fanatics' reliance on features and language of the

term sheets in the Amended Complaint, the Court finds the term sheets integral to the Amended

Complaint and proper for consideration at this stage.  See I. Meyer Pincus & Assoc., P.C. v.

Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991) (finding a prospectus integral to the

complaint, "despite the fact that the complaint contains only 'limited quotation' from that

document" because the claims pleaded therein were based on an alleged misrepresentation in the

document (internal citation omitted)); see also DeLuca, 695 F. Supp. 2d at 60.

Preliminary Agreement

        The Court finds that Fanatics has not sufficiently alleged facts that support a

plausible inference that the parties entered into a binding Type II agreement.  First, the language

of the agreement specifically disclaims any intention by the parties to be bound by the "non-

binding letters of intent" shared between the parties.  (See McElroy Decl. at A-K.)  While,

starting in July 2022, both Panini's counsel and Fanatics' counsel sent versions of the term sheets

that contained a proposed provision obligating the parties to continue negotiating in good faith,

the disclaimer at the top of each sheet contained a provision stating that the document "does not constitute a legally binding commitment except as set forth in the 'Confidentiality,' 'Governing Law and Dispute Resolution,' and 'Fees and Expenses' provisions below[.]"  (See McElroy Decl. at Ex. D-K.)  The "good faith" negotiation provision is outside of the provisions that the term sheets denominate as binding to any degree.  Therefore, this factor weighs heavily against finding such an agreement.

Nor do the context of the negotiations and Fanatics' expenditures in connection with the negotiations militate in favor of the existence of a Type II agreement.  Fanatics asserts that it partially performed its obligations under the alleged agreement because the negotiations were lengthy and costly, given that the parties exchanged draft term sheets for several months at a cost of "tens of millions of dollars" spent on due diligence and drafting deal documents.  (Pl. Mem. at 11; AC ¶ 148.)  In support, Fanatics cites EQT Infrastructure Ltd. v. Smith, which held that "partial performance, such as completing due diligence and legal steps in furtherance of achieving the ultimate contractual goal, can give rise to binding obligations contemplated in preliminary agreements."  EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 230 (S.D.N.Y. 2012) (citing FCOF UB Sec. LLC v. MorEquity, Inc., 663 F. Supp. 2d 224, 230 (S.D.N.Y. 2009)).  This argument is unpersuasive.  Fanatics relies on cases in which the completion of due diligence followed the execution of an agreement that contemplated such action.  See FCOF, 663 F. Supp. 2d at 230 (finding the complaint plausibly alleged that plaintiff had partially performed based, in part, on its completion of due diligence and allegations that the "[a]ccepted and [a]greed" to preliminary agreement referred to "a settlement date and due diligence to be conducted in anticipation of the closing of the transaction"); EQT, 861 F. Supp. 2d at 230 (finding plaintiff's due diligence provided a plausible basis for partial performance because the

parties had "executed" a Letter of Intent which acknowledged "that Plaintiff would 'expend significant time, effort, and expense in connection with [the transaction]"). Here, the parties did not execute any agreement expressly contemplating the performance of due diligence or other specific preparatory steps. Thus, Plaintiff's investment of time and expense in the opening of negotiations for a potential commercial transaction does not necessarily constitute partial performance of the obligations contemplated by the draft term sheets.

Finally, with respect to open material terms in the agreement, Fanatics alleges that the parties had agreed on the "core structure" of the agreement – which: (1) included a pricing formula to calculate the early termination fee, and (2) specified the relevant licenses – and that the parties had left open additional terms for further negotiation. (AC ¶ 82.) The existence of open material terms, particularly where a "core structure" has been negotiated, does not necessarily preclude a finding of a Type II agreement. See Brown, 420 F.3d at 158 ("Where the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, these same omissions may support finding a binding Type II agreement." (internal citations omitted)). There is no evidence, however, that the obligation that Fanatics claims was breached – to negotiate in good faith toward finalization of the early transfer agreement – was part of the core terms, and the term sheets expressly disclaimed the existence of any such binding obligation. Thus, whether or not there was a Type II agreement with respect to the deal in general, Fanatics has not pleaded facts that plausibly demonstrate that Panini had, or breached, an obligation to negotiate to conclude the agreement.

Therefore, weighing the relevant considerations, the Court finds that the allegations do not support a plausible inference that the parties formed a Type II agreement

requiring Panini to continue negotiating in good faith.  Panini's motion to dismiss is therefore
granted with respect to Count III.


Tortious Interference with Business Relations Claim

In Count II, Fanatics asserts that Panini tortiously interfered with Fanatics'
prospective business relationships with Panini's current and former employees, whom Fanatics
attempted to hire in Spring 2023.  (AC ¶¶ 94, 135.)  To establish a prima facie claim for tortious
interference with prospective business relations, Fanatics must allege facts supporting a plausible
inference that: (1) it had a business opportunity, (2) Panini knew about the opportunity,
(3) Panini intentionally interfered with that opportunity using "dishonest, unfair, or improper
means," and (4) Fanatics lost the opportunity due to that interference.  Scutti Enter., LLC. v. Park
Place Ent. Corp., 322 F.3d 211, 215 (2d Cir. 2003) (citations omitted); Glob. Packaging Serv.
LLC v. Glob. Printing & Packaging, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017).  To sustain a
tortious interference claim, "as a general rule, the defendant's conduct must amount to a crime or
independent tort."  Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004).

Fanatics alleges that, in April 2023, it hired thirty-four Panini employees and that,
although Fanatics sought to hire additional Panini employees, it was unable to do so because
Panini wrongfully threatened its employees with meritless litigation if they left to join Fanatics.
(AC ¶¶ 136-41.)  A litigation threat is wrongful and can support a cause of action for tortious
interference if "the actor has no belief in the merit of the litigation, [or] . . . having some belief in
the merit of the suit, 'nevertheless institutes or threatens to institute the litigation in bad faith,
intending only to harass the third parties and not bring his claim to definitive adjudication.'"
Univ. City Studios, Inc. v. Nintendo Co., Ltd., 797 F.2d 70, 75 (2d Cir. 1986) (internal citation

omitted); see also RFP LLC v. SCVNGR, Inc., 788 F. Supp. 2d 191, 197 (S.D.N.Y. 2011)

(litigation threats that are wrongful or frivolous can support tortious interference claim).

Fanatics alleges that Panini had no viable legal basis on which to sue its

employees, asserting that they were employed on an "at-will" basis without "any non-compete

covenant restraining their move to Fanatics." (AC ¶ 102.) Fanatics further alleges that Panini

maliciously used the threats solely to harm Panini and stop its employees' departures, with no

intention of seeking adjudication of any of the claims. (Id. ¶ 137.) At the same time, however,

Fanatics acknowledges that Panini did initiate a lawsuit against several "longtime former Panini

employees who had joined Fanatics." (Id. ¶ 102 (citing Panini Am., Inc. v. Matijevich et al., No.

DC-23-4798 (Tex. Dist. Ct., Dallas Cnty., filed Apr. 14, 2023) (the "Texas Action").) Panini

argues that its litigation threats were not frivolous, requesting that the Court take judicial notice

of the Texas court's grant of a consent preliminary injunction against Panini's former employees

in the Texas Action. (Pl. Mem. at 19-20.) Even if the Court were to take such notice, the

existence and issuance of a consent preliminary injunction in the Texas Action are insufficient to

demonstrate that Fanatics could not state a tortious interference claim upon which relief may be

granted. The Texas Action involves seven "high-level" former Panini employees who were

alleged to have stolen thumb drives containing trade secrets, and none of whom is a subject of

the claim Fanatics asserts here. Moreover, the injunction in that action was entered on consent

and thus does not constitute a victory on the merits for Panini. Accordingly, where, as here, the

Court is required to draw all plausible inferences in favor of Fanatics, the facts pleaded are

sufficient to allege plausibly that Panini used wrongful threats of litigation to interfere with Fanatics' prospective business relations.[5]

    Noerr-Pennington Doctrine

      Panini also argues that its alleged litigation threats cannot form a proper basis for Fanatics' tortious interference claims due to the Noerr-Pennington doctrine, which immunizes from liability "efforts to influence governmental action through litigation and lobbying." Singh v. NYCTL 2009-A Tr., 683 F. App'x 76, 77 (2d Cir. 2017) (summary order). This doctrine initially protects "concerted actions before courts and administrative agencies" and has been extended to "encompass concerted efforts incident to litigation, such as pre-litigation threat letters and settlement offers." Primetime 24 Joint Venture v. Nat'l Broad., Co., 219 F.3d 92, 100 (2d Cir. 2000) (internal citations omitted). Noerr-Pennington does not, however, protect "sham" litigation, where the litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Singh, 683 F. App'x at 78.

      The Noerr-Pennington doctrine provides an affirmative defense that may only be used to dismiss a claim at the pleading stage when it is clearly applicable from the face of the

---

[5]    Panini also argues that the litigation threats cannot support a tortious interference claim because Panini was acting in its normal economic interest. (Def. Mem. at 19-20.) See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) ("When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown." (emphasis added)). This argument overlooks allegations in Fanatics' Amended Complaint allege that Panini had no business need for these employees (AC ¶ 137), which support a plausible inference that the wrongful interference was not in Panini's "normal economic self-interest." Thus, it is not obvious on the face of the Amended Complaint that Panini will be able to invoke the "economic interest" defense successfully, and the claim cannot be dismissed on that basis at the pleading stage. See Ithaca Cap. Inv. I S.A. v. Trump Panama Hotel Mgmt. LLC, 450 F. Supp. 3d 358, 372-73 (S.D.N.Y. 2020) ("[T]he economic interest justification is an affirmative defense to a tortious interference claim . . . [that can only be considered on a motion to dismiss if] the facts necessary to establish the defense are evident on the face of the complaint[.]").

complaint.  360 Mort. Grp., LLC v. Fortress Inv. Grp. LLC, No. 19-CV-8760-LGS, 2020 WL

5259283, at *4 (S.D.N.Y. Sept. 3, 2020) (citing Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d

406, 425-26 (2d Cir. 2008)).  Although Panini argues that the Texas Action demonstrates the

merit of the threatened litigation (Def. Mem. at 22), as discussed above, the Court is unpersuaded

that the consent preliminary injunction in a factually distinct lawsuit necessarily demonstrates the

merit of the threats underlying Fanatics' claim.  Fanatics alleges that Panini knew it had no

meritorious basis to sue at-will employees for accepting employment in the absence of non-

competes and made the threats solely to intimidate those employees.  (AC ¶¶ 102, 105, 135-38.)

These allegations are sufficient to withstand the Noerr-Pennington affirmative defense at the

pleading stage.

Causation

Panini also argues that Fanatics has insufficiently alleged that Panini's threats

actually caused the loss of any business opportunities.  (Def. Mem. at 20-21.)  To satisfy this

element of Fanatics' tortious interference claim, it must be "reasonable to infer" from the

allegations that the Defendants' wrongful actions caused the lost opportunity.  See Ritani, LLC v.

Aghjayan, 880 F. Supp. 2d 425, 451-52 (S.D.N.Y. 2012).  Fanatics must plead "the basis on

which it claims the 'relationship' and the expectation it would yield future business."  Id. at 451.

Fanatics alleges that it generally lost business opportunities with some of Panini's employees, as

evidenced by the "stark drop-off" of employees who came to Fanatics following Panini's

litigation threats.  (Pl. Mem. at 17-18.)  Although Fanatics cannot, at this stage, identify which

specific employees were "scared off" by Panini's threats, Fanatics persuasively argues that "[i]t

would be unreasonable to require more specific pleadings prior to discovery."  Leadsinger, Inc.

v. Cole, No. 05-CV-5605-HBP, 2006 WL 2320544, at *13 (S.D.N.Y. Aug. 10, 2006).  The Court agrees.

   While Plaintiff lacks access, at this stage, to the information necessary to prove which specific employees were influenced by Panini's alleged threats, Fanatics has identified the targeted group of individuals with whom Fanatics had the opportunity and sought to form business relationships (the remaining Panini employees), an allegedly wrongful act committed by Panini targeting that group (the threats of litigation), and a resulting change in Fanatics' ability to recruit those employees, as evidenced by the "stark drop-off" in new hires.  (AC ¶¶ 135-40.)  The Court finds these allegations sufficient to support a plausible inference, at the pleading stage, that Panini's wrongful interference cost Fanatics those business opportunities.  A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 217 (S.D.N.Y. 2015) ("[T]o state a claim for intentional interference with prospective economic advantage, a plaintiff need only identify interference with a specific business relationship"); Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) (finding a plausible claim where plaintiff alleged that the defendants' wrongful actions pressured distributors to refuse to contract with plaintiff, against their "clear[]" self-interest, without requiring "more specific pleadings" of a particular contract plaintiff would have formed "but for" defendants' interference).

   Therefore, the Court finds that Fanatics has stated a claim for tortious interference with prospective business relations.  Panini's motion to dismiss is accordingly denied as to Count II.

Consolidation

Defendant seeks, in the alternative, to consolidate all remaining claims in this action with the related action before this Court, Panini Am. v. Fanatics, Inc., No. 23-CV-9714-LTS (filed Aug. 3, 2023) (the "Antitrust Action").  Plaintiff opposes this aspect of the motion and instead requests the coordination of discovery between the two actions.  (Pl. Mem. at 23-25.)

Under Rule 42(a) of the Federal Rules of Civil Procedure, the Court has broad discretion to determine when it is appropriate to consolidate separate actions involving a common question of law or fact.  Fed R. Civ. P. 42(a); see also Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990).  The Court must "balance the interest of judicial convenience against any delay, confusion, or prejudice that might result from such confusion."  Sheet Metal Contractors Ass'n. of N. N.J. v. Sheet Metal Workers Int'l, 978 F. Supp. 529, 531 (S.D.N.Y. 1997).  The factors to consider include: whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues; the burden multiple lawsuits would impose on parties, witnesses, and available judicial resources; the length of time required to conclude multiple suits versus a single one; and the relative expense to all concerned of the single-trial and multiple-trial alternatives.  Johnson, 899 F.2d at 1285.  "At all times, the burden remains with the moving party to convince the court that consolidation is appropriate."  Internet L. Libr., Inc. v. Southridge Cap. Mgmt. LLC, 208 F.R.D. 59, 61 (S.D.N.Y. 2002).

The Court finds that Panini has not met this burden.  At this stage, the sole viable claim Fanatics asserts is Panini's allegedly tortious interference with business relations during Fanatics' attempts to recruit various Panini employees during the spring of 2023.  While the factual background of that claim overlaps with some of the subject matter and time frame of

Panini's claims in the Antitrust Action, the claims arise from a separate nucleus of core events.

Additionally, the litigation of Fanatics' sole surviving claim will most likely be significantly less

time consuming and resource intensive compared to the Antitrust Action, which asserts a slew of

claims arising from the Sherman Act, Clayton Act, and various common law torts. This disparity

weighs against consolidation. Finally, although the events giving rise to Fanatics' claim and the

events underlying the Antitrust Action have certain commonalities, it appears at this point that

the overlapping factual issues would increase the risk of confusion and prejudice if the two cases

were to be consolidated into a single trial. See, e.g., KGK Jewelry LLC v. ESDNetwork, No. 11-

CV-9236-LTS, 2014 WL 7333291, at *3 (S.D.N.Y. Dec. 24, 2014) (denying consolidation in

part because the first action was significantly more "streamlined," while the second action

involved numerous, unrelated claims which might cause prejudice if consolidated into one trial).

   The Court finds that coordination of discovery and other appropriate pretrial

matters between these related cases will be sufficient to ensure efficient case management at this

stage. See D'Amico v. Waste Mgmt. of N.Y., LLC, No. 18-CV-6080-EAW-MJP, 2019 WL

6648982, at *3 (W.D.N.Y. Dec. 6, 2019) (finding "informal consolidation" to be beneficial and

formal consolidation to be inappropriate where one action involved much more extensive

discovery and thus risked delaying the more streamlined action, "despite the fact that there may

be an overlapping legal claim and factual allegations" between the two actions). Therefore,

Panini's request for consolidation is denied without prejudice to renewal at a later stage of the

proceedings in these cases.

Leave to Amend

   Rule 15(a) provides that a court "should freely give leave [to amend] when justice

so requires."  Fed. R. Civ. P. 15(a)(2).  There is a particularly strong preference for allowing

amendment when "the plaintiff has not had the benefit of a court ruling with respect to the

deficiencies of its pleading."  Allianz Glob. Invs. GmbH v. Bank of Am. Corp., 473 F. Supp. 3d

361, 365 (S.D.N.Y. 2020); see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC,

797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see

the necessity of amendment or be in a position to weigh the practicality and possible means of

curing specific deficiencies.").  Therefore, Plaintiff may file a motion for leave to amend its

deficient Unfair Competition and Breach of the Obligation to Negotiate in Good Faith claims,

Counts I and III of the Amended Complaint.  Any such motion must comply with all applicable

federal, local and individual rules of practice.  Should Plaintiff fail to file such a motion within

**21 days** of the entry of this Memorandum Order, Plaintiff's deficient claims will be dismissed

with prejudice and without further advance notice.

CONCLUSION

   For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint

is granted with respect to Counts I and III and denied in all other respects.  Plaintiff may file a

motion for leave to file a Second Amended Complaint regarding any deficient claims within **21**

**days from the date of this Memorandum Order**.  Any such motion must comply with the

procedures outlined above.  Defendant's request to consolidate the case with Panini v. Fanatics,

No. 23-CV-9714, is denied without prejudice to renewal.

This Memorandum Order resolves docket entry no. 46.  This case remains referred to Magistrate Judge Figueredo for general pretrial management.

SO ORDERED.

Dated: New York, New York
March 10, 2025

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge