**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FANATICS COLLECTIBLES TOPCO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PANINI S.P.A.,<br><br>Defendant. | **Case No. 1:23-cv-06895**<br><br><u>**SECOND AMENDED COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Fanatics Collectibles Topco, Inc. (hereinafter, "Plaintiff" or "Fanatics Collectibles," and collectively with its affiliates, "Fanatics"), through its undersigned attorneys, brings this amended complaint against Defendant Panini S.p.A. (hereinafter, "Panini") seeking damages and other appropriate relief in this forum, pursuant to a governing forum-selection clause, in order to remedy Panini's tortious interference with contractual business relations and tortious interference with prospective business relations.

**INTRODUCTION**

1. This case highlights the stark contrast between two competitors in the sports and entertainment collectibles industry: it pits Fanatics Collectibles, the innovative disruptor, against Panini, the stagnant, long-time incumbent with the antiquated business model. Fanatics Collectibles is revitalizing the sports and entertainment collectibles industry by introducing innovations and quality enhancements that have resonated with athletes, players' associations, sports leagues, teams, and collectors. Its commitment to reinvesting in the industry has proved to be a winning strategy with these key stakeholders, significantly benefiting collectors and consumers. Indeed, since the inception of this litigation, the industry has grown substantially due

to Fanatics Collectibles' investments and innovations. Shaking up long-established industry norms, Fanatics Collectibles has dramatically reduced reliance on redemption cards, created innovative, one-of-a-kind collectibles such as MLB Rookie Debut Auto Patch Cards (which it has since extended to other sports), invested in a card manufacturer to enhance production quality across the board, and revitalized interest in the hobby by partnering with hobby shop owners, card breakers, and athletes to create unique marketing events and experiences for collectors. On the other hand, Panini has become more and more complacent, failing to invest in marketing or innovation, ignoring its end-user customers and the hobby shops, and delivering unacceptable products to collectors, as it funnels hundreds of millions of United States dollars in profits back to a few individuals in Italy who own the company while, at the same time, openly—and unsuccessfully—trying to sell its business for nearly a decade. As certain of Panini's licensing deals neared expiration, those licensors unsurprisingly chose Fanatics Collectibles as their new licensee that would commit long-term to the business, quite different from Panini's strategy of non-investment and siphoning cash to its headquarters overseas. Instead of fighting back on the merits, Panini sought to cause delay in Fanatics Collectibles' successful entry by misleading Fanatics Collectibles into pursuing a deal with Panini through massively falsified earnings projections, interfering with Fanatics Collectibles' ability to hire at-will employees, and ultimately suing Fanatics for engaging in the same sort of licensing arrangements that Panini itself had capitalized on for more than a decade. This case is about Panini's protracted campaign to squeeze the last dollars from its U.S. business by trying to stifle Fanatics Collectibles' hard-earned success through a campaign of tortious, unfair, and unlawful actions.

2.      Over the last two decades, Fanatics has continued to innovate in licensed fan gear. With a world-class organization, the company is best-known for cutting edge e-commerce, as well

2

as designing, manufacturing, and selling officially licensed sports fan gear, jerseys, headwear, and other sports merchandise.  During that time, Fanatics has become a fan favorite and trusted partner of athletes, players' associations, sports leagues, and teams thanks to a vision and business model that emphasize integrity, authenticity, quality, innovation, and customer satisfaction.  Fanatics' established relationships with leagues and players' associations through its sports merchandise business provided a strong platform for Fanatics to help launch its successful collectibles business. Thus, it was no surprise that in 2021, certain professional players' associations and sports leagues decided to exercise their right to license their intellectual property to Fanatics for collectible trading cards.

3.      Like a sprinter benefiting from a head start, Panini had a sizable lead as the incumbent.  Prior to Fanatics Collectibles' entry, and for the last 16 years, Panini held exclusive licenses for sports and entertainment collectible cards in the U.S. and around the world pursuant to long-term license agreements—and Panini has long touted itself, even today, as a "global entity … [whose] products are sold everywhere around the world"[1] and the "world's largest sports and entertainment collectibles company and … world leader"[2] as a result.  In spite of these long-term exclusive privileges with the players' associations and leagues, however, Panini chose to sit on its rights and maintain the lackluster status quo.  Instead of innovating and investing in growing the collectible cards business, Panini elected to funnel as much of its profits as possible to its owners. That choice to send profits overseas instead of investing in its business yielded a track record of

---

[1]   Layten Praytor, *Behind The Deal: Why Dallas-Based Panini America Partnered With LIV Golf*, D MAGAZINE (Mar. 8, 2024), https://x.com/Jayhayyy7/status/1896030089084878871.

[2]   *Shedeur Sanders Signs Exclusive Autograph Trading Card Deal With Panini America*, PANINI AMERICA BLOG (Apr. 9, 2025), https://blog.paniniamerica.net/shedeur-sanders-signs-exclusive-autograph-trading-card-deal-with-panini-america.

dismal customer service, quality control issues, shoddy product offerings, massive numbers of outstanding redemption cards, and missed opportunities to grow revenues (which could in turn be shared with the players' associations and leagues) through secondary sales and by capitalizing on new phenomena such as "card breaking" (also known as "breaking")—where card packs are opened live online, generating interactive and suspense-driven experiences for viewers as the cards are revealed.

4.      Despite Panini's substantial head start, Panini failed to innovate its business. Consequently, Fanatics Collectibles—utilizing the success of its other business relationships with players' associations and leagues, and building upon its track-record as a proven partner to the licensors with the ability to deliver quality, innovation, and customer satisfaction—overcame the gap by sharing an obviously superior vision, investment, and business model for the future of sports and entertainment collectibles.  That juxtaposed with Panini's embarrassing track record of dismal customer service, heavy reliance on the use of redemption cards (enormous amounts of which remain unfulfilled), egregious quality control issues, shoddy product offerings, and pervasive underinvestment—all while Panini put itself up for sale throughout much of the last decade.

5.      Panini's mismanagement of its privileged position as exclusive licensee betrayed a lack of vision and a neglect of its obligations to both licensors and customers.  Its licensors suffered from lost opportunities as Panini failed to devote remotely adequate resources to marketing, innovation, and customer service.  Nor did Panini anticipate or participate in, much less allow its licensors to profit from, industry trends such as the explosion of secondary markets for trading cards or the incredibly popular practice of card breaking.  Panini's owners' pursuit of short-term profits, underscored by its corner cutting, has also left collectors thoroughly dissatisfied.  Panini

has long failed to staff an adequate support team to field the flood of customer complaints it receives, resulting in a 95% customer abandonment rate and leaving Panini with an "F" rating from the Better Business Bureau in 2023.

6.    Given these differences in track record and vision, it is no surprise that many players' associations and leagues (represented by negotiators who are highly experienced and knowledgeable) have embraced Fanatics Collectibles to usher in the next generation of trading cards.  Over the course of the next year, several players' associations and leagues will begin licensing their intellectual property to Fanatics Collectibles for a multi-year period.  And Panini well understands the procompetitive benefits of its own multi-year exclusive agreements with the players' associations and leagues, having repeatedly trumpeted those benefits:

- Mark Warsop, Panini CEO: "Strategically, if you're in a non-exclusive environment you're more reluctant to invest in new brands and new technologies because you have a certain number of releases and you have to put your best feet forward. ...  Whereas, when you have an exclusive, you can try new things.  You can take risks to grow the hobby in a way you wouldn't be able to do with a non-exclusive."  Mark Warsop has also explained that when there were more licensees for a particular product, "there was a lot of confusion and way too many products."

- D.J. Kazmierczak, Panini SVP of Operations: "One of the key benefits [of the exclusive is that it] allows us to make the right numbers and types of release for the [sic] every channel, something that would have been more challenging to do in the past."

7.    Beyond maximizing royalties for licensors, Fanatics Collectibles' model promises to afford marketing tools and vehicles for fan engagement so as to drive the overall popularity of the players and leagues.

8.    Panini's complacent leadership was content to perpetuate the status quo—poor marketing, nonresponsive customer service, pervasive underinvestment in product quality, and an overreliance on (and lack of fulfillment of) redemption cards.

9.    Fanatics Collectibles, by contrast, was eager to push the industry to new heights by tapping into new revenue streams and business lines, developing innovative products to enhance fan engagement, expanding royalty payments for business partners, and generally investing in the long-term health and success of the industry.  Put simply, when faced with a choice between (a) continuing in an exclusive relationship with a company that was not investing in its business and was attempting to cash out through a sale (Panini) or (b) moving those exclusive relationships to a known and trusted partner and innovator that offered better deal terms, is in it for the long haul, and was willing to invest in growing the collectible cards business (Fanatics Collectibles), the licensors chose Fanatics Collectibles.  That's a decision that's all too easy to understand—but apparently far too difficult for Panini to swallow.

10.    Having lost a number of major licenses, Panini embarked on a protracted, unlawful, and deceitful campaign of unfair trade practices, strong-arm tactics, and tortious misconduct to hamper Fanatics Collectibles' nascent business, in the hopes that it could force Fanatics Collectibles to pay an extortionate amount for Panini to terminate its licenses early, even though early termination would inure to the benefit of collectors and licensing partners—and Panini—alike.  Desperate to sabotage Fanatics Collectibles' progress, or at least slow it down considerably, Panini first stooped to providing massively falsified earnings projections, relying on two sets of

books (the falsified set shared with Fanatics Collectibles and the internal set kept secret) to bait Fanatics Collectibles into continuing sham talks of early terminating Panini's licenses, impeding Fanatics Collectibles' business plans to work with players' associations and individual athletes to grow the sports and entertainment collectible cards category. Panini then capitalized on its deception by securing its own exclusive deals with those same athletes.

11. Next, Panini began targeting star college athletes who had already signed exclusive deals with Fanatics Collectibles in a deliberate and unlawful attempt to induce these athletes to breach their contracts with Fanatics Collectibles and enter new contracts with Panini. As a result of Panini's actions, Fanatics Collectibles was forced to choose between risking harm to its athlete relationships or altering the already agreed-upon terms of its exclusive contracts. Valuing its relationships with athletes, Fanatics Collectibles took costly steps to preserve its signed and existing deals, including by agreeing to amend the previously agreed-upon terms and pay higher amounts.

12. Panini additionally elected to begin a campaign of harassment in the courts, bringing suits against at-will former employees, who did not have non-compete restrictions, after they followed the industry currents and decided to join Fanatics Collectibles. And it threatened others who considered following their lead.

13. Specifically, in June 2022, Fanatics and Panini preliminarily agreed (subject to licensors' approval) that Panini would terminate certain of its licenses early, initially with a target effective date of July 31, 2022, thereby allowing Fanatics Collectibles to accelerate the start date of the licenses it had already been awarded. In return, Fanatics would pay Panini an early termination fee based on Panini's projected earnings (Panini used false projections to fraudulently increase the termination fee) for the remaining years of the licenses.

14.    Over the course of the ensuing eight-plus months, however, Panini dragged out the early termination negotiations in bad faith by slow-walking negotiations for several months and ultimately trying to pass off knowingly inflated earnings projections that translated to an unreasonably high early termination fee.

15.    Because of Panini's deceit, Fanatics Collectibles lost valuable opportunities, devoted substantial internal resources, and spent tens of millions of dollars paying lawyers, accountants, and other professionals for their advice, negotiation, preparation, and diligence related to the transaction.  Those funds and focus were spent in good faith and otherwise could have fueled opportunities to even further promote the intellectual property of its business partners and build its business overall.  All the while, Panini knew early termination would never happen because Panini would never be willing to agree to a termination fee that matched its own accurate, real-world earnings projections.

16.    In fact, Fanatics Collectibles eventually learned through private discussions with the CEO of Panini America, Mark Warsop, that Panini had two sets of books and was itself relying on a different, materially lower set of accurate, updated figures for its own internal use while still feeding Fanatics Collectibles the pumped-up projections to string the negotiations along.  In the end, Panini's purported moves towards reaching agreement on early termination were a series of head-fakes—an unfair tactic and a bid to advance its position through subterfuge rather than good old-fashioned competition.

17.    Confirming its bad faith, Panini would go on to paint (in retaliatory litigation) the exact circumstance that it had been coaxing Fanatics Collectibles to pay vast sums of money to achieve—early terminations enabling Fanatics Collectibles to step into parallel licensing as soon as the deal closed—as a flagrant antitrust violation.  That is, Fanatics Collectibles was being

8

induced by Panini to pay Panini a fortune for the prize of Fanatics Collectibles walking into what Panini now (disingenuously) portrays as massive alleged antitrust liability.  In precious few cases has a Defendant telegraphed its bad faith and ill intent the way that Panini has here.

18.     After license-termination negotiations with Fanatics Collectibles ended, Panini again shifted gears and escalated its campaign to slow down Fanatics Collectibles' success, first by approaching athletes under contract with Fanatics Collectibles and attempting to induce those athletes to break their contracts with Fanatics Collectibles and enter into new contracts with Panini. Specifically, Panini offered to help these athletes "get out" of their existing contracts with Fanatics Collectibles, making clear its knowledge of the existence of contracts between the athletes and Fanatics, and demonstrating Panini's deliberate and bad-faith intent.  Panini's flagrant interference with Fanatics Collectibles' valid and enforceable contracts—which cost Fanatics Collectibles by forcing it to amend the already-agreed upon terms and pay higher amounts—is just another installment in Panini's unceasing campaign to sabotage Fanatics Collectibles' superior business and execution.

19.     At the same time, Panini brought litigation in Texas against Fanatics and a group of former at-will employees, some of whom previously had been told by Warsop that they likely would be given the opportunity to work for Fanatics after the transaction closed and who were excited about the prospect of joining Fanatics Collectibles and its meteoric success.  Once the transaction was terminated, many of those same employees—knowing both that certain of Panini's licenses would soon be coming to an end and that Fanatics had secured licenses from a number of the leagues and players' associations and would soon be producing licensed sports cards—had the legitimate right to seek out better opportunities, longer-term prospects, and a more modern, inclusive workforce at Fanatics Collectibles.

20.     In further misconduct, Panini also threatened litigation against other of its employees and thereby dissuaded them from leaving Panini for Fanatics Collectibles as they otherwise expressed a desire to do.  Those former employees who had the courage to depart Panini recall the emotional turmoil, failures of transparency, and bleak trajectory that led to their interest in a brighter future at Fanatics Collectibles.  Panini's policies and workforce composition also contributed to its business decline and the willingness of its employees to join Fanatics Collectibles.  In the end, Panini prevented further employee departures by threatening litigation.

21.     Four years ago, Panini took the remarkable step of removing the express (albeit hollow) commitment to diversity to which it had previously paid lip service on its website.  Alarmingly, Panini also removed race as a protected class from its code of conduct.  Panini's racially insensitive practices have drawn the attention of social activists, who have blasted the company for having "no Black leadership in the United States" despite employing "hundreds of employees in the United States" and deriving "75% of its business from selling depictions of Black and Brown athletes."[3]  And more recently, four former Panini employees filed workplace discrimination suits against Panini.[4]  These lawsuits, especially when viewed together, paint a troubling picture of systematic racial discrimination within the Panini organization, where non-Caucasian employees were allegedly subjected to racist verbal remarks, denied advancement opportunities based on their race, and even segregated from Caucasian coworkers.  Panini reportedly placed employees of color in "storage rooms," while their Caucasian coworkers worked

---

[3]  Letter from Tamika D. Mallory and Rev. Michael McBride to Mark Warsop, *Re: Panini America Inc.'s ("Panini") Lack of Diversity In Its Executive Leadership* (May 15, 2023), https://thesource.com/wp-content/uploads/2023/05/Letter-to-Panini-America2-002.pdf.

[4]  *Dulce Huerta v. Panini America, Inc.*, No. 3:23-cv-02529-K (N.D. Tex., Nov. 15, 2023); *Nora Vargas v. Panini America, Inc.*, No. 3:23-cv-02689-B (N.D. Tex., Dec. 6, 2023); *La Shanda Woods v. Panini America, Inc.*, No. 3:23-cv-02690-X (N.D. Tex., Dec. 6, 2023); *Derrick Pickett v. Panini America, Inc.*, No. 3:23-cv-02691-N (N.D. Tex., Dec. 6, 2023).

10

in conventional office spaces. Rather than facing reality and reckoning with its internal problems, Panini has instead waged war in court against several of the employees who left Panini for Fanatics Collectibles, while simultaneously and explicitly threatening their colleagues with similar litigation if they too depart—all in an effort to prevent those workers from seeking out more fulfilling employment and a brighter future, including at Fanatics Collectibles.

22.     Panini's unfair tactics do not stop there. In August 2023, Panini (through its American subsidiary) filed a baseless and incoherent antitrust lawsuit against Fanatics. Not only is the lawsuit littered with factual inaccuracies, but Panini's own licensing practices and experience as the longstanding incumbent presiding over multiple, overlapping exclusive licenses with players' associations and leagues give the lie to any allegations that such licensing arrangements now make Panini an antitrust victim. Long before Fanatics entered the sports and entertainment collectibles space, Panini proclaimed its goal of becoming "fully licensed in every [U.S.] sport." Now that Panini's future in U.S. sports is changing, due to its own complacency and the existence of a fierce competitor, Panini brazenly argues that the very same goal it once aspired to is now, somehow, illegal. What is more, Panini is now pillorying Fanatics Collectibles for the very state of affairs that Panini previously sought to facilitate (purportedly in good faith). If prior contract negotiations between the parties had reached their supposed objective, Panini would have readily allowed Fanatics Collectibles to assume the exclusive licenses currently held by Panini (for a massively inflated fee based on falsified projections). But the antitrust laws protect consumers, not entrenched incumbents like Panini who wish to avoid competition from new, innovative entrants like Fanatics Collectibles.

23.     Panini built its "world leading sports and entertainment collectibles business" through a series of long-term exclusive contracts—contracts that the players' associations and

leagues believed were in their best interests at the time. But times have changed, and those players' associations and leagues no longer feel the same way about Panini.

24. It is hypocritical for Panini now to suggest that there was a violation of the antitrust laws arising out of the decision by the players' associations and leagues to choose to enter into exclusive licenses of their intellectual property with Fanatics Collectibles, as opposed to Panini. Panini has stated publicly that it chose not to sue the leagues and players' associations because they "remain partners" of Panini.[5] Yet Panini has filed a lawsuit directly challenging those licensors' independent, informed decision as to how to license their intellectual property. Panini's lawsuit has since fomented a copycat class action lawsuit purportedly brought by consumers that is in reality a mirror image of Panini's lawsuit.

25. Panini's strategy is an admission of its ineptitude: rather than elevating the collector experience, granting licensors access to downstream opportunities, or improving the broader industry, Panini is trying to undermine its upstart competitor through unfair and unlawful tactics so that it may continue to treat its American subsidiary as an ATM serving its private owners abroad. But Fanatics Collectibles will not be bullied.

26. Fanatics Collectibles has nothing to fear from the baseless litigation that Panini has brought, as Fanatics Collectibles has done nothing other than outcompete Panini by convincing athletes, players' associations, and leagues that Fanatics Collectibles will maximize the value of their intellectual property in the future. That is called competition—and it is what the antitrust laws promote and protect. All Fanatics Collectibles has ever wanted is to fairly compete in the industry, where all stakeholders will benefit from seeing both parties commit themselves, as

---

[5] Jordyn Holman & Ken Belson, *Will Fanatics Upend the World of Sports Collectibles?*, NY TIMES (Jan. 26, 2024), https://www.nytimes.com/2024/01/26/business/fanatics-sports-memorabilia.html.

Fanatics Collectibles so clearly has, to delivering products and services that promise improved experiences for consumers worldwide. But Fanatics Collectibles must put a stop to Panini's bad-faith acts and unrelenting campaign to hobble a new, innovative competitor. These parties should ultimately be judged on the merits of what they are each offering to licensors and customers alike. By that most important measure, Fanatics Collectibles has proved to be the company that is rightly poised to bring much-needed innovation to the marketplace in the coming years.

## THE PARTIES

27.     Plaintiff Fanatics Collectibles is a Delaware corporation with its principal place of business in New York, NY. Fanatics Collectibles is a subsidiary of Fanatics Holdings, Inc., alongside Fanatics Commerce Holdco, Inc. ("Fanatics Commerce") and other related entities operating different business units. Fanatics Holdings, Inc. and its subsidiaries are collectively referred to as "Fanatics." Fanatics has developed its brand as a leader in selling and producing licensed sports merchandise. For over 15 years, Fanatics has operated the official e-commerce sites for certain sports leagues in the United States, including the NFL, MLB, NBA, and NHL, along with many professional and collegiate teams. It has invested deeply in technology and marketing to better serve sports fans and its business partners and has significantly increased e-commerce sales. Thanks to Fanatics' track record of success with its partners, Fanatics has consistently expanded its rights, including the right to produce a broad range of apparel such as jerseys, championship products, and most recently collectible products including trading cards. Fanatics has also partnered with major entertainment companies, including World Wrestling Entertainment, Inc. ("WWE"). Fanatics sells licensed consumer products for these companies on its website, along with products related to music, pop culture, and other segments of the entertainment industry.

13

28.    Defendant Panini S.p.A. ("Panini") is an Italian corporation with its principal place of business in Modena, Italy.  It describes itself as the "world's largest sports and entertainment collectibles company."[6]  Based in Italy, Panini produces books, stickers, trading cards, and other consumer sports products through its collectible and publishing subsidiaries across the globe.[7] Panini dominates sales of soccer stickers across the European Union and has long enjoyed the right to produce soccer stickers exclusively and trading cards for major soccer national federations and leagues.[8]  Panini's partnership with FIFA dates back more than 50 years.[9]  It owns manufacturing facilities in Italy and Brazil, where it manufactures its soccer stickers and other sports merchandise. Upon information and belief, Panini produces and markets well over 90% of the soccer stickers sold across the globe.

29.    Prior to his passing on April 21, 2025, Aldo Sallustro and his partners Anna and Teresa Baroni were, upon information and belief, the 100% owners of Panini.

30.    Non-party Panini America, Inc. ("Panini America") is a Delaware corporation with its principal place of business in Irving, Texas.  Panini America is a subsidiary of Panini S.p.A. Panini America holds licenses with athletes, players' associations, sports leagues, entertainment companies, and other entities, and otherwise operates Panini's U.S. business.

---

[6]   @paniniamerica, PANINI, https://www.instagram.com/paniniamerica/?hl=en (last visited Apr. 30, 2025).

[7]   PANINI, https://www.paninigroup.com/en/us/about-us (last visited Apr. 30, 2025).

[8]        *Brand collaborations*, FIFA (May 8, 2015), https://web.archive.org/web/20150508222147/http://www.fifa.com/about-fifa/marketing/licensing/brand-collaborations.html; Greg Lansdowne, *Peter Warsop on Panini EPL deal (Full Interview)*, CARDZREVIEW.COM (Oct. 9, 2018), https://www.cardzreview.com/peter-warsop-panini-epl-interview/.

[9]  *FIFA and Panini continue historic partnership to inspire football fans across generations*, FIFA (Dec. 14, 2023), https://www.fifa.com/fifaplus/en/tournaments/mens/worldcup/canadamexicousa2026/articles/fifa-panini-continue-historic-partnership-to-inspire-football-fans.

31.    Non-party Mark Warsop is the current CEO of Panini America.  Warsop has been CEO of Panini America since 2009 and previously served as Panini's marketing director.  Before joining Panini, Warsop was a marketing manager at Topps Europe, a subsidiary of the Topps Company, Inc. ("Topps").

## JURISDICTION AND VENUE

32.    The Court has subject matter jurisdiction over all claims under 28 U.S.C. § 1332, as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

33.    This Court may exercise personal jurisdiction over Panini pursuant to N.Y. C.P.L.R. § 302(a) because Panini has transacted business within the State of New York and has purposefully availed itself of the privilege of doing business in the State, including by selling soccer stickers, sports and entertainment trading cards, and other products within New York state; soliciting sales of the same products and other business within New York state; and deriving substantial revenue from these sales and other business activities conducted in New York state.  In addition, Panini is subject to personal jurisdiction in New York because it committed an array of tortious conduct aimed at Fanatics Collectibles—a New York-based company that felt the effects of this conduct in New York.  This conduct includes making material misrepresentations of fact to Fanatics Collectibles; intentionally stringing Fanatics Collectibles along in dead-end negotiations for Panini to terminate certain of its licenses early (some of which negotiations occurred in New York); tortiously preventing Fanatics Collectibles from securing licenses with NFL and NBA prospects, and the NBPA; tortiously interfering with Fanatics Collectibles' existing contracts by

attempting to induce breach; and tortiously preventing Fanatics Collectibles from hiring qualified employees.[10]

34.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, as set forth in the previous paragraph and elsewhere in this Complaint.  Venue is further proper—and indeed, required—under a mutual non-disclosure agreement ("NDA") that Fanatics and Panini entered into on April 12, 2022, in connection with their negotiation of a potential early termination of certain of Panini's licenses.

35.    The NDA provides, in relevant part:

> Any court action or proceeding arising out of or relating to the subject matter of this Agreement shall be brought only in the federal or state courts located in the borough of Manhattan, New York. Each Party agrees and submits to the exclusive jurisdiction of these courts for any such action or proceeding and each Party agrees not to commence any such action or proceeding in any other court or forum. Each Party further acknowledges and agrees that the federal or state courts located in the borough of Manhattan, New York, are and would be convenient forums and irrevocably and unconditionally waives any objection to the laying of venue of an action or proceeding in such courts, and, further, irrevocably and unconditionally waives, and agrees not to plead or claim in any such court, that the action or proceeding has been brought in an inconvenient forum or should be transferred.

36.    In addition, the term sheet between Fanatics and Panini for early license terminations correspondingly provided for "[e]xclusive venue with the federal or state courts in Manhattan, New York," thereby confirming that both parties viewed New York as the proper forum for any disputes arising from the termination negotiations that are specifically at issue in this action.

---

[10]  For all purposes relevant to personal jurisdiction, executives of Panini America and Panini S.p.A. operate in tandem and make decisions together, and Panini America is 100% owned and controlled by Panini S.p.A. Accordingly, Fanatics treats Panini America as an arm of Panini for purposes of personal jurisdiction.

37.     Because this action arises from the negotiations and business relationship reflected in the NDA and term sheet, the instant action belongs before a New York court.

## FACTS

### A.     Sports & Entertainment Collectibles

38.     The sports and entertainment collectibles industry generates tens of billions of dollars in annual sales of memorabilia from areas such as sports, entertainment, music, television, and film; items from collectible trading card games (*e.g.*, Pokémon, Magic: The Gathering); merchandise from diverse entertainment franchises (such as Disney trading pins and Marvel action figures); game-worn sports jerseys, shoes, gear, equipment, and other memorabilia; and a variety of miscellaneous items such as ticket stubs and bobbleheads.  Collectibles vary from autographs and trading cards to action figures, pins, limited-edition trading game collectibles, and entertainment collectibles such as movie props and television posters.

39.     Trading cards, one type of collectible product, are typically made of paperboard or other thick paper.  Trading cards feature a range of subjects including athletes, cartoons, and characters from television, films, comic books, or the trading game itself.  Key players in the sports trading card segment of the sports and entertainment collectibles industry include Fanatics Collectibles and Panini, as well as Upper Deck and Leaf.  Before creating and selling a trading card featuring intellectual property like team logos or player images, the card creator must obtain the legal right to use the intellectual property from the owners.  For sports trading cards in the U.S., relevant intellectual property is owned by sports leagues or organizations (*e.g.*, the NFL, NBA, WNBA, MLB, NHL, FIFA, UEFA, UFC, NASCAR, colleges, etc.), and players' associations or individual athletes.  Examples of players' associations include the NFLPA, NBPA, MLBPA,

NHLPA, and others.    Collectively, the athletes, players' associations, leagues, and other organizations that license intellectual property for sports cards are referred to as "licensors."

40.    Additionally, subject to certain restrictions and limitations, companies can now reach deals with thousands of individual college athletes before they join a professional players' association.  For many years, NCAA rules prohibited college athletes from receiving compensation from third parties for use of their name, image, and likeness ("NIL") rights.  These rules barred college athletes from being paid "to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind."  Those rules changed in 2021 with the enactment of various state laws allowing college athletes to monetize their NIL rights.  As a result, college athletes (as well as high-school athletes[11]) can now earn money from their social media presence, autographs, and trading cards.[12]  For the top college (and even high-school) athletes, their NIL rights can be valuable; overnight, college athletes earned the right to monetize their rights.  Likewise, the opportunity for card creators to sign these college athletes grew dramatically.  Separately, companies can also reach deals with and produce cards featuring retired players, who fall outside the group license.

41.    The players' associations and leagues that license rights for professional-level sports trading cards are run by experienced and knowledgeable executives.  Licensing decisions involve careful consideration and planning to ensure a successful long-term partnership.  Subject to extensive negotiations and deliberations (including input from owners and players), licenses are

---

[11]  Gena Terranova, *Panini America Signs Tre Johnson To Exclusive Multi-Year Agreement*, THE KNIGHT'S LANCE (June 27, 2023), https://blog.paniniamerica.net/panini-america-signs-tre-johnson-to-exclusive-multi-year-agreement.

[12]   Alan Blinder, *College Athletes May Earn Money From Their Fame, N.C.A.A. Rules*, N. Y. TIMES (June 30, 2021, updated Sept. 29, 2021), https://www.nytimes.com/2021/06/30/sports/ncaabasketball/ncaa-nil-rules.html.

often awarded several years in advance, giving licensees time to build out the necessary logistics for production and distribution. Licensors have complete control over the process for awarding licenses. The licensors recognize that trading cards can contribute materially to the expansion of a sport's or athlete's popularity by acting as marketing tools and driving fan engagement. Professional sports intellectual property is valuable, and often licensed on a long-term basis, whether to sports trading card creators, merchandisers, sponsors, or media partners. Through long-term licenses, licensees are given the opportunity and incentivized to invest heavily—including in manufacturing, marketing, logistics, infrastructure, customer relations, and more—all to support the long-term growth of the brand for the shared benefit of licensees, licensors, and ultimately consumers. Ten- and twenty-year licenses are commonplace for sports leagues' media rights and other commercial agreements.[13]

42.    Over the course of the past 70-plus years, the rights to sports trading cards have been licensed to a select group of companies for long-term deals (with extensions), including:

---

[13]    Ken Belson and Kevin Draper, *N.F.L. Signs Media Deals Worth Over $100 Billion*, N. Y. TIMES (Mar. 18, 2021, updated May 26, 2021), https://www.nytimes.com/2021/03/18/sports/football/nfl-tv-contracts.html.

| Manufacturer | Sport | Start year | End year |
|---|---|---|---|
| Topps | Baseball | 1951 | 2021 |
| Topps | Basketball | 1969<br>1992 | 1981<br>2009 |
| Panini | FIFA World Cup | **1970**<br>**1998** | **1990**<br>**Present** |
| Panini | UEFA European Championship | **1980** | **2021** |
| Topps | UEFA European Championship | 2021 | Present |
| Donruss | Baseball | 1981<br>2001 | 1998<br>2005 |
| Fleer | Baseball | 1981 | 2005 |
| Fleer | Basketball | 1986 | 2004 |
| Upper Deck | Baseball | 1989 | 2009 |
| Upper Deck | Hockey | 1990 | 2026 |
| Upper Deck | Football | 1991 | 2009 |
| Topps | UFC | 2009 | 2020 |
| Panini | Football | **2009** | **2026** |
| Panini | Basketball | **2009** | **2025** |
| Panini | Hockey | 2010 | 2014 |
| Topps | Major League Soccer | 2013 | 2021 |
| Panini | NASCAR | **2016** | **Present** |
| Panini | UFC | 2021 | 2023 |

And the full list of sports and entertainment cards is dramatically longer.

20

## B.       The Panini Era in U.S.

43.      Panini grew its presence in the U.S. in 2009 by obtaining licenses from key players' associations and sports leagues and ultimately progressing into long-term exclusive licenses with a number of them.  Prior to 2009, Panini had no offices or staff in the U.S.[14]

44.      In 2009, Panini entered the U.S. by obtaining a sports card deal with the NBA, dislodging the then-holder of the license.[15]  That same year, Panini America acquired Donruss, an established competitor and a U.S. trading card manufacturer with licenses from the NFL and NFL Players Association ("NLFPA").[16]

45.      By 2011, despite a minimal presence, Panini America quickly amassed rights to make cards for the NHL and its Players Association ("NHLPA"),[17] along with the MLB Players Association ("MLBPA").[18]

46.      In just two years, the previously unknown Panini America took rights across four major U.S. sports leagues and their player groups.  Panini's aggressive approach also led to exclusive deals with NASCAR, WWE, the Collegiate Licensing Company ("CLC"), and UFC,

---

[14]   *See, e.g.*, Terry Lefton, *Five more years for Panini's NBA trading card deal*, SPORTS BUSINESS J. (Oct. 29, 2012), https://www.sportsbusinessjournal.com/Journal/Issues/2012/10/29/Marketing-and-Sponsorship/NBA-Panini.aspx ("The NBA surprised the trading card industry in 2009 when it signed a virtual unknown brand in Panini while dropping two household names in Topps and Upper Deck. At the time, Panini had no U.S. offices nor staff.").

[15]   Darren Rovell, *Topps No Longer Tops With NBA*, CNBC (Jan. 28, 2009, updated Aug 5., 2010), https://www.cnbc.com/id/28895814.

[16]   Darren Rovell, *Panini Buys Donruss*, CNBC (Mar. 13, 2009, updated Aug. 5, 2010), https://www.cnbc.com/id/29678317.

[17]   Michael Long, *Extended deal on the cards for the NHL*, SPORTSPRO (Mar. 26, 2010), https://www.sportspromedia.com/news/extended_deal_on_the_cards_for_the_nhl.

[18]   Tracy Hackler, *Breaking News: Panini America Inks Multi-Year Trading Card Deal with MLBPA*, THE KNIGHT'S LANCE (Sept. 15, 2011), https://blog.paniniamerica.net/breaking-news-panini-america-inks-multi-year-trading-card-deal-with-mlbpa.

dislodging existing licensees and securing various collectibles rights, portions of which extend at least through 2025.

47.    After seizing these long-term licenses (and despite benefiting from increased consumer demand and interest during COVID), Panini sat on its opportunities.  Over time, instead of innovating and expanding the collectibles category, Panini began to treat its sports card franchise like the proverbial cash cow, which Panini's owners milked at the expense of its licensing partners, athletes, and collectors alike.

i.    Panini's Outdated Business Model and Failure to Invest in Marketing, Downstream Sales, Secondary Markets, and Breakers

48.    Panini primarily sells to distributors, who then sell to retailers, hobby shops, and breakers at enormous markups, none of which flow to the licensors.  Though this is simpler for Panini, this practice works to the detriment of retailers, hobby shops, breakers, and ultimately collectors.

49.    While the reliance on distributors enriches distributors with outsized profits, it often results in significantly higher prices paid by the retailers, hobby shops, and breakers, which are in turn passed on to collectors.  This outdated business model underscores Panini's inability to adapt to modern business dynamics and consumer trends.  Its approach lacks the forward-thinking strategies, savvy marketing, and embrace of new opportunities and investment in technology evident in more progressive companies in the industry, such as Fanatics Collectibles.

50.    As the players' associations and leagues understood, Panini's complacent approach to managing its business resulted in it failing to adequately invest in marketing, overlooking downstream sales opportunities, disregarding burgeoning secondary markets, and failing to effectively leverage the emerging trend of breakers.  Panini's lack of strategic investment and

failure to capitalize on new opportunities have curtailed its growth potential, leaving it ill-equipped to compete effectively in today's rapidly evolving trading card industry in key ways.

51. First, upon information and belief, Panini allocates approximately 1% of its revenues towards marketing. Other consumer products companies traditionally invest significantly in marketing to acquire new customers and maintain brand visibility, consumer engagement, and market share. They understand that a robust marketing strategy not only propels sales but also cultivates brand loyalty and drives long-term growth.

52. Second, Panini chose not to capitalize on downstream sales of its products for its licensors. Historically, trading card royalties provided a significant revenue stream for leagues and associations. Under the prevailing royalty system utilized by Panini, the licensors are only compensated on the "first sale" of the trading cards, meaning that royalties are calculated as a percentage of the wholesale price that Panini charges to its distributors. Once the trading cards leave Panini's control and enter the retail or secondary market, the licensors no longer share in the revenues generated, even though the licensors' intellectual property is the most valuable component of these products.

53. This "first sale" royalty system has inherent limitations. While it provides a steady stream of revenues based on wholesale prices, it fails to account for the significant additional value that is often created downstream. As trading cards make their way from distributors to retailers, hobby shops, and collectors, their prices usually escalate significantly. This is especially true in the secondary market, where rare or high-demand cards can command exponentially higher prices. Additionally, the value of trading cards is fluid over the years, and unlike other collectibles, can vary depending on player performance. For example, a rookie card may be worth much more ten years after that player's rookie year, depending on that player's performance. Panini ignores this

23

reality, and by leaving its business model unchanged, Panini has willingly enabled distributors to reap outsized profits at the grave expense of consumers, industry stakeholders, and Panini's licensors.

54. Under this system, athletes (directly or through players' associations) and leagues do not participate in these downstream revenue opportunities. As a result, they miss out on potentially substantial royalties that could have been earned if the system were structured to account for the true market value of the cards at every stage of the supply chain, rather than just the initial wholesale price to distributors.

55. The "first sale" royalty model is reflective of Panini's overall business strategy, which prioritizes distribution through intermediaries rather than direct engagement with consumers and the secondary market. This business model only benefits Panini.

56. Indeed, this approach limits the financial benefit to licensors and prevents them from fully capitalizing on the value of their licensed intellectual property. It also leaves Panini with less control over its products, depriving it and its licensors of the opportunity to engage with consumers downstream as much of the sports card community participates through hobby shops and secondary markets.

57. Third, Panini failed to develop a secondary market platform, ceding a multi-billion dollar business to third parties like eBay. The trading card industry was revolutionized by the advent of online trading platforms. These platforms facilitate a global exchange of trading cards, bringing together buyers and sellers from around the world in a dynamic, digital marketplace. They also make it possible to conduct transactions with ease and speed that were unimaginable just decades ago.

58.    Not only do these platforms allow for the buying and selling of individual cards, but they also offer services such as digital portfolios, price tracking, and even secure storage.  They have effectively digitized the hobby, adapting it to a new generation of tech-savvy collectors who demand convenience and transparency.

59.    Yet Panini has been remarkably slow to adapt to these trends.  While other companies capitalized on the secondary market's growth and the opportunities it presents, Panini's lack of a strong online presence and digital strategy has resulted in missed revenue and customer engagement opportunities.  Panini's outdated model, which emphasizes selling to distributors and neglects direct engagement with most consumers and hobby shops, leaves much of the online platforms untouched.

60.    Fourth, Panini also ignored an important segment of the secondary market— "breaking."  Breaking involves individuals or businesses ("breakers") that buy boxes or cases of trading cards, then open them live on the internet for a paying audience.  Each participant pays a fee for a share in the cards opened, often allocated by team, player, or card type.  This trend has gained considerable momentum in recent years, particularly with the increasing popularity of live-streaming platforms.  The emergence of breaking represents a remarkable shift in the way consumers engage with trading cards, transforming it into a shared, community experience.  It offers another layer of excitement to the hobby, akin to the thrill of opening a pack of cards, but amplified by the sense of anticipation shared with others.  Panini's approach, however, fails to leverage this trend.  Its traditional business model, focused on selling to distributors and not directly engaging with collectors, hobby shops, and in this case, breakers, has failed to adapt to these industry innovations.  Panini's refusal to sell to breakers directly forces breakers to buy from distributors at marked up prices and pass those inflated prices on to collectors.  This oversight

25

opened the door for other companies to step in and capitalize on the breaker phenomenon, driving further participation and interest in trading cards.

61.    By failing to seize any of these opportunities, Panini effectively ceded a significant chunk of potential income to other entities in the trading card ecosystem.  This not only represents a lost revenue stream for Panini—and more importantly its licensors—but also a missed chance to engage more dynamically with the customer base, a critical factor in maintaining and growing business in a rapidly evolving industry.

ii.    Panini's Poor Reputation Among Consumers

62.    Not only has Panini failed to invest in a robust business model, marketing, or innovation, but critically it has also failed the most important constituency—collectors.  In particular, Panini has conspicuously failed to field a dedicated customer service and support team for U.S. collectors, exemplifying Panini's larger disregard for consumers.  Unsurprisingly, dissatisfaction has soared due to Panini's shoddy quality control and questionable marketing practices.  For example, savvy collectors keep catching Panini mislabeling certain player patch cards as "game-worn" or "game-used," *i.e.*, incorrectly representing that the jersey patch embedded in this type of specialty card was worn by the player in question in a game.  After one collector noticed the numbering on a so-labeled "game-worn" Russell Wilson patch card was off from the team's jersey design, Panini issued a statement confessing that certain cards featuring "*event*-worn" jerseys, which are much less valuable, had been "mistakenly labeled as 'game-worn'" due to an "oversight."[19]  Even after this *mea culpa*, collectors continued to find dubious

---

[19]    BLOWOUT CARDS FORUM, https://www.blowoutforums.com/showthread.php?t=797728; 2014 *Panini Flawless "Mislabeled" Game Worn Jersey Card Scam*, YOUTUBE, https://www.youtube.com/watch?v=BC6VL_oWH34 (last visited Apr. 30, 2025); Tracy Hackler, *Panini America CEO Addresses Jersey-Card Labeling Errors in 2014 Flawless Football*, THE KNIGHT'S LANCE

labeling on Panini's cards, such as jerseys marked as "game-worn" or "game-used" after the player

had retired or with labels from manufacturers that did not even make game jerseys:



[20]

(Nov. 18, 2014), https://paniniamerica.wordpress.com/2014/11/18/panini-america-ceo-addresses-jersey-card-labeling-errors-in-2014-flawless-football.

[20]    @SportsCardNews,    X    (Feb    25,    2015,    10:05    PM), https://twitter.com/SportsCardNews/status/570781761644277761?ref (collectors spotting Panini game-used card for a player who had retired before the manufacturer started making game jerseys).

 

63.    Some of the other embarrassments aired by collectors and journalists include fake,

machine-generated autographs,[23] player jersey patches from the wrong team,[24] and autograph

---

[21]    Darren    Rovell    (@darrenrovell),    X    (Apr.    30,    2017,    10:51    PM), https://twitter.com/darrenrovell/status/858876536820256769?ref (collectors spotting Panini game-used cards with patches from manufacturers who did not make game jerseys).

[22]    milehighmagic80    (@Isaacortiz0730),    X    (Apr.    29,    2019,    12:51    PM), https://twitter.com/Isaacortiz0730/status/1122906373728145409 (collectors spotting Panini game-used card for NFL player who was already retired when the featured NFL shield was adopted).

[23]  Ryan Cracknell, *Head of Beckett Grading Responds to Dak Prescott Panini Autograph Card Recall*, Beckett, https://www.beckett.com/news/dak-prescott-autographs-recalled-by-panini (last visited Apr. 30, 2025);    The    Collectibles    Guru    (@ericwhiteback),    X    (Feb.    16,    2024,    1:47    PM) https://x.com/ericwhiteback/status/1758563800356143238 ("Panini is allegedly under investigation for producing Anthony Richardson cards with FAKE autographs").

[24]                                   @cardcollector2,                                   Instagram, https://www.instagram.com/p/CngKJcOsQhy/?igshid=NTc4MTIwNjQ2YQ%3D%3D (last visited Apr. 30, 2025).

cards sporting a blank autograph box.[25]  Even after the "first high profile mistake by Panini," which was identified in 2010, Panini has nonetheless neglected to remedy its manufacturing mishaps and woeful customer service over the last 14 years.[26]



[27]

---

[25]    Jordan    (@collectinghurts),    X    (May    28,    2023,    11:40    AM) https://twitter.com/collectinghurts/status/1662846249362669569?s=46&t=YvmVhv17xmlSiQjcFER5tQ.

[26]  Sports Card Radio, *Panini America Greatest Hits of Fraud, Scams & Mistakes*, SPORTS CARD RADIO, https://www.sportscardradio.com/panini-america-greatest-hits-of-fraud-scams-mistakes/ (last visited Jan. 25, 2024).

[27]    Adam    berner    +X    (@i_bern_em),    X    (Apr,    5,    2023    6:27    PM) https://twitter.com/i_bern_em/status/1643742166710358016.



28

28 Rob_Cards (@Camillerinho), X (Jun, 30, 2023 4:13 AM) https://twitter.com/camillerinho/status/1674692699176222723.



29

29     Josh wickersham (@wick6380), X (Mar 11, 2021, 9:43 AM) https://twitter.com/wick6380/status/137002245070356544.



[30]

---

[30]    Abock22    (@abockjr),    X    (Jul    29,    2023,    5:08    PM)
https://twitter.com/abockjr/status/891405082926997505.



[31] The Collectibles Guru (@ericwhiteback), X (Feb. 22, 2025, TIME) https://x.com/ericwhiteback/status/189335282197836254.



32

64.    Panini's disregard for customers meant that many collector complaints and requests went unanswered.



33

---

32    K8e (@tacok8e), X (Mar. 18, 2025, 4:36 PM) https://x.com/tacok8e/status/1902096873671778398.

33    Ethan    (@Ethan_Norof),    X    (Dec    16,    2023,    11:02    AM) https://twitter.com/Ethan_Norof/status/173605422713473039.







[34]    Big    Turk    (@BigTurk21),    X    (Apr    13,    2023,    11:37    AM)
https://twitter.com/BigTurk21/status/1646538117116043265.

[35]    Mookie    (@Mook_Franchize),    X    (Sep,    16,    2022,    12:14    PM)
https://twitter.com/Mook_Franchize/status/1570808371040890882.

[36]    hit_kingsportscards    (@kingsportscards)    X    (Dec    1.    2021,    5:05PAM)
https://twitter.com/kingsportscards/status/146616699875610630.



<sup>37</sup>

65.     In addition, NBC-NY reported that a collector who received defective cards had to resort to the network's consumer reporter program *Better Get Baquero* to obtain replacement cards after calling Panini for ten months to no avail.

66.     Panini's practices with redemption cards generates other continued fiascos and significant consumer dissatisfaction and backlash. A "redemption card" is a placeholder that can be exchanged ("redeemed") for a high-value autograph card that the manufacturer was unable to secure in advance of packaging the cards. For example, if Panini has not yet secured an autograph from a player, Panini inserts a redemption card into the pack instead. Once the autograph becomes available, Panini is supposed to provide it to the customer. Panini's currently outstanding redemptions, on a volume-adjusted basis, are estimated to be ***5 to 10 times higher*** than those issued by Fanatics Collectibles/Topps. Over-reliance on redemptions is in direct contrast to the approach of Fanatics, whose CEO has publicly and repeatedly expressed a desire to eliminate redemptions as a practice, and who has followed through on that promise, already having achieved material reductions in the 24 months since acquiring Topps—all to the significant benefit (and delight) of collectors.

---

<sup>37</sup>     JRdaHBK (@HbkRda), X (May 27, 2020, 10:02 AM) https://twitter.com/HbkRda/status/1265644449683603456.

67.    Panini's sheer neglect of customer service has left collectors suffering repeated failures to fulfill redemptions.  Despite assurances from Panini that it endeavors to redeem cards within 4 to 8 months, it is not uncommon for fans to wait *years* for redemptions from Panini. Reports abound of collectors waiting to be redeemed for as long as seven years,[38] and one social-media survey shows that around 75% of Panini's consumers have waited over one year for their redemption cards.



[39]

---

[38]    BLOWOUT    CARDS    FORUM, https://www.blowoutforums.com/showpost.php?p=16516274&postcount=13 (last visited Apr. 30, 2025, 2023);    BLOWOUT    CARDS    FORUM, https://www.blowoutforums.com/showpost.php?p=16515665&postcount=1 (last visited Apr. 30, 2025).

[39]    Gliberts    #2    fan    (@TheKpd),    X    (Aug    15,    2023,    11:00    AM), https://x.com/TheKpd/status/1691464796590510080.



40



41



42

---

40      DJACK      (@topshotblazers),      X      (Dec      11,      2023,      1:40      PM),
https://twitter.com/topshotblazers/status/1734281949290864999.

41      Michael      Joseph      (@mjk1930),      X      (Dec      15,      2023,      5:24      PM),
https://twitter.com/mjk1930/status/1735787876091134126.

42      Butler      (@BUTLERxCLEx),      X      (Jul      29,      2023,      11:34      AM),
https://twitter.com/BUTLERxCLEx/status/1685312760916115456.

68.     Other collectors reported never receiving redemptions at all or being sold redemption cards that had already expired.[43]  Speculation grew that Panini was hoping the old redemptions would simply be forgotten so that they would never need to be fulfilled.  Panini has done nothing to quell such speculation.



([https://www.blowoutforums.com/showpost.php?p=16515665&postcount=1](https://www.blowoutforums.com/showpost.php?p=16515665&postcount=1))



([https://www.blowoutforums.com/showpost.php?p=16516730&postcount=16](https://www.blowoutforums.com/showpost.php?p=16516730&postcount=16))

69.     Instead, Panini has litigated with its own customers over its redemption card failures.  In 2020, a group of consumers sued Panini America for deceptive trade practices, fraud, and other legal violations, claiming among other things that the company failed to honor and redeem redemption cards as promised, misled customers through false advertising related to the redemption card process, and purposely obscured the expiration dates associated with the redemption cards.[44]  Regarding Panini's dismal customer service, the lawsuit alleges:  "It is nearly

---

[43]  *Kevin B. Brashear and Christopher S. Kitchen v. Panini America Inc*, No. DC-20-08771 (Tex. Dist. Ct., Dallas Co., June 26, 2020), ¶¶ 16, 20-25.
[44]  Complaint, *Brashear*, at ¶¶ 10-19.

impossible [for customers] to contact Panini through any means."[45]   Subsequently, Panini's

redemption card practices took an even more disturbing turn.  As collectors awaited the cards

promised to them by Panini, they began to find them popping up on secondary markets like eBay.

One collector was chagrinned to find that a "1/1" card (*i.e.*, a card with only one copy in existence)

for which he received a redemption card from Panini—and for which he had been waiting for four

years to be fulfilled—had mysteriously popped up on eBay and was just sold on May 23, 2023 for

$34,000:



[46]

---

[45]   *Id.* ¶ 14.

[46]    @carl_zou, INSTAGRAM, https://www.instagram.com/p/CspktHvpnFz/?hl=en (last visited Apr. 30, 2025).

Other collectors have since come forward with similar experiences.[47]

70.    Consumers assert a never-ending stream of customer complaints and dissatisfaction about Panini, as shown in the below series of tweets from a one-week period in mid-July 2023.



71.    Even after Panini settled with some customers in early 2024, the problems with its redemption cards have not gone away.[48]

72.    Today, customers are more frustrated than ever, with one going so far as to call "Panini [] the worst thing to ever happen to the sports card industry.  Not only is their redemption system a joke[,] their customer service is rude as hell.  I've never had a redemption fulfilled from them in less than a year and they've shipped cards I bought from them to other [people]."[49]

---

[47]    Shaiel Ben-Ephraim, *Are Your Pending Panini Redemptions Going To Someone Else?*, CARDLINES.COM (May 30, 2023), https://cardlines.com/panini-redemption-sales-scandal.

[48]    Matt Higgins, *Panini Reaches Settlement In Unfulfilled Redemption Card Lawsuit After Four Years*, HOBBY LISTINGS (Mar. 8, 2024), https://hobbylistings.com/panini-settlement-redemptions/.

[49]    TrajectoryCards    (@TrajectoryCards),    X    (Jan.    29,    2025) https://x.com/TrajectoryCards/status/188462820343701790.



50

[50]      J_Grant_C    (@J_Texas_C),    X    (Feb.    22,    2025,    12:11    PM)
https://x.com/J_Texas_C/status/1893347778282130666.



51



52

51     Mat   Taylor   (@Fredbirdjr),   X   (Feb.   2,   2024,   12:28   PM) https://x.com/FredbirdJr/status/1753470508639645901.

52     Aero   Uprising   (@AeroUprising19),   X   (Jan.   29,   2025,   8:05   PM) https://x.com/AeroUprising19/status/1884588778301403595.



53

73.    As of 2023, the Better Business Bureau had received customer complaints against

Panini America from collectors in 46 states, as well as three Canadian provinces, "with an average

loss reported to the BBB of $1,700."[54]  It is therefore no surprise that Panini America held an "F"

rating with the Better Business Bureau for its abysmal customer treatment, including its failure to

---

53    PelsBreakdown    (@BirdWatcher504),    X    (June    26,    2024,    4:47    PM)
https://x.com/BirdWatcher504/status/1806066839547785573.

54    Caresse Jackman, *BBB warns collectors about pattern of complaint against trading card company*,
WSAZ3 NEWS CHANNEL, (Oct. 11, 2023), https://www.wsaz.com/2023/10/11/bbb-warns-collectors-about-pattern-complaints-against-trading-card-company.

honor redemptions or even communicate with customers inquiring about redemptions.[55]  Despite years of purported efforts toward resolving the litany of complaints and issues raised by customers, Panini has managed only to improve its rating to a "C."[56]  Fanatics, by contrast, maintains an A+ rating on the Better Business Bureau's website.[57]

74.     In one customer's words: "Panini, for us consumers, sucks.  Their QC, customer service, redemption fulfillment, and I'm probably missing so much more is just awful.  I hope Fanatics mops the floor here once and for all."[58]  And regarding redemption cards, another customer wrote:  "Topps is already heads and shoulders better than Panini ever was."[59]

iii.     Panini Refuses Any Long-Term Commitment to the Hobby

75.     Panini's egregious track record, and utter failure to invest in the collector experience, can be partially explained by the fact that Panini's ownership has been trying to sell its business, without success, for roughly a decade.

76.     Perhaps most famously, Panini tried (and failed) to merge with Alex Rodriguez's Special Purpose Acquisition Company ("SPAC") in 2021.

---

[55]  Shaiel Ben-Ephraim, *Strong Misdeed Allegations Against Panini America*, CARDLINES.COM (Nov. 26, 2021), https://cardlines.com/strong-misdeed-allegations-against-panini-america; *Several northwest Indiana Hoosiers report losing money to Panini American*, WBIW (Nov. 4, 2021), https://www.wbiw.com/2021/11/04/several-northwest-indiana-hoosiers-report-losing-money-to-panini-american.

[56]  *Panini America,* BETTER BUSINESS BUREAU, https://www.bbb.org/us/tx/irving/profile/baseball-cards/panini-america-0875-90338985 (last visited Apr. 30, 2025).

[57]  *Fanatics, Inc.*, BETTER BUSINESS BUREAU, https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-29000877 (last visited Apr. 30, 2025).

[58]  Realist     (@Worm_The_Trader)     X     (Mar.     10,     2025) https://x.com/Worm_The_Trader/status/1899204598528680210.

[59]  Constantvariable     (@visorboy1974)     X     (Apr.     18,     2024) https://x.com/visorboy1974/status/1781005323576262683.

77.     Although completion of the transaction would have, among many other requirements, required the approval of relevant licensors *and* extensions of licenses, Panini never even *discussed* the transaction with these licensors, even though Panini was engaging in talks with Rodriguez.  Panini's view of itself as the inevitable incumbent apparently led it to believe that its licensors would have no choice but to approve the transaction, regardless of their views on how it may affect their business.

78.     In short, Panini has proven time and time again that its top priority is not collector experience or benefiting other industry stakeholders, but funneling profits to its owners overseas.

79.     Having seen Panini fail to grow and improve its business, Panini's business partners have sought out better prospects.

80.     As far back as 2014, the NHL and NHLPA opted not to renew their partnership with Panini and to license their trading cards exclusively to the Upper Deck Company.[60]

81.     In 2021, the NHL and NHLPA again opted for Upper Deck over Panini, their former partner.  Around the same time, some of Panini's business partners in the U.S.—the multiple sports players' associations and leagues—made their dissatisfaction and lack of belief in Panini known by announcing new licensing contracts with Fanatics Collectibles instead of Panini.

82.     By August 2023, both the NFLPA and WWE sought to exercise their early termination rights to end their contracts with Panini and accelerate the start of their licenses with Fanatics Collectibles.[61]

---

[60]   Tracy Hackler, *Panini America Issues Statement Regarding NHL/NHLPA Licensing Situation*, THE KNIGHT'S LANCE (Feb. 27, 2014), https://blog.paniniamerica.net/panini-america-issues-statement-regarding-nhlnhlpa-licensing-situation.

[61]   *NFLPA terminates Panini contract, executes Fanatics football license; Panini requests arbitration hearing*, SPORTS COLLECTORS DIGEST (Aug. 22, 2023), https://sportscollectorsdigest.com/news/nflpa-terminates-panini-contract-fanatics-football-trading-cards-nfl; *Panini Sues After WWE Moves to Terminate*

**C.      Fanatics Is Transforming the Sports and Entertainment Collectibles Industry**

83.      While Panini America has opted to focus on its sale efforts over innovating and improving its business for collectors, Fanatics has been revolutionizing the sports and entertainment collectibles business with a fresh model and vision that values and prioritizes the industry's key stakeholders—athletes, players' associations, collectors, leagues, and teams—rather than simply focusing on its own profits.

i.      Fanatics' Entry into Collectibles

84.      In 2021, multiple players' associations and leagues were searching for something new, while Panini's complacent, checked-out leadership was preoccupied trying to sell their business and taking licensing renewals for granted.

85.      Against this backdrop, Fanatics approached the players' associations and leagues with a new, more compelling value proposition.  Fanatics Collectibles proposed investing in the industry as a whole over the *long-term*—including through marketing, customer service, improving manufacturing quality and timeliness, and related lines of business such as sports card manufacturing.  As an *innovative* partner, Fanatics Collectibles would sell directly to consumers, hobby shops, retailers, and "breakers," thereby allowing for better engagement with collectors and opening up new revenue streams for its licensors.  Instead of relying entirely on distributors, Fanatics Collectibles evolved its distribution practices to reduce reliance on middlemen and increase servicing of hobby shops and breakers directly.  As a result, in the last two years, Fanatics Collectibles has grown substantially—improving the business and the industry as a whole, ultimately to the benefit of collectors.  By selling directly and substantially reducing reliance on

_____

*Card    License*, SPORTS    COLLECTORS    DAILY    (Sept.    20,    2023), https://www.sportscollectorsdaily.com/panini-sues-after-wwe-moves-to-terminate-card-license.

distributors, Fanatics Collectibles is growing the market and benefiting consumers through lower pricing.

86.     Moreover, as an *inclusive* partner, Fanatics Collectibles would share a greater percentage of revenue earned through the marketing and sale of the licensors' intellectual property with players and leagues.  Historically, players and leagues supplying content for sports trading cards only profited off the initial sale of the card (*i.e.*, the sale from a manufacturer to a distributor).

87.     Fanatics Collectibles disrupted that traditional model by offering players and leagues the right to share in revenues it receives from not only primary sales—which were already more lucrative given Fanatics Collectibles' increased direct-to-consumer sales—but also from secondary markets (*e.g.*, through its Fanatics Live platform), as well as from complementary businesses.

88.     In the end, the players' associations and leagues made the only logical choice— they chose to partner with Fanatics Collectibles instead of Panini.  Tellingly, although Fanatics Collectibles sought no restrictive negotiation covenants, such as an exclusive negotiating window, the licensors chose not to even ask Panini to bid on renewal of their licenses, clearly recognizing Panini's value proposition paled in comparison to that presented by Fanatics Collectibles.  Indeed, licensors could see that Fanatics Collectibles was a more attractive partner in every respect. Whereas Panini had surfed an uptrend in a cyclical industry that reached an unprecedented peak during COVID-19, Fanatics—through raw ingenuity and innovation—had grown from a $10 million company into a $6 billion company in less than two decades.  Whereas Panini had a selfish, profit-first mindset, Fanatics had developed a reputation as a dedicated long-term partner with a demonstrated ability to create growth and value for business partners.  Whereas Panini's owners were trying (and failing) to cash out through a sale at the earliest opportunity, Fanatics was a

48

future-focused visionary committed to the long-term investment in, and growth and health of, the industry.

89.    The best test of ingenuity is success, and Fanatics has proven its ingenuity by consistently outperforming the competition in the eyes of industry stakeholders.  Fanatics' track record in collectibles speaks for itself.  Since entering the space in 2021, Fanatics Collectibles has won key licenses with the NFL, NFLPA, MLB, MLBPA, NBA, and NBPA—all of whom chose Fanatics Collectibles over Panini.  Fanatics Collectibles' groundbreaking deals with the MLB and MLBPA ended Topps' 70-year run as the licensee for baseball cards.  Fanatics then entered into a transaction to acquire Topps, giving Fanatics Collectibles the right to design, manufacture, and distribute baseball cards immediately, instead of having to wait until its own deals with MLB (in 2026) and the MLBPA (in 2023) began.

90.    These licensors' decisions to choose Fanatics Collectibles have already been thoroughly vindicated.  For example, Fanatics Collectibles (through Topps) has nearly tripled baseball card revenues.  In 2021, MLB revenues were lower than both NBA and NFL revenues.  Today, MLB revenues surpass NBA and NFL revenues by a wide margin.  Meanwhile, as of 2023, the NFL and NBA experienced meaningful declines as a result of Panini's years of stewardship:



[62]

---

[62]    Nat    Turner    (@natsturner),    X    (May    14,    2023,    8:51    PM), https://twitter.com/natsturner/status/1657911619584655364?s=42&t=cf5qfUoX9U6bUWaniG3NYw; *see*

Fanatics Collectibles achieved its superior results by doing what Panini would not do: making significant marketing investments, product innovations, customer service enhancements and investments, and product quality and manufacturing improvements, dramatically reducing reliance on redemptions, and significantly reducing product delays. While Panini has virtually no customer service and a ~95% customer abandonment rate as of 2023,[63] Fanatics Collectibles' top-of-the-line customer service boasts a ~3% abandonment rate. Similarly, while Panini is heavily reliant on redemption cards—prompting the backlash described above—Fanatics Collectibles is able to rely significantly less on redemptions given its operational prowess, strong relationships with athletes who sign cards and more innovative product offerings, and it intends to eliminate them entirely over time except in limited and unavoidable situations.

91.     Fanatics Collectibles has also had great success with college players who have declared their intent to participate in the draft ("prospects"), following the recent sea change on NIL rights allowing college athletes to enter deals before they join players' associations. In 2023 and 2024, Fanatics Collectibles struck key deals to create trading cards for star football and basketball prospects. Panini competed for dozens of these prospects, but Fanatics Collectibles won every player it pursued, even though Panini offered nearly every prospect the same or, in most cases, more money.

---

*also* Holman & Belson, *supra* n.5 ("Major League Baseball has vaulted ahead of the N.B.A. and N.F.L. in the licensed trading card market. According to one industry executive, sales of baseball cards this season are expected to hit about $640 million, up from $370 million two seasons ago, when Fanatics purchased Topps. Sales of N.B.A. and N.F.L. trading cards are expected to fall to about $350 million, from about $550 million two seasons ago.").

[63]     A company's customer abandonment rate is the percentage of customers who call the company's customer service line and give up before speaking with a representative (*i.e.*, abandon the attempt), usually because of long wait times.

92.     The prospects chose Fanatics Collectibles because they wanted a partner who cared about the industry and cared about them—and not just about short-term profits.  As one example, Fanatics Collectibles proved its commitment to the industry by conceiving and creating a viral "Rookie Premiere" marketing video, in which legendary NFL players (including Joe Montana, Tom Brady, Aaron Rodgers, Jerry Rice, Peyton Manning, and Rob Gronkowski) provided personalized words of wisdom and signed jerseys to star prospects.  The prospects praised the special experience that Fanatics Collectibles created.[64]

93.     Fanatics Collectibles' MLB Rookie Debut Auto Patch Cards (which Fanatics Collectibles has begun rolling out for other sports) are another example of how Fanatics Collectibles has capitalized on the hype surrounding rookie players:  in spring 2023, Fanatics Collectibles and Topps introduced this new memorabilia patch created specifically for trading cards from MLB rookies making their debuts.  These 1/1 cards contain an authentic patch worn by an MLB rookie during his debut game.[65]  Fanatics Collectibles' partners at the MLB and MLBPA praised this innovation.  For example, the MLBPA's Executive Director stated: "For a player there is no bigger moment than the first time they step onto a field for their Major League debut.  The debut patches are one way to capture the timeless nature of this moment and provide fans the opportunity to be part of it by collecting a player-worn item."[66]  The Commissioner of the MLB offered similar praise: "A Major League player's debut day is a cause for great celebration and the

---

[64]   Isabel Gonzalez, *LOOK: NFL legends surprise rookies with personalized messages at Rookie Premiere festivities*, CBS SPORTS (June 8, 2023), https://www.cbssports.com/nfl/news/look-nfl-legends-surprise-rookies-with-personalized-messages-at-rookie-premiere-festivities.

[65]   *Fanatics debuts new MLB rookie patches as part of its expansion into collectibles*, FAST COMPANY (Mar. 30, 2023), https://www.fastcompany.com/90871389/fanatics-mlb-rookie-patches-topps-trading-cards-collectibles.

[66]   *Id.*

culmination of many years of hard work. … I think this particular initiative is crucial to the development of deeper fan engagement."[67]  MLB players like Joey Loperfido have likewise noted just how transformative Fanatics' approach has been:  "It captures an exciting and once-in-a-lifetime moment for guys in their career; their first game played in the big leagues … I think it's special. … People are looking for them.  The guys coming up in the league, great players like Paul Skenes, these cards are really going to be worth something one day."[68]  Collectors, too, place great value on Fanatics' innovative MLB Rookie Debut Auto Patch Cards.  For example, Paul Skenes' Rookie Debut Auto Patch Card recently sold for $1.1 million at an auction.[69]

94.    Professional sports players and leagues have long praised Fanatics as a partner.  In Tom Brady's words:  "Fanatics is a brand synonymous with authenticity, in both the merchandise they provide and the timeless memories they create that go well beyond a jersey or a football."[70]  More recently, the NFL's chief media and business officer remarked on the NFL's "belief that [Fanatics] is building a business that is new, unique and valuable."[71]

95.    The same is true of Fanatics' entertainment partners.  WWE's Head of Corporate Development recently commented:  "Fanatics has been an amazing partner and will immediately

---

[67]  Rafael Canton, *Fanatics unveils special MLB Debut Patches for player jerseys, rookie cards*, SPORTS COLLECTORS DIGEST (Mar. 30, 2023), https://sportscollectorsdigest.com/news/mlb-debut-patches-rookie-cards-fanatics-tops; *see also* Holman & Belson, *supra* n.5 ("When you think about it, fans want a piece of players," M.L.B. Commissioner Rob Manfred said, referring to the rookie patches. "It just seemed like an idea that could really help invigorate the business.").

[68]  *Id.*

[69]  Thomas Harrigan, *Skenes MLB debut patch card sells for $1.11M at auction*, MLB (March 21, 2025), https://www.mlb.com/news/paul-skenes-mlb-debut-patch-card-sold-at-auction.

[70]  Mike Chiari, *Tom Brady, Fanatics Agree to Long-Term Contract for Exclusive Memorabilia*, BLEACHER REPORT (Oct. 21, 2021), https://bleacherreport.com/articles/2914408-tom-brady-fanatics-agree-to-long-term-contract-for-exclusive-memorabilia.

[71]  Jessica Golden, *NFL, MLB and players unions lead the latest round of investment in rapidly growing Fanatics*, CNBC (Apr. 6, 2022), https://www.cnbc.com/2022/04/06/nfl-mlb-players-unions-lead-latest-investment-in-fanatics.html.

bolster WWE's event retail business. Expanding our partnership will allow WWE to further expand our offering to fans and grow merchandise revenue in 2023 and beyond."[72]

96.     An array of stakeholders have praised Fanatics Collectibles' commitment to investment and innovation, which has reinvigorated the sports and entertainment collectibles industry. In Brady's words: "This is what the industry really needed, you know? … There's new product innovation, getting all the Fanatics athletes involved. All the other athletes talk to me about what Fanatics is doing, and they're excited about working with them."[73] An accomplished appraiser of sports collectibles views Fanatics Collectibles' growth as a "good thing," adding: "I think this hobby needs innovation, new ideas. For too long, it's the same old, same old."[74] Various participants in the sports and entertainment collectibles ecosystem have prospered due to Fanatics Collectibles' innovations. For example, after moving his business to the Fanatics Live platform, one prominent breaker noted: "All of a sudden our brand equity went through the roof."[75]

97.     Fanatics Collectibles has also reinvigorated the hobby shop environment. A major sports card investor has lauded Fanatics Collectibles' efforts on this front: "Fanatics understands and recognizes the importance of the hobby shop, because it is a touchpoint for consumers to experience cards."[76]

---

[72]  *WWE® & Fanatics Expand Partnership to Include All Global Event Retail and Merchandise Operations*, BUSINESS WIRE (Apr. 18, 2023), https://www.businesswire.com/news/home/20230418005782/en/WWE%C2%AE-Fanatics-Expand-Partnership-to-Include-All-Global-Event-Retail-and-Merchandise-Operations.

[73]  Holman & Belson, *supra* n.5.

[74]  *Id.*

[75]  *Id.*

[76]  Greg Bates, Fanatics Setting Tone For New, Interactive Card Shops That Offer A Community For Collectors, SPORTS COLLECTORS DIGEST (Apr. 2, 2024), https://sportscollectorsdigest.com/news/fanatics-setting-tone-for-new-interactive-card-shops-that-offer-a-community-for-collectors.

98.     The same cannot be said for Panini, according to a longtime collector: "I've talked to people, it seems like it's easier to get [trading cards at hobby shops] from Fanatics than it is to get Panini products."  Recognizing how important local hobby shops are to the industry, Fanatics Collectibles has taken a grassroots approach to creating a more innovative and interactive experience for collectors, with Fanatics Collectibles partnering directly with shop owners to create unique events like trade nights, buyback programs, and Hobby Rip Night where professional athletes visit hobby shops.[77]  In the words of one hobby shop owner:  "It's tremendous—I mean, we've never had this kind of national event where everyone gets together … Before it was just one-offs.  The Fanatics marketing ability just dwarfs anything the industry has seen before.  So they're getting a lot of fresh eyes on the industry and they're pointing those fresh eyes toward our hobby shops.  It's tremendously successful, especially for some of the store owners that got athletes."[78]

99.     Fanatics Collectibles has also redefined the fan experience through interactive events that connect everyday collectors with celebrities and world-class athletes.  For example, Fanatics' annual "Fanatics Fest" event is both open to fans and collectors and attended by some of the biggest names in the sports world.  The three-day, highly anticipated event features athlete meet-and-greets, celebrity appearances, athlete photo ops and autograph signings, live breaking, immersive brand and league activations, rare collectibles offerings, and exclusive merchandise drops.  Fans have raved about the unique and energizing experience that Fanatics Fest provides.

---

[77]     Ben Burrows, *Fanatics Plans To Energize The Hobby And Local Card Shops Are The Key*, COLLECTIBLES ON SI (Mar. 8, 2024), https://www.si.com/collectibles/news/fanatics-plans-to-energize-the-hobby-and-local-card-shops-are-the-key.

[78]     *Id.*

ii.    Fanatics Collectibles' Investment in GCP

100.    After acquiring Topps, Fanatics Collectibles made a strategic investment in the card-manufacturing company GC Packaging LLC ("GCP") in an effort to shore up manufacturing issues that were affecting Fanatics Collectibles and various other companies in an industry fraught with significant quality issues, capacity constraints, consistent delivery issues, theft, and underinvestment caused by industry cyclicality.

101.    GCP is a full-service card-manufacturing company known for its expertise in trading card production.  GCP offers a comprehensive array of card-making processes, such as printing, laminating, foil stamping, embossing, wrapping, packaging, and more.  For more than 40 years, various trading card companies—including Panini, Topps, Upper Deck, and Konami (the parent company of Yu-Gi-Oh)—have used GCP to convert trading cards from design to reality.  These sports and entertainment trading-card companies supply the content (e.g., pictures, autographs, memorabilia/relics) along with detailed instructions and specifications for how the cards must be manufactured.  GCP receives the content and instructions and manufactures the cards according to these instructions and specifications.

102.    Prior to Fanatics Collectibles' investment in GCP, the card-manufacturing industry as a whole was fraught with issues.  Supply chain hiccups, poor quality control, and missed delivery dates had long been issues, and rising demand for sports trading cards from 2017 to 2020 only exacerbated them further.  Then in 2020, COVID-19 rocked the industry with supply-chain issues at the same time as consumer demand skyrocketed to unprecedent levels, correlating to an unprecedented increase in delays and quality control issues as already-thin capacities were nearly stretched to breaking.

103.    GCP was no exception to the industry's troubles.  By the time Fanatics Collectibles acquired Topps (late 2021), high demand and underinvestment by the industry had resulted in pervasive issues with quality control, capacity, delay, and even theft.  Manufacturing trading cards is a multi-step process where both the manufacturer (e.g., GCP) and card supplier (e.g., Topps) have numerous interdependent deliverables and deadlines.  If delays, errors, or other quality issues arise (e.g., missing pictures or autographs, incorrect formatting instructions, etc.), complications and delays can cascade across the entire production line, affecting numerous other jobs if the manufacturer lacks sufficient capacity and flexibility to adjust.

104.    Prior to Fanatics Collectibles' investment, GCP was a prime example of a manufacturer plagued by that kind of underinvestment.   High demand combined with underinvestment and capacity constraints meant that GCP was often unable to adjust to the rampant shortfalls in deliverables from trading card companies (including Panini), such as failure to provide pictures or autographs, as well as other complications, resulting in jobs often finishing late or otherwise delayed.  More than 70% of GCP's jobs were late in the last quarter of 2020, and the situation only worsened in 2021.  This was especially problematic for Topps (and by extension, Fanatics Collectibles) as Topps relied on GCP to produce approximately 40% of its trading cards. Collectors of trading cards demand perfection—rightfully so—and GCP's difficulties in meeting demand were having a severe impact on Topps' reputation.  Moreover, while companies in other sport-adjacent markets—such as the sports video game and sneaker markets—have been able to capitalize on heavily promoted release dates in order to generate additional demand for their products, sports trading card companies lacked reliable manufacturing solutions that could deliver cards on schedule for major release dates.  That inability to create—and appropriately market— reliable release dates meant leaving opportunities for greater sales on the table.

105.    By investing in GCP, Fanatics Collectibles could resolve Topps' supply-chain issues by introducing much-needed improvements to the production process that would benefit both producers and consumers while at the same time capitalizing on the industry-wide demand for card manufacturing from Topps and other trading card companies.  Independent card-manufacturing solutions companies, like GCP, have little ability or willingness to invest in their own improvement as, for years, the trading card trends have been largely cyclical in nature. Companies that spend time and capital building capacity to meet demand run the risk of finishing right as that demand dries up.  As such, a number of trading card companies have invested in or acquired their own card-manufacturing solutions.  This enables the trading card company to grow the card-manufacturing solutions alongside demand—Pokémon, one of the largest trading card companies, bought Millennium Print Group in 2021; likewise, Panini has its own manufacturing solution abroad.

106.    Indeed, even Panini America's CEO, Mark Warsop, recognized the need for investment into GCP, advising the CEO of GCP to sell the business.  Warsop likely realized that an outside investment in GCP would increase GCP's ability to print Panini's cards, alleviate systemic delay issues, and generally expand GCP's capacity and flexibility—thereby allowing for greater innovation and fewer quality control issues.

107.    Fanatics Collectibles' investment in GCP has paid off for collectors.  In the first 18 months alone, Fanatics  Collectibles' investment in GCP allowed it to:  (i) tighten quality control, already reducing the number of cards that fell short of "centering" standards by 70%; (ii) increase capacity from less than 300 million to over 400 million packs per year; (iii) substantially reduce delays, allowing trading card companies to meet precise release schedules far more often; (iv) enhance security procedures, resulting in significantly less theft which can impact cards'

uniqueness; and (v) increase investment and innovation, with GCP doubling its capex since investment, deploying state-of-the-art innovations, and investing in new facilities.

108. Fanatics Collectibles' investment has benefited itself and Topps, as well as GCP's other customers—including Panini. Indeed, not only did Panini's output improve directly as a result of GCP's increased capacity, but Panini's share of that capacity grew substantially over time, resulting in GCP producing significantly more packs for Panini and the capacity to produce even more. Fanatics Collectibles' investment also clearly benefited trading card collectors, given the increase in not only the *quantity* of card production available, but their quality and timely production as well.

109. Ironically, while GCP's capacity and flexibility have grown by multiples, Panini's own mismanagement has prevented it from capitalizing on these improvements. While Panini has accused GCP of impeding its production, Panini has only itself to blame. For years, GCP has set aside adequate capacity to run Panini's jobs far in advance. But both before and after Fanatics Collectibles' investment, Panini regularly failed to timely supply deliverables including production files, autographs, and memorabilia/relics, causing delays and complications as GCP scrambled to accommodate these issues while meeting Panini's preferred timeline. In the end, while Panini's blunders may have resulted in some self-inflicted wounds, they harmed GCP most of all, as capacity that is reserved and not used is lost. In 2023, Panini's mistakes led GCP to miss its own budget and profit goals by tens of millions of dollars—even though GCP was able to successfully complete many jobs for Panini that were initially compromised by Panini's mismanagement and lack of organization.

### iii.    Fanatics Collectibles' Growth

110.    Licensors, long experienced with these sorts of deals, have recognized the dynamic new opportunities Fanatics Collectibles offers, and licensors such as Bundesliga, colleges, Disney, F-1, MLB/MLBPA, NBA/NBPA, NFL/NFLPA, UEFA, UFC and WWE have all chosen to enter into license agreements with Fanatics Collectibles.  Those licenses have varying terms depending on the interests of the licensor (the holder of the IP rights).

111.    Yet, for all its success, Fanatics Collectibles' share of the sports and entertainment collectibles market remains small—in fact, much smaller than Panini's as of today.  Indeed, Fanatics Collectibles' portfolio of sports licenses largely resembles Panini's—except that many of Fanatics Collectibles' key licenses will not kick in until late 2025 or early 2026.  The following chart compares Fanatics Collectibles' suite of licenses to Panini's past or present licenses:

| Fanatics Collectibles | Panini |
|---|---|
| MLB | FIFA |
| MLBPA | MLBPA |
| NFL | NFL |
| NFLPA | NFLPA |
| NBA | NBA |
| NBPA | NBPA |
| F-1 | NASCAR |
| UFC | UFC |
| WWE | WWE |
| Colleges | Colleges |
| Bundesliga | EPL |
| UEFA | UEFA |

112.    Panini also holds licenses with other major collectibles licensors such as Marvel, the global entertainment goliath.

**D.    Panini's Unlawful Campaign to Disrupt Fanatics Collectibles**

113.    Unable to keep pace with Fanatics Collectibles and having lost key licenses in football and basketball beginning in 2025, Panini launched a campaign of dirty tricks.

114.    Panini's intention behind these maneuvers was twofold:  to disrupt Fanatics Collectibles' momentum and to possibly coax Fanatics Collectibles into early transitioning its remaining license years, a maneuver that would lead to an undeserved windfall profit for Panini. Panini strung Fanatics Collectibles along by negotiating a sham agreement with respect to the early termination of certain licenses.  In fact, Panini had no intent to consummate that agreement, which

served merely as a vehicle to stall Fanatics Collectibles' development of its business—as Fanatics Collectibles believed that it would be able to rely on Panini personnel, many of whom could freely join Fanatics Collectibles following the early termination of Panini's licenses—and prevent Fanatics Collectibles from beginning its business relationships with the NBA and NFL prospects. Panini then turned to wielding litigation and the threat of litigation as a weapon to prevent its employees from seeking greener pastures at Fanatics Collectibles.  Finally, Panini filed an unfounded antitrust action against Fanatics.

               i.    <u>Panini Bait-and-Switches Fanatics Collectibles with Sham Prospects of Early Termination</u>

115.    Unable to keep up with Fanatics Collectibles fair-and-square, Panini engaged in a campaign of stalling, misdirection, and misrepresentation to prevent Fanatics Collectibles from solidifying relationships with and acquiring licenses from the NBPA, NBA prospects, and NFL prospects.

116.    With many of Fanatics Collectibles' licensing rights commencing after licenses held by Panini were set to expire in 2025-2026, Panini engaged with Fanatics in February 2022 about the early termination of certain of its licenses, which would facilitate an early transition of these licenses to Fanatics Collectibles, in exchange for a lump-sum fee equivalent to Panini's projected earnings for the remaining license years, less a discount factor.

117.    Fanatics Collectibles welcomed the opportunity, recognizing that the collaboration could ensure a smooth transition for its licensor partners and for collectors.  The proposed early termination would be extremely lucrative for Panini.  At the time Fanatics and Panini began their discussions, the COVID-19 pandemic and the rise of NFTs brought a surge in demand and value for sports cards.  As a result, the potential early termination presented Panini with the opportunity to secure compensation for years of future earnings predicated on unusually favorable market

conditions and historically high valuations at that time. The huge cash infusion that Panini would receive from the early termination would allow it to remain highly competitive in the industry for years to come.

118. In furtherance of these discussions, Fanatics and Panini held numerous meetings, both in-person and virtual, and exchanged numerous communications by phone and email. Several of the in-person meetings took place in New York and were attended by representatives of Panini and/or Panini America. The negotiations that took place by videoconference, call, or email typically involved Fanatics' New York-based agents and representatives participating from New York.

119. The first milestone in negotiations occurred in June 2022, when the companies reached a preliminary agreement: with the approval of the licensors, Panini would terminate the remaining years on its licenses with the NFL, the NBA, their respective players' associations, the WWE, UFC, and the CLC. In exchange, Fanatics Collectibles would pay Panini an early termination fee based on Panini's projected earnings (as of the closing date) for the residual terms of the licenses. These core terms (price formula and licenses subject to early termination) remained unchanged throughout the parties' negotiations.

120. The precise amount of the agreed-upon termination fee remained unchanged throughout June, July, and at least half of August 2022. But unbeknownst to Fanatics, Panini knew that it was materially underperforming against its annual projections by nearly 30%—a reality it intentionally disguised and fraudulently concealed to maintain an inflated termination fee. Fanatics received these false representations in New York.

121. The parties reached their preliminary agreement shortly after Fanatics sent Panini a draft term sheet outlining the terms of the contemplated transaction. After receiving the draft

term sheet in May 2022, Panini executives orally informed Fanatics executives that Panini accepted the core structure proposed for the early termination deal, although certain less significant terms (e.g., trademarks, technology) remained open for negotiation. Although the duty to negotiate the remaining terms in good faith was implied as soon as the parties reached their preliminary agreement, the following month, Panini's counsel added a provision to the draft term sheet stating that the parties "will continue to negotiate in good faith with the goal of expeditiously resolving all matters," thereby evincing that Panini recognized its ongoing duty to negotiate in good faith. In the coming months, the parties exchanged various draft term sheets and other deal documents containing materially similar language. These documents continued to reflect the core terms that the parties had agreed upon.

122. Unfortunately, Panini did not live up to its duty to negotiate in good faith. Closing was initially set for July 2022, but this date repeatedly slipped as Panini delayed, delayed, and delayed some more. Panini's delays were perplexing: a quick execution would give Panini the unique opportunity to take advantage of the sky-high valuations that COVID-19 and the NFT-related industry fervor had created. Yet even in the absence of any substantive disagreements, Panini routinely went weeks without providing any comments on draft transactional documents. More than once, Panini waited over a month to return its mark-up of the term sheet. Fanatics Collectibles, on the other hand, made every effort to advance negotiations, retaining top-tier lawyers and other advisers, engaging in robust due diligence, promptly turning comments on the parties' working term sheet, and leveraging key connections to secure commitments from lenders to fund the early termination payment to Panini. In doing so, Fanatics Collectibles devoted vast amounts of time, energy, and capital to effectuate the early termination. Despite all of Fanatics

Collectibles' best efforts, Panini's repeated delays resulted in monthly postponements of the targeted closing date.

123.    Around October 2022, after several months of stalling by Panini, Fanatics attempted to advance the discussions by drafting a long-form agreement to memorialize the detailed terms of the anticipated early termination.  However, Panini continued to stonewall with serial delays and inexplicable intransigence.  It took Panini 28 days to send Fanatics its initial mark-up of the long-form agreement, and a later turn took Panini 34 days before returning its mark-up.  Panini exhibited equally egregious delays with respect to other deal documents and diligence tasks.  Ultimately, Panini's stalling delayed closing for the rest of 2022 and into 2023.

124.    As Panini stalled, the collectibles industry grew more challenging.  By early 2023, market realities had dramatically changed.  The COVID-19 pandemic was showing signs of subsiding, and 2022's "crypto winter" (which also adversely affected demand for NFTs) coincided with a general downturn in economic conditions.

125.    It was around this time that Fanatics learned Panini had created falsified financial projections to inflate the amount of the early termination fee, as part of its efforts to dupe Fanatics Collectibles into continued negotiations.  Astonishingly, Warsop admitted to Fanatics privately that Panini was maintaining two sets of projections during negotiations with Fanatics Collectibles: (1) an internal set that Panini used and relied on to properly budget and operate its business, and which had been approved by Panini's Italian owners, and (2) a separate, much rosier set of falsified projections that were carefully and systematically fed to Fanatics for its consumption at the direction, and with the endorsement, of Panini's Italian owners.  This was not some off-hand comment; in a series of meetings that occurred on November 14, 2022, November 19, 2022, December 5, 2022, December 11, 2022, and January 16, 2023, Warsop repeatedly confessed that

64

Panini's own internal projections for 2023 had been revised downward by hundreds of millions of dollars in annual profits. During the January 16, 2023 meeting, Warsop confirmed that Panini's Italian owners had formally approved these reduced figures.

126.    Even as it became clear to Fanatics that the projections provided by Panini's owners in Italy materially misrepresented the attractiveness of Panini's business, Panini continued to reiterate to Fanatics that it stood by the same inflated earnings projections. On January 26, 2023—ten days after Warsop confirmed that Panini's Italian owners had formally approved the reduced figures—Panini provided Fanatics with financial projections that still overstated its future earnings by hundreds of millions of dollars in 2023. A month later (on February 26, 2023), in complete contradiction to this representation, Warsop confirmed once more that Panini's internal projections for 2023 were down dramatically in line with its actual earnings in 2022. Because the early termination price was directly tied to Panini's projections, its inflated projections were designed to justify an inflated price.

127.    Panini employed other maneuvers to extract an inflated termination fee. While Fanatics Collectibles engaged with Panini about the potential for early termination of Panini's licenses, Panini repeatedly threatened, both explicitly and implicitly, that Fanatics would face an antitrust lawsuit if the parties failed to reach agreement. In this respect, Panini was attempting to strong-arm Fanatics into paying the falsely inflated fee that Panini wanted.

128.    As a result of Panini's delays, misdirection, and misrepresentations, Fanatics Collectibles missed out on lucrative business opportunities worth hundreds of millions in revenue over the last year of negotiations. Before entering negotiations with Panini, Fanatics Collectibles had arranged certain potential deals adjacent to Panini's established licenses.

65

129.    Specifically, prior to and during the negotiations with Panini, Fanatics Collectibles had agreed to a present-day licensing arrangement with the NBPA and was pursuing specific exclusive licenses with NBA and NFL prospects that included autograph rights alongside the prospects' NILs for trading cards.  No other company was vying for the NBPA license at the time, and Panini was in competition against Fanatics for the NBA and NFL prospect deals.

130.    Understanding the importance of developing relationships with athletes as early as possible in their careers, Fanatics Collectibles worked to nurture relationships with prospects in both sports—a labor intensive process requiring consistency of time, resources, and personalized effort to meet each prospect's specific needs.  Once the parties reached a preliminary agreement to an early termination of certain of Panini's licenses, however, Fanatics Collectibles paused pursuing these other deals because it reasonably believed it would no longer need to acquire the licenses that it was exploring, as it would obtain substantively similar licenses through the early termination.  Meanwhile, knowing Fanatics Collectibles would rely on the potential early termination by pausing its relationship-building efforts with prospects, Panini swooped in to sign the top three 2022 NFL and NBA draft picks.[79]  Rookie cards are particularly sought after for the same reason first editions of novels are valuable—a player has only one rookie year, never to repeat it.  Even as an individual player may have dozens of cards made over the years of their career, the finite nature of the rookie card makes it among the most valuable cards for collectors, who will pay top dollar to get them.[80]  And the value of a rookie card often increases with time

---

[79] Ryan Cracknell, *2022 Panini Chronicles Draft Picks Basketball Checklist And Details*, BECKETT (2022) https://www.beckett.com/news/2022-panini-chronicles-draft-picks-basketball-cards/; *see also Top 2022-23 NBA Rookie Cards Guide & Basketball Rookie Card Hot List*, THE CARDBOARD CONNECTION (2022), https://www.cardboardconnection.com/top-2022-23-nba-rookie-cards.

[80]    *See, e.g., Rookie Card Collecting: The Allure Of A Player's First Card*, COLLECTIBLES INSURANCE SERVICES (last visited Apr. 30, 2025), https://collectinsure.com/2023/10/25/rookie-card-collecting-the-allure-of-a-players-first-card.

and player popularity.  For example, one of Panini's 2022 NBA rookies is now selling for almost $300 dollars a card, and $600 for a mint condition rookie card.[81]  Panini thus benefited financially by virtue of its opportunity to pursue (and secure) these licenses in parallel, without having to contend with competition from Fanatics Collectibles, and by being able to secure autograph rights (which are separate from the group license).  Panini's misrepresentation caused Fanatics to miss an opportunity to earn untold millions of dollars.

131.    By the time early termination talks terminated, Fanatics Collectibles had missed the opportunity to pursue valuable parallel business opportunities.  When the parties finally reached an impasse in early 2023, the NFL prospects for 2022 had already been drafted, effectively preventing Fanatics Collectibles from entering license arrangements with the prospects.  And while Fanatics Collectibles was able to re-enter and salvage its negotiations with the NBPA after its negotiations with Panini terminated, Panini had already signed the top three 2022 NBA and NFL draft picks, and Fanatics Collectibles missed out on a full year of revenue stream as Panini deceptively led it down a path to nowhere.   By contrast, in years where Fanatics Collectibles has been able to compete fairly in the market, its approach to early relationship building with college athletes has yielded impressive results.  Without Panini's interference in 2023, 2024, and 2025, Fanatics Collectibles succeeded in signing the top three NBA and NFL draft picks, respectively. Fanatics Collectibles estimates that these missed opportunities in 2022 would have generated substantial amounts of revenue for football and basketball collectibles products in the first year alone.

---

[81]    *Prices for 2022 Panini Chronicles Basketball Cards*, SPORTSCARDSPRO (last visited Apr. 30, 2025), https://www.sportscardspro.com/console/basketball-cards-2022-panini-chronicles.

132.    Also, as a result of Panini's misdirection, Fanatics Collectibles leveraged key lender relationships to no end, devoted valuable time and attention of its senior leadership, spent tens of millions of dollars paying lawyers, accountants, and other professionals to perform extensive due diligence work, invested in new facilities and expansion, chose to forgo pursuing relationships with athletes and players' associations, and suffered other harm in connection with the early termination—which Panini knew would never happen because Panini approached negotiations entirely in bad faith.

133.    Fanatics Collectibles was not alone in suffering from Panini's drawn-out misdirection campaign:  consumers also suffered, as did the industry at large.  By tying up Fanatics' senior leadership in dead-end early termination talks that lasted nearly a year, Panini prevented Fanatics Collectibles from devoting its full attention to creating, improving, and delivering better products and services for the group that matters most—collectors.  A strong sports and entertainment collectibles industry requires an engaged and loyal consumer base.  Unlike Panini, Fanatics Collectibles' defining mission is to serve collectors and constantly improve their experience.  By standing in Fanatics Collectibles' way, Panini harmed the entire industry to the detriment of collectors.

134.    Lest there be any doubt as to Panini's ill intent and bad faith in negotiating for early termination of its licenses, Panini's continuing antitrust action against Fanatics affords smoking-gun proof.  After all, Panini was bidding to receive a large financial payment in order to *accelerate* the very same circumstance—simultaneous holding of parallel, long-term exclusive licenses by Fanatics Collectibles—that Panini now paints as a flagrant antitrust violation.  For Panini now to contend that Fanatics Collectibles would, upon paying a vast sum to Panini, have been walking

68

into massive antitrust liability amounts to Panini confessing that it was proceeding in bad faith from the start.

ii.    Panini Tortiously Interferes with Fanatics Collectibles' Exclusive Contracts with College Athletes

135.    In spring 2023, after drawing out licensing negotiations in bad faith, Panini expanded its tortious campaign to harm Fanatics Collectibles' growing business with college athletes.

136.    Fanatics Collectibles' success depends in large part on developing and maintaining strong relationships with athletes. Cultivating these individual relationships is a long process that Fanatics Collectibles strives to begin with athletes at the beginning of their career, including by developing relationships with athletes who are in college and before they are drafted into professional sports leagues. As part of this, Fanatics has partnered with universities and student athletes to offer collegiate sports trading cards.

137.    Between February and early-April 2023, Fanatics Collectibles negotiated and signed exclusive license agreements with several top NFL draft prospects, which included, among other things, autograph rights and personal appearance services.

138.    On information and belief, in spring 2023, Panini approached numerous athletes under contract with Fanatics Collectibles and attempted to induce those athletes to break their contracts with Fanatics Collectibles and instead sign exclusive deals with Panini. Panini's attempts failed and Fanatics proceeded to develop and release innovative trading card products that generated collector excitement and enhanced these young athletes' brands and images.

139.    But Panini's interference did not stop after the 2023 draft.  In fall 2023, Fanatics Collectibles negotiated and signed individual licensing deals, which similarly included autograph and personal services rights, with numerous top 2024 NFL draft prospects.

140.    Shortly thereafter, in December 2023, Fanatics Collectibles learned that Panini was again brazenly attempting to induce several top athletes under contract with Fanatics Collectibles to breach their exclusive contracts with Fanatics Collectibles and enter into new contracts with Panini.  In doing so, Panini not only offered outsized compensation as an inducement for breach but also offered "assistance" to athletes and/or their families to help them "get out" of their exclusive deals with Fanatics Collectibles.

141.    The athletes were free to solicit competing bids prior to signing with Fanatics Collectibles.  Indeed, Fanatics Collectibles welcomes competition from Panini or any other competitor during the bidding process and fully respects the athletes' rights to maximize the value of their rights and services.  But exclusive deals between the athletes and Fanatics Collectibles were signed, binding, known to Panini and in effect at the time of Panini's outreach.  Consequently, Panini's efforts to cause a breach were neither legitimate nor protected action, but rather deliberate tortious interference.

142.    Fanatics Collectibles has already suffered monetary damages as a result of Panini's tortious interference.  While none of the athletes accepted Panini's offers, some sought increased compensation from Fanatics Collectibles, which Fanatics Collectibles provided to retain the contracts and preserve the relationships.

143.    Panini's egregious interference with Fanatics Collectibles' contractual rights fits within a broader pattern of malicious and economically irrational actions taken solely to harm Fanatics and have threatened reputational harm.

      iii.    <u>Panini Uses Threats and Litigation to Prevent Its Employees from Joining Fanatics Collectibles</u>

144.    In parallel to interfering with Fanatics Collectibles' existing athlete deals, Panini resorted to heavy-handed litigation threats to scare its at-will employees away from joining Fanatics.

145.    While negotiations with Panini were ongoing, Fanatics Collectibles deferred hiring new employees to build out its growing sports card business in anticipation that certain of Panini's employees would naturally transition to Fanatics Collectibles as part of the early termination.  In late March and early April 2023, shortly after talks fell apart, Fanatics Collectibles sought to hire new employees to support its existing collectibles business and to prepare for the impending start of certain of its licenses, which began as early as October 2023 and included such sports as basketball (through its NBPA license), UFC, tennis, boxing, and football.  As part of this effort, Fanatics Collectibles posted over 100 job openings.

146.    Fanatics Collectibles expected many Panini employees would be interested, given that Panini's sports business was struggling, and its owners continued to attempt to sell the business to third parties, even as a number of Panini's licenses approached expiry.  Given the circumstances, Fanatics Collectibles assumed that those employees who worked on products associated with those licenses would be concerned about their futures and would be interested in working for a new, dynamic participant in the card collectibles space.

147.    That month, 37 former Panini employees chose to leave the company and join Fanatics Collectibles.  Fanatics Collectibles gave them essential roles across its marketing, operations, athlete relations, and product development departments, and those employees have been active and productive since they were hired.  Fanatics Collectibles had a business need for these employees (today it still has over 75 job openings to support its growing business), and would

71

have hired them earlier if Panini had not bait-and-switched Fanatics Collectibles into dead-end talks of early termination.

148.    Panini's low morale among its workforce also contributed to the departures.  Former Panini employees recall the emotional turmoil, stress, and lack of transparency that drove them to Fanatics Collectibles.  Notably, Panini kept loyal employees in the dark as Panini negotiated the early termination of its licenses with Fanatics Collectibles.  Caught unaware, these veterans felt slighted upon learning their licenses would transfer to Fanatics Collectibles with no consideration of their dedication over the years.  Rather than receive due appreciation or reassurance, many felt devalued and expendable.  Instead of reassuring staff, Panini leadership resorted to intimidation to prevent exits and attempted to pin the blame on Fanatics Collectibles— villainizing it for the very climate of fear Panini itself cultivated.  On or about April 5, 2023, D.J. Kazmierczak, Panini SVP of Operations, told the Panini product development team that Fanatics was exposing itself to scrutiny from licensors, and that Fanatics Collectibles' contracts with licensors could be voided.  Ultimately, Panini's strong-arm tactics worked as numerous Panini employees in product development rebuffed Fanatics Collectibles' attempts to hire them and stayed at Panini.  Upon information and belief, these employees decided against joining Fanatics Collectibles because of Panini's threats.

149.    Moreover, many Panini employees did not feel their salaries were reflective of what they deserved.  Before they left Panini for Fanatics Collectibles, Panini America had not raised employee salaries in over two years, leaving many workers disappointed and disgruntled.  Only when it became clear that its employees would rather work for Fanatics Collectibles did Panini's ownership find motivation to offer employee raises.  Remarkably, Warsop himself acknowledged Panini's stinginess towards employees.  In May 2023, Warsop told Fanatics that Fanatics

Collectibles' hiring of Panini America employees was great for Panini America because it finally got Panini's owners to open their checkbook after years of being "cheapskates" toward workers.

150.    Ironically, as employee morale plummeted, Panini used the prospect of joining Fanatics as a tool to retain its employees. During early termination negotiations, Panini executives, including Warsop, incentivized dissatisfied Panini employees to stick with Panini by telling them that they could join Fanatics after the deal closed. Playing both sides, Warsop provided Fanatics insight and advice, upon which Fanatics relied, about Panini employees, even going so far as to make introductions and arrange meetings between Fanatics and Panini employees.

151.    Making matters worse, Panini's business was hampered, upon information and belief, by its stark lack of diversity, including at the highest levels. Panini's racially intolerant workplace culture has occasioned ongoing widespread public concern and criticism. In the last two months alone, four former Panini employees have filed workplace discrimination actions against Panini.[82] These complaints allege that, for over a decade, Panini has maintained a racially hostile work environment for its employees of color and systematically suppressed their professional advancement. Amidst this hostile culture, Panini's employees of color have had nowhere to turn. The complaints allege that Panini never mandated employees or management undergo anti-discrimination training, and that Panini neglected to institute any formal complaint process or remedial avenue related to workplace discrimination.

152.    Further, these complaints allege Panini's employees of color experienced segregation and harassment from their Caucasian coworkers and supervisors. Not only did Panini

---

[82]    *Dulce Huerta v. Panini America, Inc.*, No. 3:23-cv-02529-K (N.D. Tex., Nov. 15, 2023); *Nora Vargas v. Panini America, Inc.*, No. 3:23-cv-02689-B (N.D. Tex., Dec. 6, 2023); *La Shanda Woods v. Panini America, Inc.*, No. 3:23-cv-02690-X (N.D. Tex., Dec. 6, 2023); *Derrick Pickett v. Panini America, Inc.*, No. 3:23-cv-02691-N (N.D. Tex., Dec. 6, 2023).

allegedly physically segregate "non-Caucasian" employees "from their Caucasian counterparts" during work and social events,[83] but Panini also allegedly placed employees of color in "storage rooms" while their Caucasian coworkers worked in conventional office spaces.[84]  Further, Panini's supervisors allegedly made discriminatory remarks towards Black and Latinx employees,[85] and allegedly failed to take any remedial action when other Caucasian employees engaged in racist behavior toward Black employees.[86]  Panini also allegedly restricted its diverse employees' ability to advance professionally and denied them equal privileges and pay.[87]

153.    Given these egregious allegations, it is no surprise that Panini rolled back some of its internal protections for employees of color years ago.  In 2021, Panini removed its previously proclaimed commitment to workplace diversity from its code of ethics.[88]  It went still further by

---

[83]   Complaint, *Huerta v. Panini America, Inc.*, ¶ 4; Complaint, *Woods v. Panini America, Inc.*, ¶ 35.

[84]   Complaint, *Woods v. Panini America, Inc.*, ¶ 12; Complaint, *Vargas v. Panini America, Inc.*, ¶ 12; Complaint, *Pickett v. Panini America, Inc.*, ¶ 12.

[85]   Complaint, *Huerta v. Panini America, Inc.*, ¶ 5; Complaint, *Vargas v. Panini America, Inc.*, ¶ 13; Complaint, *Woods v. Panini America, Inc.*, ¶ 13; Complaint, *Pickett v. Panini America, Inc.*, ¶ 13. These supervisors allegedly told Latinx employees that they would be more "efficient" if they were not "distracted" by "having so many children." Complaint, *Huerta v. Panini America, Inc.*, ¶ 6; Complaint, *Vargas v. Panini America, Inc.*, ¶¶ 24-25. Panini supervisors and even a Panini vice president deliberately referred to a Black employee by the wrong name "twice a month for multiple years," telling him that it was the result of them mixing up the names of other Black people they knew.  Complaint, *Pickett v. Panini America, Inc.*, ¶¶ 33-36.

[86]   Complaint, *Pickett v. Panini America, Inc.*, ¶¶ 37-39 (alleging that supervisors failed to take remedial action after Caucasian employees called Black employees the wrong name and insinuated that Black people were not affluent enough to live in certain neighborhoods).

[87]   When Panini did promote employees of color, Panini allegedly provided them merely ceremonial titles that were not accompanied by "any real change in responsibilities, pay, or authority." Complaint, *Huerta v. Panini America, Inc.*, ¶ 37.  And while Panini permitted Caucasian employees to work from home during the pandemic, Panini allegedly temporarily furloughed two Black employees and required its employees of color to work in person.  Moreover, Panini employees of color allegedly experienced disproportionate workloads, scrutiny, and retaliation compared to Caucasian counterparts—all for less pay.

[88]   *Compare Code of Ethics*, Panini S.p.A. at 8 (Dec. 1, 2016), https://s3.amazonaws.com/prod-paninicx-store/info/PANINI_SpA_Code_of_Ethics.pdf ("The Company believes diversity is an opportunity in terms of innovation and development through dialogue and exchanging ideas, opinions and experiences."), *with The Code of Ethics*, Panini S.p.A. at 2, 5 (Dec. 17, 2021),

74

removing "race" from what Panini lists as the classes protected from workplace discrimination.[89] More recently, social-justice advocates sent scathing letters to Panini and top sports league executives protesting the stark contrast between the lack of Black employees at the company and the enormous sums that Panini has made from the talents and contributions of Black athletes. Since entering the U.S., Panini has generated massive revenues selling football and basketball cards featuring Black and Brown athletes, who comprise the overwhelming majority of NBA and NFL players. Yet, as one letter observed, "[t]here are virtually no Black executives at the senior level [at Panini America]," and there is "very little Black employment at any level of the organization."[90] Another letter blasted Panini for having "no Black leadership in the United States" despite employing "hundreds of employees in the United States" and deriving "75% of its business from selling depictions of Black and Brown athletes."[91] Notably, "only 3 of Panini's 800 employees on LinkedIn are [B]lack."[92]

---

https://a.storyblok.com/f/71890/x/ee6c3e7ee1/panini_spa_code_of_ethics.pdf. Panini S.p.A.'s 2016 code of ethics is archived on Panini America's website. Panini S.p.A.'s current code of ethics is available on Panini S.p.A.'s website.

[89] *Compare Code of Ethics*, Panini S.p.A. at 8 (Dec. 1, 2016), https://s3.amazonaws.com/prod-paninicx-store/info/PANINI_SpA_Code_of_Ethics.pdf ("Discriminatory behaviour based on race, religion, age, health, political and trade union opinions, nationality, sexual orientation and in general any personal quality of a human being is not admitted in internal and external  relations.") (emphasis added), *with The Code of Ethics*, Panini S.p.A. at 5 (Dec. 17, 2021), https://a.storyblok.com/f/71890/x/ee6c3e7ee1/panini_spa_code_of_ethics.pdf ("Panini s.p.a. condemns any conduct that harms individual personality, and, in particular, disapproves of and forbids, in its own organisational context, any discriminatory behaviour founded on nationality or origin, religious creed, age, health condition, political and trade union opinions, sexual orientation, and on any and all other subjective characteristics or conditions.").

[90] Eileen Reslen, *The scathing letter sent to NFL, NBA, MLB execs over Panini's alleged 'racial injustice'*, N.Y. POST (May 24, 2023), https://nypost.com/2023/05/24/tamika-mallory-accuses-panini-of-racial-injustice-in-scathing-letter-to-sports-leagues.

[91] Letter from Tamika D. Mallory and Rev. Michael McBride to Mark Warsop, *Re: Panini America Inc.'s ("Panini") Lack of Diversity In Its Executive Leadership* (May 15, 2023), https://thesource.com/wp-content/uploads/2023/05/Letter-to-Panini-America2-002.pdf.

[92] Complaint, *Huerta v. Panini America, Inc.*, ¶ 15.

The scathing letter sent to NFL, NBA, MLB execs over Panini's alleged 'racial injustice'
By Eileen Reslen — NEW YORK POST

Despite Panini's public commitments to diversity, Panini falls far short of its ideal. Panini has no Black leadership in the United States. While this failure would be notable for any organization, Panini's lack of diversity is especially shocking since its multi-billion dollar business has been built on the backs of Black and Brown athletes. Indeed, Panini, which has hundreds of employees in the United States, has derived 75% of its business from selling depictions of Black and Brown athletes.

154. Rather than address the root causes of these employee departures—and unable to keep its employees even with heavy-handed offers of pay raises and other incentives—Panini retaliated against its former employees with legal action. On April 14, 2023, Panini instituted an action in Texas state court against Fanatics and seven longtime former Panini employees who had joined Fanatics Collectibles.[93] Each and every named defendant was an at-will employee without any non-compete covenant restraining their move to Fanatics Collectibles. Even so, Panini sought immediate injunctive relief preventing Fanatics and the former employees from using Panini's supposed trade secrets and enjoining the former employees from recruiting more Panini employees.[94] The Texas state court initially granted Panini's application for a temporary restraining order, with language agreed to by the parties, and ordered expedited discovery.[95]

---

[93] *Panini America, Inc. v. Eli Nicholas Matijevich, Jr. et al.*, No. DC-23-04798 (Tex. Dist. Ct., Dallas Co., Apr. 14, 2023).

[94] Complaint ¶¶ 53-60, *Panini America, Inc. v. Matijevich et al.* (Apr. 14, 2023).

[95] Temporary Restraining Order, *Panini America, Inc. v. Matijevich, et al.* (Apr. 17, 2023).

76

155.    For the sake of avoiding further dispute, Fanatics consented to a temporary injunction barring the seven former employees from recruiting other Panini employees and enjoining both Fanatics and the seven former Panini employees from using Panini's confidential information.[96]

156.    While the litigation remains ongoing, the record developed provides zero support for the notion that Fanatics or Panini's former employees did anything unlawful.  Panini accuses Fanatics of trade secret misappropriation because former employees left with thumb drives, but neutral forensic evidence has confirmed that no former employee ever accessed any Panini-related information on the thumb drives after leaving Panini.  Meanwhile, Panini's alleged "trade secrets" are a hodgepodge of public or valueless categories of information.  For example, Panini suggests that the identity of its employees is a trade secret, but its corporate representative readily agreed that this information is public knowledge.

157.    Panini's heavy handed legal threats have succeeded at preventing other employees from joining Fanatics Collectibles.  Since the first wave of employee departures, Panini has initiated a campaign of intimidation, leveraging the threat of further litigation to stem the tide of further employee departures.  Panini has reportedly threatened current employees, regardless of seniority or whether they were under non-competes, with legal actions should they choose to transition to Fanatics Collectibles.  In threatening litigation, Panini could point to no legally protected rights of interest; rather, Panini threatened litigation solely as a tactic to prevent the departures of its at-will employees.  Upon information and belief, Panini's scare tactics, compounded by its actual suit against certain former employees, have instilled a climate of fear among its personnel. Consequently, many more Panini employees have been deterred from joining

---

[96]    Agreed Temporary Injunction, *Panini America, Inc. v. Matijevich, et al.* (May 25, 2023).

Fanatics Collectibles and forced to remain captive at Panini as their sole avenue for maintaining gainful employment in the industry. These are qualified, experienced employees who would add great value at Fanatics Collectibles.

158.    Hiring statistics demonstrate that Panini's strategy of stemming employee departures through litigation threats and actual litigation has succeeded. Between April 4, 2023, and April 14, 2023, Fanatics Collectibles hired 34 former Panini America employees. Since Panini filed suit in Texas on April 14, 2023, however, Fanatics Collectibles has hired just three former Panini America employees, despite posting hundreds of job openings that other Panini America employees could have filled. Indeed, since April 2023, Fanatics Collectibles has made approximately 1,125 hires and over 1,000 of these hires have begun their employment. These numbers strongly suggest that many other employees of Panini America would have joined Fanatics Collectibles but for Panini's vindictive litigation and litigation threats.

### iv.    Panini Alleges "Antitrust" Violations to Protect Its Incumbency

159.    In early August 2023, Panini finally came through on its longstanding threats to bring a (baseless) antitrust action against Fanatics. In its latest move to thwart Fanatics' rise, Panini (through Panini America) has filed a federal action against certain Fanatics entities. [97] Panini America's lawsuit, which alleges violations of federal antitrust laws and state tort laws, is factually inaccurate, legally incoherent, and ultimately upside-down. At bottom, Panini is misusing the antitrust laws to try to insulate itself against competition, and doing so after Fanatics has proved to be the superior option, on the merits, for licensors as well as consumers. Indeed, while Panini is directing its allegations against Fanatics, what Panini is really doing is challenging decisions by sports leagues and players' associations to license their exclusive intellectual property

---

[97]    *Panini America, Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714 (S.D.N.Y., filed Aug. 3, 2023).

rights as they deem best, in furtherance of their interests and those of consumers.  As the longtime incumbent, Panini had every opportunity to prove itself to the licensors.  Instead, Panini took the renewal of its licenses for granted while openly trying to sell its business.  Moreover, Panini is faulting conduct by Fanatics (including Fanatics' displacement of Panini, after Panini displaced Topps) that is no different from what Panini did to position itself in prior years.  Examples of Panini's disingenuousness jump out from its amended complaint:

160.    **Panini's Track Record**.  Panini America alleges that, "[t]hrough competitive prowess and product innovation," it has "generated win-win results for the leagues, players associations, and consumers."[98]  But Panini's actual track record tells a much different story—of dismal customer service, enormous amounts of unfulfilled redemption cards, egregious quality control issues, shoddy product offerings, and pervasive underinvestment.  The upshot has left athletes, players' associations, leagues, entertainment properties, and collectors hungering for a new alternative over the last decade, while Panini devoted itself to hoarding profits and trying to sell its business.

161.    **Fanatics' Competition for Licenses**.  Panini America cries foul because it was not "given an opportunity to bid or otherwise compete for the licenses Fanatics acquired."[99]  Setting aside that Panini America should have been competing for the future business of its licensors every day it held a license, the reality is that sophisticated licensors choose for themselves whether or not to run a bidding process.  Here, the licensors independently decided not to solicit bids from Panini because Panini had made painfully clear throughout its long tenure that it was trying to sell

---

[98]    Panini Amended Complaint ¶ 78, ECF No. 69, *Panini America, Inc. v. Fanatics, Inc. et al.* (hereafter, "Panini Amended Complaint").

[99]    *Id.* ¶ 110.

its business and lacked the vision, leadership team, and willingness to invest and deliver the way that Fanatics Collectibles is positioned and committed to do. Simply stated, it was obvious to licensors that the bold, comprehensive, and innovative vision Fanatics Collectibles brought to the table marked the path forward for the future and would best serve the interests of collectors and licensors alike. And Panini should well understand why licensors here proceeded as they did, having *itself* acquired licenses (including its long-held NFLPA license) *without* having to participate in a bidding process.

162.    **Prospect Deals**. Panini America alleges that Fanatics "began a targeted effort to execute exclusive deals with star, rookie players to deprive Panini of the ability to include those players' original, handwritten autographs with its trading cards during the remaining years of Panini's existing licenses."[100] This allegation, too, is demonstrably false. Fanatics Collectibles had strong business reasons for entering the referenced deals with prospective draft candidates, which have generated collector excitement and significant revenue, in addition to igniting successful, viral marketing campaigns. Notably, Panini fails to mention that it competed for dozens of these prospects and lost *every single one* to Fanatics Collectibles, even though Panini offered nearly every prospect the same or, in most cases, more money.

163.    **Long-Term, Exclusive Deals**. Panini claims "[t]he durations of Fanatics' exclusive dealing arrangements are beyond anything that is necessary for any legitimate economic or other purpose."[101] This allegation ignores the fact that the licensors choose the terms upon which to license their intellectual property. It also flouts basic economic theory, as well-known to and long trumpeted by Panini itself. Long-term, exclusive IP licensing incentivizes parties to work

---

[100]  *Id.* ¶ 164.

[101]  *Id.* ¶ 105.

together to grow and improve a business. Fanatics' long-term deals are enabling it to invest deeply in marketing, product development, and innovation; to build strong, lasting relationships with athletes; and to take a variety of steps to improve the industry and enhance collector experience, including as reflected in Fanatics' GCP investment. Collectors fare better, not worse, in a world where licensors have long-term deals with Fanatics as opposed to Panini.

164.    **Topps Acquisition**.    Panini America alleges that Fanatics "extinguished competition by acquiring Topps," while ignoring Panini's materially indistinguishable acquisition of Donruss, prior to which Panini had no U.S. staff or offices.[102]    Panini further suggests that "the monopoly power and effective market control created by [Fanatics'] exclusive deals with the Major U.S. Professional Sports Leagues and their players associations" pressured Topps to sell to Fanatics.[103]    Yet Panini itself was in the same position as Topps—having lost its key licenses to Fanatics Collectibles—and Panini remains independent today, refuting the notion that Topps had no choice but to sell to Fanatics.    And this Court rightly dismissed Panini's antitrust claim premised on the Topps acquisition.

165.    **GCP Investment**.    Panini alleges that Fanatics invested in GCP "to weaken Panini" and that the investment compromises Panini's ability produce cards "according to the exacting standards Panini requires."[104]    This, too, is demonstrably false.    Fanatics invested in GCP to improve an industry that has been plagued by significant quality issues, capacity constraints, consistent delivery delays, numerous theft issues, and underinvestment.    Fanatics' investment benefits everyone, including Panini—which has seen its share of GCP's capacity grow

---

[102]    *Id.* ¶ 207.

[103]    *Id.* ¶¶ 118-120.

[104]    *See id.* ¶¶ 131, 138.

substantially since Fanatics' investment, resulting in GCP producing significantly more packs for Panini, even while Panini has been actively moving jobs to other manufacturers. Collectors should judge for themselves whether Panini truly maintains "exacting standards," as Panini alleges. But the facts are that Fanatics' investment in GCP has been improving the quantity, quality, and security of GCP's production, and, in fact, has even expanded GCP's facilities, all for the benefit of collectors and the industry as a whole.

166. **Alleged "Raid" of Employees**. Panini America alleges that Fanatics hired dozens of its employees "to harm Panini's current ability to perform under its existing licenses and to bolster Fanatics' monopoly power by trying to put Panini out of business."[105] To the contrary, Panini employees were desperate to escape from Panini's dim prospects and bleak, hostile workplace environment, and they eagerly flocked to Fanatics Collectibles to help it prepare for the license rights which would become effective in the near future. More would have joined Fanatics Collectibles had it not been for Panini's tortious threats of legal action against them.

167. **"Fir[ing]" of Distributors**. Panini America claims that Fanatics is using its alleged "monopoly power and effective market control" to "threaten distributors … with cutting them off if they do not provide Fanatics with higher margins."[106] In truth, Fanatics has yet even to step into most of the licenses in question. As it does, however, Fanatics will be prioritizing selling directly to hobby shops, retailers, and breakers. And Fanatics' approach will benefit licensors and consumers, as it will avoid the enormous markups charged by distributors, which reduce profit margins for Fanatics' business partners and subject consumers to higher prices.

---

[105] *Id.* ¶ 162.

[106] *Id.* ¶ 194.

168.    **NFLPA Termination**.    Panini America alleges that Fanatics "induce[d]" the NFLPA to terminate its contract with Panini ahead of schedule, including by raiding Panini America's employees to trigger an event of termination under the NFLPA's contract with Panini.[107]  This outlandish allegation is refuted by an arbitral decision that Panini submitted to this Court.  ECF 114 (citing ECF 113-1 at 29-30).  Fanatics had a genuine need for every former Panini employee that it hired—indeed, it would have hired many more but for Panini's tortious conduct. In truth, the NFLPA independently chose to end its contract with Panini.  In fact, in June 2023, the NFLPA elected a new executive director, who has no prior relationship with Fanatics.[108]

169.    **WWE Termination**.    Similarly, Panini America claims that Fanatics induced the WWE to terminate its contract with Panini.[109]  But Panini provides no facts in support of this conclusory assertion, and public filings show that the WWE attempted to terminate Panini's contract for poor performance, specifically citing Panini's serial delays, which eroded the WWE's "confidence in the partnership . . . [as the entertainment group] became concerned about Panini's ability to perform under the Agreement to the standards expected."[110]

170.    **Equity**.    Panini claims that Fanatics "induce[d] the Leagues and players associations to acquiesce in Fanatics' monopolization scheme" by providing them equity shares in

---

[107]    *Id.* ¶¶ 179-87.

[108]    Michael Baca, *NFLPA elects Lloyd Howell as new executive director*, NFL (June 28, 2023), https://www.nfl.com/news/nflpa-elects-lloyd-howell-as-new-executive-director#:~:text=The%20NFL%20Players%20Association%20on,the%20solidarity%20amongst%20our%20players.

[109]    Panini Amended Complaint ¶¶ 188-93.

[110]    Supplemental Declaration of Scott Zanghellini in Support of Motion for Preliminary Injunction ¶¶ 17, 21, ECF No. 25, *Panini S.p.A. v. World Wrestling Entertainment, Inc.*, No. 23-cv-8324 (S.D.N.Y.); Declaration of Steven Pantaleo in Support of Motion for Preliminary Injunction ¶ 8, ECF No. 40-1, *Panini S.p.A. v. World Wrestling Entertainment, Inc.*, No. 23-cv-8324 (S.D.N.Y.). In November 2023, the parties confidentially settled their dispute. *Panini, WWE Settle Licensing Dispute*, SPORTS COLLECTORS DAILY (Nov. 15, 2023), https://www.sportscollectorsdaily.com/panini-wwe-settle-licensing-dispute.

Fanatics.[111]  In essence, Panini complains that Fanatics won licenses by offering more attractive terms than Panini ever offered.  That is called competition—and is what the antitrust laws are designed to protect.  Indeed, providing licensors with equity is part and parcel of Fanatics' broader strategy to expand economic opportunities for athletes, players' associations, teams, and leagues.

171.   **Fanatics' Track Record.**  In an effort to distract from the pervasive and egregious shortcomings that led licensors to abandon Panini *en masse*, Panini America includes a few paragraphs of cherrypicked allegations that supposedly demonstrate Fanatics' track record of "poor quality" offerings.[112]  Ironically, the few examples that Panini cites prove just the opposite: defects in Fanatics' products are exceedingly rare, and when they inevitably occur on occasion, Fanatics accepts responsibility and provides immediate customer support.

172.   Collectors, fans, and commentators quickly seized on the hypocrisy of Panini America's lawsuit, *i.e.*, complaining that Fanatics had fairly won long-term licenses with many of the same licensors with whom Panini has enjoyed a relationship for many years.  On August 4, 2023, shortly after filing its lawsuit, Panini issued an out-of-touch public statement bragging that it had supposedly "driven the trading card category to unprecedented heights never before witnessed among our licensed partners and players through the development of the industry's most popular trading card brands."[113]  Social media begged to differ—and had a lot to say about it. Panini was immediately met with a sea of criticism from collectors, fans, and commentators who expressed dismay and incredulity at Panini's arrogant (and dubious) self-characterization in its statement.  Of the 250+ postings in response to Panini's public statement that poured in over the

---

[111]   Panini Amended Complaint ¶ 8.

[112]   *Id.* ¶¶ 85-94.

[113]       Panini   America   (@PaniniAmerica),   X   (Aug.   4,   2023,   1:52   PM), https://twitter.com/paniniamerica/status/168752193560788 5824?s.

next two days, through August 6, more than 95% were negative towards Panini.   The onslaught of

angry consumers and commentators was piercing:[114]



173.    Indeed, Panini's underpaid and overworked social media team gave up after hiding a

dozen or so negative replies:

---

[114]   See **Appendix A** for a full compilation of the immediate responses to Panini's public statement.



174.    Panini's clumsy attempts to hide negative reactions to its postings about its lawsuit garnered further ridicule from collectors, fans and other commentators:







\*        \*        \*

175.    To be clear, Fanatics intends to present a robust defense—and prevail—against Panini America's baseless lawsuit.  What should be said here and now is that Panini's lawsuit is

87

merely the latest installment in Panini's ongoing campaign to stifle Fanatics' rise through any and all means (other than competition on the merits).

176.    Even casual observers will see that Panini's antitrust claims seek to turn the antitrust laws on their head.  Fanatics Collectibles is a dynamic new player that presented expanded economic opportunities to licensors, including players' associations and leagues, for their intellectual property.  These licensors—who are led by experienced and knowledgeable businesspeople—decided that their future was brighter if they licensed their intellectual property to Fanatics Collectibles.  That is not an antitrust violation.  It reflects competition and the fundamental principle that an entity has the freedom to license its intellectual property rights exclusively, non-exclusively, or not at all.  Panini has no real standing to complain that these licensors exercised that freedom to enter into a new exclusive relationship with Fanatics Collectibles, a new and innovative player in the industry.  And Panini's antitrust litigation plainly lacks merit considering that, *e.g.*, Panini expanded its global business to the United States in 2009 based on exclusive licenses with licensors, a number of which it *still* has.[115]  The antitrust laws protect competition, not incumbent competitors like Panini, which failed to convince its long-term partners to enter into a new exclusive relationship with it.

---

[115] *See, e.g.*, Terry Lefton, *Five more years for Panini's NBA trading card deal*, SPORTS BUSINESS J. (Oct. 29, 2012), https://www.sportsbusinessjournal.com/Journal/Issues/2012/10/29/Marketing-and-Sponsorship/NBA-Panini.aspx ("The NBA surprised the trading card industry in 2009 when it signed a virtual unknown brand in Panini while dropping two household names in Topps and Upper Deck. At the time, Panini had no U.S. offices nor staff."); Rich Mueller, *NBA Trading Card License to Remain with Panini*, SPORTS COLLECTORS DAILY (June 1, 2017), https://www.sportscollectorsdaily.com/nba-trading-card-license-remain-panini/ ("The league and the trading card maker announced [in June 2017] what they called a 'long-term, multiyear extension' of the exclusive trading card contract first signed in 2009. The deal means Panini won't be facing any competition from other trading card makers for at least the next several years.").

177.    By Panini's own account, it remains the global market leader to this day.  Panini America's social media accounts also describe Panini as the "global leader in licensed sports & entertainment collectibles" or, alternatively, "the world's largest sports and entertainment collectibles company":


116


117

116   Panini America, FACEBOOK, https://www.facebook.com/PaniniAmerica/ (last visited Apr. 30, 2025).

117   @paniniamerica, INSTAGRAM, https://www.instagram.com/paniniamerica/?hl=en (last visited Apr. 30, 2025).



118

178.    Panini and its leadership have made similar statements to the press and in blog posts on countless occasions,[119] as well as in pitch materials.  When it was attempting to combine with Alex Rodriguez's SPAC, for example, Panini boasted that it was "the largest global sports and entertainment trading cards & collectibles company," elsewhere describing itself as a "[g]lobal market leader in the Collectibles industry."  In the words of Peter Warsop, Panini's then-Licensing Director, "[t]he two biggest Football Collectable programmes anywhere are the FIFA World Cup and the UEFA Euro tournaments.  Panini have [sic] exclusive rights for both 2020 and 2022. Looking back over the years at Panini sales achievements the World Cup has grown with each and every tournament since we started in 1970 and is now the world's biggest collectable event.  The

---

[118]    @officialpaniniamerica, TIKTOK,  https://www.tiktok.com/@officialpaniniamerica?lang=en  (last visited Apr. 30, 2025).

[119]    *See, e.g.*, Gena Terranova, *Panini America Signs Quinn Ewers to Exclusive Autograph Trading Card Agreement*, PANINI AMERICA BLOG (July 13, 2023), https://blog.paniniamerica.net/panini-america-signs-quinn-ewers-to-exclusive-autograph-trading-card-agreement;    Gena Terranova, *Panini America to Immortalize Select Top Youth Football Players with Their Very Own Exclusive NFT Rookie Trading Cards*, PANINI AMERICA BLOG (July 11, 2023), https://blog.paniniamerica.net/panini-america-to-immortalize-select-top-youth-football-players-with-their-very-own-exclusive-nft-rookie-trading-cards;    Gena Terranova, *Panini America Signs Tre Johnson to Exclusive Multi-Year Agreement*, PANINI AMERICA BLOG (June 27, 2023), https://blog.paniniamerica.net/panini-america-signs-tre-johnson-to-exclusive-multi-year-agreement.

same is true of the Euros, where we have grown every one of them since we started in 1980." The list of examples goes on.[120] A global market leader losing the competition for a few contracts is not an antitrust issue—and by calling it one, Panini seeks to turn the antitrust laws upside down to try to extract more money for its owners.

179.    Nor can Panini legitimately complain about Fanatics Collectibles' investment in a single manufacturing firm (GCP), which aligned with comments by Panini's own CEO (Warsop) to GCP. As explained above, Fanatics Collectibles' investment clearly benefits the industry and consumers, increasing the capacity to produce 100 million more card packs annually (giving Panini the ability to manufacture more card packs at GCP), while making improvements to ensure the quality of the cards and their timely production. And, to manufacture cards, Panini can still use GCP, its own manufacturing plants in Italy and Brazil, the services of another printing company (such as U.S.-based companies like Carlson Print Group, R.R. Donnelley & Sons Company and foreign manufacturers like Sinigaglia), or acquire another facility.

180.    The same is true of Fanatics Collectibles' acquisitions of Topps in light of Panini's earlier acquisition of Donruss, the second oldest card company in the United States, in 2009. That acquisition allowed Panini to assume Donruss' NFL and NFLPA licenses,[121] similar to how the Fanatics Collectible-Topps deal allowed Fanatics Collectibles to assume Topps' MLB and the MLBPA licenses. In 2009, Panini characterized its acquisition of Donruss as "overwhelmingly

---

[120]    *See, e.g.*, Matt Bowen, *The FUTRSPRT Interview Series: Panini CEO Mark Warsop*, MEDIUM (Dec. 30, 2019), https://medium.com/futrsprtpodcast/the-futrsprt-interview-series-panini-ceo-1014d25bab6c (Mark Warsop stating in a 2019 interview that, in three years, Panini would "still be known for being the largest company in the world when it comes to collectibles").

[121]    *See, e.g.*, Darren Rovell, *Panini Buys Donruss*, CNBC (Mar. 13, 2009, updated Aug. 5, 2010), https://www.cnbc.com/id/29678317 ("While Panini is the world's largest publisher of collectibles and has worldwide distribution of its products, the [2009 acquisition of Donruss] will quiet the talk of concern over Panini's relative lack of experience in the American market.").

positive" for all parties involved.[122]  Panini's characterization of Fanatics Collectibles' materially indistinguishable acquisition of Topps as anticompetitive (a claim this Court has now dismissed) is the height of hypocrisy.

181.    In sum, despite its position as the global leader in the sports and entertainment collectibles industry with ample resources, Panini is either unable or unwilling to legitimately compete with Fanatics Collectibles on the merits.  As explained above, Fanatics has been able to grow its partnerships with licensors, including players' associations and leagues by being a better competitor.  Fanatics Collectibles is a more *inclusive* partner than Panini (by delivering a new model that enables athletes and licensors to earn more for the use of their intellectual property); a more *innovative* partner than Panini (by opening up new revenue streams for licensors through selling directly to consumers, hobby shops, retailers, and "breakers"); and a more *long-term* partner than Panini (by investing in the industry as a whole through marketing, customer service, and related lines of business such as sports card manufacturing).  Unable or unwilling to rise to meet the challenge of Fanatics Collectibles' competition, Panini's baseless accusations of antitrust violations should be seen for what they are:  a hypocritical and desperate attempt to stymie Fanatics Collectibles' innovation and growth so that Panini can keep funneling profits back to its owners in Italy.

v.    Panini Interferes with Fanatics' Licenses and Business Operations in Europe

182.    Panini's bad faith conduct is not limited to the United States.  In the trading card industry, depicting players on what are sometimes derogatorily referred to as "pajama cards," *i.e.*, cards where any proprietary insignia or mark is removed from players' jerseys (also referred to as

---

[122]    *Panini Buys Donruss:  Q&A With Panini's Peter Warsop*, BECKETT (2009), https://www.beckett.com/news/panini-buys-donruss-qa-with-paninis-peter-warsop.

"washed kits"), is a common industry practice.[123]  In fact, Panini's entire professional baseball trading card business relies on such cards—because Panini does not have license agreements with the MLB or MLBPA—as does a substantial portion of Panini's college trading card business:



[123]    Panini Amended Complaint ¶ 168. Panini attributes the phrase "pajama cards" to Michael Rubin, but in the video clip cited by Panini, Rubin is referring to Panini's own use of the phrase "pajama cards." *Id.* n.11 (citing Santiago Sports LLC (@santiago_sports_), INSTAGRAM (Sept. 24, 2023), https://www.instagram.com/reel/CxmOszAMIJ-/?igshid=MzRlODBiNWFlZA%3D%3D).

183.    Yet, ironically, Panini has frivolously pressured European licensors to take legal action against Topps for engaging in this same practice and, upon information and belief, spread untrue and misleading statements to European retailers regarding Topps' use of so-called "pajama cards" to discourage them from selling Topps' official Euro 2024 card and sticker collections.

184.    In 2020, Topps won rights from UEFA to produce collectibles in connection with UEFA national team competitions, including Euro 2024.  Under these rights, Fanatics is licensed to use photographs, player likenesses, and branding of 51 out of 55 UEFA national associations. Panini holds the licensing rights for the remaining four national associations, but Fanatics maintains 68 licensing agreements with individual players (or their clubs) belonging to these four national associations.  To avoid infringing on Panini's licenses with these four national associations, Fanatics (through Topps) has depicted players from these associations in washed kits for its European soccer collections.

185.    Panini has nonetheless attempted to interfere with Fanatics' lawful activities and licenses by, upon information and belief, representing to national associations and retailers that Topps' use of washed-kit cards is unlawful.  After Topps' 2022 UEFA Nations League sticker collection and Match Attax 101 trading card collection launched, Topps learned that Panini was pressuring a national association, players, and players' agents to challenge the legality of Topps' washed-kit cards.  Upon information and belief, Panini also told various retailers in Europe that they may be exposed to intellectual property infringement claims if they carry any of Topps' Euro 2024 collection.  Panini's actions are a calculated and baseless attempt to interfere with Fanatics' ability to lawfully conduct business in Europe while clearing the way for the launch of Panini's own competing products.  Panini's misconduct has already substantially harmed Fanatics' European business, causing approximately $30 to $40 million in lost profits per annum.

94

## CLAIMS FOR RELIEF

### Count 1: Tortious Interference with Prospective Business Relations

186.    Fanatics realleges and incorporates by reference the allegations of every paragraph of this Complaint.

187.    Fanatics has sought to hire a number of employees to support its sports and entertainment collectibles business.

188.    Many of the employees interested in and qualified for these positions are current or former Panini employees.  These Panini employees are at-will employees who are not subject to non-competition obligations.

189.    Knowing that Fanatics is hiring, Panini has intentionally interfered with Fanatics' opportunity to employ Panini's current or former employees by threatening litigation should the employees enter into employment with Fanatics.

190.    Panini's litigation threats are meritless.  Panini acted willfully and maliciously by making these threats in order to deprive its employees of alternative employment and Fanatics of qualified employees, especially as Panini's licenses have expired or are expiring and it has no business need for many of the threatened employees.

191.    Upon information and belief, Panini threatened litigation to prevent employee departures—not to protect any legal right or interest.

192.    Panini's litigation threats have prevented Fanatics from entering into employment contracts with specific Panini employees, as demonstrated by the stark drop-off in Fanatics' hiring of Panini employees after Panini filed suit against some of its former employees.

193.    Panini has also intentionally interfered with Fanatics' opportunity to hire Panini employees by telling some of these employees that Fanatics would be exposed to scrutiny by

95

licensors and that its contracts with licensors could be voided. Upon information and belief, multiple Panini employees decided against joining Fanatics because of Panini's thinly veiled threats.

194.    Panini's unlawful actions have caused Fanatics to suffer economic harm by depriving it of the ability to hire qualified, sought-after employees.

**Count 2: Tortious Interference with Prospective Business Relations**

195.    Fanatics realleges and incorporates by reference the allegations of every paragraph of this Complaint.

196.    Unable to compete fairly in the industry, Panini has employed a pattern of unfair and deceptive practices to benefit itself and to harm Fanatics by intentionally interfering with Fanatics' business relations and contracts.

197.    As described above, Fanatics had business relationships with the NBPA, NBA prospects, and NFL prospects in spring 2022 and was in the process of negotiating various deals with those licensors.

198.    Panini knew of Fanatics' relationships and business opportunities with the NBPA, NBA prospects, and NFL prospects.

199.    To interfere with Fanatics' business relationships and prevent Fanatics from pursuing these opportunities within the limited window, Panini intentionally bait-and-switched Fanatics with a sham prospect of early termination.

200.    Namely, Panini acted willfully and maliciously by sidetracking Fanatics—using stall tactics, falsely inflated earnings projections, and other bad-faith tactics to string Fanatics along. Once the parties entered into a preliminary agreement in spring 2022, Fanatics reasonably believed it would no longer need to acquire the competing licenses, as it would obtain licenses

covering the same subject matter through the proposed early termination.  This was a diversion. Employing bad-faith dilatory practices, Panini intentionally ran the clock on negotiations, postponing closing for months through delays and other bad-faith tactics until Fanatics' window to acquire the competing licenses had closed.  By the time talks terminated, Fanatics' ability to timely acquire the NBPA license and licenses with NBA and NFL prospects was impeded, and the window to reach agreements with the NBA and NFL prospects had expired completely for 2022.

201.    Panini's actions—proposing early termination, and then stringing along Fanatics through stall tactics and false earnings projections—were unfair, intentional, malicious, and done in bad faith.

202.    Were it not for Panini's intentional actions to induce Fanatics to enter sham negotiations, Fanatics would have pursued and obtained the deals with the NBPA, NBA prospects, and NFL prospects in the spring of 2022.

203.    Panini, on the other hand, used this time to sign exclusive autograph agreements with certain of the same 2022 NBA and NFL prospects with whom Fanatics was pursuing licenses, directly benefiting from its campaign of deception and obfuscation.

204.    By misappropriating the time, effort, and attention of Fanatics' leadership by tying them up in dead-end negotiations for nearly a year, Fanatics had less time, opportunity, and incentive to pursue deals that would have competed with Panini's business.  Panini's unlawful tactics prevented Fanatics from doing deals with the NBPA, NBA prospects, and NFL prospects for which Panini had competing licenses, and directly harmed Fanatics' relationships with those players and ability to pursue future deals.

205.    As a result of Panini's tortious actions preventing competition on its licenses for an entire season, Fanatics was unable to develop its relationship with these licensors, missed out on

97

tens of millions of dollars in revenue and earnings, lost the time and attention of key senior leadership personnel, and suffered harm to business relationships with the NBPA, NBA prospects, and NFL prospects.

**Count 3: Tortious Interference with Contractual Business Relations**

206.    Fanatics realleges and incorporates by reference the allegations of every paragraph of this Complaint.

207.    As described above, Fanatics has exclusive licenses with several top NFL draft prospects ("Athletes"). Each of these contracts is valid, enforceable, and active until at least 2026.

208.    In the spring and fall of 2023, Fanatics negotiated and signed deals with the Athletes.

209.    Panini knew of Fanatics' relationships and exclusive licensing deals with these Athletes.

210.    Upon information and belief, Panini brazenly, intentionally, and unlawfully tried to induce various Athletes to breach their exclusive contracts with Fanatics and enter into new contracts with Panini. Upon information and belief, Panini attempted to induce several Athletes to breach their contracts with Fanatics, by: (i) offering Athletes more money to induce breach; and (ii) offering Athletes legal and advisory aid in breaching their contracts with Fanatics.

211.    As a result of Panini's unlawful conduct, Fanatics has suffered monetary damages. Specifically, following Panini's outreach, certain Athletes requested increased compensation from Fanatics, which Fanatics provided to preserve the contracts and maintain its relationships with the Athletes.

212. Had Fanatics not materially changed the terms of its contracts and offered these Athletes increased compensation, certain of the Athletes would have breached their contracts with Fanatics in favor of deals with Panini.

213. Fanatics has also suffered reputational harm as a result of Panini's conduct.

## DEMAND FOR JURY TRIAL

214. Fanatics hereby respectfully requests trial by jury on any and all issues so triable.

## PRAYER FOR RELIEF

215. Wherefore, Fanatics respectfully seeks the following relief:

  i. actual damages, punitive damages, and any such other relief available under the causes of action stated here;

  ii. pre- and post-judgment interest on this monetary relief;

  iii. equitable relief in the form of an injunction prohibiting the illegal conduct complained of here;

  iv. the costs of bringing this suit, including reasonable attorneys' fees; and such other, further, and different relief as to the Court appears just and proper.

DATED:  May 13, 2025                    Respectfully submitted,

                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN LLP

                                        */s/ Michael B. Carlinsky*
                                        Michael B. Carlinsky
                                        Kathryn D. Bonacorsi
                                        295 Fifth Avenue
                                        New York, NY 10016
                                        michaelcarlinsky@quinnemanuel.com
                                        kathrynbonacorsi@quinnemanuel.com
                                        (212) 849-7000

                                        Derek L. Shaffer
                                        1300 I Street NW, 9th Floor
                                        Washington, DC 20005
                                        derekshaffer@quinnemanuel.com
                                        (202) 538-8000

                                        *Attorneys for Plaintiff Fanatics Collectibles*