August 4, 2025

<u>**Via ECF**</u>

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  ***Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS (S.D.N.Y. 2023); *Fanatics Collectibles TopCo, Inc. v. Panini S.p.A.*, Case No. 1:23-cv-06895-LTS-VF (S.D.N.Y. 2023)**

Dear Judge Figueredo:

The parties make this submission to update the Court regarding the status of the case before the conference on August 11, 2025, in the matter above.

## I.    <u>Issues That Are Ripe for the Court's Consideration</u>

### a.  <u>Panini's Position</u>

Fanatics contends that the only issues that are ripe for the Court's consideration at the August 11 hearing are the matters set forth in Sections II and III (in part) below.  That position is belied by its own conduct. Since June 24, Fanatics has stonewalled discovery on crucial issues by refusing outright to produce documents or deliberately avoiding taking any position on Panini's requests. It persisted with this strategy despite Panini's diligent efforts to advance discovery through prompt responses and good-faith engagement—including responding promptly to all issues raised by Fanatics in both this matter and Fanatics' related case against Panini.  This strategy culminated when Fanatics stated during a meet and confer on Thursday, July 31, that it was planning to withhold its positions on issues raised by Panini weeks ago until Monday, August 4, 2025—*the very day this joint submission was due*.

Fanatics' delay strategy began with its deficient responses to Panini's requests for production, which violated basic discovery obligations. *See* Panini Exhibit A. Rather than comply with Federal Rule of Civil Procedure 34(b)(2)(C)'s mandate to state whether documents were being withheld, Fanatics responded to nearly a quarter of Panini's requests by merely expressing a willingness to "meet and confer" without committing to produce documents or specifying the basis for its objections. And it responded to over three-quarters of Panini's requests with impermissible boilerplate objections claiming the requests were "overly broad and unduly burdensome"—again without stating whether any documents were being withheld on these purported grounds.

As a result of Fanatics' non-responsive approach, Panini was forced to expend time and resources seeking basic clarification about what, if anything, Fanatics had actually agreed to produce—burden-shifting that undermines the straightforward information exchange contemplated by the Rules. This approach is improper. *See Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) ("[S]tating that requests are 'overly broad and unduly burdensome' is meaningless boilerplate. Why is it burdensome? How is it overly broad? This language tells the Court nothing."); *Jacoby v. Hartford Life & Acc. Ins. Co.*, 254 F.R.D. 477, 478 (S.D.N.Y. 2009) ("boilerplate objections that include unsubstantiated claims of undue burden, overbreadth and lack of relevancy" paired with a lack of document production "are a paradigm of discovery abuse").

On June 24, Panini sent a letter to Fanatics seeking basic clarifications on the scope of Fanatics' intended production and proposing that the parties exchange charts discussing their positions on the numerous individual Requests for which Fanatics refused to produce documents based on boilerplate objections. *See* Panini Exhibit B.  Panini's letter also raised other issues. These included the appropriate time-period for production, the types of products that should be subject to discovery in this matter, and the burden objections that Fanatics had asserted to Requests—which Panini believes can be resolved through appropriate search parameters.  The letter also requested that the parties schedule a meet and confer the next week. Fanatics, however, insisted on delaying the meet and confer for nearly two weeks. And after two emails from Panini requesting Fanatics' position on Panini's proposed chart process, Fanatics responded that it would not agree to engage in the proposed chart process due to outstanding threshold issues. Fanatics did not explain why resolution of these issues was needed before addressing Fanatics' objections to specific requests by Panini.

The parties finally met on July 10 and discussed the appropriate time period and scope of products. Fanatics, however, was not prepared to provide a position on its burden objections for the requests listed in Panini's June 24 letter. And it reiterated its rejection of the proposed chart process for resolving the disputes over these requests and other individual requests for which Fanatics claimed it was willing to "meet and confer" in its responses. Instead, Fanatics asked Panini to address the individual request issues by category.  So to move discussions forward, Panini obliged. On July 18, Panini sent a letter that grouped the individual Request issues by category. *See* Panini Exhibit C. The July 18 letter also followed up on the burden objections raised in Panini's June 24 letter and expanded on the relevance of the requests.

Panini followed up on these issues at the parties' July 22 meet and confer and over email on July 29. Each time, Panini informed Fanatics that it would raise the issues with the Court if the parties could not reach agreement and that for any issues for which Panini does not receive a response, Panini would assume the parties are at an impasse. During the July 22 meeting, Fanatics confirmed that it would not withhold documents on the basis of its confidentiality objections, but

it was otherwise unprepared to provide a position on the other issues detailed in Panini's July 18 letter.

At the parties' July 31 meet and confer, Fanatics informed Panini that it would not provide a response to Panini's July 18 letter until Monday, August 4—***the day that this joint letter is due to the Court***. When Panini reiterated over email that, despite this inappropriate timing, Panini would still raise unresolved issues with the Court, Fanatics relented and sent a letter late in the evening of August 1. That letter, however, contains more of the same stonewalling. It addresses a few categories of the documents that Fanatics is improperly withholding, while ignoring others. And although Fanatics clearly states that it "maintains its objections" to Requests 129-131 (which are the subject of Section III below) without offering any compromise, it refuses to admit this issue is ripe and instead repeats its refrain that "it is willing to meet and confer regarding these Requests."

This conduct by Fanatics transforms what should be a collaborative process into a delay strategy, making Court resolution of all issues set forth in this letter both necessary and appropriate.

As to Fanatics' representations regarding the timing of this joint submission, Panini has been very clear since June 24 that it plans to raise all issues remaining open at the August 11 conference. Because Fanatics was unprepared to discuss the individual RFP issues raised in Panini's July 18 letter in the three meet and confers held after that date, and did not respond to the issues until Friday, August 1, at 10:18 p.m., Panini could not get Fanatics all of its joint submission inserts before the weekend. Panini did, however, identify the subset of issues that it would be addressing in an email sent to Fanatics the very next day: Saturday, August 2. This email narrowed the issues that would be included in the joint submission from the issues raised in Panini's July 18 letter, which Fanatics has known that Panini would raise. Panini then sent its inserts on these issues on Sunday, August 3, with time for Fanatics to add its own separately drafted inserts.

To the extent Fanatics contends that Panini is in any way misrepresenting the nature of the parties' correspondence, Panini is happy to provide the Court with a detailed timeline and full record of the parties' emails and letters.

### b. Fanatics' Position

Panini's narrative of Fanatics' "stonewalling" is pure fiction. The reality is that, even though this Court rejected Panini's request for an expedited discovery schedule, *see Panini Am., Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-LTS-VF, Dkt. ("Antitrust Dkt.") 172, 174, Panini is ignoring that ruling and trying to force Fanatics to comply with the highly expedited schedule that this Court refused to impose. To be clear, fact discovery in this matter closes ***ten months*** from now. There is absolutely no need to resolve every single dispute over both parties' document requests in both actions ***right now***.

3

As the Court knows, discovery in these cases is broad and complex: In the antitrust case, Panini has issued a set of 154 Requests for Production ("RFPs") to Fanatics; Fanatics has issued a set of 67 RFPs to Panini; and both parties intend to serve additional RFPs in short order. Meanwhile, the parties each issued 33 RFPs to each other in Fanatics' tort case against Panini. The number of RFPs served to date (287), the parties' negotiations about issues impacting both sides (such as date ranges and product scope), and the necessity of coordinating across Panini's antitrust case and Fanatics' tort case, mean that significant time and effort is required to prepare proposals and counterproposals to ensure that discovery will yield relevant documents without imposing undue burden. That is why Fanatics sought—and obtained—a reasonable discovery schedule that accounts for the complexity of these matters.

Despite Panini's false claim of delay, the parties have made substantial progress negotiating the scope of each party's RFPs. To start, although Panini's letter makes no mention of it, Fanatics has agreed to produce documents in response to the substantial majority of Panini's 154 RFPs in the antitrust case. *See* Panini Ex. A. That is not "stonewalling." The parties have also exchanged proposed custodians in both cases, and Fanatics has begun producing certain go-get documents to Panini. (Meanwhile, Panini has not produced a document to Fanatics since February.) Despite this progress, negotiations are ongoing, and many issues are under active discussion. Between June 24 and August 4, the parties held several lengthy meet and confers and collectively exchanged *over 80 single-spaced pages* of letters and appendices. Among other issues, those letters address: the start and end dates of each party's productions; the scope of the collectible products that will be subject to discovery; the appropriate geographic scope of discovery; the extent to which documents from other litigations are subject to discovery here; the propriety of discovery on Fanatics' acquisition of Topps—which the Court held is not "causally connected" to any of Panini's purported injuries; and overbreadth issues affecting dozens of individual RFPs.

Only two of these issues—(1) discovery on the Topps acquisition in the antitrust case and (2) discovery into trade secrets and employment agreements in the tort case—are currently ripe. Fanatics expects that, through continued negotiations, the parties will be able to reach a reasonable compromise on most or all issues still under discussion. The Court should not accept Panini's invitation to resolve unripe disputes that the parties have not yet discussed in any meaningful way.

Finally, Fanatics notes that Panini provided the above multi-page mischaracterization of the parties' discovery efforts in the late afternoon of Sunday, August 3—*i.e.*, about 24 hours before this submission was due. At the same time, Panini sandbagged Fanatics with its positions on five issues that Fanatics has repeatedly explained are not ripe for the Court's consideration, and many of which the parties have never discussed live at all. In total, just 24 hours before the deadline for this joint letter, *Panini added nearly 15 pages* to its portion of this submission on numerous issues

4

on which the parties' meet-and-confer efforts are ongoing. Panini's conduct is neither fair nor efficient—and yet it is becoming a pattern. Panini is plainly attempting to manufacture disputes prematurely, without properly meeting and conferring, and the Court should not reward that misconduct.

II. **Fanatics' Response to Panini's Second Requests for Production (Requests Concerning Fanatics' Acquisition of Topps).**

Fanatics objects to producing documents in response to Requests 46 and 64-67 from Panini's Second Requests for Production in the antitrust case. These Requests are as follows:

- RFP No. 46: All Documents concerning any revisions or updates to Your financial projections for the Exclusive License Agreements following the Topps Acquisition.

- RFP No. 64: All Documents relating to the Topps Acquisition, including, but not limited to, Documents concerning the valuation of Topps, the strategic rationale for the acquisition, and the anticipated competitive effects of the acquisition.

- RFP No. 65: All Documents concerning Your plans for Topps's business operations, brands, products, and personnel following the Topps Acquisition.

- RFP No. 66: All Documents concerning any analyses of the impact of the Topps Acquisition on competition in the markets for Sports Trading Cards, MLB Cards, NFL Cards, or NBA Cards.

- RFP No. 67: All Communications with MLB and/or the MLBPA regarding the Topps Acquisition.

*See* Panini Ex. A

The parties have met and conferred concerning the above Requests. On these Requests, the parties agree they are at an impasse.

a. **Panini's Position**

***The Topps RFPs Are Relevant.*** Discovery into Fanatics' acquisition of Topps is appropriate because it is relevant to Panini's surviving Section 2 claims. As Panini alleges in its Amended Complaint, by acquiring Topps, Fanatics obtained an existing exclusive MLB license agreement, Am. Compl. ¶ 118, enabling it to accelerate its monopolization of the market for MLB cards. Panini further alleges that Fanatics' acquisition "solidified and increased Fanatics' market power, which in turn it leveraged … to disadvantage Panini." *Id.* ¶ 120. The Amended Complaint

is clear that the Topps acquisition was a key component of Fanatics' anticompetitive strategy of leveraging its "long-term monopoly to secure for itself a short-term monopoly of the Relevant Markets before its long-term monopoly began" by eliminating Topps as a competitor. *Id.* ¶¶ 207, 224. The Court recognized as much in its motion to dismiss opinion: "[b]y acquiring Topps and its licenses, Fanatics gained an immediate exclusive license with the MLB that lasts until 2025 and a semi-exclusive license—shared with Panini—with the MLBPA that expired at the end of 2022." Dkt. 164 at 4.

The Topps acquisition furthers Fanatics' market power in the short and long term. In fact, the very trading cards produced by Fanatics that are at issue in this case are produced ***through Topps*** and under the Topps brand name. Without acquiring Topps, Fanatics at least would not have been able to produce MLB cards before the end of 2022, and may not have had the ability to produce trading cards even after that, without the benefit of acquiring the Topps resources and brands. Ultimately, Fanatics' acquisition of Topps is relevant to Panini's Section 2 claims. And "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," because the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Fanatics, however, has refused to produce any documents concerning its acquisition of Topps. It contends that *all* discovery into the Topps acquisition is irrelevant and shielded from discovery because the Court ruled that Panini lacks standing to pursue its separate, Section 7 claim based on the acquisition. Fanatics is wrong. Its position ignores that Panini's factual allegations concerning the Topps acquisition separately support Panini's Section 2 claims, which survived dismissal.

Courts have recognized that discovery of facts underlying dismissed claims is appropriate when those facts are relevant to other surviving claims. For instance, in *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *4 (S.D.N.Y. Apr. 29, 2003), the Court struck certain state-law claims from the complaint but found that the factual allegations underlying those claims "continue to serve as support in connection with the federal antitrust claims that remain pending in this action." While the Court did not specifically address whether discovery into those factual allegations would be permissible,[1] it found that the factual allegations underlying the dismissed, state-law claims continued to support the federal antitrust claims even though they did not support the state-law claims. This holding negates Fanatics' contention that the allegations concerning the

---

[1] Under Federal Rule of Civil Procedure 26(b), discovery into the allegations in *Masters* would have been permissible since the allegations were relevant to the surviving federal antitrust claims. Fed. R. Civ. P. 26(b) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").

Topps acquisition are irrelevant because the Court concluded that they don't support an separate, independent claim under a different statute.

Similarly, in *In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 266 (D. Mass. 2017), the court found that the plaintiffs there lacked standing to bring an independent claim regarding a settlement agreement but emphasized the allegations "may still support" the plaintiffs' "claims as to an overall monopolization scheme" because the plaintiffs "may rely upon these allegations in its anticompetitive scheme allegations as to these Defendants 'insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct.'" So, in *Asacol*, the court specifically held that the plaintiffs could rely on evidence of the factual allegations—which would come from *discovery* on that topic—in support of its monopolization claim.

And in *Vertex Aerospace, LLC v. Womble Bond Dickinson, LLP*, 2022 WL 1830715, at *7 (S.D. Miss. Apr. 26, 2022), the court found that dismissal of some claims did "not exclude the parties from discovering information relevant to live claims," and that the "factual underpinnings of the dismissed counterclaims [were] relevant and important to the live claims in this matter." In other words, where the factual underpinnings underlying the dismissed claim are still relevant to the surviving claims, discovery into those claims is appropriate.

In the end, discovery into the Topps acquisition is relevant to Panini's surviving Section 2 claims. Panini is therefore entitled to it.

In response, Fanatics points to a single case outside the Southern District (and Second Circuit): *FTC v. Facebook*, 581 F. Supp. 3d 34 (D.D.C. 2022). That case is readily distinguishable. The FTC's monopolization claim there was based on two discrete types of actions by Facebook: (1) acquiring competitors and (2) implementing certain platform policies. *Id.* at 40. The court allowed FTC's monopolization claim to proceed based only on the first category of conduct—Facebook's acquisitions—while finding that the platform-related allegations were "legally infirm." *Id.* at 61. Because of this finding, the court refused to allow the FTC discovery into these platform policies. *Id.*

There has been no similar finding here. The Court dismissed Panini's Section 7 claim on standing grounds. Even if the Court found that the allegations related to the Topps acquisition did not on their own support a claim for relief under Section 7 of the Clayton Act, it did not find, as the *Facebook* court concluded, that the factual allegations pertaining to the Topps Acquisition have "no conceivable bearing on this case"—such as Panini's surviving claims under Section 2 of the Sherman Act. Panini's allegations about the Topps acquisition are central to that claim.

***The Topps RFPs Are Not Overbroad or Unduly Burdensome.*** For the first time, in this submission, Fanatics expands on its boilerplate overbreadth and burden objections that it raised in its Responses and Objections. Any legitimate concerns about the overbreadth or burden of these

requests can be resolved through the negotiation of search terms and custodians. Regardless, had Fanatics raised these concerns earlier, Panini would have offered the following compromises:

- Panini will withdraw Request 46 if Fanatics agrees that it will produce all documents responsive to this request in response to Request 39.

- Panini will narrow Request 64 to "All Documents concerning the valuation of Topps, the strategic rationale for the acquisition, and the anticipated competitive effects of the acquisition."

Requests 65 and 66 are narrowly tailored and not duplicative of the requests that Fanatics points to. Request 67 for "All Communications with MLB and/or the MLBPA regarding the Topps Acquisition" is distinct from Panini's Request 68 for "All Communications with MLB, MLBPA, NBA, NBPA, NFL, NFLPA, WWE, OneTeam or any other Licensor relating to, referencing, or discussing Panini." Accordingly, Panini asks the Court to order Fanatics to produce documents in response to these requests identified through reasonable search terms and custodians.

### b.  Fanatics' Position

Panini's continued pursuit of discovery targeting Fanatics' 2022 acquisition of Topps blatantly ignores the Court's clear ruling that Panini failed to present "any allegation that could support a plausible inference of particularized harm to Panini" from the Topps acquisition, that "Panini's alleged injuries in this action were not causally connected to Fanatics' acquisition of Topps," and that "Panini lacks standing" to challenge the Topps acquisition.  Antitrust Dkt. 164 ("Antitrust MTD Order"), at 8–9.  Panini has persisted in demanding unbounded discovery into that 2022 transaction, including demanding "[a]ll Documents relating to the Topps Acquisition" (Panini RFP No. 64), "[a]ll Documents concerning Your plans for Topps' business operations, brands, products, and personnel following the Topps Acquisition" (Panini RFP No. 65), "[a]ll Documents concerning any analyses of the impact of the Topps Acquisition" (Panini RFP No. 66), "[a]ll Communications with MLB and/or the MLBPA regarding the Topps Acquisition" (Panini RFP No. 67), and "[a]ll Documents concerning any revisions or updates to Your financial projections . . . following the Topps Acquisition" (Panini RFP No. 46).  These RFPs are irrelevant, overbroad, and unduly burdensome.

***The Topps RFPs Are Irrelevant.***  The discovery Panini seeks in RFP Nos. 46 and 64–67 into the Topps acquisition and its effects is irrelevant in light of the Court's finding that Panini was not injured by this 2022 acquisition and therefore lacks standing to challenge it.  The court's ruling in the FTC's antitrust case against Facebook is instructive.  In *Facebook*, the court ruled that allegations related to Facebook's platform policies were "legally infirm" and could not support a plausible monopolization scheme.  *FTC v. Facebook*, 581 F. Supp. 3d 34, 61 (D.D.C. 2022).  The court allowed other alleged conduct to proceed as part of the FTC's monopolization claim,

but specifically cautioned that it would not permit that ruling to be used as a "Trojan horse to smuggle in the Platform policies." *Id.* at 60–61. Because the allegations about platform policies were "legally infirm," discovery into them was not allowed, even though the monopolization claim could proceed: "there is no reason 'that discovery should be allowed of information that has no conceivable bearing on the case.'" *Id.* at 61 (quoting *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997)). To rule otherwise would grant the plaintiff an improper "discovery windfall." *Id.* at 60.

Panini seeks to do exactly what *Facebook* found improper: to smuggle "legally infirm" allegations into discovery on a surviving monopolization claim. Just as the court in *Facebook* held that allegations related to Facebook's platform policies were "legally infirm," this Court held that "Panini's alleged injuries in this action [are] not causally connected to Fanatics' acquisition of Topps." ECF No. 164, at 8–9. Causation is an essential element of any antitrust claim. *See, e.g.*, *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (explaining that the "three required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages") (citation omitted). Accordingly, Panini's failure to present "any allegation that could support a plausible inference of particularized harm to Panini" from the Topps acquisition (Antitrust MTD Order at 8–9) means that any antitrust claim based on this alleged conduct is "legally infirm" and cannot be the basis for discovery.

The cases Panini cites are not on point. Most did not involve the question of whether broad discovery into alleged conduct that did not harm the plaintiff as a matter of law was appropriate. For instance, in *In re Asacol Antitrust Litigation*, the court declined to dismiss factual allegations about a settlement that the direct purchaser plaintiffs lacked standing to challenge in a separate claim, but did *not* address whether or to what extent the direct purchasers could seek discovery of that settlement. 233 F. Supp. 3d 247, 266 (D. Mass. 2017); *see also Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *4 (S.D.N.Y. Apr. 29, 2003) (declining to strike allegations in an amended complaint related to dismissed claims, but not addressing scope of discovery). Here, Fanatics is not arguing that the Topps-related allegations in Panini's monopolization claims should be dismissed or stricken, but that the extensive discovery Panini seeks regarding the acquisition is improper, overbroad, and unduly burdensome since the acquisition did not cause Panini any harm, the count aimed at that transaction was dismissed, and discovery in this case is already extensive. On this discovery question, *Facebook* is recent and highly persuasive authority supporting Fanatics' position.[2]

---

[2]    In Panini's final case, *Vertex Aerospace, LLC v. Womble Bond Dickinson, LLP*, the court allowed discovery into factual allegations the court had already ruled were "relevant and important to the live claims," 2022 WL 1830715, at *7 (S.D. Miss. Apr. 26, 2022). Here, the Court has already ruled the opposite—*i.e.*, that the Topps acquisition did not cause any harm to Panini at all.

***The Topps RFPs Are Overbroad and Unduly Burdensome.***  Even if they were relevant, Panini's RFPs in the antitrust case related to the Topps acquisitions remain disproportionate and unduly burdensome because Fanatics has already agreed to substantial searches regarding the actual trading card licensing practices at issue in this case.  For example, Fanatics has already agreed to conduct a reasonable search for:

- Documents "concerning financial projections, business plans, or forecasts related to [its] expected sales, revenues, profits, or returns on investment under the Exclusive License Agreements," in response to Panini RFP No. 39;
- Fanatics' communications with MLB and MLBPA, in response to Panini RFP No. 68; and
- Documents analyzing the effect of competition on Fanatics' trading card prices or quality, in response to Panini RFP No. 105.

*See* Panini Ex. A.

This is in addition to dozens of searches Fanatics has agreed to undertake in response to the more than 150 RFPs Panini has issued in this case.  Panini has no basis to seek to expand the scope of those searches by insisting that they also include any and every document related to an acquisition that this Court has already ruled *did not harm Panini at all*.[3]

## III.    Requests concerning trade secrets and former Panini employees' non-disclosure and non-solicitation employment agreements.

### a.   Panini's Position

In both cases, Fanatics objects to producing documents concerning the misappropriation of trade secrets by Panini's former employees and Fanatics' knowledge of those employees' employment agreements.[4]

To begin with, these requests are ripe for the Court's consideration—especially in light of Fanatics' strategy of delay described above. Panini first raised these requests in a June 24 letter to Fanatics that suggested that Fanatics' overbreadth and burden objections could be resolved through reasonable search terms and proposed a chart process for negotiating disputes on individual requests. Weeks later, Fanatics finally responded to that letter (on July 9) and asserted that these

---

[3] Panini's eleventh-hour "compromise" positions—made for the first time the afternoon of Sunday, August 3—do not solve the problem.  Panini is still seeking to end-run around the Court's ruling that nothing about the Topps acquisition caused Panini any harm, period.

requests "are so plainly overbroad or so likely to capture irrelevant information that they cannot be reasonably narrowed with search terms and custodians."

At the parties' July 10 meet and confer, Panini again proposed a chart process for resolving disputes concerning these requests. Fanatics refused. It asked that Panini instead group its individual requests by category. Panini did so in a letter that it sent on July 18, which again raised these requests and explained their relevance. At the parties' subsequent meet and confers, Fanatics refused to discuss the requests in Panini's letter. Fanatics finally sent a letter late in the evening on August 1 addressing some of the issues Panini raised in its July 18 letter. In this letter, Fanatics said it was maintaining its objections to Requests 129-131 but that it is still "willing to meet and confer regarding these Requests," without explaining what was left to discuss. The parties are at an impasse.

As for the merits of the dispute, in *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS (S.D.N.Y. 2023), the requests in dispute are as follows:

- **RFP No. 129**: All Documents concerning any statements made to current or former Panini employees regarding Fanatics' future plans for the Sports Trading Card industry or Panini's future prospects in the industry.

- **RFP No. 130**: All Documents relating to Panini's employment agreements with former employees who were hired by You, including any analyses or discussions of the non-disclosure and non-solicitation provisions in those agreements.

- **RFP No. 131**: All Documents concerning or constituting any information, Documents, or trade secrets brought from Panini to You by former Panini employees.

These Requests seek documents that are highly relevant to Panini's Section 2 claim, including its allegations that Fanatics engaged in a campaign to undermine Panini's business by soliciting and hiring away key employees, misappropriating Panini's confidential information, and making disparaging statements about Panini's viability and future in the industry. Chief Judge Swain recognized that Panini plausibly alleged that Fanatics' dissemination of "disparaging statements regarding Panini to … Panini's current and former employees" was part of Panini's "campaign of anticompetitive conduct." Dkt. 164 at 5. Chief Judge Swain further recognized that Panini plausibly alleged that Fanatics used "unlawful means" to lure Panini's employees away "by threatening to exclude them from the market once Fanatics' license began." *Id.* Request 129 for statements made by Fanatics to Panini's employees regarding Fanatics' future plans and Panini's future prospects in the industry are plainly relevant to these allegations.

As for Requests 130 and 131, Chief Judge Swain further found that Panini plausibly alleged that "Fanatics induced these employees to breach non-solicitation and nondisclosure provisions of their employment contracts." *Id.* at 6. Further to this allegation, in Panini's Amended Complaint, Panini alleges that the employees Fanatics hired "stole Panini's trade secrets and helped Fanatics recruit other employees away from Panini" in violation of those provisions of their employment agreements. Dkt. 69 ¶ 160. Requests 130 and 131 are relevant to these allegations.

These three requests are also relevant to Panini's surviving claim that Fanatics tortiously interfered with Panini's contracts with its former employees, "whom Fanatics hired in April 2023 and induced to breach their non-solicitation and proprietary agreements with Panini." Dkt. 164 at 28. Chief Judge Swain found that Panini stated a "viable interference claim with respect to the employee contracts." *Id.* at 29.

In its August 1 letter finally addressing these requests, Fanatics tries to justify its refusal to produce these documents by asserting that Panini is using these requests to "jumpstart discovery" in *Panini America, Inc. v. Eli Nicholas Matijevich, Jr. et al.*, No. DC-23-04798 (Tex. Dist. Ct., Dallas Co., Apr. 14, 2023), where discovery is stayed. Panini brought that action against Fanatics and Panini's former employees for breach of the restrictive covenants in their employment agreements and misappropriation of Panini's trade secrets. But, as Chief Judge Swain recognized, the factual allegations underlying that litigation are separately relevant to Panini's claims here, including its Section 2 claim and its claim that Fanatics tortiously interfered with Panini's contracts with its employees. Dkt. 164 at 5-6, 28-29. That Fanatics has managed to stay discovery in that case through procedural ploys does not mean that Panini should be denied access to plainly relevant discovery on overlapping issues here.

Fanatics has also asserted overbreadth and burden objections in response to these three requests. But Fanatics has never explained why these three requests are overly broad or unduly burdensome, rendering these objections "meaningless boilerplate." *Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017). There is no reason why any legitimate overbreadth or burden objections cannot be addressed with reasonable search terms. It is the objecting party's burden to show any undue burden, and Fanatics has offered no support of its burden claims, which means it has not met its burden. *See Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984) ("Defendant cannot evade its discovery responsibilities by 'simply inton[ing] this familiar litany' that the interrogatories are burdensome, oppressive or overly broad." (citation omitted)).

As for Case No. -6895, Panini has requested a similar set of documents, and Fanatics has also refused their production in that matter. *See* Panini Exhibit D, Fanatics' Responses and Objections to Panini's First Set of Requests for Production, Case No. Case No. 1:23-cv-06895-LTS, Requests Nos. 16, 21, 22. In that case, the documents are relevant to Fanatics' sole surviving claim that Panini supposedly tortiously interfered with Fanatics' prospective business relationships

with Panini's own employees by threatening those employees with frivolous litigation if they left to join Fanatics.  Dkt. 120 ¶¶ 187-193.   Threats of litigation may only be used to establish the "wrongful means" element of a claim for tortious interference where the litigation is "wrongful" or "patently frivolous." *Gucci Am., Inc. v. Exclusive Imports Int'l*, 2007 WL 840128, at *7 (S.D.N.Y. Mar. 19, 2007).   So to establish the purported frivolity of those supposed threats, Fanatics placed at issue the terms of Panini's employment agreements by alleging that the employees it sought to hire were "not subject to non-competition obligations." *Id*. ¶ 188. Fanatics also alleged that "neutral forensic evidence has confirmed that no former employee ever accessed any Panini-related information … after leaving Panini" and that the alleged trade secrets are "a hodgepodge of public or valueless categories of information." *Id*. ¶ 156.

These allegations show that even Fanatics recognizes that whether Fanatics was enticing Panini's former employees to steal its trade secrets or violate the restrictive covenants in their employment agreements bears directly on the legitimacy of the alleged litigation threats by Panini against those employees.  These issues also bear on Fanatics' own unlawful conduct with respect to the subject matter of its claim, which Panini intends to raise in its defenses.   Panini is entitled to test the truth of Fanatics' allegations on these issues in discovery to establish that Panini did not use "wrongful means" to prevent its employees from joining Fanatics and that Fanatics' own conduct was unlawful.

Plus, while Fanatics now suggests that the requested documents are irrelevant because they implicate the actions of Panini's former employees, Fanatics has conceded the relevance of the former employees in discovery by seeking documents relating to them in its own requests for production. For example, Fanatics has numerous requests directed to Panini S.p.A. for documents concerning the "Texas Employment Litigation Employees" and Panini's "Former Employees," which is defined to include the "Texas Employment Litigation Employees." This includes broad requests for documents concerning the solicitation, recruitment, or actual or potential employment of any former Panini employees by Fanatics; any employee complaint made by those former Panini employees; all documents produced in the Texas litigation; documents concerning agreements between Panini and those former Panini employees; and Panini's internal documents concerning that litigation. Fanatics cannot refuse to produce documents in response to Panini's requests while insisting that Panini produce documents on these same issues.

For all these reasons, there is no justification for Fanatics to withhold documents in response to any of these three specific requests. Panini asks the Court to compel Fanatics to produce documents responsive to Requests 129-131 of its Second Set of Requests for Production in Case -09714 and Requests 16, 21, and 22 of Panini's First Set of Requests for Production in Case No -06895.

### b. Fanatics' Position

*Fanatics v. Panini (-6895)*.  In Fanatics' tort action, Panini has requested documents from Fanatics concerning (i) former Panini employees' employment agreements with Panini (RFP No. 16), (ii) any information, documents, or trade secrets that former Panini employees brought to Fanatics (RFP No. 21), and (iii) any analysis by Fanatics of whether former Panini employees brought trade secrets to Fanatics (RFP No. 22).  *See* Panini Ex. D.

The requested documents are irrelevant to Count 1 of Fanatics' Second Amended Complaint (*Fanatics Collectibles TopCo, Inc. v. Panini S.p.A.*, Case No. 1:23-cv-06895-LTS-VF, Dkt. ("Tort Case Dkt.") 120),[5] which alleges that *Panini* tortiously interfered with *Fanatics'* business opportunities with Panini employees.  SAC ¶¶ 186-194.  Specifically, Fanatics alleges that Panini threatened baseless litigation against its employees to prevent them from joining Fanatics, even though Panini had no business need for the employees, who were employed at-will and not subject to non-competes or other restrictions on their mobility.  SAC ¶¶ 157, 190.  Panini's intimidation tactics worked, as shown by "the 'stark drop-off' of employees who came to Fanatics following Panini's litigation threats."  Tort Case MTD Order at 15-17.  Whether certain former Panini employees who actually joined Fanatics breached their contracts or misappropriated trade secrets is irrelevant to Count 1, which centers on Panini's interference with Fanatics' opportunity to hire remaining Panini employees.

While the requested documents are irrelevant to Fanatics' tort action, they are directly relevant to separate litigation in Texas where Panini has sued Fanatics and several former Panini employees who now work at Fanatics.  *Panini Am. v. Eli Nicholas Matijevich, Jr. et al.*, No. DC-23-04798 (Tex. Dist. Ct., Dallas Cnty., filed Apr. 14, 2023) (the "Texas Action").  In that action, Panini alleges that the former employees breached their non-disclosure agreements with Panini, misappropriated Panini's trade secrets, and breached their fiduciary duties to Panini with Fanatics' assistance.  *See* Panini Am. Compl., Texas Action.  Fanatics and the individual defendants deny those allegations and have moved to dismiss Panini's claims.

Critically, discovery in the Texas Action has been stayed for nearly two years and remains stayed as Fanatics and the individual defendants appeal the denial of their motion to dismiss. Moreover, Panini recently informed Fanatics that Panini is likely to seek to amend its complaint again in the Texas Action.  As such, Fanatics has serious concerns that Panini is attempting to use discovery in Fanatics' tort action to circumvent the discovery stay in the Texas Action and develop

---

[5]  To date, in Fanatics' tort action, the parties have only served discovery on Count 1, which the Court sustained over Panini's motion to dismiss.  Tort Case MTD Order at 107.  Fanatics has since filed a Second Amended Complaint, which asserts two additional claims for tortious interference. Tort Case Dkt. 120.

evidence to bolster its claims in that action.  This would be a clear abuse of the discovery process. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978) ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied.").

Panini claims the requested documents are relevant to demonstrating that its alleged litigation threats were not frivolous, and that the Texas Action is not a "sham."  But as Judge Swain correctly recognized, the merits of the Texas Action are distinct from the merits of Panini's litigation threats in this action.   *See* Tort Case MTD Order at 15-17.  Count 1 is premised on Panini's litigation *threats* against *remaining* employees who did *not* join Fanatics and are *not* alleged to have misappropriated trade secrets or breached any agreement.  Panini's claims in the Texas Action relate to Panini's *actual litigation* alleging *trade secret misappropriation* and *breaches of contract* by certain *former* Panini employees who *did* join Fanatics.  *See id.* at 15 ("The Texas Action involves seven 'high-level' former Panini employees who were alleged to have stolen thumb drives containing trade secrets, and none of whom is a subject of the claim Fanatics asserts here.").  Whether these former Panini employees—who are not "subject[s] of the claim Fanatics asserts here"—misappropriated trade secrets or breached their employment agreements (and Fanatics maintains they did not) is irrelevant to whether Panini tortiously interfered with Fanatics' business relations with remaining Panini employees whom it had no possible basis to sue.  *See id.* at 15, 17 ("Fanatics alleges that Panini knew it had no meritorious basis to sue at-will employees for accepting employment in the absence of non-competes and made the threats solely to intimidate those employees.").

Panini's other arguments fare no better.  Panini does not need discovery from Fanatics to investigate Fanatics' allegation that Panini's remaining employees were not subject to non-competes.  Panini itself is a party to those employment agreements and can easily confirm whether its remaining employees are subject to non-competes.   Similarly, Panini does not need discovery from Fanatics to probe whether neutral forensic evidence confirmed that no former Panini employee accessed Panini-related information.  As Panini knows, this allegation refers to a forensic analysis from the Texas Case, which Panini already has in its possession.  Finally, Panini is not entitled to discovery from Fanatics simply because Fanatics requested some discovery from Panini related to Panini's former employees.  Fanatics requested discovery related to complaints by former Panini employees because such complaints are relevant to the workplace conditions at Panini that created a business opportunity for Fanatics.  Panini can make no similar showing of relevance with respect to its former employees' alleged breaches of employment agreements and alleged misappropriation of trade secrets.

For these reasons, the Court should reject Panini's request to compel production of these documents.

*Panini v. Fanatics (-9714)*.  Panini's position above regarding Panini RFP Nos. 129–131 in the antitrust action contains two pages of substantive argument that Fanatics has never previously seen or heard.[6]  On August 1, Fanatics clarified to Panini that it maintained its previously stated objections to these requests, while adding: "[T]he requested documents are directly relevant to the Texas Employment Litigation Action, where discovery has been stayed for nearly two years.  Posing these Requests in this action to jumpstart discovery in another action is an improper use of the discovery process."  At the same time, however, Fanatics made clear that it was willing to meet and confer regarding these RFPs.  Among other things, the parties should discuss (i) which requested documents (if any) are relevant to the antitrust action, (ii) which of those documents Panini does not already have in its possession, and (iii) how (if at all) Fanatics can make those documents available to Panini without creating a risk of substantial prejudice to Fanatics and the individual defendants in the Texas Action.  The parties have not yet discussed these and other issues, and thus there is no ripe dispute over Panini's RFP Nos. 129–131 in the antitrust action.[7]

## IV.    Requests concerning OneTeam (Requests 74-75, 82)

### a.  Panini's Position

Fanatics objects to producing documents concerning OneTeam.  These requests include:

- **RFP No. 74**: All Documents relating to Your agreements with OneTeam.

- **RFP No. 75**: All Documents relating to the establishment of OneTeam.

- **RFP No. 82**: All Documents relating to Your control, voting rights, or other governance rights in OneTeam, including, but not limited to, all Documents and Communications concerning Your board seats or board observer rights on OneTeam's board of directors.

---

[6]  At best, Panini previewed its position in two conclusory sentences buried in the middle of a 10-page letter that Panini sent to Fanatics on July 18.  *See* Panini Ex. C.

[7]  While Fanatics will not respond to Panini's substantive arguments as to this unripe dispute, Fanatics notes that Panini incorrectly represents that Judge Swain "found" certain facts relevant to RFP Nos. 129–131. In fact, Panini is quoting the factual background section of Judge Swain's opinion, which merely paraphrases Panini's own allegations.  *See* Antitrust MTD Order at 5–6.

In response to these Requests concerning Fanatics' relationship with OneTeam, Fanatics has stated it will not produce any more documents beyond "any agreements with OneTeam related to sports trading cards." This is insufficient.

Panini alleges that OneTeam "reveals that the decision of at least the NFL Players Association and MLB Players Association to go with Fanatics was not one made independently. Rather, both the NFL Players Association and the MLB Players Association worked together to agree jointly on deals with Fanatics through OneTeam." Dkt. 69 ¶¶ 112-113. As "the Executive Directors of the MLB Players Association and the NFL Players Association" said at the time, the deals "'never would have happened' if their organizations had not 'joined forces to create OneTeam.'" *Id.* ¶ 12.

Indeed, according to public sources, ***OneTeam—together with Fanatics' CEO, Michael Rubin—"launche[d] Fanatics Collectibles,"***[8] and then immediately turned around and awarded Fanatics Collectibles—the entity OneTeam and Rubin had just launched—twenty-year, exclusive deals for the two licenses that OneTeam controlled: NFLPA and MLBPA, Dkt. 164 at 20-21; Dkt. 69 ¶¶ 112-113.

Chief Judge Swain also agrees that Panini's "OneTeam allegations suffice to show that there was a conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." Dkt. 164 at 20-21. Thus, discovery into Fanatics' relationship with OneTeam is relevant. All documents responsive to Requests 74-75 and 82 should be produced. For Request 74, this includes not only Fanatics' trading-card agreements with OneTeam, but also all documents relating to such agreements.

### b. Fanatics' Position

Fanatics has already agreed to produce *substantial* documents in response to more than a dozen Requests in the antitrust case seeking "[a]ll Documents and Communications" that in some way relate to OneTeam. Panini completely ignores those discovery efforts that Fanatics has already committed to, and does not even attempt to explain how these three additional Requests are proportional, not unduly burdensome, and necessary given the searches that Fanatics has already agreed to perform. Fanatics offered to meet and confer so Panini could attempt to articulate those positions, but Panini never did, and instead rushed to raise this issue with the Court without any basis.

Fanatics has committed to perform substantial searches for materials related to OneTeam. To begin with, Fanatics agreed to produce any agreements with OneTeam related to sports trading cards during the relevant time period. But contrary to Panini's claim, Fanatics did not stop there.

---

[8]    *About Us*, OneTeam, https://oneteam.com/about-us/.

Fanatics also agreed weeks ago that it would perform reasonable searches (subject to agreement on custodians and search terms) in response to the following Requests from Panini:

- RFP No. 37, seeking "All Documents constituting or relating to pitch materials, proposals, or presentations concerning Your plans for the marketing, production, distribution, and sale of Sports Trading Cards provided to the NFL, NFLPA, MLB, MLBPA, NBA, NBPA, OneTeam, or other Licensors by You."

- RFP No. 38, seeking "All Documents concerning control, voting rights, or other governance rights (including board seats or board observer rights) in Fanatics provided to the NFL, NFLPA, NBA, NBPA, MLB, MLBPA, or OneTeam in connection with the Exclusive License Agreements."

- RFP No. 76, seeking "All Documents concerning any business plans, strategies, or objectives shared between You and OneTeam related to Sports Trading Cards."

- RFP No. 77, seeking "All Communications with OneTeam relating to the launch of Fanatics Collectibles."

- RFP No. 78, seeking "All Documents concerning any financial arrangements, payments, equity interests, or other consideration exchanged between You and OneTeam."

- RFP No. 79, seeking "All Documents concerning the formation, ownership structure, governance, or management of OneTeam, including, but not limited to, any Documents related to the equity or other financial interests held by You, NFLPA, MLBPA, or other entities and individuals in OneTeam."

- RFP No. 81, seeking "All Documents relating to OneTeam's control, voting rights, or other governance rights in Fanatics, including, but not limited to, any Documents and Communications concerning OneTeam's board seats or board observer rights on Fanatics's board of directors."

*See* Panini Ex. A.

Panini has issued so many discovery requests related to OneTeam that it apparently lost track and began issuing duplicative Requests for the same information, imposing undue additional costs on Fanatics by requiring it to respond to the same request multiple times. For example, Panini RFP No. 68 seeks "All Communications with . . . OneTeam or any other Licensor relating to, referencing, or discussing Panini." A few requests later, Panini RFP No. 80 again seeks "All Communications with OneTeam relating to, referencing, or discussing Panini." Fanatics agreed

18

to perform reasonable searches in response to both Requests, but Panini's practice of issuing redundant, overlapping, or seemingly similar Requests should not be rewarded.

Panini's only theory of relevance regarding OneTeam's connection to the licensing of rights for the NFL Players Association and MLB Players Association is more than covered by the above searches. But Fanatics has agreed to do even more, because Panini issued similar requests targeting the same types of information with respect to the NFLPA and MLBPA trading card licenses. For example, Panini issued, and Fanatics agreed to perform reasonable searches in response to, the following additional Requests:

- RFP No. 24, seeking "All Documents and Communications discussing, expressing, analyzing or relating to Your decision to enter into the NBPA License Agreement."

- RFP No. 25, seeking "All Documents concerning the negotiations and execution of the NBPA License Agreement . . . ."

- RFP No. 26, seeking "All Documents concerning equity or other financial interests in Fanatics provided to the NBPA in connection with the NBPA License Agreement . . . ."

- RFP No. 33, seeking "All Documents and Communications discussing, expressing, analyzing, or relating to Your decision to enter into the MLBPA License Agreement."

- RFP No. 34, seeking "All Documents concerning the negotiations and execution of the MLBPA License Agreement . . . ."

- RFP No. 35, seeking "All Documents concerning equity or other financial interests in Fanatics provided to the MLBPA by You in connection with the MLBPA License Agreement . . . ."

- RFP No. 36, seeking "All Documents and Communications concerning the duration of the Exclusive License Agreements . . . ."

Fanatics requested that Panini articulate how Panini RFP Nos. 74, 75, and 82 seek any material that is even arguably relevant and not already covered by the numerous searches Fanatics has already committed to with respect to OneTeam and its members MLBPA and NFLPA. Panini provided no response on that question at all, and instead reflexively demanded full compliance, with no compromise, and no explanation for what searches would satisfy RFP Nos. 74, 75, and 82 that are not already satisfied by searches being performed in response to RFP Nos. 24, 25, 26, 33, 34, 35, 36, 37, 38, 68, 76, 77, 78, 79, 80, and 81. The Court should not reward Panini's discovery

misconduct by requiring Fanatics to do anything more than the substantial amount it is already doing with respect to discovery regarding OneTeam.

**V.    Documents Concerning Equity and Governance Rights (Requests 112-116)**

Fanatics objects to producing documents concerning equity and governance rights that it exchanged with major sports leagues and players associations, except to the extent those rights were granted in connection with the license agreements. The requests in the antitrust case that Fanatics objects to include:

- **RFP No. 112**: All Documents relating to Your provision of equity ownership in Fanatics to Major U.S. Professional Sports Leagues, Team Owners, professional Athletes, Players Associations, and OneTeam, including, but not limited to, equity subscription agreements and equity exchanges.

- **RFP No. 113**: All Documents relating to Your receipt of equity ownership in Major U.S. Professional Sports Leagues, Players Associations, and OneTeam, including, but not limited to, equity subscription agreements and equity exchanges.

- **RFP No. 114**: All Documents relating to the receipt of equity ownership in Major U.S. Professional Sports Leagues or Players Associations by any individual or entity who holds a controlling interest in You.

- **RFP No. 115**: All Documents relating to Your control, voting rights, or other governance rights in Major U.S. Professional Sports Leagues or Players Associations, including any Documents concerning Fanatics' board seats or board observer rights on Major U.S. Professional Sports Leagues' boards of directors, Players Associations' boards of directors and executive committees, or OneTeam's board of directors.

- **RFP No. 116**: All Documents relating to control, voting rights, or other governance rights held by Major U.S. Professional Sports Leagues, Players Associations, or OneTeam in Fanatics, including any Documents concerning board seats or board observer rights on Fanatics's board of directors held by Major U.S. Professional Sports Leagues, Players Associations, or OneTeam.

*See* Panini Ex. A.

### a.  Panini's Position

These requests are critical to understanding the dynamics, potential conflicts of interest, and the motivations, inducements, and incentives that led to the exclusive license agreements that are at the heart of Panini's allegations. Chief Judge Swain recognized that Panini plausibly alleged that "Fanatics achieved these deals by giving the Relevant Licensors equity in Fanatics and 'other

considerations' premised on 'monopoly profits' Fanatics would earn once it controlled the Relevant Market." Dkt. 164 at 3, 16 n.10. Specifically, Panini alleges that Fanatics "provided equity shares in Fanatics to induce the Leagues and players associations to acquiesce in Fanatics's monopolization scheme, effectively precluding them from dealing with Panini and other competitors in any way that might disadvantage Fanatics." Dkt. 69 ¶ 8. "In acquiring all six U.S. Major Sports League licenses from existing Relevant Market licensors, Fanatics leveraged its relationships with leaders of the players associations and certain League personnel, the equity stakes that relevant Leagues and players associations were provided, and other considerations premised on the monopoly profits Fanatics expected to earn." *Id.* ¶ 111.

The collective equity stakes that the leagues and players associations have been awarded over the course of many years is "worth between $5 and $10 billion." *Id.* ¶ 111. Public reporting suggests that Fanatics began awarding equity to the leagues and players associations at least as early as 2017. Terry Lefton, *NFL, MLB, NFLPA Buy Equity Stakes in Fanatics*, Sports Business Journal (May 7, 2017), https://www.sportsbusinessjournal.com/Journal/Issues/2017/05/08/Leagues-and-Governing-Bodies/Fanatics/. Accordingly, Panini has asked Fanatics to produce these documents going back to 2017.

Indeed, in its Second Amended Complaint in its case against Panini, Fanatics concedes that it used its "established relationships with leagues and players' associations through its sports merchandise business … to help launch its successful collectibles business." Dkt. 120 ¶ 2. These established relationships included the equity and governance rights that Fanatics had already awarded the leagues and players associations. Thus, by Fanatics' own admission, these requests are relevant to show how Fanatics was able to monopolize the sports trading card business.

In response to all these requests, Fanatics again lodges boilerplate overbreadth and burden objections. As with the other requests that Fanatics raises these objections to, these meaningless boilerplate objections should not preclude discovery into these highly relevant requests, *Fischer*, 2017 WL 773694, at *3, especially because the parties can resolve these concerns through search term and custodial negotiations. And if the leagues and players associations have so many equity investments in Fanatics that these requests are burdensome, that fact only highlights their critical relevance to Panini's claims.

Further, Fanatics claims these requests are duplicative of Panini's other requests concerning equity and governance rights. But these requests are distinct because they are not limited to the receipt or provision of such rights in connection with the exclusive license agreements. For the reasons above, all of Fanatics' receipts and provisions of these rights are relevant to Panini's Section 1 and Section 2 claims and should be produced.

### b. Fanatics' Position

Panini again attempts to manufacture a dispute without properly meeting and conferring. In response to RFP Nos. 112 and 116—which the parties have never specifically discussed in a meet and confer—Fanatics already agreed to produce responsive documents to the extent those documents are responsive to other requests. This makes sense in light of Panini's voluminous and duplicative approach to document discovery. For example, documents related to Fanatics' "provision of equity ownership in Fanatics" to licensors (RFP No. 112) will be captured by the same license agreement negotiation documents Fanatics has already agreed to search for (in response to, *e.g.*, RFP Nos. 16, 19, 22, 25). Likewise, documents about "control, voting rights, or other governance rights held by" licensors in Fanatics (RFP No. 116) will be the same documents Fanatics has already agreed to produce in response to RFP No. 38 (which seeks documents about "control, voting rights, or other governance rights . . . in Fanatics provided to" various licensors "in connection with the Exclusive License Agreements").

Panini now argues—for the first time—that it is entitled not only to documents regarding the provision of equity to licensors in connection with Fanatics' trading card license agreements, but also to documents regarding the provision of equity to licensor entities in connection with *any* aspect of Fanatics' business. That is wildly overbroad. Fanatics has a number of business lines that have nothing to do with this case, such as apparel (*e.g.*, new jerseys, headwear, etc.), hardgoods (*e.g.*, license plate frames, flags, decals, mugs, keyrings, etc.), and betting and gaming. Panini is not entitled to highly sensitive information regarding these irrelevant aspects of Fanatics' business to explore the "dynamics" and "motivations" (*see supra*) in Fanatics' relationships with licensors unrelated to this case.

As for RFP Nos. 113–115—which, again, the parties have never discussed in a meet and confer—those requests seek information far outside the bounds of the Amended Complaint. Specifically, they relate to *Fanatics'* purported receipt of equity or control in various licensors. But the equity-related allegations in the Amended Complaint go the other way: Panini's theory is that the ***licensors' receipt*** of equity interests in Fanatics somehow supports an antitrust claim. *See* Am. Compl. ¶ 111, Antitrust Case Dkt. 69. Panini is not entitled to a fishing expedition to explore a theory that does not appear in its allegations.

## VI.    Documents Concerning GCP (Requests 118, 121, 124, 125)

### a. Panini's Position

On four GCP-related requests, Fanatics objected and said that it will meet and confer with Panini. But it has refused to do so. Panini responded to these objections in writing on July 18 and made clear that it will raise the requests with the Court on August 11 if the parties do not reach agreement. Fanatics ignored Panini's response and has not responded to Panini's position on these four requests. These Requests are:

- **RFP No. 118**: Documents sufficient to show the percentage of any stock or other interests owned by each Fanatics entity in GC Packaging's corporate structure.

- **RFP No. 121**: All Documents relating to Your acquisition of a stake in GC Packaging, including, but not limited to, the negotiations, valuation, strategic rationale, and structure of the transaction.

- **RFP No. 124**: All Documents concerning Your knowledge of GC Packaging's contractual relationship with Panini before Your acquisition of a stake in GC Packaging.

- **RFP No. 125**: All Documents and Communications concerning Panini's contract with GC Packaging, including the change of control, confidentiality, property rights, and technical information provisions in that contract.

The documents sought by these Requests are relevant to at least Panini's Section 2, tortious interference, and Clayton Act claims—including Panini's allegations that Fanatics intentionally induced an unjustified breach of GCP's manufacturing obligations to Panini and that Fanatics' interference with the Panini-GCP relationship was part of Fanatics' anticompetitive strategy.

As to Request 118 specifically, Fanatics said that it had produced the Membership Interest Purchase Agreements associated with the GCP acquisition. But the Membership Interest Purchase Agreements that Fanatics has produced cannot provide the full picture of the current ownership percentage and control rights. To fully respond to the request, Fanatics should also produce documents such as the current capitalization table, operating or shareholder agreements, and any amendments or schedules.

For Request 121, Panini offered to narrow its request in an effort to reach compromise and move discovery forward. Panini informed Fanatics that it will accept documents sufficient to show the structure of Fanatics' transaction to acquire a stake in GCP. But Panini made clear that Fanatics must produce all documents concerning the strategic rationale for the acquisition. Those documents are relevant to Panini's claim that Fanatics acquired a controlling stake in GCP not to meet any current economic need, but to hasten Panini's exit from the Relevant Market. *See, e.g.*, Am. Compl. ¶¶ 138, 207. These documents are also relevant to Panini's claims—which the Court found plausibly alleged—that Fanatics intentionally induced an unjustified breach of GCP's manufacturing obligations to Panini after acquiring a stake in GCP, Dkt. 164 at 28, and that Fanatics' purposeful interference in the Panini-GCP business relationship was part of Fanatics' anticompetitive strategy that, if true, would violate Section 7 of the Clayton Act and Section 2 of the Sherman Act, Dkt. 164 at 31. Fanatics has refused to respond to this offer. The parties are thus at an impasse and the Court should order production of these documents.

As for Requests 124 and 125, they seek documents related to Fanatics' knowledge of GCP's contractual relationship with Panini before its acquisition of a stake in GCP. These documents are relevant to Panini's Section 2 claims, Panini's claim that Fanatics induced GCP to breach its contract with Panini, and Panini's Clayton Act claim. To start, the Court found that Panini plausibly alleged that Fanatics intentionally induced an unjustified breach of GCP's manufacturing obligations to Panini. Dkt. 164 at 28. In support of this claim, Panini alleges that Fanatics was aware of the Panini-GCP relationship and of GCP's contractual obligations to produce cards for Panini. Am. Compl. ¶ 134. Accordingly, documents demonstrating this knowledge are relevant to Panini's claim.

The Court also found that Panini adequately pleaded that Fanatics purposefully interfered with the Panini-GCP business relationship by acquiring GCP and that this was an anticompetitive act in violation of Section 7 of the Clayton Act. Dkt. 164 at 28, 31. In doing so, the Court cited Panini's allegations of Fanatics' knowledge of the Panini-GCP production agreement. *Id.* at 28 (citing Am. Compl. ¶¶ 134, 140). Accordingly, documents going to this knowledge are relevant and should be produced.

Fanatics objects to Request 125 on the grounds that it references "provisions in a contract to which Fanatics is not a party." This is not a proper basis for withholding responsive documents. If Fanatics has documents or communications concerning Panini's contract—including the specific provisions mentioned in Request 125—they must be produced. Any other concerns that these Requests are overly broad or unduly burdensome can be resolved with reasonable search terms.

Accordingly, Panini asks the Court to order Fanatics to produce documents in response to Requests 118, 121, 124, and 125.

b. **Fanatics' Position**

Contrary to Panini's unfounded claim, Fanatics has never "refused" to meet and confer on any GCP-related request (or any other request, for that matter). As explained above, the parties have exchanged *dozens* of pages of letters and met and conferred multiple times. Fact discovery does not close for 10 months, and certain issues are still outstanding—including the GCP-related requests Panini prematurely raises in this section.

RFP No. 118 is emblematic of Panini's failure to properly meet and confer. This request seeks "[d]ocuments sufficient to show the percentage of any stock or other interests owned by each Fanatics entity in GC Packaging's corporate structure"; Fanatics responded that "it has already produced Documents sufficient to show its ownership interest in GCP, but would "meet and confer regarding what, if any, additional Documents Panini seeks through this Request." Panini Ex. A. Setting aside two sentences of Panini's 10-page July 18 letter, *the parties have never discussed this RFP at all*. And, for the first time in its portion of this submission, Panini now indicates that

24

it specifically seeks GCP's "current capitalization table, operating or shareholder agreements, and any amendments or schedules." Fanatics is considering this new, more specific request, but it cannot provide a response on just 24 hours' notice.

RFP No. 121 is also appropriate for further discussion by the parties—since it is unclear what Panini is seeking that Fanatics has not already agreed to produced. This request seeks documents related to Fanatics' "acquisition of a stake in GC Packaging, including, but not limited to, the negotiations, valuation, strategic rationale, and structure of the transaction." Fanatics agreed to produce documents "sufficient to show the structure of the transaction and the strategic rationale of Fanatics' investment in GC Packaging." Fanatics also agreed to produce financial projections, including after the GCP investment (in response to RFP No. 47), as well as "[d]ocuments relating to [Fanatics'] business or strategic plans for manufacturing Sports Trading Cards with GC Packaging" (in response to RFP No. 120). These are more than sufficient, and to the extent Panini continues to believe otherwise, it should explain its rationale in a meet and confer.

Finally, as Fanatics would have explained had the parties met and conferred, RFP Nos. 124 and 125 relate to claims the Court has dismissed. RFP No. 124 seeks documents regarding Fanatics' "knowledge of GC Packaging's contractual relationship with Panini before [Fanatics'] acquisition of a stake in GC Packaging." But "Fanatics' knowledge of the [Panini-GCP] contract" is an element of the tortious inference claim that the Court *dismissed* as to the Panini-GCP contract, on the ground that "Panini does not allege . . . that Fanatics had specific knowledge of the terms of the contract, nor any indication that the acquisition would violate a specific change-of-control provision of that contract." Antitrust MTD Order at 27–28. RFP No. 125—which seeks documents regarding specific terms of "Panini's contract with GC Packaging, including the change of control, confidentiality, property rights, and technical information provisions in that contract"— is irrelevant for the same reason.

## VII.    Documents Concerning Complaints and Quality (Requests 134-136, 139)

### a.  Panini's Position

Fanatics has inappropriately limited its agreement to produce documents responsive to the following Requests:

- **RFP No. 134**:  All Documents concerning complaints by consumers about Sports Trading Cards and other products manufactured, distributed, or sold by You or sold under the Fanatics brand, including, but not limited to, Sports Merchandise and uniforms for professional Athletes.

- **RFP No. 135**:  All Documents concerning complaints by professional sports leagues or professional sports player associations about the quality of Sports Trading Cards and other

products manufactured, distributed, or sold by You or sold under the Fanatics brand, including, but not limited to, Sports Merchandise and uniforms for professional Athletes.

- **RFP No. 136**: All Documents concerning any manufacturing defects, errors, misprints, or other quality issues with Sports Trading Cards manufactured, distributed, or sold by You.

- **RFP No. 139**: All Documents concerning any internal discussions, analyses, or reports regarding the quality of Your Sports Trading Cards compared to those of Your competitors, including, but not limited to, Panini and Topps (before the Topps Acquisition).

These Requests seek documents relevant to establishing whether Fanatics' market power and anticompetitive conduct has resulted—and will result—in diminished quality and other consumer harms. These documents are also relevant to disproving Fanatics' purported defenses, including its claims of innovation, competition on the merits, and purported "quality enhancements … across the board." Dkt. 173 at 3.

Fanatics, though, has agreed to produce documents in response to Requests 134-136 and 139 concerning only MLB trading card products. This is improper, particularly given Fanatics' contention that the relevant market is far broader than that alleged in the Complaint. Fanatics should produce documents responsive to these Requests concerning all sports trading cards that Fanatics contends may be relevant, including all sports trading cards that Fanatics has already begun producing (e.g., collegiate cards, NBPA licensed cards, etc.) and will begin producing (NBA and NFL).

In response to Requests 134 and 135 specifically, Fanatics should also produce documents relating to complaints about sports merchandise and uniforms for professional athletes. Fanatics admits that its "sports merchandise business provided a strong platform for Fanatics to help launch its successful collectibles business." Dkt. 120 ¶ 2. So these documents on Fanatics "sports merchandise business" quality decline are relevant to Panini's allegations that a decline in quality is likely to follow from Fanatics' monopolization of the sports trading card market, too—for which there is remarkably already evidence. *See, e.g.*, Dkt. 69 ¶¶ 11, 230.  Accordingly, Panini asks the Court to order Fanatics to produce documents in response to these requests.

### b. Fanatics' Position

Fanatics has already agreed to search for and produce substantial materials in response to Panini's Requests for information about the quality of Fanatics' trading cards.  For all of the trading cards that Fanatics currently sells within Panini's alleged relevant market, Fanatics has agreed to search for and produce, subject to reasonable search terms and custodians: (i) "All Documents concerning complaints by consumers" in response to RFP No. 134; (ii) "All Documents concerning complaints by professional sports leagues or players associations about [quality]" in response to RFP No. 135; (iii) "All Documents concerning any manufacturing defects, errors,

misprints, or other quality issues" in response to RFP No. 136; and (iv) "All Documents concerning any internal discussions, analyses, or reports regarding the quality of Your Sports Trading Cards compared to those of Your competitors" in response to RFP No. 139.[9]

Panini's demands for even broader searches are an entirely irrelevant and unduly burdensome fishing expedition. *First*, in connection with RFP Nos. 134 and 135, Panini demands that Fanatics expand its searches to include any and all products that the Fanatics' Commerce business (*not* Fanatics' Collectibles business) sells, including all "sports merchandise and uniforms for professional athletes." That demand is baseless. Fanatics' apparel operations have entirely different producers, production processes, distribution chains, and even business units than Fanatics Collectibles' sale of trading cards. A customer complaint about the size of a t-shirt, whether a hat is comfortable, whether a hoody shrunk in the wash, or anything of that nature relating to apparel, even if it did exist, has zero relevance to whether the trading cards Fanatics produces through GCP are high quality. GCP does not make apparel or professional athlete uniforms; it makes trading cards. The different production processes, distribution chains, and operations teams for apparel versus trading cards also render Panini's request unduly burdensome. Expanding these requests to reach the non-trading card and non-collectibles products that Panini seeks would require Fanatics to search the files of additional custodians and locations that have zero connection to trading cards, because the relevant operational teams do not overlap. Panini has not offered any compromises to mitigate that burden. Instead, it continues to demand "all Documents concerning complaints" by consumers, professional sports leagues, or professional sports players associations.

*Second*, Panini cannot justify the burden on Fanatics of expanding the searches it has agreed to perform beyond MLB trading card products. Because *Panini* has long-held exclusive licenses for NBA and NFL trading cards, Fanatics *does not currently sell* fully licensed trading cards of players in those leagues. *See* Am. Compl. ¶ 98, Antitrust Dkt. 69. Instead, the only products in Panini's alleged market of "fully licensed sports trading cards," *id.* ¶ 33, that Fanatics currently sells are MLB trading cards. Fanatics began selling those cards in 2022, and they make up the bulk of Fanatics' trading card sales. If any consumer concerns regarding Fanatics' trading card product quality exist—something Panini has presented zero evidence of—then they would be captured within the searches Fanatics has already agreed to perform regarding its MLB trading card products.[10] Furthermore, if the NFL, NBA, or their players associations have expressed any

---

[9] As discussed *infra*, Fanatics' production in response to these RFPs should be limited to MLB trading card products.

[10] Panini reveals the weakness of its position with its tepid quotation of a few words from Fanatics' Answer. In Fanatics' 45-page answer, Panini notes that Fanatics refers once to quality enhancements "across the board." But Panini omits the actual sentence language showing this reference was to Fanatics having "invested in a card manufacturer to enhance production quality across the board." Antitrust Dkt. 173 at 2. That manufacturer is GCP. And Fanatics has already

concerns regarding Fanatics' trading card quality, those communications would already be captured from the numerous searches Fanatics has agreed to perform regarding those licenses, including reasonable searches for "All Documents concerning the negotiation and execution" of those trading card licenses (RFP Nos. 16, 19, 22, 25) and "All Communications with MLB, MLBPA, NBA, NBPA, NFL, NFLPA, WWE, OneTeam or any other Licensor relating to, referencing, or discussing Panini," (RFP No. 68). The Court should reject Panini's scorched-earth demands for anything more.

## VIII.    Other Open Issues

### a.  Panini's Position

Panini has raised several other categories of requests for which Fanatics has refused to produce documents or inappropriately limited its production. These include requests for documents concerning Fanatics Live, Retailer, and Card Shops (Requests 83, 89, 90, and 92); documents concerning Fanatics' name, image, and likeness and Autograph agreements with football and basketball players (Requests 49, 50, 54, 56, 62, and 63); documents concerning Fanatics' use of customer data (Request 48); and documents relating to an internal investigation into whether Fanatics improperly distributed high-value cards (Request 141). Panini has also asked Fanatics to clarify its objections and the scope of what it has agreed to produce in response to Requests 40-42, 44, and 47, which relate to the expected financial performance, value, and financial terms of the exclusive licenses at the heart of this case. In its July 18 letter, Panini detailed the relevance of these requests and explained that Fanatics' burden objections may be resolved through appropriate search terms. *See* Panini Exhibit C at 2-3, 5.

To date, Fanatics has not provided a response on these issues. Panini has asked Fanatics to do so before the conference and offered to continue the meet-and-confer process this week. If these issues remain in dispute at the time of the conference, Panini will request that the Court schedule another conference later this month to resolve these matters.

### b.  Fanatics' Position

Panini concedes that none of the issues in its gratuitous "other open issues" section are ripe. The parties will bring any additional issues to the Court's attention if and when any impasse is actually reached.

---

agreed to perform numerous searches in connection with that investment. Moreover, Panini should have documents of its own regarding GCP's quality, as GCP also makes cards for Panini. Am. Compl. ¶¶ 132–135.

## IX.    Request for Interim Discovery Deadlines

### a.    Panini's Position

To avoid additional delays in the discovery process and to ensure the parties are moving forward in a manner that allows them to meet the substantial completion deadline in this case, Panini respectfully requests that the Court enter interim deadlines for the finalization of search-term-and-custodian negotiations and for initial productions as follows:

- **September 12**: Finalize negotiations of custodians and search terms and raise any disputes with the Court

- **October 24**: Begin initial document productions

Panini believes that Court deadlines for the parties to finalize negotiations on search terms and custodians and to begin producing documents are necessary given the slow pace of the parties' current negotiations and the positions Fanatics has taken with regard to custodians. On June 24, Panini requested that the parties exchange custodians on July 2. Fanatics then proposed an August 1 deadline. Panini responded and requested an exchange on July 9 instead, but Fanatics insisted on a July 23 exchange. On July 23, after nearly a month, Fanatics proposed a list of just *eight* custodians that excluded many of its key collectibles personnel.[11] This list was identical to the brief list Fanatics provided before the decision on the motion to dismiss and the start of formal discovery, except for one additional custodian. Panini responded the next day with a list of additional custodians identified from Fanatics' organization charts that Panini believes should have been included. Fanatics still has not responded to this email.

It is unclear why Fanatics needed over a month to identify its custodians, when this case has been pending for two years now and the parties already exchanged initial disclosures and a preliminary list of proposed custodians in December 2024. Further, Fanatics has had months to consider Panini's requests for production and should have been identifying relevant custodians for these requests during that time. Fanatics thus should have identified the necessary custodians in its disclosure, but it left the burden on Panini to pick up the slack.

Panini is doing everything it can to progress discovery to ensure the parties can meet the February 20, 2026 deadline for substantial completion of document productions. But due to the pace at which Fanatics has proved it intends to negotiate with Panini, court intervention is necessary. The parties should begin rolling productions long before this deadline. To achieve this, the parties must finalize negotiations on search terms and custodians in the near term.

---

[11] By contrast, Panini's list identified nineteen custodians.

Unfortunately, Panini believes this will not occur without court-ordered deadlines. If Fanatics intends to proceed diligently and in good faith, interim deadlines should not be objectionable.

### b. **Fanatics' Position**

Panini seeks to short-circuit the parties' ongoing and productive discovery negotiations by requesting that the Court impose deadlines for various issues the parties are currently discussing. Pursuant to agreement, the parties exchanged proposed custodian lists on July 23.  On July 24, Panini demanded that Fanatics add *18 additional custodians* to its original list of 8 custodians. While Panini's proposal is facially overbroad and unduly burdensome, Fanatics is nonetheless evaluating the large number of individuals Panini has proposed to add and intends to respond shortly.  Once custodians and outstanding scope issues are settled, the parties can test and propose search terms; negotiate search terms based on hit reports; and bring any disputes to the Court once ripe.  At this early stage of discovery, with fact discovery set to close in June 2026, additional interim deadlines are not necessary.

Respectfully submitted,

| | |
|---|---|
| */s/* David Boies | */s/* Lawrence E. Buterman |
| David Boies | Lawrence E. Buterman |
| | |
| */s/* Stuart Singer | */s/* Michael B. Carlinsky |
| Stuart Singer | Michael B. Carlinsky |
| | |
| *Counsel for Panini* | *Counsel for Fanatics* |