# EXHIBIT B



June 24, 2025

**VIA ELECTRONIC MAIL**

Lawrence Buterman
Latham & Watkins, LLP
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com

Kathryn Bonacorsi
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
kathrynbonacorsi@quinnemanuel.com

**Re: *Panini America, Inc. v. Fanatics, Inc. et al*., Case No. 1:23-cv-09714-LTS**

Counsel:

We write regarding Defendants' June 6, 2025 Responses and Objections to Panini's Second Set of Requests for Production ("Responses") to resolve disputes over the appropriate scope of production and begin search term discussions and negotiations. This letter is organized into four sections:

I.      **Disputes Affecting the General Scope of Production**. This section discusses our objections to Fanatics' overly narrow time-period and broad refusal to produce certain categories or types of documents. Since these issues fundamentally affect the scope of both parties' productions, we view their resolution as the highest priority.

II.     **Requests for Clarifications in Writing**. Even where Fanatics has agreed to produce documents, the scope of what Fanatics has agreed to produce is unclear due to its unspecified reliance on specific and general objections and inappropriate narrowing of certain definitions. We request that Fanatics clarify in writing by **July 1, 2025,** whether it is withholding otherwise responsive documents based on these objections and narrowed definitions.

III.    **Search Term and Custodian Negotiations**. In Section III, we propose a schedule for an initial exchange of search terms and custodians.

IV.     **Process for Resolving Disputes Over Individual Requests**. For a significant number of requests, Fanatics is refusing to produce documents but has stated it is willing to meet and confer. Since discussing these requests during meet and confers would likely take many hours and require extensive back and forth, we outline a proposal for

BOIES SCHILLER FLEXNER LLP

401 East Las Olas Boulevard, Suite 1200, Fort Lauderdale, FL 33301 | (t) 954 356 0011 | (f) 954 356 0022 | www.bsfllp.com



narrowing the issues and efficiently raising any remaining areas of the dispute over individual requests with the Court.

**Please let us know your availability for a meet and confer on the following dates and times:**

- **June 30 between 10 a.m. and 1 p.m. E.T.**
- **July 1 between 2 p.m. and 4:30 p.m. E.T.**
- **July 2 between 10 a.m. and 2 p.m. E.T.**

We are providing our positions in writing on these issues before scheduling a meet and confer so that we can have a productive conversation that allows us to identify areas of agreement and areas of dispute. If we cannot reach agreement on these issues, we intend to brief them before the next discovery conference. Accordingly, we ask that you come fully prepared to discuss Fanatics' positions on these matters.

## I.    Disputes Affecting the General Scope of Production

### A.  The relevant time-period Fanatics proposes is overly narrow.

Fanatics' unilateral limitation of its document production to the period of December 1, 2020, through October 10, 2023, is improper and unjustifiably narrow in light of the scope of the claims and the allegations in this case.

**Begin Date for Production**. We do not find it credible that there was no relevant conduct by Fanatics before December 1, 2020, including, but not limited to, Fanatics' planning, negotiations, and efforts to obtain the Exclusive Licenses at the heart of this case, and the leagues and player associations' investments in Fanatics. If Fanatics maintains that no such relevant conduct occurred before December 1, 2020, and is willing to provide a declaration to that effect, we are open to discussing the implications for the appropriate begin date for certain of Panini's Requests. Absent that, however, the begin date should be no later than January 1, 2017.

**End Date for Production**. Panini's allegations are not limited to past conduct. The Amended Complaint asserts that Fanatics' anticompetitive conduct is ongoing and continues to harm Panini and the market through the present. By cutting off its production at October 10, 2023, Fanatics is withholding relevant documents that would evidence the continuation of the alleged conduct. These ongoing actions are directly relevant to both liability and potential injunctive relief. Indeed, Fanatics' own Requests to Panini seek documents through the present, which suggests that Fanatics agrees discovery into the parties' ongoing conduct is appropriate. The end date for the production of documents should, at a minimum, be mutual.

While Panini is willing to meet and confer regarding narrower time periods for a few of the requests, Fanatics should withdraw its improper time limitations and agree to produce responsive documents for a period that begins at least as early as January 1, 2017 (to capture the full scope of planning and negotiations) and continues through the present.



**B. Fanatics' objections to "Competing Products" and "Relevant Market" are improper and leave Panini unable to determine the scope of products that Fanatics has agreed to produce.**

Fanatics' objections to the definitions of "Competing Products" and "Relevant Market" are both inappropriate and inconsistent with its own discovery conduct and positions in this litigation. Fanatics objects to the definition of "Competing Products" as "vague and ambiguous" and further objects to the definition of "Relevant Market" on the grounds that it purportedly calls for expert opinion or legal conclusions. Not only are these objections unsupported, but they provide no alternative working definitions or clarify the scope of products that Fanatics considers responsive. This lack of clarity is compounded by Fanatics' failure to specifically identify the categories of documents it is actually agreeing to produce, leaving Panini unable to ascertain whether Fanatics is withholding responsive materials based on its improper objections to the definitions of "Competing Products" and "Relevant Market."

Fanatics' position is particularly untenable given that its own Requests to Panini are exceedingly broad, seeking documents and information related to products and markets well beyond the scope of the Relevant Markets as defined by Panini in the Amended Complaint. Fanatics cannot, on the one hand, demand expansive discovery from Panini regarding a wide array of products and markets, and, on the other hand, refuse to produce documents directly relevant to the categories of products and product markets described with a high degree of specificity in the Amended Complaint.

Panini requests that Fanatics specifically identify the categories of products it believes are relevant so that the parties can engage in a meaningful and good faith negotiation on a mutual scope of production for documents that accommodates each side's view of the Relevant Market.

**C. Fanatics wrongly objects to certain Requests that it says seek discovery into a claim that has been dismissed.**

Fanatics objects to Requests Nos. 46 and 64–67, claiming these Requests seek "discovery into a claim that has already been dismissed," and states it "will not produce Documents in response" to these Requests. These Requests are all relevant to Panini's surviving monopolization claims. As Panini alleges in its Amended Complaint, by acquiring Topps, Fanatics obtained an existing exclusive MLB license agreement Am. Compl. ¶ 118, enabling it to accelerate its monopolization of the market for MLB cards. Panini further alleges that Fanatics' acquisition "solidified and increased Fanatics' market power, which in turn it leveraged … to disadvantage Panini." *Id.* ¶ 120. The Amended Complaint is clear that the Topps Acquisition was a key component of Fanatics' anticompetitive strategy of leveraging its "long-term monopoly to secure for itself a short-term monopoly of the Relevant Markets before its long-term monopoly began" by eliminating Topps as a competitor. *Id.* ¶¶ 207, 224. Fanatics should withdraw its objection to these Requests, as they seek documents highly relevant to Panini's remaining claims, and it should confirm that it will produce responsive documents.

3



### D. Fanatics wrongly lodges overbreadth objections that can be resolved with reasonable search terms.

Fanatics asserts that many Requests are overly broad and unduly burdensome. But Fanatics cannot withhold relevant documents merely by labeling Requests as overbroad, particularly where the Requests seek relevant information and the parties can and should employ reasonable discovery tools to capture responsive information. Any legitimate concerns about the breadth of Panini's Requests can be effectively addressed through the use of mutually agreed-upon search terms and custodian limitations, as contemplated by the ESI Protocol.

Accordingly, Fanatics should withdraw its burden and overbreadth objections and agree to produce documents responsive to Requests for which responsive documents can be targeted with reasonable search terms, including the following Requests:

- No. 4 – Documents concerning Fanatics' percentage ownership interests in other Fanatics entities, such as Fanatics Collectibles.

- No. 5 – Documents concerning equity or financial interests in Fanatics.

- No. 8 – Documents relating to any change in ownership of any part of Fanatics' Sports Trading Card business.

- Nos. 27-29 – Documents and communications relating to Fanatics' license agreement with the NBPA for a Player's Only Non-Exclusive License for Off Court Products.

- No. 40 – Documents concerning financial models, pro forma statements, or economic analyses prepared in connection with entering into the Exclusive License Agreements.

- No. 41 – Documents concerning the anticipated financial performance or expected returns from the Exclusive License Agreements.

- No. 42 – Documents concerning the value of the Exclusive License Agreements.

- No. 44 – Documents relating to the financial terms of the Exclusive License Agreements.

- No. 46 – Documents concerning revisions or updates to financial projections for the Exclusive License Agreements following the Topps Acquisition.



- No. 47 – Documents concerning revisions or updates to financial projections for the Exclusive License Agreements following Fanatics' acquisition of an interest in GC Packaging.

- No. 48 – Documents concerning Fanatics' use of customer data in connection with the marketing or sale of Sports Trading Cards.

- No. 49 – Documents concerning Fanatics' plans or ability to use the NIL and Autographs of NFL Players on NFL Cards before March 2026.

- No. 50 – Documents concerning Fanatics' plans or ability to use the NIL and Autographs of NBA Players on NBA Cards before October 2025.

- No. 51 – Documents relating to or concerning the 2025 Topps Football Releases and any additional NFL Cards products that Fanatics intends to release in 2025.

- No. 54 – Fanatics' agreements with Athletes for the right to use their NIL or Autographs on NFL Cards.

- No. 56 – Fanatics' agreements with Athletes for the right to use their NIL or Autographs on NBA Cards.

- No. 62 – Documents concerning the business rationale for signing Athletes who participate in football to exclusive Individual Athlete Agreements with terms before March 2026.

- No. 63 – Documents concerning the business rationale for signing Athletes who participate in basketball to exclusive Individual Athlete Agreements with terms before October 2025.

- No. 64 – Documents relating to the Topps Acquisition.

- No. 65 – Documents concerning Fanatics' plans for Topps's business operations, brands, products, and personnel following the Topps Acquisition.

- No. 66 – Documents concerning any analyses of the impact of the Topps Acquisition on competition in the markets for Sports Trading Cards, MLB Cards, NFL Cards, or NBA Cards.

- No. 67 – Communications with MLB and/or the MLBPA regarding the Topps Acquisition.

- No. 72 – Documents relating to Communications with Licensors, Athletes, their representatives, Player Agencies, or other third parties regarding Panini's business, financial condition, or future prospects.

5

**BSF**

- No. 75 – Documents relating to the establishment of OneTeam.

- No. 82 – Documents relating to Fanatics' control, voting rights, or other governance rights in OneTeam.

- No. 83 – Documents concerning Fanatics' development and launch of the Fanatics Live platform for Case Breaking.

- No. 84 – Fanatics' communications with Case Breakers.

- Nos. 89 – Documents concerning Fanatics' negotiations or agreements with Retailers regarding the display, promotion, or sale of Sports Trading Cards.

- No. 90 – Documents concerning any restrictions or limitations imposed on Retailers regarding the display, promotion, or sale of Sports Trading Cards.

- No. 92 – Fanatics' Communications with Local Card Shops regarding pricing, distribution, direct accounts, or sales of Sports Trading Cards.

- No. 94 – Documents relating to Fanatics' business or strategic plans for opening retail stores that sell Fanatics' Sports Trading Cards.

- No. 112 – Documents relating to equity ownership in Fanatics.

- No. 113 – Documents relating to Fanatics' receipt of equity ownership in Major U.S. Professional Sports Leagues, Players Associations, and OneTeam.

- No. 114 – Documents relating to the receipt of equity ownership in Major U.S. Professional Sports Leagues or Players Associations by any individual or entity who holds a controlling interest in Fanatics.

- No. 115 – Documents relating to Fanatics' control, voting rights, or other governance rights in Major U.S. Professional Sports Leagues or Players Associations.

- No. 116 – Documents relating to control, voting rights, or other governance rights held by Major U.S. Professional Sports Leagues, Players Associations, or OneTeam in Fanatics.

- No. 121 – Documents relating to Fanatics' acquisition of a stake in GC Packaging.

- No. 124 – Documents concerning Fanatics' knowledge of GC Packaging's contractual relationship with Panini.

6



- No. 125 – Documents and communications concerning Panini's contract with GC Packaging.

- Nos. 129-133 – Documents relating to former Panini employees.

- Nos. 135-136 – Documents concerning quality issues with, or complaints about the quality of, Fanatics' products.

- No. 139 – Documents concerning the quality of Fanatics' Sports Trading Cards compared to those of its competitors.

- No. 140 – Documents and communications related to reports, questions, complaints, or criticisms related to Fanatics' products, customer service, or policies.

- No. 141 – Documents concerning the investigation by KPMG into Fanatics.

- No. 143 – Documents produced by Fanatics in the American Arbitration Association matter between Panini and NFLPA, Case No. 01-23-0003-7163.

- Nos. 145-146 – Documents and transcripts in *Panini America, Inc. v. Eli Nicholas Matijevich, Jr., et al.*, Case No. DC-23-04798 (Tex. Dist. Ct., Dallas Cnty., April 14, 2023).

- Nos. 147-149 – Transcripts, documents, pleadings, legal briefs, and correspondence in *National Football League Players Ass'n, et al. v. Fanatics SPV, LLC, et al.*, JAMS Ref. No. 5425003449.

- No. 150 – Documents produced in *Fanatics Collectibles AC, Inc. v. Harrison*, Index No. 652540 (N.Y. Sup. Ct., N.Y. Cnty., June 27, 2024).

II.    **Requests for Clarifications in Writing**

   A. **Fanatics' responses violate Rule 34(b)(2) by failing to specify documents that Fanatics intends to withhold on the basis of its specific and general objections.**

Where Fanatics has agreed to produce documents, it "incorporates by reference each of its General Objections and Objections to Definitions and Instructions" and then states that it will produce responsive documents "subject to and without waiving its objections," without specifying the precise scope of documents it has agreed to produce. This approach leaves Panini unable to determine what categories or types of responsive documents Fanatics is actually producing, and which documents, if any, are being withheld on the basis of its specific and general objections. It is not appropriate for Fanatics to withhold non-privileged, responsive documents based on generalized or unspecified objections without identifying what is being withheld and on what



grounds, and what is being produced. *Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) ("[I]ncorporating all of the General Objections into each response violates [Federal] Rule [of Civil Procedure] 34(b)(2)(B)'s specificity requirement as well as Rule 34(b)(2)(C)'s requirement to indicate whether any responsive materials are withheld on the basis of an objection."); *see also Cambridge Cap. LLC v. Ruby Has LLC*, 2022 WL 889143, at *6 (S.D.N.Y. Mar. 24, 2022).

To ensure transparency and remedy Fanatics' failure to comply with Rule 34, Panini requests that Fanatics promptly confirm in writing that, for all Requests where it has agreed to produce documents, it is not withholding any non-privileged, responsive documents on the basis of its previously stated specific or general objections.

**B. Fanatics' narrowed definitions of the sports leagues and players' associations are improper.**

Panini disputes the narrowed definitions of "MLB," "MLBPA," "NBA," "NBPA," "NFL," "NFLPA," and "OneTeam" proposed by Fanatics. Narrowing the terms as Fanatics suggests would exclude documents and communications relating to the entities that Fanatics entered into license agreements with, including MLB Advanced Media, L.P., MLB Players, Inc., NBA Properties, Inc., NBA Players, Inc. d/b/a Think450, NFL Players, Inc., NFL Properties LLC and NFL International Licensing, Inc.

Please confirm in writing that Fanatics will produce all relevant documents and communications responsive to the Requests related to the sports leagues and players' associations regardless of the specific entity or affiliation of the individuals or entities referenced in those documents or communications.

**C. Fanatics' narrowed definition of "Fanatics" is improper to the extent Fanatics is relying on it to withhold otherwise responsive documents.**

Fanatics proposes an overly restrictive definition of "Fanatics." Fanatics' proposed definition improperly excludes Fanatics' affiliates and subsidiaries outside the collectibles business line and associated individuals who may be in possession of relevant documents pre-dating the inception or formation of the entities in the collectibles line.

Please confirm in writing that Fanatics will produce all responsive documents regardless of which Fanatics entities or individuals have possession or control of such documents.

**III.    Search Term and Custodian Negotiations**

To begin the search term and custodian negotiations, we propose that each party do the following by **Wednesday, July 2:**

(1) Exchange an initial draft of proposed custodians and search terms for the production of documents by the other party (Fanatics will propose terms and custodians for Panini to use and vice versa), without waiver of the ability to add or revise such terms and custodians later in the negotiation process.



(2) Identify the specific requests for which that party intends to use a targeted, non-custodial search to identify responsive documents (*i.e.*, "go-get" requests).

### IV.    Panini's Proposal for Resolving Disputes Over Specific Requests

To facilitate the efficient resolution of outstanding discovery disputes over specific Requests, Panini proposes the following process:

- Panini will prepare a chart identifying each specific request for production where Panini believes that Fanatics has either improperly refused to produce documents or stated that it will "meet and confer" regarding its response. For each such request, Panini will set forth its position, including the basis for its view that the requested documents are relevant and should be produced. Panini will send the chart to Fanatics by **July 3.**

- Fanatics will then provide its written response to Panini's position in the same chart, stating its objections or grounds for withholding documents, or clarifying the scope of any intended production. Fanatics will provide this response by **July 10.**

Panini believes that this process will allow the parties to clearly articulate and narrow the large number of disputes in writing before a meet and confer on specific requests. If disagreements remain after a meet and confer on the specific requests, the parties may elect to present the chart reflecting the disputed requests to the Court, which will provide a clear and organized summary of the issues for judicial resolution.

Please let us know by **June 27** if this process is agreeable.

Regards,
*/s/ Sabria McElroy*
Sabria McElroy