```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------x

 3    FANATICS COLLECTIBLES TOPCO,
      INC.,
 4
                      Plaintiff,              New York, N.Y.
 5
                  v.                          23 Civ. 6895 (LTS)(VF)
 6
      PANINI S.P.A.,
 7
                      Defendant.
 8
      -------------------------------x
 9
      PANINI AMERICA, INC.,
10
                      Plaintiff,
11
                  v.                          23 Civ. 9714 (LTS)(VF)
12
      FANATICS, INC., et al.,
13
                      Defendants.
14
      -------------------------------x       Remote Conference
15
                                             August 11, 2025
16

17

18    Before:

19                      HON. VALERIE FIGUEREDO,

20                                       U.S. Magistrate Judge

21

22

23

24

25
```

1                              APPEARANCES

2


3    LATHAM & WATKINS, LLP
          Attorneys for Fanatics
4    BY:  LAWRENCE E. BUTERMAN
          AMANDA P. REEVES
5         ALICIA R. JOVAIS


6

     QUINN EMANUEL URQUHART & SULLIVAN, LLP
7         Attorneys for Fanatics
     BY:  MICHAEL B. CARLINSKY
8         KATHRYN DELVEAUX BONACORSI
          TED OVROM

9

10   BOIES, SCHILLER & FLEXNER, LLP
          Attorneys for Panini
11   BY:  DAVID BOIES
          STUART H. SINGER
12        SABRIA McELROY

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  Good morning.  This is the matter

2     of Fanatics Collectibles TopCo, Inc. v. Panini, S.P.A.,

3     Case No. 23 Civ. 6895 and Panini America, Inc. v. Fanatics,

4     Inc., et al., Case No. 23 Civ. 9714.  The Honorable Valerie

5     Figueredo presiding.

6          Counsel that will be speaking for this conference,

7     please make your appearances for the record, starting with

8     plaintiff ⸺ starting with the Fanatics attorneys.

9          MR. BUTERMAN:  Good morning.  This is Lawrence

10    Buterman, from Latham & Watkins, along with my partners Mandy

11    Reeves and Alicia Jovais, for Fanatics.

12         MR. CARLINSKY:  And also joining for Fanatics, this

13    is Michael Carlinsky, from Quinn Emanuel, and I am joined by

14    my colleagues Ted Ovrom and Kate Bonacorsi.

15         Thank you, your Honor.

16         MR. BOIES:  Good morning, your Honor.  This is David

17    Boies, of Boies Schiller and Flexner, and with me on the phone

18    are my partners Stuart Singer and Sabria McElroy.

19         THE COURT:  Good morning, everyone.  This is

20    Judge Figueredo.

21         I just want to make sure, can everyone hear me?

22         MR. BOIES:  Yes, your Honor.  You are a little faint,

23    but we can hear you.

24         THE COURT:  Okay.  So if at any point you can't hear

25    me, because we have had, I guess, technical issues with the

1   phone before, just let me know, just interrupt, and I will try

2   to speak as loudly as possible.

3          So thanks for being here.  The purpose of the

4   conference is to address the various disputes that you

5   submitted in a letter at ECF 133 from August 4.

6          I will just start with the first one, which has to do

7   with RFP 46, 64, 65, 66, and 67.  These are the ones that have

8   to do with the Topps acquisition.

9          I guess I am trying to understand, is there no

10  argument that the Topps acquisition is relevant to showing a

11  pattern of anticompetitive conduct that would be relevant to

12  (audio disruption) claim that survived?  And I suppose this

13  question is for Fanatics.

14          MR. BUTERMAN:  Thank you, your Honor.  Good morning.

15  This is Larry Buterman.

16          Fanatics' position is that Judge Swain's ruling with

17  respect to the Topps acquisition means that Panini should not

18  be entitled to discovery on that claim.  Judge Swain, in

19  ruling and dismissing the Section 7 claim, made some very

20  clear statements regarding Panini's ability to maintain claims

21  based on that conduct.

22          If we look at the —— Judge Swain's decision on the

23  motion to dismiss at pages 8 through 9, Judge Swain stated

24  very clearly that Panini has failed to present "any allegation

25  that could support a plausible inference of harm to Panini"

1    from the acquisition of Topps.

2              Judge Swain also said that "Panini's alleged injuries

3    in this action were not causally connected to Fanatics'

4    acquisition of Topps and that Panini lacked standing to

5    challenge Topps' acquisition."

6              What Judge Swain made clear is that if there were any

7    claimed anticompetitive conduct involving the Topps

8    acquisition, that Panini actually benefited from that.

9              Now, what Panini has said is that, well, that's all

10   true, but when you look at Judge Swain's opinion on the

11   Section~7 claim, she didn't actually repeat everything that

12   she had just said a page earlier; and, therefore, because our

13   allegations in our complaint are so broad, we should still be

14   entitled to discovery on the Topps acquisition.  In other

15   words, Judge Swain's rulings, her statements that Panini

16   cannot challenge the Topps acquisition, somehow are not

17   relevant for purposes of discovery.

18             And we have pointed to the *Facebook* decision, which

19   we believe is squarely on point here, and --

20             THE COURT:  Mr. Buterman --

21             MR. BUTERMAN:  -- Panini, in response ⸺ Panini, in

22   response, has pointed to a few cases that don't address this

23   issue at all, and so we think that it is really nothing more

24   than an end run around Judge Swain's decision and her clear

25   statements that Panini does not have standing to claim any

1    harm from the Topps acquisition.

2            THE COURT:  Mr. Buterman, can you hear me?

3            MR. BUTERMAN:  Yes, your Honor.

4            THE COURT:  I am so sorry to interrupt but, despite

5    being on a landline, my call dropped.  I don't even —— I don't

6    know how it could have possibly.

7            So you cut out for me almost at the start, when you

8    said —— you started by referring to Judge Swain's decision.

9    And I do apologize.  We have had technical issues with this

10   phone before and I got it swapped out, so maybe that hasn't

11   resolved the issue, but if you could just repeat what you

12   said, I would greatly appreciate it.

13           MR. BUTERMAN:  Of course, your Honor.  It actually

14   happens to me when I am in my office sometimes, too.  I don't

15   know why, but let me start again.

16           So if we look at Judge Swain's ruling on the motion

17   to dismiss at pages 8 through 9, Judge Swain makes some very

18   clear statements regarding Panini's ability to challenge the

19   Topps acquisition.  And specifically what Judge Swain says is

20   that Panini failed to present "any allegation that could

21   support a plausible inference of particularized harm to Panini"

22   from the acquisition of Topps.

23           Judge Swain also said that "Panini's alleged injuries

24   in this action were not causally connected to Fanatics'

25   acquisition of Topps" and that "Panini lacks standing" to

1    challenge the Topps acquisition.

2          What Judge Swain said is that from an antitrust

3    perspective, if there is any anticompetitive conduct that

4    occurred with respect to the Topps acquisition——and of course

5    there wasn't——that Panini, as a competitor, benefited from

6    that.

7          Now, those statements, they stand on their own, but

8    what Panini's argument is, that because a page or two later,

9    when Judge Swain is analyzing the Section 2 monopolization

10   claim, Judge Swain doesn't repeat and say again that Panini

11   has no basis to claim any harm from the Topps acquisition,

12   that somehow, that means that they should be entitled to

13   discovery related to the Topps acquisition.

14         In essence, they are trying to do an end run around

15   Judge Swain's statements in the opinion, and we simply do not

16   believe that that is appropriate or consistent with the case

17   law.  And we have cited the *Facebook* decision, which we

18   believe is squarely on point here.

19         And the cases that Panini cites, they don't have to

20   do with whether a party is entitled to discovery on a

21   dismissed claim, and that is really what this all comes down

22   to.  They want discovery on a dismissed claim, and that is

23   completely inappropriate and should be rejected.

24         THE COURT:  Does anyone from Panini want to respond?

25         MR. BOIES:  Yes, your Honor.  This is David Boies.

```
 1            First, we are not seeking, as I think the Court may
 2   understand, discovery on a dismissed claim.
 3            What we are seeking is discovery on the claims that
 4   were sustained, which are our Sherman Act claims.  And, there,
 5   what we are asking for are documents that relate to our
 6   Sherman Act claims.
 7            Now, Mr. Buterman says the Court denies standing on
 8   Section 7, but the Court explicitly upheld standing on our
 9   Section 2 claim, for example.  And what we are seeking is
10   discovery that is relevant to our Section 2 claim.
11            I think Mr. Buterman may confuse --
12            THE DEPUTY CLERK:  Excuse me.  Can you ——
13            MR. BOIES:  -- the question --
14            THE DEPUTY CLERK:  Hello?  Can you just hold on one
15   second.
16            MR. BOIES:  Sure.
17            THE DEPUTY CLERK:  I'm trying to -- the judge is
18   having an issue.  Just hold on one second.
19            (Pause)
20            THE COURT:  Mr. Boies, can you hear me?
21            MR. BOIES:  Yes, I can hear you.
22            THE COURT:  Mr. Boies, can you hear me?
23            MR. BOIES:  Yes, I can hear you.  Can you hear me?
24            THE COURT:  Yes.  I am sorry.  The phone completely
25   died, so I have called in using another phone, but
```

KJC REPORTING & TRANSCRIPTION (848) 459-3124

1    unfortunately it started —— it dropped out at the very

2    beginning.

3        I think you were saying —— you were talking —— you

4    had just started talking about the Sherman Act claim, if you

5    could just start again.  And I do apologize.  I don't know why

6    the phone is having so many problems this morning.

7        MR. BOIES:  Certainly, your Honor, not a problem.  I

8    am just glad it is happening to you and not to me.

9        MR. BUTERMAN:  Your Honor, can we just ask that

10   everybody who is not speaking mute themselves, because I think

11   we are also getting some background noise.

12       THE COURT:  Yes.  That is a great suggestion,

13   Mr. Buterman.

14       MR. BOIES:  Yes.

15       What I was saying, your Honor, is that the discovery

16   we are seeking is not on the dismissed claim, it is on the

17   Sherman Act claims, and the Sherman Act claims are claims that

18   the Court has held we do have standing on.  And there is

19   obviously a distinction between Section 7 and Section 2 of the

20   Sherman Act, and that distinction underlies both the Court's

21   decision to dismiss the Section 7 claim but retain the

22   Section~2 claim as well as the reason why this discovery is

23   relevant to our Section 2 claim.

24       By acquiring Topps, they acquired certain licenses.

25   If they had acquired those licenses simply directly from the

1    league and the players association, there would be no question

2    that that would be relevant.  The fact that they acquired those

3    licenses by acquiring Topps doesn't make the information that

4    we are seeking and the documents that we are seeking any less

5    relevant.

6        I think the *Facebook* claim, which is a district court

7    decision from the District of Columbia relating to an FTC

8    enforcement, I think, actually illustrates why we are entitled

9    to discovery here.

10        What that case involved was two separate sets of

11    conduct.  One was conduct relating to acquisitions, and the

12    other was related to certain platform policies.  What the

13    Court held was that the actions with respect to the

14    acquisitions stated a claim, but the actions relating to

15    certain platform policies did not state a claim and so barred

16    discovery with respect to the platform policies.  The

17    platform policies didn't have anything to do with the

18    acquisitions.

19        By contrast, in our case, the acquisition of Topps is

20    directly relevant to the acquisitions of the other licenses.

21    As I said before, how you acquire the licenses I don't think

22    talks about relevance.  I think what is relevant here is the

23    fact that they were acquiring these licenses and how many

24    licenses they acquired and for what period.

25        So I think that this is quite unlike the *Facebook*

```
1   case.

2            I also think that it is important to keep in mind

3   the difference between what claims are relevant and what

4   evidence is relevant.  If the evidence is relevant both to

5   Section 7 and Section 2, the fact that Section 2 remains and

6   Section 7 is dismissed does not mean that the material is not

7   relevant.

8            I also think it is important to keep in mind that we

9   are not talking about what is admissible at trial——although I

10  think this is clearly admissible at trial——but what is

11  appropriate for discovery.  And I think that, certainly, at

12  the discovery question, this is sufficiently related to the

13  claims that remain that we should be entitled to it.

14           THE COURT:  So, Mr. --

15           MR. BUTERMAN:  So, your Honor --

16           THE COURT:  Can I just ask a quick question, and then,

17  Mr. Buterman, you can definitely chime in.

18           I am just wondering, for the acquisition of Topps,

19  that resulted in acquiring which licenses?

20           MR. BOIES:  MLB, your Honor.

21           THE COURT:  Okay.

22           Mr. Buterman, you were going to say something?

23           MR. BUTERMAN:  Yes, your Honor, a few comments.

24           First of all, I think the *Facebook* case is completely

25  on point, because what the *Facebook* case holds is that you
```

1    cannot use this type of monopolization claim as some sort of
2    Trojan horse to get discovery on a claim that has been
3    dismissed, and that is exactly what Panini is doing here,
4    your Honor.  The Court held that the acquisition of Topps was
5    off limits, and what Panini is trying to do is use Section 2
6    as a back door.
7         Your Honor, the most interesting thing about what
8    Mr. Boies said is that if you actually look at Judge Swain's
9    decision——and I am looking at page 13, where Judge Swain
10   actually addresses antitrust standing——Judge Swain cites to
11   paragraphs 163 through paragraph 209 from Panini's complaint,
12   where she says "Panini alleges that it has been injured by the
13   loss of business opportunities, sales, and exclusion from the
14   market because of Fanatics' anticompetitive and coercive
15   conduct."
16        Now, your Honor, if you actually look at the
17   substantive allegations in those paragraphs, they are not
18   about the Topps acquisition.  They actually —— they talk about
19   Fanatics paying stars and rookie players.  There are
20   paragraphs here about disparagement to third parties,
21   threatening to coerce Panini and cut off plaintiff's supply of
22   jerseys, inducements with respect to termination of license
23   agreements, the WWE.  But it actually doesn't talk about the
24   substantive allegations regarding the Topps acquisition, which
25   actually appear earlier in the complaint.  And so I think that

1    Mr. Boies might just have not looked through that and

2    understood what the Court was actually ruling.

3            And if you look at Judge Swain's decision,

4    Judge Swain makes very, very clear pronouncements about

5    Panini's ability to challenge the Topps acquisition.  And

6    then, once we get to the Section 2 claim, Judge Swain doesn't

7    mention Topps at all.  So Mr. Boies's statement that somehow

8    the Topps acquisition is still part of this, based on

9    Judge Swain's decision, Judge Swain doesn't talk about Topps

10   within Section 2, and for good reason, because just a couple

11   of pages earlier in Judge Swain's decision, she specifically

12   says that Panini does not have standing to claim harm from

13   that Topps acquisition.

14           MR. BOIES:  The only thing I would say --

15           MR. SINGER:  Your Honor, this is Stuart Singer.  One

16   point, on behalf of Panini.

17           Mr. Buterman is just wrong.  If you look at paragraph

18   207, which is within the scope of the paragraphs that he was

19   referring to, page 64, and I am quoting from the complaint,

20   "Fanatics leveraged that long-term monopoly to secure for

21   itself a short-term monopoly of the relevant market before its

22   long-term monopoly began, including by"——and the very first

23   item, No. 1, is——"extinguishing competition by acquiring

24   Topps."

25           So whatever else we might disagree on, there is no

1    question but that the acquisition of Topps is squarely pled

2    within the very paragraphs that Mr. Buterman was referring to.

3         MR. BUTERMAN:  I wish that Mr. Singer would have

4    listened to me before he actually said that.

5         What I said is that there is no substantive

6    allegation regarding the Topps acquisition.  Paragraph 207,

7    which comes after three ellipses, which I think Mr. Stuart

8    Singer notes -- knows, is the summary paragraph just lists

9    12 ―― 11 different types of conduct.  What I said is there are

10   no substantive allegations regarding the Topps acquisition in

11   the paragraphs that Judge Swain cited to, and that's true.

12   They aren't there.  That's not the conduct that Judge Swain

13   said gave the plaintiffs standing.

14        And I am not ―― I just don't understand how it is

15   that Panini believes that Judge Swain could state definitively

16   that they do not have standing to complain about the Topps

17   acquisition and still maintain that it is part of this case.

18   I don't understand how they believe that there are different

19   rules and that Judge Swain, I guess, is required, under their

20   rationale, to state definitively every single time, with

21   respect to every single claim, that they do not have standing;

22   that Judge Swain had to go through and say specifically, once

23   again, they don't have standing on the Topps acquisition, and

24   her failure to do that somehow means that her ruling should be

25   ignored and her clear statement should be ignored.

1          MR. BOIES:  Your Honor, this is David Boies.

2          Let me try to explain again.  There is a difference

3    between Section 7 and Section 2.  Judge Swain recognized that

4    when she held we had standing under Section 2 and not under

5    Section 7.

6          The question here is whether this information is

7    relevant to our Section 2 claim.  The Section 7 claim has been

8    dismissed, but the question is whether it is relevant to our

9    Section 2 claim.

10          In the *Facebook* case that he cites from the District

11    of Columbia, the Court held there that the evidence was not

12    relevant to the remaining claims, and you can understand that

13    if you simply look at the opinion, because there were two

14    separate areas, courses of conduct——one relating to

15    acquisitions and one relating to platform policies——and the

16    Court held that those two were distinct and separate.

17          That is not the case here.  Both the direct

18    acquisition of licenses by Fanatics from the leagues and the

19    players associations and the acquisition of licenses from

20    Topps both go directly to what we are claiming in our

21    Section 2 claim.

22          And Judge Swain, at page 4 of her order says, "By

23    acquiring Topps and its licenses, Fanatics gained an immediate

24    exclusive license with the MLB that lasts until 2025 and a

25    semi-exclusive license shared with Panini and the MLBPA that

1    expired at the end of 2022."  So the idea that somehow

2    acquiring licenses by an acquisition of a company is

3    irrelevant to a case in which what we are talking about is the

4    acquiring of those licenses, by any means, is something that I

5    think does not really make a lot of sense.

6              I think that Mr. Buterman and Mr. Singer and I may

7    have different views of what is substantive, but there can be

8    no doubt that we have alleged that the acquisition of Topps,

9    by acquiring the Topps licenses, is something that is relevant

10   to our case, and I think that ⸺ I think -- to be candid, I

11   think that is clearly so.

12             MR. BUTERMAN:  Your Honor, if I just may ⸺

13             THE COURT:  Mr. Buterman, can you --

14             MR. BUTERMAN:  Yes, just one point.

15             THE COURT:  Sure.  Can I ⸺

16             MR. BUTERMAN:  Sorry, your Honor.

17             THE COURT:  No worries.  I just had one question.  If

18   you want to make the point, I just had a follow-up.

19             MR. BUTERMAN:  The point that I was ⸺ yes.

20             The point that I was going to make, your Honor, is

21   that what Mr. Boies just cited to is the background section

22   where the Court is recounting the allegations that Panini has

23   made, and that is really what this comes down to.

24             Panini believes that because its complaint contains

25   an allegation regarding the Topps acquisition that that

1    somehow means that because the Section 2 claim has not been

2    dismissed that that means that, regardless of what the Court

3    has said, that they have the ability to seek discovery of that

4    claim.

5            And what Mr. Boies cannot point to is anything in

6    Judge Swain's opinion that actually suggests that they get to

7    decide what is within the scope of discovery because it is in

8    their complaint.  They are asking —— they are asking

9    your Honor to ignore the clear statement -- they are asking

10   your Honor to ignore the clear statements of Judge Swain with

11   respect to the infirmities of them maintaining claims

12   regarding the Topps acquisition and to allow discovery.  And

13   they have not cited to a single case that suggests that that

14   is appropriate.  And for good reason, because you can't get

15   discovery into dismissed claims, and that is what they are, in

16   essence, doing.  The acquisition of Topps should not be part

17   of this case.  That is what Judge Swain has said, and they

18   should not be permitted to back-door.

19           MR. BOIES:  Your Honor, I think the Court knows

20   that's not what I am saying, but if there is any question

21   about it, I would be happy to clarify it.

22           THE COURT:  No.  I think I fully understand both

23   sides' positions, and I just want to ask Mr. Buterman a

24   question.

25           Let's just assume the relevance of the Topps

acquisition for the Section 2 claim is just limited to the

fact that they acquired one of these league licenses through

that acquisition.  If you just take that assumption——and I

understand that is disputed——would Fanatics have an issue with

these requests if they were limited to just providing

information.  For instance, I am looking at RFP 64.  The idea

with the acquisition of all of these licenses was that it was,

you know, anticompetitive.  If requests like 64 were limited

to just information related to the strategic rationale for the

acquisition or the anticipated competitive effects, would

Fanatics still have an overbroad or burden argument?

        MR. BUTERMAN:  I think, your Honor -- so, look.

Your Honor.  I think your Honor may have seen this in our

submission.  We are always aim —— always attempting to narrow

the disputes here and to see if there are ways that we can

compromise even when, like here, we believe that Panini is

seeking something that they are not entitled to.

        There is no dispute that Fanatics —— there is no

dispute about the Topps acquisition, and so there are certain

documents——like the license agreement, the transfer

documents——that we have already agreed to produce and there

are some materials.

        I think that some of the elements within the RFPs in

question go a little bit broader, beyond that, and I think

that they are out of bounds, but certainly the underlying

1    agreement wasn't something that we raised a concern about

2    producing.

3            THE COURT:  What about not just the underlying

4    agreement but also any analysis as to the impact of obtaining

5    that exclusive license on competition?

6            MR. BUTERMAN:  I am quite sure there aren't any such

7    documents, your Honor.  I think, though, that, more generally,

8    there —— this goes to the issue of search terms and

9    custodians, and our view is that what your Honor is asking

10    about are topics that more generally will be —— the documents

11    will be produced concerning.

12            So, for instance, if we are talking about the impact

13    of acquisitions on the marketplace and our views of the

14    relevant market, there are countless, countless RFPs that we

15    have agreed to produce documents for that will go to those

16    issues.  But what we do object to are specific RFPs

17    specifically focused on the Topps acquisition because the

18    Court has said that that is out of bounds.

19            THE COURT:  Mr. Boies, are there other RFPs that

20    would capture some of the documents that are in these RFPs

21    related to Topps that are at issue that would concern

22    specifically either the anticompetitive effect of obtaining

23    that license through Topps or the strategic rationale for that

24    acquisition, things that go to the anticompetitive nature of

25    that transaction?

1          MR. BOIES:  I think there are some other RFPs that

2     would cover some of the documents but probably not the

3     documents that the Court is referring to.

4          I mean, for example, if they had a document that

5     talked about the Topps acquisition as being a first step in

6     their attempt to achieve these licenses, I am not sure that

7     would ── I don't think that would be covered.

8          I think that, to the extent that there are additional

9     documents that are covered here, those are all documents that

10    go directly to the claims that we are making.  And what I am

11    concerned about is that documents that exist that describe the

12    purpose and the effect of this acquisition are trying to be,

13    you know, kept from discovery.

14         And if I could just give the Court an analogy, if we

15    ask these very things about the acquisition of the licenses

16    directly from the leagues or the players association, there

17    would be no question these are relevant.  And the fact that

18    the acquisition of these licenses is coming through the

19    acquisition of a company, I respectfully suggest, cannot make

20    it less relevant.

21         MR. BUTERMAN:  So, your Honor, if I could answer the

22    question that Mr. Boies didn't, RFP 39 calls for documents

23    concerning "financial projections, business plans, or

24    forecasts related to respective sales revenues, profits, or

25    returns on investments under exclusive license agreements";

1    RFP 68 calls for "communications with the MLB and MLBPA"; RFP

2    96 calls for "all documents referring or relating to any of

3    your actual, proposed or prospective price or price quotation

4    methods, practices, policies, or strategies for sports trading

5    cards and competing products in the United States"; and RFP

6    105 calls for "documents analyzing the effects of competition

7    on Fanatics' trading card prices or quality."  I am sure there

8    are others.  Those are the ones I was just able to do on the

9    fly.

10          Your Honor, we have agreed to produce documents in

11   response to all of those RFPs.  We are in the process of

12   negotiating custodians and search terms with Fanatics on

13   those.  And this highlights the problem; that Panini has

14   provided us with 154 RFPs.  In many instances, they are

15   completely duplicative of one another.  That might just be

16   error, that they just repeated the same ones.  In other — we

17   fail to understand what the additional information is that

18   they are seeking.

19          But as what I just read indicates, we are already

20   producing a significant amount of material on the topics that

21   Panini is claiming that it is interested in, and we think

22   that, as a general matter, it is incumbent on Panini to

23   identify specifically what they are not getting through the

24   requests that we have already agreed to produce documents in

25   response to; and, more specifically, that that burden on

1    Panini should be much higher when it comes to the Topps

2    acquisition, where Judge Swain has already ruled that

3    (indiscernible).

4              MR. BOIES:  Your Honor, if I could just answer the

5    Court's question—I thought I had—but take the Court's

6    reference to RFP 64.  None of the things that Mr. Buterman

7    refers to cover the valuation of Topps, which is significant,

8    because they overpaid for Topps as a part of their attempt to

9    achieve monopoly power.  Nothing in what Mr. Buterman

10   described for you in the other requests would cover the

11   strategic rationale for the Topps acquisition or the

12   anticompetitive effects of the acquisition, all of which are

13   requested in 64.  And that is true for the other RFPs—46, 65,

14   66 and 67.

15             So Mr. Buterman is right, there are a lot of other

16   RFPs.  But in what he read, you can tell, just by looking at

17   the RFPs and comparing them to the ones at issue here with

18   respect to Topps, that they don't cover the documents that we

19   are seeking from Topps.  And I won't repeat what I said before

20   about why we think they are relevant.

21             THE COURT:  Okay.

22             MR. BUTERMAN:  I'm actually not even sure that what

23   Mr. Boies just said is an allegation in their complaint.  It

24   may be buried somewhere there, but it sounds new to us,

25   so . . .

1          THE COURT:  Okay.  Did we want to move on —— at the

2     end of the conference I will issue an order resolving all of

3     these.  If I don't get it on the docket today, I will get it

4     out tomorrow.

5          Can we move on to Section 3, which had to do with the

6     trade secrets and the former Panini employees' nondisclosure

7     and nonsolicitation employment agreements?

8          MR. BUTERMAN:  Yes.

9          THE COURT:  I am curious, and I guess this also goes

10    to Mr. Buterman, Judge Swain did find that they had adequately

11    alleged this interference claim with respect to the employee

12    contracts.  So at least with regards to maybe some set of

13    these disputed RFPs——the 129, 130, and 131——it seems like some

14    portion of that may be seeking information relevant to, at a

15    minimum, a back claim.

16         MR. BUTERMAN:  Your Honor, I am going to turn it over

17    to my co-counsel, Mr. Carlinsky, to address this issue.

18         I will say that, with respect -- as your Honor saw in

19    our submission, with respect to these requests and their

20    relevance to the RFPs in the Panini v. Fanatics matter, we

21    believe this issue is actually not ripe.  We continue to have

22    discussions with Panini on that.

23         And so I would like to turn it over, though, to my

24    co-counsel, Mr. Carlinsky, to address this within the context

25    of the Fanatics v. Panini litigation and the overlap with the

1    trade secrets claims.

2         MR. CARLINSKY:  Thank you, your Honor.  It is Mike

3    Carlinsky speaking.

4         So let me first start by saying -- I want to cover two

5    points.  One, which is the discovery that's being sought and

6    how it directly overlaps with the Texas case —— by the way, I

7    would ask if anybody who is not muted to please mute their

8    line.  We are getting a lot of interference.

9         So, first, we have overlap with the Texas case and

10   then, number two, we have, of course, the RFPs for which we

11   have agreed to produce, because there are certainly going to

12   be RFPs that are relevant to the extent that there are claims

13   that have remained in the case.

14        So the first point to make is, when you look at the

15   requests that are at issue here, they are largely requests

16   concerning former employees who left Panini and joined

17   Fanatics, former employees.  I want to underscore that,

18   because former employees are not at issue in this case in

19   either of the two cases.  And Judge Swain's decision, which I

20   will reference in a moment, makes that point clear.

21        When you consider what they are asking for as it

22   relates to trade secret information from former employees or

23   the like or agreements violated by former employees, all of

24   that is covered in the Texas action.  That Texas action has

25   now been pending for two years.  It is still pending.  And

1    there is a stay of discovery there.

2            We have also heard from Panini.  They recently

3    advised that they intend to amend their complaint in Texas,

4    and they may be filing an additional complaint in Texas.

5            Why do I mention all of that?  Because first point is

6    that it would be highly inappropriate for Panini to be using

7    either the Fanatics case or the Panini case that is before

8    this Court as effectively the stalking-horse to get discovery

9    for use in Texas.  Where the discovery here is covered by the

10   Texas case, respectfully, we think it would be both

11   inappropriate and unwise to consider or grant discovery of

12   that subject matter.  That matter should be left for the Texas

13   court and for the Texas court to decide what the contours are

14   of that discovery.  So that is sort of point one.

15           Now, if you then turn to what they claim first in the

16   Fanatics case, so -- which we refer to as the tort case, the

17   argument, as I understand it, from Panini is, we want certain

18   discovery because we want to be able to show that Fanatics'

19   claim —— remember, Fanatics' claim, which Judge Swain did

20   sustain in the *Fanatics v. Panini* case, is that Panini was

21   using improper threats of litigation to otherwise cause

22   employees, who had a free, God-given right to move from Panini

23   to Fanatics, to ultimately stay in their seats out of fear

24   that they would somehow be ensnared in litigation.  That claim

25   goes forward.

1          The discovery which Panini is seeking and the

2     justification for the discovery makes no sense.  Their

3     argument is, well, we want to be able to get this additional

4     discovery to show that our claims were legitimate, the claims

5     that we brought in Texas were legitimate.

6          But here, I think this is where Judge Swain's

7     decision, at both pages 15 and 17, is highly relevant.

8          First, Judge Swain said, quote -- this is at 15 of

9     the decision on the motion to dismiss in the Fanatics case,

10    "the Texas action involves seven high-level

11    former"——underscoring it——"Panini employees who were alleged

12    to have stolen thumb drives containing trade secrets and none

13    of whom is the subject of the claim Fanatics asserts here."

14    In other words, in plainspeak, it is not relevant to the case

15    that is before the Southern District court.

16          Judge Swain goes on at 17, "The Court is unpersuaded

17    that the consent preliminary injunction in a factually

18    distinct lawsuit"——a factually distinct lawsuit——"necessarily

19    demonstrates the merits of the threats underlying Fanatics'

20    claims.  Fanatics alleges that Panini knew that it had no

21    meritorious basis to sue at-will employees for accepting

22    employment in the absence of noncompetes and made the threats

23    solely to intimidate those employees."

24          So Judge Swain's two points there are what is

25    happening in Texas and what relates to former employees, if it

1    includes theft of trade secret information or breach of

2    employment agreements or breaches of noncompetes, that is

3    separate subject matter.  It is not part of the Fanatics case,

4    for sure.

5         And then when we look at the argument as to why it is

6    somehow relevant in the antitrust case, again, the documents

7    that they are seeking, we have agreed to produce a universe of

8    documents.  We have agreed to produce RFPs 73, 127, 128.  Why?

9    Because those RFPs do go to relevant subject matter.

10        But Requests 129, 130, and 131 don't.  They are,

11   again, overlapping with Texas and they relate, again, to

12   allegations regarding what we allegedly did——we, Fanatics,

13   did——in Texas to induce 36 employees to leave Panini and what

14   we did in Texas allegedly to aid and encourage those employees

15   that allegedly stole trade secret information; subject matter,

16   again, that is appropriate for the Texas court to handle, not

17   appropriate for discovery in these cases.

18        So net-net, your Honor, as Mr. Buterman started,

19   there is still some wood to chop here, which means there is

20   still some, for us, meeting and conferring to do to see if we

21   can further refine and agree on, because we have not said, no,

22   we are not going to give you anything.  To the contrary, we

23   have said yes on 73, yes on 127, yes on 128.  We want to

24   continue that dialogue, and we think that dialogue should

25   continue and these issues should await another day, if there

1    is anything left to resolve.

2         But if the Court were to address these issues, again,

3    the bottom line here is if it is relevant to existing claims,

4    we are going to produce it; if it is relevant to what is going

5    on in Texas, then, by definition, it is really not relevant

6    here, and it should not be the subject of any rulings by this

7    Court in favor of Panini.

8         Thank you, your Honor.

9         THE COURT:  Thank you, Mr. Carlinsky.

10        So does anyone want to --

11        MR. BOIES:  Your Honor?

12        THE COURT:  Yes.

13        MR. BOIES:  This is David Boies.  Mr. Singer is going

14   to respond to this.

15        MR. SINGER:  Thank you, your Honor.

16        By my (indiscernible), there are four points I would

17   like to make, the first of which is that this is clearly

18   relevant to our case against Fanatics, both on the antitrust

19   claims, where their efforts to take employees relates directly

20   to anticompetitive conduct that we have alleged, as well as to

21   our tortious interference now where, on page 28 and 29 of her

22   ruling on the motion to dismiss, Judge Swain said that,

23   "Fanatics was able to recruit 36 Panini employees"——these of

24   course are referring to former employees——"the loss of these

25   employees harmed Panini's business directly and indirectly by

1    providing a basis for allegedly terminating our license," and

2    then she says, "Panini has stated a viable interference claim

3    with respect to the employee conflict."  So both on antitrust

4    and tortious interference claim, they are relevant.

5         Second, they would be relevant in connection with the

6    one claim in Fanatics' case against Panini that was sustained,

7    and it is -- Mr. Carlinsky is referring to parts of an opinion

8    which said that the Court was going to allow them to proceed

9    with their tortious interference claim, saying that we

10   tortiously interfered by discouraging other employees from

11   going with Fanatics.  And we have pled requests for production

12   in connection with the former employees because if in fact

13   they were taking trade secrets, that supports our position

14   that we had every reason to justifiably tell the employees, If

15   you take trade secrets and go to Fanatics, then you are apt to

16   be sued.

17        Third point, your Honor, and that is the issue of the

18   overlap with the Texas case.  The Texas case was brought to

19   achieve—which was done by TRO and a preliminary injunction—a

20   stop on their efforts to take trade secrets and take employees

21   in violation of nonsolicitation agreements.  Those were

22   entered on consent.  The motion to dismiss that case was

23   denied.  There was one count there which dealt with an

24   anti-SLAPP statute, which was also denied.  But because the

25   defendants in that case decided to appeal that up to the

1    courts in Texas, the state courts, thus far unsuccessfully,

2    nevertheless it triggered a procedural rule which said if you

3    file an appeal on that type of count, then the entire case

4    gets stayed.

5         There is nothing inappropriate or otherwise improper

6    about us seeking discovery that was relevant in this case

7    notwithstanding the procedural posture of the Texas case.  It

8    is not like this information is allegedly privileged.  It is

9    simply that procedurally, because of the tacks that defendants

10   took there, discovery has been stayed.  But this is relevant

11   to our case, and it is also relevant to our defense of the

12   case Fanatics brought here.  And so, for both of those

13   reasons, it is proper to proceed.

14        Now, the fourth and final point I wanted to make is

15   in connection with the assertion that there needs to be more

16   meet-and-conferring.  I don't want to spend a lot of time on

17   this.  We set it forth in the papers.  We have, from the

18   outset, indicated our efforts to resolve this so these could

19   be teed up for decision.

20        The very objections to 129, 130, and 131 are

21   nonexistent.  All they said with respect to those three claims

22   is "willing to meet and confer," which is not a proper -- an

23   objection.

24        We think that 129, where it says "documents and

25   statements made to current or former Panini employees

1    regarding Fanatics' future plans for the sports trading card

2    industry or Panini future prospects in the industry" are

3    clearly relevant in an antitrust case about monopolizing that

4    industry."

5          130 is documents relating to Panini's employment

6    agreements that they —— that former employees, who they hired,

7    including an analysis or discussion of the nondisclosure

8    nonsolicitation provisions in those agreements.  That is a

9    narrow request focused specifically on what did they know

10   about the nondisclosure and nonsolicitation provisions in the

11   agreements of the employees that they hired.

12         And then the third point is, "All documents

13   concerning any information, documents, or trade secrets

14   brought from Panini to you by former Panini employees."  Also

15   focused, also relevant to the case.

16         So we should not have to go back for a further

17   meet-and-confer on this, your Honor.  We have raised it now,

18   as we set forth in the letters on multiple occasions, and we

19   haven't gotten any further than where we are today.

20         THE COURT:  Mr. Carlinsky, can I ask you --

21         MR. CARLINSKY:  Your Honor --

22         THE COURT:  Can I ask you a --

23         MR. CARLINSKY:  Sure, of course.

24         THE COURT:  May I ask you a couple of questions for

25   RFP 30 and RFP 129?

1          So let's take RFP 129.  Is there not a subset of

2     documents there that would be relevant to the Section 2 claim

3     in the Panini action here?

4          MR. CARLINSKY:  Well, your Honor, I think that the

5     real answer is if you look also at what we did agree to

6     produce, which is RFP 73, you will see 73, which is "all

7     documents relating to Fanatics' communications with Panini's

8     current and former employees regarding business" -- "Panini's

9     business, financial condition, future prospects, to the extent

10    they do not relate solely to a dismissed claim."  That's what

11    we have agreed to produce.  So we have agreed to produce that

12    universe of documents.

13          The difference between what is in 129 and 73, what I

14    will call the delta, which may be what you are interested in,

15    like, okay, so, what is the difference between 129, to which

16    we object, versus — versus 73, which we have agreed to

17    produce.  The answer, really, is that the delta covers what is

18    exclusively within the Texas court proceeding.  And again, for

19    the reason —

20          THE COURT:  When you say exclusively within the Texas

21    court proceeding, can you be more specific?

22          MR. CARLINSKY:  Yes.  Allegations in the Texas court

23    proceeding that what Fanatics did was encouraged former

24    employees to breach their obligations, breach their contracts,

25    misappropriate trade secret information, and the

1    misappropriation of trade secret information.  That is

2    exclusively in Texas.  There is no claim in the cases in

3    New York for trade secret misappropriation.  They just don't

4    assert them.

5        THE COURT:  No, but I thought —— and there might not

6    be a claim for the trade secret misappropriation, but isn't

7    there -- and I thought I saw this in Judge Swain's decision,

8    again, since we are focused on what she did in the motion to

9    dismiss in the Panini action, but she does talk about

10   acquiring these employees as, you know, either further

11   evidence of anticompetitive conduct or monopolizing the

12   industry.  So I am just curious as to why this information

13   wouldn't be relevant here for the Section 2 claim.

14       MR. CARLINSKY:  Well, again, so 127, which is another

15   RFP which we have agreed to produce, is "all documents

16   concerning Fanatics' knowledge of and any nondisclosure

17   agreements, nonsolicitation provisions, or other contractual

18   obligations."

19       I guess your question, your Honor, is with regard to

20   the antitrust claims, are there documents which identify the

21   reasons why we were hiring these employees?  These are all

22   employees that are terminable at-will, and so if the universe

23   that you are focused on is documents identifying why we hired

24   these particular employees, that would be covered in 127 or

25   128.  We wouldn't push back on that universe of documents to

1    the extent that universe of documents exists.  But that is a

2    pretty narrow subset relative to what we understand they are

3    asking for more broadly in 129, 130, 131, as well as in their

4    Requests 16, 21, and 22 in the Fanatics case.

5            So if the universe here is documents which discuss

6    the hiring of those employees, we are going to produce those.

7            MR. SINGER:  Your Honor, if I can respond to that.

8            They referred to Request for Production No. 73, and

9    that, by its terms, deals with documents concerning

10   communications with Panini's current and former employees

11   regarding Panini's business, financial condition, or future

12   prospects.

13           It does not, among other things, deal with the part

14   of RFP No. 129 that talks about statements made to Panini

15   employees regarding Fanatics' future plans for the sports

16   trading card industry.  So it doesn't by any means be

17   coextensive with that, nor do the other requests they mention

18   cover the request here that deals with plans, future

19   prospects, as opposed to just discussions about the

20   agreements.

21           And there is no exclusive Texas jurisdiction.  There

22   is nothing exclusive about it.  We have two cases pending.

23   This is an antitrust tortious interference case in New York.

24   And if it is relevant here, there is nothing in the Texas case

25   that in any way says that they should not have to produce

1  those relevant documents in this action.

2        THE COURT:  Do we want to move on to the Section 4,

3  which is the OneTeam RFP?

4        MR. BUTERMAN:  Yes, your Honor.

5        MS. McELROY:  Your Honor, this is Sabria --

6        THE COURT:  I --

7        MS. McELROY:  McElroy.

8        THE COURT:  No worries.  Sorry to --

9        MS. McELROY:  Apologies.

10        THE COURT:  No, no.  I'm sorry to cut you off.

11        I just wanted to ask, at some point, I am curious,

12  because RFP 74 and 75, would that information not come in

13  through what was agreed to be produced for RFP 79 and 81?

14        MS. McELROY:  Your Honor, this is Sabria McElroy, on

15  behalf of Panini.

16        You referred to RFP 79 and 81?

17        THE COURT:  Right.  I think at issue is 74, 75 --

18        MS. McELROY:  Yes.

19        THE COURT:  -- and 82, and I just curious, I thought

20  maybe what you wanted from 74 and 75 would maybe come through

21  79 and 81.

22        MS. McELROY:  What I think, your Honor, with respect

23  to RFP 74, which is focused not only on the any trading card

24  agreements with OneTeam but also includes all documents

25  related to those agreements, that would include documents such

KJC REPORTING & TRANSCRIPTION (848) 459-3124

1    as drafts, negotiations, you know, amendments, and

2    correspondence, and we —— I think that RFP, you know, 79 is

3    more narrower —— is narrower in scope than RFP 74.

4          And I will also note that, you know, to the extent

5    Fanatics has now argued in its letter that some of these are

6    overlapping or duplicative, but in response to 74, 75 and 82,

7    they have not agreed to produce documents, they haven't said,

8    you know, we treat this request as duplicative of request X

9    and we will produce documents.  Instead, they have proceeded

10   to produce documents, so at this point it is unclear, you

11   know, what it is that they intend to produce and what it is

12   that they intend to withhold.

13         With respect to RFP 75, which specifically targets

14   the formation and establishment of OneTeam, RFP 79 is, again,

15   I think narrower in scope and encompasses all -- 75

16   encompasses all aspects of the establishment process, which

17   would go to the motivations, participants, and strategic

18   rationale.

19         MR. BUTERMAN:  Your Honor, this is Lawrence Buterman,

20   if I may respond.

21         So with respect to this, frankly, we are just a bit

22   confused.  We have agreed to search for documents in response

23   to RFP 77, which calls for "all communications with OneTeam

24   related to the launch of Fanatics Collectibles," RFP 78 which

25   calls for "all documents concerning any financial arrangements,

1  payments, equity interests, or other consideration exchanged

2  between you and OneTeam," and RFP 79, which calls for "all

3  documents concerning the formation, ownership structure,

4  governance or management of OneTeam, including, but not limited

5  to, any documents related to the equity or other financial

6  interest held by you, MFLPA, MLBPA, or other entities and

7  individuals and OneTeam."  And as your Honor knows, we have

8  already produced the OneTeam agreements pursuant to the prior

9  requests.

10          And so, again, what we asked Panini was to say to us

11  the same thing that your Honor just asked, which is, how is it

12  that you don't already have what you need by virtue of what

13  Fanatics has already agreed to produce?

14          And what you just heard from counsel is, well, they

15  didn't say that they are producing in response to these RFPs,

16  and they didn't say that they are absolutely duplicative.

17          That is true, your Honor.  We are trying to be

18  careful here.  We are trying to understand what is it that is

19  additional in these RFPs that they are seeking.  Because if

20  there is something that is relevant, we are willing to produce

21  it.

22          You know, there is something really funny, ironic

23  about this whole discussion.  We actually —— Fanatics has

24  agreed to produce documents in response to many, many more

25  RFPs than Panini has.  Now, part of that is by virtue of the

1   fact that we were actually careful and we didn't serve

2   duplicative RFPs.  But we have agreed to produce documents in

3   response to the vast majority of RFPs, and the truth is that,

4   by virtue of the search terms and custodial discussions that

5   we believe Panini is going to get all the documents that they

6   actually have been seeking.  And all we have asked for them is

7   to explain what is different in 74, 75, and 82 from what you

8   have already —— what we have already agreed to produce.  And

9   to this point, they actually haven't engaged with us on that.

10  And that is why we say these issues aren't ripe.

11          MS. McELROY:  Your Honor, if I may respond to that

12  with a couple of points.

13          You know, first, I was surprised by Fanatics' claim

14  in a joint submission, which Mr. Buterman just repeated, that

15  it requested that Panini articulate how RFPs 74, 75, and 82

16  seek relevant information that is not already covered.

17  Because I was in every meet-and-confer call, I reviewed my

18  team's notes on those calls, and the only thing that I am

19  aware of that Mr. Buterman could possibly be referring to is

20  there are responses and objections to 82 and 74, in which they

21  said that -- you know, they asserted some boilerplate

22  objections and then said that they would meet and confer.

23          However, when we asked that they meet and confer on

24  those issues, they were never prepared to discuss these RFPs

25  or the issues relating to these specific requests.  And in

1    fact, we provided a written response on these requests on

2    July 18.  And in that letter, we specifically clarified what

3    74 is seeking beyond what they have already agreed to produce.

4    Fanatics has still never provided a response on that issue.

5           Secondly, to the extent that some requests overlap,

6    that does not excuse a party from responding fully and

7    completely to a request and stating clearly what it is that

8    they intend to produce.  And if the request is truly

9    duplicative, as they believe, then the response, as I said

10   earlier, is pretty straightforward and easy.  It is, We will

11   treat this request as the same as this request and produce

12   responsive documents.

13          But that is not what they said.  They did not even

14   object on the basis of duplication.  So they asserted

15   boilerplate objections and simply refused to respond.  So

16   clearly, it is clear from their response that they do view

17   these requests as distinct and that they do intend to withhold

18   something.

19          Now, if they want to represent that they are going to

20   produce all of the responsive documents and not treat these as

21   distinct from the other requests, then I think we can move

22   forward.  But without that representation, we have a dispute,

23   and we don't know what it is that they are agreeing to produce

24   and what they are intending to withhold.

25          Lastly, with respect to RFP 82, I want to note that

1    that focused on Fanatics' governance rights in OneTeam,

2    including board seats and observer rights.  The other requests

3    seek documents about OneTeam's governance rights in Fanatics.

4    So RFP 82 is the converse, Fanatics' rights in OneTeam, and

5    that is not covered by the other requests, and they refused to

6    produce documents responsive to that request.

7            MR. BUTERMAN:  I think that they are, your Honor,

8    covered by the requests that I highlighted before.  I am not

9    going to go over them.  I also am not going to engage in a

10   back-and-forth into the weeds of the meet-and-confers.

11   Your Honor has seen it.

12           The reality is that we were not even aware that these

13   were issues that Panini planned to raise until hours before

14   the deadline to submit a joint submission.  They added

15   approximately 15 pages of argument out of nowhere to the joint

16   submission.

17           But I think that what Ms. McElroy just highlighted is

18   something that we do agree to, because counsel just said that,

19   at this juncture, we do not know what the parties have agreed

20   to produce and what they haven't; and that actually is true,

21   your Honor, because we don't understand how these requests are

22   not completely duplicative.

23           And, therefore, what I do believe makes the most

24   sense here is for the parties to continue their

25   meet-and-confer process, to go forward with the negotiations

1    that have been ongoing on search terms and custodians, and see

2    if, at the end of the day, there really is a live dispute

3    here, because I am actually not sure there is, your Honor.

4         I just don't know because when I see document request

5    after document request that is seeking what appears to be the

6    same things, but may have one or two different words in them,

7    we have a legitimate question as to whether there is something

8    different that they are seeking.  We just don't know.

9         I think that if Panini had gone forward and instead

10   of trying to come up with as many document requests as they

11   could, actually tried to do what Fanatics did, which is

12   identify the universe of relevant information and ask for

13   those materials only once, then perhaps we would be ripe on a

14   lot of these issues.  But it is not an unreasonable request to

15   say to them, You have approximately X separate requests that

16   seem to be calling for everything related to OneTeam.  And so

17   what is it with these specific requests that you aren't

18   getting?  Let's identify that.  Let's have a conversation

19   about that.  And then if there is something that we believe is

20   out of bounds, then we can take that to your Honor.

21        But just saying, well, here we are, yes, they have

22   agreed to produce documents in response to three RFPs that

23   look pretty broad regarding OneTeam, but there are these other

24   ones where they have raised questions, so we are at an

25   impasse, that is not the way that this should be played out.

1          MS. McELROY:  And, your Honor, I won't belabor the

2     point too much on the course of correspondence set forth in

3     our letter, but I will just note that the problem here is that

4     we have a party that refuses to engage.  We raised these

5     issues multiple times.  We told them we intended to raise

6     issues multiple times, well in advance.  So this notion that

7     they were somehow sandbagged or surprised by what we raised is

8     completely false, and I say that, having been on all of those

9     calls and involved in all of that correspondence.

10          And this is a situation where we have a party that is

11     selectively engaging on a handful of issues and still mulling

12     on others, and this is one of those issues and they have not

13     shown a willingness to have a conversation that Mr. Buterman

14     just referred to, and that is why we brought this issue to

15     your court.

16          MR. BUTERMAN:  Says the party that hasn't produced

17     any documents in this litigation, your Honor.

18          I'm sorry.  I'm not going to — I think we have

19     exhausted this, but the accusations that we are selectively

20     engaging are completely false.  What happens here, and the

21     pattern here, is that after these conferences, Panini goes

22     silent on us.  They may send a letter.  They don't want to

23     follow up.  And by the time we get to a day or two before the

24     next date for a submission, all of a sudden there are

25     countless issues that they want to raise that we have never

1  met and conferred on.  It is not the way to move this forward.

2  And, nonetheless, here we are, and we have had

3  numerous discussions with them because we want to get

4  custodians and search terms done so that we can move forward

5  and meet the deadlines that we have for production.  And we

6  believe that we are actually pretty far along in that

7  endeavor.  But honestly, this pattern of waking up, you know,

8  days before a submission is due to your Honor and then taking

9  a kitchen-sink approach, and throwing in anything that they

10 may have said in a letter and declaring impasse, including ——

11 and, your Honor, we had conversations with them —— a

12 meet-and-confer with them on Friday where they tried to

13 declare impasse on numerous topics that were not even in the

14 agenda because that's what they want to do.  They want to

15 raise issues so that they can come in here, in front of

16 your Honor, and make accusations against Fanatics, and it's

17 wrong.  We should be focused on trying to get discovery done

18 in this case, not in mudslinging.

19 THE COURT:  Do we want to —— in the interest of just

20 moving us along, do we want to move on to Requests 1 through

21 12 —— I'm sorry, 112 through 116, which have to do with the

22 equity and governance rights?

23 On this one, I am just curious, from Panini's

24 perspective, why the documents concerning these equity rights

25 and ownership that are not tied to the licensing agreements

1    are necessary.

2          MR. BOIES:  Certainly, your Honor.  This is David

3    Boies.

4          One of the things that Fanatics argues——and this is

5    in paragraph 2 of their second amended complaint, which is

6    Docket 120——they say that Fanatics used its "established

7    relationships with leagues and players associations to help

8    launch its successful collectibles business."  And these

9    established relationships included the equity and governance

10   rights that Fanatics had already awarded to leagues and

11   players associations.  It also includes the equity and

12   governance rights that Fanatics received from the leagues and

13   the players associations.

14         This goes to the heart of one of the issues that is

15   at play here.  Panini argues that this was part of their

16   monopolization.  Fanatics says, We got all these licenses just

17   because we were better.  They have said that throughout, that

18   We competed on the merits and they just liked our product

19   better.

20         Whether or not that is true depends on what the basis

21   for this decision was.  And what they have said themselves is

22   that the established relationships that they have, undefined,

23   was what was important to them, and we think those established

24   relationships certainly included any equity and governance

25   rights that Fanatics had with the leagues and the players

1    associations or that the leagues and the players associations

2    had with Fanatics.  So we think this is directly relevant not

3    only to our case, but to their defense.

4         MR. BUTERMAN:  Your Honor, if I may, what I

5    understand Mr. Boies to have just argued is Fanatics is

6    asserting the reality that it is an excellent company that

7    leagues and players associations want to do business with and,

8    therefore, he is entitled to discovery on every single aspect

9    of (audio disruption) to either confirm or disprove that, and

10   that is wildly overbroad.

11        Panini is arguing that they are entitled not only to

12   documents regarding the provision of equity to licensors in

13   connection with Fanatics' trading card licensing agreements,

14   which we agreed to produce, but also to documents regarding

15   the provision of equity to licensor entities in connection

16   with any aspect of Fanatics' business.

17        So, for instance, Fanatics has business lines that

18   have nothing to do with the case——apparel, new jerseys,

19   headwear, hard goods, like, license plate frames, flags,

20   decals, mugs, key rings, and other aspects your Honor——and what

21   Mr. Boies is now saying, your Honor, is, well, you have said

22   you are now better and people want to work with you because

23   you are better, so now we need to be able to get information

24   regarding every single aspect of your business.  That is

25   wildly overbroad and just highlights the kind of fishing

1    expedition that is unfortunately part and parcel of Panini's

2    strategy in this case.

3        Again, with respect to the licensors' receipt of

4    equity, Fanatics has agreed to search for and produce

5    documents in response to those requests, but we don't

6    understand why Fanatics' purported receipt of equity or

7    control in various licensors is at all relevant to this case.

8    It doesn't seem to be part of their antitrust complaint as far

9    as I can tell.  I don't see it anywhere in their complaint.

10        MR. BOIES:  Your Honor, just to respond very briefly,

11    we are not seeking——and I think the Court knows we are not

12    seeking——everything relating to their business.  And if some

13    of this equity was awarded after the licenses so that it did

14    not play a part in the license decision, I think Mr. Buterman

15    has a point, that is probably not directly relevant.

16        But whether or not the claim is that a particular

17    award of equity was "in connection with license agreements" or

18    not, if it occurred prior to those license agreements, I think

19    we are entitled to know it in part so we can assess whether it

20    was in connection with it or not.  But even if it was not

21    directly in connection with it, it is relevant to the

22    decision-making process, and the decision-making process is

23    something that is directly at issue, put in issue by us, but

24    also put in issue by them.

25        MR. BUTERMAN:  I just —— I just don't understand.  I

1  appreciate Mr. Boies making an argument about the temporal

2  issues here, but I don't think it gets over the overbroad

3  issue that he is going to areas of the business that go well

4  beyond the contours of this case.

5        THE COURT:  Mr. Buterman, on that --

6        MR. BUTERMAN:  Yes, sure.

7        THE COURT:  -- can I just ask you a question related

8  to that?

9        MR. BUTERMAN:  Yes.

10        THE COURT:  Let's say -- it sounds like -- I could

11  have misheard this, but it sounds like Fanatics wouldn't

12  dispute producing information concerning the licensors'

13  receipt of equities so long as it relates, I guess, most

14  directly to the trading card business, which seems to be the

15  one at issue.

16        I know -- I thought that Mr. Boies had mentioned

17  something about Fanatics Collectibles.  I am not sure if

18  that's a different business line, but I guess for purposes of

19  my questions (audio disruption) is -- can you all still hear

20  me?

21        A VOICE:  Your Honor, I can hear you, but somebody --

22  yeah, somebody put the call on hold.

23        A VOICE:  And because they put us on hold --

24        A VOICE:  Oh, good.  Okay.  We're good.

25        THE COURT:  No --

1              A VOICE:  We are good.  We are back.

2              THE COURT:  -- no worries.  It's a classic Monday.

3              A VOICE:  Go ahead, your Honor.  We heard you.

4              THE COURT:  Okay.  So I'm trying to —— what I was

5     trying to focus on is let's say it sounds like there is a

6     world in which Fanatics would produce information regarding

7     the licensors' receipt of equity in, for instance, the trading

8     card business.  I understand Panini wants it far broader,

9     unconnected to the trading card business.

10             Is this not a situation where, perhaps, the

11    allegation is that the licensors got equity in this one line

12    of business, but maybe discovery might see that it extended

13    much further, and so maybe this is the type of request where,

14    if Panini could come back and point to, you know, something

15    that might indicate a far broader grant of equity in Fanatics'

16    business, but then they would be entitled to more?  Does that

17    make sense?

18             (Indiscernible crosstalk)

19             MR. BUTERMAN:  So, your Honor ——

20

21             MR. BOIES:  Your Honor, the only --

22             MR. BUTERMAN:  Oh, go ahead.  Mr. Boies.

23             MR. BOIES:  No, the only thing I would say there,

24    your Honor, is we believe that any equity that existed at the

25    time the license agreements were entered into is directly

1  relevant to the decision-making process.  And there are going

2  to be all sorts of assertions about the decision-making

3  process that are made in the course of this litigation, and

4  how much equity a league or a players association had in

5  Fanatics was certainly going to be something that

6  influenced -- in fact, in an arbitration we had, that was

7  already established with respect to one of the leagues, one of

8  the players associations.

9         So this goes directly to the decision-making process,

10  and that is going to be a critical part of what is tried here.

11  And if we don't know what that equity is in advance of the

12  depositions and the like, I think we are going to be at a very

13  unfair disadvantage.

14         THE COURT:  But is that --

15         MR. BUTERMAN:  Your Honor --

16         THE COURT:  -- because the equity was ——

17         (Indiscernible crosstalk)

18         MR. BUTERMAN:  I'm sorry.

19         THE COURT:  No.

20         I'm just curious, is that true even if the equity had

21  been in place long before the negotiation as it relates to

22  these license agreements?

23         MR. BOIES:  Yes, because, your Honor, the equity that

24  they have influences their decision-making process.  For

25  example, let's suppose that a players association had an

1    equity stake in Fanatics, they don't have an equity stake in

2    Panini, and so it is deciding between the two companies.

3          It is certainly fair grounds for argument——indeed, I

4    think it is actually quite apparent——that there is going to be

5    a tendency to favor somebody that you've got an ownership

6    interest in, again, over somebody that you don't have an

7    ownership interest in.  And that is true regardless of when

8    you got that ownership interest and why you got that ownership

9    interest.  So it goes to their decision-making process, which,

10   as I say, both parties have put front and center.

11         And I don't see how it is possible to argue that a

12   league or players association is not going to be influenced by

13   what company they have an equity in and how much that equity

14   is, regardless of when they got it or why.

15         MR. BUTERMAN:  Your Honor, the problem with

16   Mr. Boies's argument is that if we accept it, there is no

17   limit to discovery in this case, and there is full discovery

18   on every single aspect of Fanatics' business, and that cannot

19   be the case.  Because everything that Mr. Boies just said with

20   respect to equity applies to other issues that are part of the

21   case, including Fanatics' performance.

22         And Mr. Boies may say, well, look, no, no, no, we are

23   limiting this just to the equity because that's of particular

24   importance, but that's belied by the very next topic that we

25   presume your Honor is going to want to talk about, which are

1    Panini's requests for documents regarding complaints and

2    quality, where, once again, they are moving well beyond

3    trading cards into every other aspect of Fanatics' business.

4    And that is not appropriate here.

5         This case is about the trading cards business, and it

6    should be limited to the trading cards business.  And

7    Mr. Boies should not be permitted to raise hypotheticals and

8    say, well, because it might just be the case that there is

9    some other relationship between Fanatics and licensors that

10   somehow I am entitled to explore the universe here and see if

11   there is some anticompetitive behavior that occurred that I

12   can now latch on to in order to bolster my claims.  It is the

13   definition of a fishing expedition, and it should be summarily

14   rejected here, your Honor.

15        MR. BOIES:  Your Honor, just to be clear, we are not

16   going into every aspect of their business.  We are not talking

17   about hypotheticals.

18        This is a specific, limited issue.  Okay?  Why the

19   leagues and players associations picked Fanatics is an issue

20   that both parties have put front and center.  There is no

21   dispute about that.  I don't think there could be any basis

22   for a reasonable dispute that what equity the leagues and the

23   players associations have in Fanatics is relevant to that

24   decision.  Maybe it is none, maybe it is a little bit, maybe

25   it is a lot.  But whatever it is, it is relevant.

1              MR. BUTERMAN:  Unfortunately, it is the exact same

2      argument that Panini makes in support of their requests on

3      RFPs 134 through 136 and 139 regarding customer complaints,

4      that we have said "We're better."  It is actually not we are

5      saying it, it is a fact.

6              But putting that aside, the reality is that because

7      in our pleadings we have made the point that licensors want to

8      work with Fanatics because, unlike Panini, which is a stale

9      company that didn't innovate, Fanatics is bringing new

10     excitement to the industry, that somehow that opens up

11     Fanatics to discovery on every single aspect of the business,

12     and it has to be rejected, your Honor.  It is going way too

13     broad.

14             THE COURT:  Mr. Boies, can I ask you a question --

15             MR. BOIES:  I would ask that —— sure.

16             THE COURT:  I'm just curious.  I understand that we

17     have made the argument about the licensors' receipt of equity.

18     Why do you need information about Fanatics' receipt of equity?

19             MR. BOIES:  With respect to Fanatics' receipt of

20     equity, that goes to —— although I agree with your Honor, it

21     is more tenuous, but it still goes to the relationship between

22     the two companies, things like, you know, where we have talked

23     about voting rights and board seats and the like.  It goes to

24     the relationship.

25             If there is no —— if Fanatics does not have any

equity in any of these institutions or companies, then that is
easy.  If it does, that, I would suggest, shows a relationship
that would affect the decision-making process.  And this is
simple.  I mean, this is not a fishing expedition.  This does
not require production of lots of documents.  It's a question
of does it exist or not.  If it does exist, it is clearly
relevant.

         Remember, this is in the discovery phase.  I am not
even talking about whether this is evidence at trial or not.
This is just whether it could lead to the discovery of
relevant information.  Although I agree with the Court that
it is less directly relevant, I think it is, nevertheless,
relevant.

         MR. BUTERMAN:  Your Honor, I will just note that what
Mr. Boies just said is the definition of a fishing expedition.
He has no idea whether it exists or not, but he wants to serve
RFPs and have us respond to them so that he can determine
whether they do, because it might be the case that, if they
do, then they are going to be relevant somehow to this
litigation.

         I would also note, your Honor, and I didn't bring
this up because I believe the fact of the matter is that this
issue is so clear -- clearly out of bounds, that it is worth
discussing, especially since your Honor raised it and it was
in their submission, but the parties have never specifically

1  discussed these requests.  I appreciate the fact that

2  Mr. Boies is essentially acknowledging the overbreadth.  I

3  wish, though, that if Panini were going to do that, that we

4  would have had meet-and-confers where we could have narrowed

5  this dispute rather than it occurring in front of your Honor,

6  because I don't think that that is the most productive way to

7  handle this.

8          MR. BOIES:  Your Honor, just to address that issue,

9  that has not been raised before.  The problem here is not

10 overbreadth here.  The problem is the fact that what we get --

11 and for virtually all of our requests, what we get are

12 boilerplate general objections, not the agreement to produce

13 documents, and then a series of saying we need to have

14 meet-and-confers.

15         I have not conceded overbreadth here.  The one thing

16 I have said is that I think that equity that was awarded after

17 the license agreements——because I don't think there was

18 any——is probably not relevant.  If that was the issue, all

19 they had to do was tell us and it would have been over with.

20         THE COURT:  I think the next one is documents

21 concerning JCP, requests 118, 121, 124, and 125.

22         MR. BUTERMAN:  Your Honor, may I --

23         MR. SINGER:  Yes, your Honor.  This is Stuart Singer.

24         MR. BUTERMAN:  Your Honor, may I begin on this,

25 because I think I can shortchange this one.

1    Again, this is one that the parties actually never

2    discussed at all prior to August 8, and Panini raised them

3    during the meet-and-confer, again, in the sort of rushed

4    attempt to make them ripe for this conference.

5    With respect to 118, we had discussions about that

6    during the meet-and-confer.  Panini made an offer for the

7    first time in its portion of the joint submission, and we are

8    considering that, that refers to the current capitalization

9    tables operating or shareholders agreement and any amendments

10   or schedules.

11   I just think that there is a lot here that is really

12   still up for discussion, and I have heard now, from I believe

13   all of Panini's counsel, this argument essentially criticizing

14   Fanatics for wanting to meet and confer with them.  I am

15   actually surprised that they keep saying that we put in

16   objections and offer to meet and confer with them as if that

17   is a bad thing.  That is what you are supposed to do.  If they

18   don't want to meet and confer with us, that's on them, but

19   they can't raise issues -- they can't raise these issues,

20   your Honor, after the joint submission has gone in, on a

21   meet-and-confer that we are supposed to have regarding other

22   topics, declare impasse, and then come before your Honor.

23   And so there are issues related to some of these RFPs

24   in that they relate to dismissed claims, as Fanatics explained

25   to them when we first discussed these requests, again, just on

1   Friday.  But we do believe that this is an area where, if we

2   could have more —— or an opportunity to actually have a

3   meet-and-confer rather than a phone call, where Panini just

4   wants to declare impasse, that we could probably resolve a lot

5   of this, and we certainly are willing to consider compromises

6   here.

7             THE COURT:  Mr. Buterman, is that the --

8             MR. BOIES:  Your Honor ——

9             THE COURT:  Oh, just one quick question.

10            Is that the case, too, about the complaint about

11  quality?

12            MR. BUTERMAN:  Quality —— your Honor, quality, I

13  think, goes back to the issue that I just raised, which is, to

14  the extent that the quality-related issues go outside of

15  Panini's alleged market, we think that there is a problem.

16  However, I will note that, during our August 8 -- again, last

17  Friday, after submissions had gone in, we had a

18  meet-and-confer which was supposed to be about other topics.

19  It ended up -- Panini raised some of these.  They proposed ——

20  they proposed some modifications to these discovery requests

21  that we are in the process of considering.  And certainly,

22  your Honor, if your Honor orders us to actually have

23  good-faith meet-and-confers on the topics related to GC, we

24  certainly are prepared to continue to discuss with them the

25  issues of the complaints.

```
 1              But I will say, your Honor, I mean, complaints going
 2         to the size of a T-shirt or whether a hat is comfortable or
 3         whether a hoodie shrunk too much in the wash or anything else
 4         related to apparel, that has zero relevance to this case, and
 5         I think that highlights how overbroad Panini's requests are
 6         that we have raised concerns about.
 7                   A VOICE:  Okay.  (Inaudible).
 8                   MR. SINGER:  Your Honor, this is Stuart Singer.
 9              May I respond on the GCP requests for a moment?
10                   THE COURT:  Yes, please.
11                   A VOICE:  Okay.  Now, has Ethan --
12                   MR. SINGER:  I think we have someone on the line --
13                   A VOICE:  Excuse me.
14                   MR. SINGER:  -- talking about something else, talking
15         about infringement, for example.
16                   MR. BUTERMAN:  Can we just ask that everyone who is
17         not speaking go on mute?
18                   A VOICE:  Okay.  (Indiscernible) it came in from
19         Duncan?
20                   MR. BUTERMAN:  Hello?
21                   A VOICE:  Okay.  All right, then.  I will ─ sounds
22         like we are ready to go on.
23                   MR. BUTERMAN:  There is an open line.
24                   A VOICE:  I would like to (inaudible) there.
25                   MR. BOIES:  I hope whoever is talking knows they are
```

1    waiving the privilege.

2              MR. BUTERMAN:  I don't know what over, but . . .

3              MR. SINGER:  Okay.  I am going to take a chance and

4    plunge ahead in the belief that maybe they are now on mute.

5              First of all, we have sought on the GCP request, as

6    well as the other requests, on numerous occasions to raise

7    this.  We wrote a letter on June 24.  There was a —— we asked

8    for a meet-and-confer on July 9.  They asked for more time on

9    that.  We suggested having charts.  We identified problems on

10   each individual request.  They didn't like that.  They wanted

11   categorical statements, so we lumped these in categories and

12   wrote them a letter on, I believe, July 24 regarding that.  We

13   have had three separate meet-and-confers.

14             We made it clear all along, our position is that all

15   these disputes that go back to an RFP that was served at the

16   end of April and responded to in June should be handled in a

17   way so that the issues could be teed up for this Court to

18   resolve at this August 11 meeting.

19             Now, the GCP issues are very straightforward, because

20   GCP is the entity that made Panini's cards, which they

21   subsequently acquired.  We have maintained that they then used

22   their control over GCP to reduce the supply of cards for

23   Panini, and the Court sustained our allegations with respect

24   to Section 2, which incorporates the GCP points, as well as

25   our tortious interference claim that they interfered with our

```
1    relationship with GCP regarding those manufacturing
2    obligations.
3              So in that context, we have four requests which are at
4    issue.
5              On 18, all we have asked for is "documents sufficient
6    to show the percentage of the stock or other interests owned by
7    each Fanatics entity and GCP corporate structure." I mean,
8    that is -- doesn't require all documents, that just requires
9    ones sufficient to show how much they own. Clearly relevant.
10   I don't know why they are fighting about that.
11             On RFP No. 121, "documents relating to that
12   acquisition of a stake, including the negotiations, the
13   valuation, the strategic rationale, and structured a
14   transaction." Now, there they say they will produce documents
15   sufficient to show the structured transaction and strategic
16   rationale. Well, it's one thing to produce documents
17   sufficient to show the structure of the transaction, but when
18   it comes to the strategic rationale that is not a "sufficient
19   to show" issue, that is a "produce everything that you have
20   concerning that topic." They don't get to pick and choose
21   which documents they like and describe the strategic
22   rationale.
23             Let's say, hypothetically, you have one saying, our
24   strategic rationale is to acquire this because we need a
25   production source, and then you have another document which
```

says, you know, if we control this, we can cut off Panini and
reduce their role as a competitor.  You don't get to choose
which of those you produce.  All the documents relating to the
strategic rationale are discoverable.

On Request No. 124, "documents concerning their
knowledge of GCP's relationship with Panini before the
acquisition of a stay."  That goes directly to tortious
interference.  We are entitled to find out what they knew
about the contractual relationship that we have alleged
interference with.

"All documents," in 125, "concerning Panini's
contract with GCP packaging, including change of control,
confidentiality, property rights, and technical information
provisions in that contract."  And the only thing they have
said in response is, well, you didn't sustain your separate
tortious interference count on the change-of-control
provision, where the Court had said you weren't able to show
that they had knowledge of that change of control.

Well, first, I don't think you parse documents that
finely.  The documents relevant to what they knew about the
contract should all be produced.  It shouldn't be on a
paragraph-by-paragraph basis.

And second, if in fact there are documents showing
that they very well knew that we had a change-of-control
provision, then that's material and should be produced.  So

1    these are relevant to Section 2.  They are relevant to tortious

2    interference.  They are well defined.  I think they should be

3    ordered to be produced at this juncture, your Honor.

4         MR. BUTERMAN:  Your Honor, I would just note that

5    everything that Mr. Singer just articulated regarding

6    Fanatics' positions are things that were discussed on

7    August 8, this past Friday, during a meet-and-confer, where we

8    said we would continue to negotiate them.

9         So, for instance, this issue with respect to RFP 121,

10   the dispute over whether they should —— we should have to

11   produce all documents versus documents sufficient to show,

12   that was a discussion that was occurring between the parties

13   this past Friday regarding ways to narrow this dispute, and we

14   are in that process.  But they don't —— they don't want that.

15   They wanted to have an issue to raise before your Honor before

16   we had resolved it.

17        It is the same thing related to 124 and 125.  We have

18   a position.  These are plainly related to the dismissed

19   claims, and Panini is trying to argue that because it is in

20   its Section 2 claim, they get everything?  Okay, fine.  But we

21   have been having conversations with them.  We had

22   conversations with them on Friday regarding ways to narrow

23   this.

24        So I don't understand why it is that, all of a

25   sudden, Panini thinks it is appropriate to cut off those

1    communications in midstream and not meet and confer to see if

2    we can narrow these.

3         THE COURT:  Okay.

4         MR. SINGER:  Your Honor, this is Stuart Singer.

5         We have been prepared to discuss those and urged

6    discussing those all the way back into the middle of July.

7    After we filed the joint submission, we initiated and

8    suggested, We are happy to talk with you now, before the

9    hearing on August 11 to see if we can resolve—not just

10   continue to talk, but resolve—some of these issues.

11        Unfortunately, what we learned on August 8 is, all we

12   want to do is talk about it subject to further discussion.

13   And that means that this issue will not be ripe if we were to

14   agree to that indeterminate amount of discussion for yet

15   another period of time.

16        So, you know, our interest is not in raising issues,

17   our interest is in getting documents, and that is why we are

18   so insistent on having these issues teed up for your Honor's

19   consideration here where they haven't been resolved

20   beforehand.

21        MR. BUTERMAN:  But these —— this went in —— the

22   submission went in on August 4, your Honor.  They raised these

23   issues on August 8.  We have to have at least some time to

24   consider them.

25        I just don't understand the idea that they could make

1    modifications, agree to narrow certain requests on August 8,

2    and then declare impasse and say, ah-ha, we are going to raise

3    them now, because if we don't raise them now, they are not

4    going to be handled until the next conference.  That is

5    just —— that is not a good reason to declare impasse.  And if

6    they really were so dead set on declaring impasse, then, in

7    the countless conversations that we have had from the last

8    conference until now, they should have gotten to that point.

9         I would hope that they wouldn't.  I would hope that

10    they are more interested in trying to resolve these issues

11    rather than manufacturing disputes for the Court, but this

12    doesn't —— this isn't —— this is not productive, to raise

13    something on a Friday afternoon the parties hadn't previously

14    discussed, declare impasse, and then bring it to the Court's

15    attention to try to get a ruling.  That doesn't solve

16    anything.

17         MR. SINGER:  Your Honor, we have this Exhibit 4 to

18    the joint submission, a letter that we wrote them on

19    July 18——not August 8, not August 4, July 18.  And on page 4

20    of that letter, we deal with a whole paragraph on

21    Requests 118, 121, 124, 125, documents concerning GCP, the

22    very four requests that we are talking about here.

23         So this is not something that we have sprung on them

24    on Friday.  This is something where they have known our

25    position.  They have known that if we can't resolve these, we

```
1    intended to bring it up here.  We gave one last opportunity on
2    Friday to see if maybe we could resolve things before this
3    hearing, and we were not able to resolve them.  We just talked
4    about them further.
5           So we would prefer, too, that these things would be
6    resolved by agreement.  But when we write them on July 18
7    and we are not able to get a substantive decision on these
8    points, it is not fair to us to have to delay the process any
9    further.
10          MR. BUTERMAN:  They wrote —— they wrote about these
11   issues and then we had subsequent conversations where they
12   were never mentioned.  And then the first time that we
13   actually have a conversation with them about it is on last
14   Friday, after the joint submission has already gone in.  And
15   during that conversation, to both sides' credit, there were
16   discussions about narrowing these requests.  So I just feel
17   like there is a process here that we should both participate
18   in.
19          MS. McELROY:  Your Honor, I am sorry to jump in here.
20   This is Sabria McElroy.  I do just feel like I need to correct
21   the record.
22          At every meet-and-confer we had after that July 18
23   letter, we were prepared to discuss those issues and Fanatics
24   was not.  So it is not correct to say that they were never
25   mentioned.  We were ready to discuss them, and Fanatics
```

1    refused to do so.

2            MR. BUTERMAN:  That's just —— your Honor, that's

3    not —— that is just not true.  But let's just leave it at

4    that.

5            I am glad that —— if something is in —— if something

6    is in Panini's counsel's head and they are prepared to discuss

7    it and then they choose not to, that is not on us.

8            MR. BOIES:  It was not that it was in their head, it

9    was that it was proposed and you wouldn't do it.

10           MR. BUTERMAN:  That's not —— with respect, Mr. Boies,

11   that's not accurate.

12           MR. BOIES:  Okay.

13           THE COURT:  So just ——

14           MR. SINGER:  Well, the very first paragraph of the

15   letter of July 18 says, "We write regarding the June 6

16   responses to follow up on issues raised in our June 24, 2025,

17   letter to discuss during the July 10 meet-and-confer.  In an

18   effort to streamline the meet-and-confer process and identify

19   issues at which we are at impasse, we are providing this

20   letter."  And one paragraph of the letter deals exactly with

21   these requests.  I think that is teeing up the issue.

22           MR. BUTERMAN:  Well, then it should have been raised

23   on the meet-and-confer, with respect, your Honor, but that

24   didn't happen until this past Friday.

25           THE COURT:  So let me just jump in, because I do have

1     a noon conference.

2              Without attributing any fault or blame, I am a little

3     concerned that the current way we are doing this, where we ——

4     or you all submit the joint letters and have the conferences

5     may be causing more problems than it is helping.  And I don't

6     want to slow you all down or create unnecessary headaches for

7     people, so I am happy to do something else if you think this

8     process is counterproductive.  I don't know if that means,

9     perhaps, having the conferences happen at more regular

10     intervals and then maybe setting a deadline for a

11     meet-and-confer.

12              Again, I think I may have said this before, I am not

13     generally a micromanager, but if you want me to be, I can.  I

14     would rather not have -- again, the letters have this whole

15     back-and-forth on who is to blame for things.  Like, I'm not

16     trying to assess fault here.  It seems like just sort of a

17     waste of time.

18              And so if there is another process that you think

19     would be more conducive to helping you all get to the close of

20     fact discovery in a more efficient manner, if you let me know,

21     I am happy to modify this.  But I am not sure that this is

22     currently working.

23              MR. BUTERMAN:  Your Honor --

24              MR. BOIES:  Your Honor, if I could make --

25              MR. BUTERMAN:  -- we appreciate that --

1          MR. BOIES:  If I could —— if I could make a

2     suggestion, your Honor, I would make two suggestions, and I am

3     always embarrassed to ask a Court to micromanage because I

4     think counsel ought to be able to do that, but we don't seem

5     to be able to.

6          What I would propose is two things.

7          First, I think we need to have some deadlines

8     where —— I mean, for example, there are two things that are

9     coming up.  One, we've got to finalize search terms and

10     custodians if we are going to have any chance of meeting the

11     deadlines that we have agreed to.  We have got to finalize

12     those dates.  And I would like to have a firm date for the

13     finalization of search terms and custodian agreements.  And if

14     we can't agree to those, it then comes to the Court.

15          And I would like to have a firm date for the

16     beginning of substantial initial document productions.  We

17     have served the document requests back in April.  We ought to

18     be in a position where we have substantial productions by both

19     sides.

20          I think a date in the first half of September for the

21     search term/custodian negotiations and a date in the first

22     half or the middle of October for document production would be

23     reasonable and would be helpful.

24          The second thing is that I do think it would be

25     useful if we had an agreement that we would have a

1    meet-and-confer to deal with all outstanding issues, a fixed
2    time every week, so that everybody who has any issues will
3    raise them at that time.

4            And I think it would be — I think my last suggestion
5    really depends on the Court's schedule.  I know the Court has
6    a very heavy schedule.  But if we could have a set time for a
7    hearing with the Court, I think both sides will have to admit
8    that having an appointment with your Honor concentrates our
9    minds, and so I think if we could have more frequent and
10   shorter hearings with your Honor, you know, where we tee it up
11   and the Court can ask whatever questions the Court has and
12   then the Court can make a decision, I think it would move
13   things along.

14           MR. BUTERMAN:  Your Honor, if I may, there is a lot
15   in what Mr. Boies just said.  I'm not sure I actually
16   understand all of it.

17           I don't understand, if you are going to have a call
18   to tee up all discovery disputes, why you would need to have
19   ones every single week.

20           But putting that aside, I mean, if we are talking
21   about this — and I will also note that we do have ten months
22   until the close of fact discovery here.  I also think that, as
23   a practical matter, once we do agree on search terms and
24   custodians—and I think that those conversations have been
25   going just fine—that a lot of this is going to fall by the

1   wayside.

2          But what I do suggest is that if the parties are

3   going to adopt a new procedure with your Honor for how to

4   handle discovery disputes moving forward, that the parties at

5   least have an opportunity to discuss with one another and

6   present alternative proposals to your Honor, not done on the

7   fly, at the two-hour mark of a status conference, but during a

8   hopefully productive meet-and-confer session.

9          I think we all agree -- this is one thing we all

10  agree, these sessions have really become counterproductive for

11  reasons that I think that your Honor has indicated, and we

12  would like to get to a place where we can get past this, where

13  we can produce our documents and have Panini produce theirs.

14         And I appreciate Mr. Boies's statement about

15  production on both sides, because I will note that, while

16  Fanatics has produced the documents that Mr. Boies has said

17  time and time again are critical to this case, we have not

18  received anything from Panini at this point.  And so we would

19  like to get to a place where we get their documents, because

20  we believe that they are going to be quite informative on the

21  actual merits of this case.

22         And so what I would ask is that the parties be

23  afforded an opportunity to meet and confer with each other

24  this week and that we propose an alternative—or alternatives,

25  if we can't agree—plan for how to handle discovery disputes

1    moving forward, your Honor.  And we can do that as early as

2    next week if we can meet and confer this week with Panini's

3    counsel.

4              MR. BOIES:  Your Honor, I agree that we —— I don't

5    have any objection to meeting and conferring, and maybe that

6    will be productive.  All I would suggest is that we meet and

7    confer this week and that we give your Honor, on Friday, what

8    our joint proposal is or, if we can't, what our alternative

9    proposals are.

10             This is not something that ought to take us longer

11   than —— this is Monday.  It should not take us longer than

12   Friday to get your Honor our views.

13             THE COURT:  So why don't you guy do this.  If you

14   meet and confer, if you send me whatever the proposal is by

15   Friday, I can then enter something.

16             I will give you an order on these disputes if not

17   today, tomorrow.

18             I will wait for the proposal to figure out what we

19   are doing for setting a conference schedule going forward.

20             Does anyone have any questions?

21             MR. BOIES:  Thank you, your Honor.

22             No.  Thank you, your Honor --

23             MR. BUTERMAN:  Thank you, your Honor.

24             MR. BOIES:  -- for your time.  Thank you for your

25   time.

1              THE COURT:  Thank you so much, everyone.

2              COUNSEL:  Okay.  Thank you.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4        I, Kristen J. Carannante, certify that the

5   transcript of the digital audio recording of the

6   proceedings in the above-entitled matter is a true

7   and accurate transcription.

8

9

10  Signature  /s/ *Kristen J. Carannante*
                KRISTEN J. CARANNANTE, RPR, RMR, FCRR
11              (848) 459-3124
                kjcarannante@gmail.com
12

13  Date:      August 12, 2025

14

15

16

17

18

19

20

21

22

23

24

25