```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK


PANINI AMERICA, INC.,                : Docket #23-cv-09714
                                              23-cv-06895
                    Plaintiff,       :

     -against-                       :

FANATICS, INC., et al,               : New York, New York
                                       November 20, 2025
                    Defendants.

---------------------------------:
                     PROCEEDINGS BEFORE
             THE HONORABLE VALERIE FIGUEREDO
              UNITED STATES MAGISTRATE JUDGE
APPEARANCES:

For Plaintiff:       BOIES, SCHILLER & FLEXNER, LLP
                     BY:   STUART SINGER, ESQ.
                           ERIC BRENNER, ESQ.
                           SABRIA MCELROY, ESQ.
                     333 Main Street
                     Armonk, New York 10504

For Defendant:       LATHAM & WATKINS, LLP
                     BY:  LAWRENCE E. BUTERMAN, ESQ.
                           ALICIA JOVAIS, ESQ.
                     1271 Avenue of the Americas
                     New York, New York 10020

                     QUINN EMANUEL URQUHART
                     & SULLIVAN, LLP
                     BY:  KATHRYN D. BONACORSI, ESQ.
                     295 Fifth Avenue
                     New York, New York 10016


Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

THE DEPUTY CLERK:  Good morning.  This is the matter of Panini America, Inc. v. Fanatics, Inc., Case No. 23-cv-9714.  The Honorable Valerie Figueredo presiding.

Counselors, can you please make your appearances, and it's just for those that will be speaking.

Attorneys for Panini, please make your appearance.

MR. SINGER:  Good morning.  This is Stuart Singer from Boies Schiller Flexner on behalf of Panini.

MR. BRENNER:  Good morning.  Eric Brenner, also Boies Schiller Flexner on behalf of Panini.

MS. MCELROY:  Good morning.  This is Sabria McElroy on behalf of Panini.

THE DEPUTY CLERK:  Appearances for Fanatics?

MR. BUTERMAN:  Good morning.  This is Lawrence Buterman from Latham & Watkins.  And with me is my partner, Alicia Jovais.

MS. JOVAIS:  Good morning.

MS. BONACORSI:  And Kathryn Bonacorsi from Quinn Emanuel, also on behalf of Fanatics.

THE COURT:  Good morning, everyone.  This

is Judge Figueredo.

So I have the letters that came in.  I know we have talked about this issue before.  There was a letter from Panini at ECF-233, and then a response from Fanatics at ECF-235.  And I guess I'd like -- well, I'd like to start with Fanatics.  And I would really just like to understand, to the extent you can provide as much detail or specifics as possible on the call, what exactly do you have to do to notify these individuals.  I'm not sure if you have to just notify them, or do you need to get their permission to give their names?  What is the procedure for disclosure here?

MS. JOVAIS:  Good morning, Your Honor. This is Ms. Alicia Jovais for Fanatics.  I'm happy to provide some additional detail on that.

SO fanatics' agreements with athletes have bargained for confidentiality and notice provisions. I can't discuss exactly what those provisions say in open court because they, themselves, are confidential.  But I can say that Fanatics generally interprets them to require individual athletes' written consent before Fanatics can disclose confidential information.  And while not all of the agreements are identical, as Your Honor recognized

at the October 9th hearing, Fanatics would need to provide each athlete with notice and an opportunity to object at the very least.  And let me explain what that process would look like and why it's particularly burdensome, even for just the 46 athletes on Panini's list.

So we're talking about 46 of the most famous athletes in the world.  It is difficult to get in contact with them, given their practice schedules, games, media obligations, charitable commitments, travel, et cetera.  We expect it would take at least a few calls with an athlete's representative to obtain written consent or confirmation that they do not object.  Then, of course, the representative would have to have separate calls with the athlete.  And this is just for a single agreement.  So it's reasonable to believe that it could take dozens, if not hundreds, of hours to complete that process just for 46 athletes.  And the process that Fanatics follows --

THE COURT:  Just a quick question.

MS. JOVAIS:  Yes.

THE COURT:  And this may not be true for all of them, but do any of them provide -- so there's a confidentiality and a notice requirement.

And does it say, like, you know, you need to contact this person and provide, presumably, the name and information to contact one representative or whatever specific individual needs to be given notice?

MS. JOVAIS:  No, Your Honor, not as far as I'm aware.  Based on the agreements that I have seen, the confidentiality and notice provision does not identify, like, an individual who should be provided with the notice.

THE COURT:  And it doesn't identify that individual by role either?  So it wouldn't say you need to contact the athlete's agent, manager, whatever?

MS. JOVAIS:  I don't believe so, Your Honor.

THE COURT:  And does it --

MS. JOVAIS:  However, I will caveat this with just this -- and this sort of illustrates the problem.  My understanding is that not all of these agreements are identical.  So the ones that I have seen, I don't believe that information exists.  But again, we would have to go through all of them and figure out exactly what's required under each agreement and comply with those bargained-for

confidentiality and notice provisions in order to do that.  And I think an important data point here is that Fanatics actually undertook this process with the Leagues and Players Associations, as the Court knows.  There were only six relevant licensors there, and we were able to pretty quickly get in touch with their in-house or outside counsel given the relationships between the parties.  And even so, the notice process there took dozens of hours and many weeks of discussion.  So the burden would be significant.

And I want to emphasize as well that our argument isn't solely about burden.  I recognize that's sort of the Court's focus at the moment, but there are a lot of relevance arguments too that I think need to go into the balance.  And so I'm happy to address those as well if that would be helpful.

THE COURT:  Well, just to ask one more question about -- and maybe this isn't clear because the agreements all vary, but is the notice provision something such that once you provide notice, if they don't respond within a specific amount of time, that fulfills your obligation?

MS. JOVAIS:  I have not seen an agreement to that effect, Your Honor.  The ones that I have

seen refer to prior written consent of the other party, but no specific time period outlined for the other party's response or objection or anything like that.

THE COURT:  Okay.  I mean, look, I'm happy to -- if you want to talk about relevance, we can discuss it.  I just really struggle with the idea that they wouldn't -- that it wouldn't be relevant whether we're talking about, you know, Cam Ward or some other lower-drafted, you know, QB.  But if you'd like to address relevance, you know, obviously --

MS. JOVAIS:  Yeah, absolutely, I would like to address that, Your Honor.  So I think it's important to go back to the theory that Panini has actually alleged in the complaint.  And that theory is that Fanatics signed agreements with NFL and NBA athletes before it could use their autographs on fully licensed cards because Fanatics' licenses hadn't taken effect yet.  So to be very clear, there's no dispute that Fanatics was free to do that.  Panini itself has done the same with MLB players when it didn't have the MLB license.  But Panini's theory is that Fanatics signed these autograph agreements just to harm Panini by ensuring

Panini couldn't use the autographs on Panini's fully licensed cards.  And that's in paragraphs 163 to 169 of the amended complaint.  Panini doesn't need athlete-identifying information to test that theory.  I want to be very clear that the anonymized summary sheets that Fanatics has already agreed to produce would include the relevant league, the length of the agreement, the payment terms, the services covered, and whether the agreement is exclusive.  And in our view, that information is more than sufficient for Panini to test whether Fanatics supposedly locked up autographs that it couldn't immediately use on fully licensed cards.  Notably, Fanatics has also already agreed to produce documents sufficient to show its actual use of athlete autographs on trading cards.  So Panini will get that information as well.

What it sounds like from Panini's submission is that what they are apparently intending to do is litigate whether Fanatics supposedly overpaid individual athletes for their autographs.  And that is truly a sideshow in our view.  This case is not about whether, with the benefit of hindsight, an individual rookie was promising enough to warrant a certain level of payment for their autographs; that would really

threaten to swallow this whole case.  And I think that Panini's proposal of non-anonymized information for 46 athletes really just underscores the relevance point.  You know, again, Panini provided us with this list of 46 of the most famous athletes in the world.  The payments made to that cherry-picked list are not representative of the many hundreds of other athlete agreements Fanatics has signed.  So what that means is that Panini won't be able to credibly claim that Fanatics overpaid athletes based only on a cherry-picked set of the most famous NFL and NBA players.  And so in our view, Panini's request for this non-anonymized athlete information is really a fishing expedition to try to gain access to a direct competitor's extremely sensitive information.

THE COURT:  As I respond, I could be misremembering, the reason we sort of ended up with something around 46 or 50 was because I think when the original request came in, there was the argument about burden as well.  And I thought at the last -- or the conference in October, we had discussed potentially coming up with a smaller list.  So I wonder if the idea that this was a cherry-picked list, maybe the solution is to do some other random

assortment of athletes.  But I, at least, understand their complaint, or their amended complaint, to be arguing that because it wasn't just the fact that they were locking up athletes, they were locking up desirable athletes at a point in time when the value of their autograph on the trading card would have been at its highest.  And for that, I don't know how you could make that argument effectively without knowing whether you're locking up the number-one pick versus someone else.

MS. JOVAIS:  Well, Your Honor, our concern is that that's going to essentially turn into a trial within a trial on, in Panini's words, the economic rationale for every single one of Fanatics' agreements with athletes.  And litigating that with the benefit of hindsight just truly feels like a sideshow to us.  And the core argument is that -- Panini's core argument is that Fanatics locked up athlete autographs that it couldn't use on fully licensed cards.  And we think that the anonymous spreadsheets that we've agreed to provide are more than sufficient for Panini to try to test that argument.

THE COURT:  I recognize I've somewhat monopolized the time.  Does anyone from Panini want

to chime in?

MR. BRENNER:  Yes.  Thank you, Your Honor. Eric Brenner from Boies Schiller Flexner, on behalf of Panini.

Starting first with a burden point.  And I think we all can recognize how unsatisfying the conversation is about what these contracts do or do not say and what these notice provisions do or do not require, because notwithstanding what I think we heard from Mr. Buterman six weeks ago at the last conference about how, if you need to make -- if you want to make a burden argument, you should come to court with a declaration and cognizable evidence, notwithstanding what Your Honor put in the October 23rd order, which required Fanatics to more concretely explain the notice obligations, we are here again six weeks later, having made no progress on this issue with nothing more than statements about how Fanatics generally interprets agreements to mean something, you know, and discussing with you about what these agreements might or might not say, but they're not sure, you'd have to look at them. That is just simply insufficient to maintain the type of burden arguments that they want to make, especially given how many chances they've had, and

especially after Your Honor expressly told them that if they wanted to maintain this position after further meet and confer discussions -- which by the way they didn't engage in -- they needed to concretely make a showing.  They could have submitted a schedule of notice provisions to the Court so we could all evaluate them.  They could have done that on a confidential basis so counsel for Fanatics would not be in a position of saying, I can't say it right now because it is open court. They could have submitted a representative contract. They could have submitted five representative contracts.  They could have done all manner of things to make a showing.  They did none of that. And now they're just asking you not to allow discovery to what is core evidence one of our claim -- and I'll get into the relevance argument in a second -- on the basis of nothing more than empty words about what, again, they generally interpret these contracts to mean.

It is common for notice provisions to say, you know, you satisfy the notice by sending, you know, such and such mailing to such and such place by such and such manner of delivery, email, FedEx, fax, whatever the case may be, back in the day, that

would give whoever the contractually specified notice party was the opportunity to work with the athlete, if necessary, and take on whatever obligations there might be that they've agreed to, to decide how they want to deal with the fact that these contracts would be produced, by the way, on an attorneys'-eyes-only basis.  If they want, and if this athlete felt compelled to object because somehow that was going to be unfair to them, they would have the right to do so.  But that's all these contracts provide.  They say they generally interpret it to require consent, negotiation of the sort that they say required weeks in the context of the players association production and the league productions; they have made no showing whatsoever, again, despite being told to do so, that the contracts require any of that.  I mean, again, they just can't, at this stage in the case in our view, rely on burden arguments to prevent discovery into a discrete set of information on such weak showing. In fact, you know, we would argue no cognizable burden showing at all that could justify the Court preventing this discovery.

And it is important discovery.  And I think Your Honor is exactly right to say that it matters

entirely to know which athlete it is.  You know, the reason it is 46 -- by the way, it's not cherrypicked.  These are all the exclusive deals we're aware of.  That's why we didn't do 50, even though Your Honor said we could do 50.  We did 46 because we don't know about anymore.  So we did all of them.  So we're not cherrypicking anything.  It is not a sideshow.  It is one of the allegations of anticompetitive conduct in our complaint that we intend to try.  We are allowed to do that.  We are allowed to get the evidence that is obviously necessary to do that.

Now, would we choose to put forward before, at trial, all 46, 6, 10?  We'll make a judgment about that.  But we plainly are entitled to get the evidence that is necessary to support one of the allegations of anticompetitive conduct in the complaint.  And again, this is not a question of hindsight.  The question is, look at the amount they paid, as counsel for Fanatics said, we'll know what they did with it, and does it make sense on an economic basis or not?  That requires knowing who the athlete is.  If they want to put in other evidence with respect to other athletes to defend the payment, they are obviously free to do so.  We

are seeking the evidence we want in defending the case. They are free to put forward whatever evidence they want. It would be discoverable. They need to share it with us. But we should not be hamstrung in this very discrete request that requires knowing who athletes are for precisely the reasons Your Honor said. So the burden -- there literally has been no showing on burden, again, despite Your Honor's requirement that there be one. And these are squarely relevant to the case.

MS. JOVAIS: May I respond to that, Your Honor?

THE COURT: Yes, go ahead. Thank you.

MS. JOVAIS: So, we have looked at many of these agreements. All we're saying is there are a significant number of them, many hundreds, and so, you know, we have not reviewed every single one of these at this stage. But they all have notice and confidentiality provisions as far as we're aware. And we have concretely explained the burden exactly as the Court directed us to. We are happy to submit a formal declaration if that would be helpful. Again, we think we have substantiated the burden in our submission at ECF-235, but we are happy to provide a declaration if that is what the Court

would like to see.

With respect to the cherrypicking point that Mr. Brenner made, by definition, Panini is cherrypicking athlete agreements because they've picked the ones that they know are exclusive. That is cherrypicking, Your Honor.

And then finally, it seems very clear to me from Mr. Brenner's argument that what Panini is really intending to do is to relitigate whether each of these agreements made economic sense, in Mr. Brenner's words. That is going to be a sideshow based on hindsight of how the athlete ultimately performed and therefore whether Fanatics' payment to a particular athlete was justified at the time. We really think that that is not necessary for Panini to test the theory in its complaint, the core of which is that Fanatics supposedly locked up athlete autographs that it couldn't use. Panini does not need athlete-identifying information to test that theory.

MR. BRENNER: Just on the confidentiality point, Your Honor. These documents will obviously be produced on an attorneys'-eyes-only basis if they want. That takes care of confidentiality concerns. We have numerous cases we've cited that said you

can't resist production on that basis.  I mean, again, I don't want to go round and round on the sideshow point, but we are entitled to present an argument of anticompetitive conduct that survived the motion to dismiss, that is premised on the fact that they paid people to not be our athletes.  That is one of our claims in the case.  We are entitled to present it unless they get it thrown out, and we are entitled to discovery for it.

And again, it's not a question of hindsight.  The analysis will be at the time they paid whatever they paid to Victor Wembanyama or C.J. Stroud or whomever, did that make sense, or is it evidence that they were acting anti-competitively to cause harm to Fanatics?

MS. JOVAIS:  Two quick responses, Your Honor.  The first is with respect to Mr. Brenner's point about the case law on confidentiality provisions, it's not our position that the confidentiality provisions alone prevent disclosure. The Court needs to weigh relevance, burden, and the highly sensitive nature of the information.  That's clear from the case law that we cited in our submission, for example, the *Trellion* case.  So again, we're not standing solely on the notice

provision.  It's a combination of these various factors that the Court needs to consider, consistent with Rule 26.

And the second point, Mr. Brenner has said repeatedly that the allegation in the complaint is whether Fanatics paid people to not be our, meaning Panini's, athletes.  Again, they don't need the identity of a specific athlete to make that point. The anonymized summary spreadsheets that we've already agreed to provide will have the financial terms of the agreement and the relevant sports league so that they're able to make the argument that they want to make.

MR. BRENNER:  Final point from me, Your Honor.

I mean, again, I don't think this is about a declaration.  It's about contract provisions, which, by the way, they could be reading in court. We could be hearing one example if they wanted. There's nothing about a notice provision that is confidential.  If they want -- I think the time is long past for them to be trying to satisfy burden requirements by making evidentiary submissions of compromisable evidence, given all the many, many opportunities they've had and how much time has

already passed.  But it is not about representations.  The contract provisions are what matter.  That is what the Court needs to make a judgment on this.

MS. JOVAIS:  And as I noted, Your Honor, we're happy to submit a declaration if that would be helpful.

THE COURT:  Does anyone else want to add anything?

Okay.  So I will give you a written order. I should actually be able to issue it today.  And we have another conference in December.

Is there anything else anyone wants to raise today?

MR. SINGER:  I don't believe there's anything further for today.  Your Honor, this is Stuart Singer.

MS. JOVAIS:  Nothing from Fanatics, Your Honor.

THE COURT:  So, as I said, I'll enter an order today, and otherwise I'll talk to you all in December.  Happy Thanksgiving.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Panini America, Inc. v. Fanatics, Inc et al, Docket #1:23-cv-09714-LTS-VF and 23-cv-6895, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature   *Marissa Lewandowski*
                Marissa Lewandowski

Date:       November 21, 2025