UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FANATICS COLLECTIBLES TOPCO, INC.,

Plaintiff,

v.

PANINI S.P.A.,

Defendant.

1:23-CV-06895-LTS

MEMORANDUM OPINION AND ORDER

Following the Court's March 10, 2025 decision (docket entry no. 107) granting in part and denying in part Panini S.P.A.'s ("Panini" or "Defendant") motion to dismiss the Amended Complaint, Fanatics Collectibles Topco, Inc. ("Fanatics" or "Plaintiff") moved (docket entry no. 113) for leave to file a Second Amended Complaint. Thereafter, the parties jointly agreed that Defendant would not oppose Plaintiff's motion for leave to amend and that Defendant would instead respond to the Second Amended Complaint (docket entry no. 120 ("SAC")) by filing a motion to dismiss. Now before the Court is Defendant's motion to dismiss Counts 2 and 3 of Plaintiff's Second Amended Complaint. (Docket entry no. 123.) The Court has subject matter jurisdiction of this action under 28 U.S.C. section 1332.

The Court has carefully considered the parties' submissions. (Docket entry no. 124 ("Def. Mem."); docket entry no. 128 ("Pl. Mem."); docket entry no. 129 ("Def. Reply").) For the following reasons, Defendant's motion to dismiss is granted in its entirety, and Counts 2 and 3 of the Second Amended Complaint are dismissed with prejudice.

BACKGROUND[1]

Unless otherwise noted, the following recitation is drawn from the Second Amended Complaint, the well-pleaded factual allegations of which are taken as true for the purposes of this motion to dismiss practice, and it only discusses those facts that are relevant to the instant motion to dismiss. Interested readers are referred to docket entry no. 107, also available at Fanatics Collectibles Topco, Inc. v. Panini S.p.A., No. 23-CV-6895-LTS-VF, 2025 WL 753950 (S.D.N.Y. Mar. 10, 2025), which discusses the factual allegations underlying Count 1 of the Second Amended Complaint, as well as general background. Terms that are not otherwise defined here retain the meaning ascribed to them in the Court's previous decision.

Panini's Alleged Interference with Prospective Business Relations

Fanatics and Panini are both in the sports merchandising and trading card business. (SAC ¶¶ 27-28.) As part of their business, each company had to secure licenses to use the intellectual property owned by sport leagues or organizations, players associations, and individual athletes. (Id. ¶ 39.) For a while, Panini was the dominant company, as it secured exclusive licensing rights for many of the major United States sports leagues and player's associations. (Id. ¶¶ 3, 43-36.) Beginning in 2021, Fanatics began to supplant Panini by securing the exclusive licensing rights that had previously been held by Panini. (Id. ¶¶ 84-89.) Fanatics' licenses, however, would not begin until Panini's existing licenses expired in late 2025 to early 2026. (Id. ¶¶ 111, 116.) To that end, in February 2022, Panini engaged with Fanatics to negotiate an early termination of certain of Panini's licenses. (Id. ¶ 116.) In exchange for the

---

[1]    Pincites to materials filed on the docket refer to ECF-designated pages.

early termination, Fanatics proposed to pay a lump-sum fee equivalent to Panini's projected earnings for the remaining license years, less a discount factor.  (Id.)

The early termination deal, however, was allegedly a "sham."  (Id. ¶ 199.)  Panini used "stall tactics, falsely inflated earnings projections, and other bad-faith tactics to string Fanatics along."  (Id. ¶ 200.)  Panini never intended to go through with the deal and only engaged with Fanatics to divert Fanatics' attention and resources, which "prevent[ed] Fanatics from pursuing [certain] opportunities within the limited window [available]."  (Id. ¶ 199.)

Specifically, "prior to and during the negotiations with Panini, Fanatics [] had agreed to a present-day licensing arrangement with the NBPA and was pursuing specific exclusive licenses with NBA and NFL prospects that included autograph rights alongside the prospects' [names, images, and likenesses] for trading cards."  (Id. ¶ 129.)  "Once the parties reached a preliminary agreement to an early termination of certain of Panini's licenses, however, Fanatics [] paused pursuing these other deals because it reasonably believed it would no longer need to acquire the licenses that it was exploring, as it would obtain substantively similar licenses through the early termination."  (Id. ¶ 130.)  "Meanwhile, knowing Fanatics [] would rely on the potential early termination by pausing its relationship-building efforts with prospects, Panini swooped in to sign the top three 2022 NFL and NBA draft picks."  (Id.)  Fanatics, however, "was able to re-enter and salvage its negotiations with the NBPA after its negotiations with Panini terminated."  (Id. ¶ 131.)  As a result of the "sham" negotiations, Fanatics "missed out on lucrative business opportunities worth hundreds of millions in revenue[.]"  (Id. ¶ 128.)

The foregoing allegations form the basis of Count 2 of the Second Amended Complaint.  (Id. ¶¶ 195-205.)

Panini's Alleged Interference with Contractual Business Relations

Between February and April 2023, Fanatics signed exclusive license agreements with several top 2023 NFL draft prospects.  (Id. ¶ 137.)  "On information and belief, in spring 2023, Panini approached numerous athletes under contract with Fanatics Collectibles and attempted to induce those athletes to break their contracts with Fanatics Collectibles and instead sign exclusive deals with Panini."  (Id. ¶ 138.)  "Panini's attempts failed[.]"  (Id.)

In fall 2023, Fanatics signed exclusive license agreements with several top 2024 NFL draft prospects.  (Id. ¶ 139.)  "[I]n December 2023, Fanatics [] learned that Panini was again brazenly attempting to induce several top athletes under contract with Fanatics Collectibles to breach their exclusive contracts with Fanatics Collectibles and enter into new contracts with Panini."  (Id. ¶ 140.)  "Panini not only offered outsized compensation as an inducement for breach but also offered 'assistance' to athletes and/or their families to help them 'get out' of their exclusive deals with Fanatics Collectibles."  (Id.)  "While none of the athletes accepted Panini's offers, some sought increased compensation from Fanatics Collectibles, which Fanatics Collectibles provided to retain the contracts and preserve the relationships."  (Id. ¶ 142.)

The foregoing allegations form the basis of Count 3 of the Second Amended Complaint.  (Id. ¶¶ 206-13.)

## DISCUSSION

Defendant Panini moves under Rule 12(b)(6) to dismiss the SAC for failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that

"allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true the nonconclusory factual allegations in the Second Amended Complaint and draws all reasonable inferences in the Plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

For the reasons discussed below, Counts 2 and 3 are dismissed.

Count 2: Tortious Interference with Prospective Business Relations

Count 2 is a claim for tortious interference with prospective business relations. To sustain this claim, Plaintiff Fanatics must plausibly plead that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."[2] Catskill Dev., LLC v. Park Place Ent. Corp., 547 F.3d 115, 132 (2d Cir. 2008) (citing Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002); Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)). For the second requirement, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004); Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009) ("In evaluating a claim for tortious interference, the wrongful conduct that is relevant [is] that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship."). As to the third requirement, "'the defendant's conduct must amount to a crime or an independent tort' or defendant's conduct must have been 'for the sole purpose of inflicting intentional harm

---

[2]     Both parties rely on New York law, and the Court does the same.

on plaintiffs.'"  Lan Sang v. Ming Hai, 951 F. Supp. 2d 504, 528 (S.D.N.Y. 2013) (quoting

Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C., 455 F. App'x 102, 106

(2d Cir. 2012)).

Count 2 must be dismissed because Fanatics has failed to plead plausibly the

second and third requirements.  First, Panini's alleged bad faith conduct during the "sham"

negotiations was directed solely at Fanatics, and is, accordingly, irrelevant to the tortious

interference claim.  As for Panini's conduct vis-à-vis third parties (i.e., the NBPA, NFL draft

prospects, and NBA draft prospects), the Second Amended Complaint is largely devoid of any

allegations about how Panini directed any conduct at these third parties.[3]  See, e.g., Valley Lane,

455 F. App'x at 106-07 (dismissing claim because "all of the aforementioned conduct was

directed at [plaintiff], rather than [third party]"); Piccoli A/S v. Calvin Klein Jeanswear Co., 19

F. Supp. 2d 157, 167-68 (S.D.N.Y. 1998) (dismissing claim because "the defendants' alleged

conduct concededly was not directed towards any third party with whom [plaintiff] had an

existing or prospective business relationship").

The only remotely relevant allegation of conduct directed at third parties is that

"Panini swooped in to sign the top three 2022 NFL and NBA draft picks," "knowing [that]

---

[3]    The Second Amended Complaint alleges that Fanatics "was able to re-enter and salvage its negotiations with the NBPA after its negotiations with Panini terminated."  (SAC ¶ 131.)  Because Fanatics had a contract with the NBPA, the relevant business tort would be tortious interference with contractual business relations rather than prospective business relations.  See C=Holdings B.V. v. Asiarim Corp., 992 F. Supp. 2d 223, 246 (S.D.N.Y. 2013) ("Whereas a tortious interference with contract claim governs breaches of 'binding agreement[s],' a tortious interference with business relations claim governs frustrations of 'nonbinding economic relation[s].'" (quoting Carvel Corp., 785 N.Y.S.2d at 362)); Printers II, Inc. v. Pros. Pub., Inc., 784 F.2d 141, 144 n.3 (2d Cir. 1986) ("Absent an existing contract, the relevant business tort is intentional interference with prospective business relations.").  Thus, the NBPA allegations cannot sustain Count 2.

Fanatics [] would rely on the potential early termination by pausing its relationship-building efforts with prospects[.]" (SAC ¶ 130.) Setting aside the conclusory nature of this allegation and the fact that there are no detailed allegations about what exactly "swoop[ing]" entailed, there is no allegation that this "swoop[ing]" was "wrongful" or that Panini owed Fanatics any duty to abstain from "swoop[ing]." See Fanatics, 2025 WL 753950, at *2-3 (dismissing Fanatics' claim that "Panini engaged in unfair competition by using the sham prospect of a deal to prevent Fanatics from forming other lucrative arrangements"); id. at *3-6 (dismissing Fanatics' claim that Panini breached its "obligation to negotiate in good faith for the early termination of Panini's licenses").

For that same reason, Fanatics' attempt to analogize its action to cases finding an actionable tortious interference claim is unpersuasive. (Pl. Mem. at 11-12 (citing Regency NYC, Inc. v. Atkinson, No. 23-CV-5479-JGLC, 2024 WL 4337486, at *11 (S.D.N.Y. Sept. 27, 2024); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97-CV-5499-DNE, 2000 WL 264295, at *31 (S.D.N.Y. Mar. 9, 2000)). In Regency, the defendant solicited the plaintiff's clients (i.e., third parties) by using the plaintiff's proprietary pricing models to underbid the plaintiff, who was defendant's former employer and who had given defendant access to the models as part of defendant's job. 2024 WL 4337486, at *1-2, *11. The defendant's activity directed at third parties (solicitation) was wrongful because the defendant used confidential information in breach of her duty of loyalty. Id. Likewise, in Six West Retail, the defendant induced a third-party movie distributor to discontinue movie showings at the plaintiff's theater, and this conduct was wrongful because the defendant, as the manager of the plaintiff's theater, owed the plaintiff a fiduciary duty. 2000 WL 264295, at *31-32. Here, there are no allegations that Panini's conduct towards third parties was wrongful.

<u>Count 3: Tortious Interference with Contractual Business Relations</u>

Count 3 is a claim for tortious interference with contractual business relations. To sustain this claim, Plaintiff Fanatics must plausibly plead: "(1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of that contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 424 (1996). The fourth requirement, actual breach, is a "formalistic" requirement." <u>RSM Prod. Corp. v. Fridman</u>, 643 F. Supp. 2d 382, 409 (S.D.N.Y. 2009). "The New York Court of Appeals and the Second Circuit" have "consistently emphasized the necessity of an actual breach." <u>ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.</u>, No. 19-CV-7800-MKV, 2021 WL 1177532, at *19 (S.D.N.Y. Mar. 29, 2021) (emphasis omitted).

Here, Fanatics fails to plead that its contracts with the 2023 and 2024 NFL draft prospects were actually breached. As to the 2023 prospects, "Panini's attempts [to incur breach] failed" (SAC ¶ 138), and as to the 2024 prospects, "none of the athletes accepted Panini's offers, [although] some sought increased compensation from Fanatics Collectibles, which Fanatics Collectibles provided to retain the contracts and preserve the relationships" (<u>Id.</u> ¶ 142).

Conceding that it fails to plead breach, Fanatics instead argues that it may bring a tortious interference claim premised on anticipatory repudiation. (Pl. Mem. at 20-21.) It is unsettled whether such a claim is cognizable under New York law. <u>See</u> <u>Kenneth Hiep, Inc. v. Interstate Waste Servs., Inc.</u>, No. 09-CV-9091-FPS, 2013 WL 12623690, at *8 (S.D.N.Y. Apr. 29, 2013) (noting that "the plaintiffs do not cite any case law which supports their assertion that anticipatory repudiation which results in a renegotiation of an existing contract qualifies as a

contractual breach under tortious interference with contract" but stating that because the claim failed on other grounds, the "Court does not today decide whether such an act could so constitute a breach for the purposes of this claim"); Artists Rts. Enf't Corp. v. Est. of Robinson, No. 15-CV-9878-ER, 2018 WL 1617890, at *6 & n.9 (S.D.N.Y. Mar. 29, 2018) (noting that "Defendants point to no cases in which a court has rejected a tortious interference claim based on anticipatory breach" and stating that "the Court sees no reason why an anticipatory repudiation claim cannot form the basis of a tortious interference claim").  In any event, however, the Court need not resolve that question because Fanatics has failed to plead anticipatory repudiation.

"An anticipatory breach of a contract is one committed before the time has come when there is a present duty of performance.  It is the outcome of words or acts evincing an intention to refuse performance in the future."  Kenneth Hiep, 2013 WL 12623690, at *9 (quoting N.Y. Life Ins. Co. v. Viglas, 297 U.S. 672, 681 (1936)).  An anticipatory repudiation "can be either 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'"  Norcon Power Partner, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463 (1998) (quoting Restatement (Second) of Contracts § 250)).  Whatever the means of indicating intent to breach, however, "repudiation can be determined to have occurred only when it is shown that 'the announcement of an intention not to perform was positive and unequivocal.'"  Difolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir. 2010) (quoting Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 150 (1978))).

Here, the only allegation of repudiation is that "some [2024 NFL draft prospects] sought increased compensation from Fanatics Collectibles, which Fanatics Collectibles provided

to retain the contracts and preserve the relationships." (SAC ¶ 142.) This allegation is insufficient because simply making a "demand for more than the contract calls for is not in itself a repudiation[.]" In re Best Payphones, Inc., 432 B.R. 46, 56 (S.D.N.Y. 2010) (citation omitted), aff'd, 450 F. App'x 8 (2d Cir. 2011). "Courts apply a stringent standard in determining whether the test for repudiation is met, and have generally required repeated insistence on extra-contractual terms; repeated, definite and absolute expressions of an unwillingness to perform; use of language such as 'termination,' which conveys finality; or conduct by the allegedly repudiating party that has rendered performance impractical or impossible." Id. (discussing cases). Fanatics fails to allege any such "plus factors." Id.; see also Kenneth Hiep, 2013 WL 12623690, at *9 (rejecting plaintiffs' tortious interference claim that "their customers committed anticipatory repudiation after they were approached with [defendant's] below-cost offers, thus requiring the plaintiffs to renegotiate their contracts in order to keep those customers from actually breaching them").

Dismissal is with Prejudice

This is Fanatics' second attempt at amendment and the Court's second decision on a motion to dismiss.[4] While "it is the usual practice upon granting a motion to dismiss to allow leave to replead," In re eSpeed, Inc. Secs. Litig., 457 F. Supp. 2d 266, 298 (S.D.N.Y. 2006) (citation omitted), because "plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation," Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) (collecting cases); see also Treppel v. Biovail Corp., No. 03-

---

[4]    Fanatics has filed a Complaint (docket entry no. 1), an Amended Complaint (docket entry no. 39), and a Second Amended Complaint (docket entry no. 120). The Court ruled on a motion to dismiss the Amended Complaint (docket entry no. 107), and this Memorandum Opinion and Order is a ruling on a motion to dismiss the Second Amended Complaint.

CV-3002-PKL, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless.").

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is granted and Counts 2 and 3 of the Second Amended Complaint are dismissed with prejudice.  This Memorandum Opinion and Order resolves docket entry no. 123.  This case remains referred to Magistrate Judge Figueredo for general pretrial management.

SO ORDERED.

Dated: New York, New York
       March 31, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge